**ROCHE FREEDMAN LLP**
Ivy T. Ngo (249860)
Velvel (Devin) Freedman (*pro hac vice*)
Constantine P. Economides (*pro hac vice*)
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 971-5943
Facsimile: (646) 392-8842
Emails: ingo@rcfllp.com
vel@rcfllp.com
ceconomides@rcfllp.com

*Counsel for Plaintiff*

*[Additional Counsel on Signature Page]*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re SONA NANOTECH INC. SECURITIES LITIGATION | Case No.: 2:20-cv-11405-MCS-MAA<br><br>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| This Document Relates To:<br><br>ALL ACTIONS. | CLASS ACTION<br>JUDGE: Mark C. Scarsi |

## TABLE OF CONTENTS


I. NATURE OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 9

III. PARTIES ..... 10

IV. SUBSTANTIVE ALLEGATIONS ..... 11

- A. The Emergence and Rapid Spread of COVID-19 ..... 11
- B. The FDA's Continued Commitment to Addressing COVID-19 ..... 13
- C. Sona Enters the Race to Bring a COVID-19 Antigen Test to Market ..... 24
- D. Defendants Mislead Investors Regarding the Status and Progress of Sona's Development and Validation of its COVID-19 Antigen Test ..... 26
- E. Defendants Conceal the Truth Behind the FDA's Rejection of Sona's EUA Request and the Withdrawal of Its Health Canada Application ..... 29
- F. Defendants Falsely Convey a Path Forward Through Additional Clinical Data and Commercialization in the European Union ..... 31

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS ..... 33

- A. Sona's Development of Its COVID-19 Nasal Swab Antigen Test ..... 33
- B. Sona's Validation Studies ..... 37
- C. Sona's Focus on More Clinical Data from Patients Within 0-6 Days of Symptom Onset and Commercialization Based on a CE Mark ..... 49

VI. THE TRUTH SLOWLY EMERGES ..... 53

- The May 12, 2020 Partial Disclosure ..... 53
- The August 6, 2020 Partial Disclosure ..... 53
- The October 29, 2020 Partial Disclosure ..... 55
- The November 25, 2020 Partial Disclosure ..... 56
- The Class Period Ending Disclosure on March 1, 2021 ..... 58

VII. ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER ..... 59

VIII. LOSS CAUSATION ........ 65
IX. CLASS ACTION ALLEGATIONS ........ 66
X. PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET ........ 67
XI. INAPPLICABILITY OF SAFE HARBOR ........ 69
XII. CLAIMS FOR RELIEF ........ 69
COUNT I ........ 69
COUNT II ........ 73
XIII. PRAYER FOR RELIEF ........ 74
XIV. DEMAND FOR TRIAL BY JURY ........ 75

Lead Plaintiff Meridian Media Ventures Inc. ("Meridian" or "Plaintiff"), by and through its attorneys, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to its own acts and on information and belief as to all other matters. Plaintiff bases this information and belief on, among other things, the investigation conducted by its counsel, which includes a review and analysis of: public filings made by Sona Nanotech, Inc. ("Sona" or the "Company") and the U.S. Food and Drug Administration ("FDA"); press releases, analyst reports, public statements, news articles and other publications disseminated by or concerning Sona; independent factual sources; and other publicly available information. Counsel's investigation into the matters alleged herein is ongoing, and many relevant facts are known only to Defendants or are exclusively within their custody or control. Plaintiff's investigation indicates substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of a Class consisting of all persons and entities that purchased or otherwise acquired the publicly traded securities of Sona between March 18, 2020 and February 28, 2021, inclusive (the "Class Period"), against Sona and corporate insiders David Regan ("Regan"), Robert Randall ("Randall"), and Darren Rowles ("Rowles") (collectively, "Individual Defendants") (together with Sona, "Defendants"), pursuing remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission ("SEC").

2. These claims are asserted against Defendants, who, during the Class Period, participated in drafting, preparing, and/or approving certain public reports and other communications and public filings while aware of, or recklessly disregarding, the misstatements contained therein and omissions therefrom. Defendants were aware

of the materially false and misleading nature of their statements; employed devices, schemes, and artifices to defraud; and engaged in acts, practices, and a course of conduct that operated as a fraud or deceit upon Meridian and other Class members.

3. In particular, as COVID-19 emerged and quickly spread worldwide in early 2020, it became clear that diagnosing infected individuals as soon as symptoms surfaced (*i.e.* 0-6 days from onset) would be key to slowing or preventing outbreaks. To address this need for COVID-19 diagnostic tests, the FDA utilized its emergency use authorization ("EUA") authority to relax validation requirements for companies developing screening tests, dramatically shortening the timeframe in which new tests could be brought to market. These loosened regulatory restrictions put the onus on companies developing COVID-19 screening tests to adhere to industry standards and maintain high quality in validating their tests. The EUA submission process allowed for a fast-track to market, but companies had to ensure that their tests were accurate and reliable for their intended use – to help stop the spread of COVID-19.

4. This case arises from fraudulent misrepresentations made by Defendant Sona and its top executives with respect to the Company's ability and progress in developing, validating, and obtaining regulatory authorization for its COVID-19 nasal swab antigen test, designed for a Point-of-Care ("POC") setting. Defendants conveyed to investors that Sona – a Canadian company engaged in the research and development of gold nanorod products for diagnostic tests and medical treatments – was succeeding at every step of developing and validating its antigen test pursuant to regulatory requirements. Defendants conveyed that Sona had the team, expertise, protocols, and resources to meet those parameters and rapidly commercialize. Throughout the Class Period, Defendants touted developmental milestones, making it seem as though Sona was on the verge of regulatory authorization and commercialization of an accurate and reliable antigen test. Indeed, Defendant Regan even assured investors that ***"[w]e're 100% confident that it gets approved.***"

5. In reality, Defendants' abilities, efforts, and success were subpar. They initially planned to use the wrong type of virus samples and hence were not prepared to conduct the in-field clinical evaluations necessary for use in a POC setting. They used inadequate enrollment criteria and improper antigen test handling procedures. Their in-field testing was not properly designed to yield sufficient data to demonstrate the efficacy of Sona's COVID-19 antigen test, particularly within 0-6 days of symptom onset. And their submission for authorization to the FDA (and Health Canada) was inferior to those of the at least 14 other antigen tests that received EUAs during the Class Period. Relying on Defendants' statements, Sona's shareholders thought they had invested in a sophisticated all-star team developing a leading antigen test. Instead, shareholders had invested in a team that was struggling at every turn and would ultimately come up short.

6. From March 18, 2020 through April 13, 2020, for example, Defendants announced that they had:

- "generat[ed] an active conjugate which produce[d] a signal when exposed to Covid-19 viral antigens,"
- secured a distributer which intended to buy 2,000,000 test kits;
- employed "qualified laboratory technicians . . . working with samples of the virus' antigen and antibodies;"
- successfully "tested a working prototype in a hospital laboratory environment with live, Covid-19 patient samples;"
- "progressed to the optimization stage," including "[c]ommenc[ing] work with two, third-party laboratories to prepare validation protocols."

7. However, Defendants did not disclose that Sona was preparing to validate its test with virus samples that had been de-activated by heat and, consequently, were an inappropriate proxy for a live sample and thus was not prepared to conduct ***in field*** clinical evaluations, which were necessary to validate the test's accuracy in its intended Point of Care setting. On May 12, 2020, Sona suddenly revealed these flaws

and the resulting need to change the design of its validation studies, delaying its submissions to the FDA and Health Canada for its COVID-19 antigen test. On this news, the price of Sona shares fell over 28%.

8. But Defendants reaffirmed their progress toward validating—and their ability to validate—an accurate and reliable COVID-19 antigen test. On the same day, they assured investors that "Sona is moving to test its devices with live virus culture and/or patient samples as part of a formal clinical study", describing "advanced discussions for arrangements with a leading U.S. laboratory to provide the independent clinical trial data" and then boasted on May 22, 2020 that Sona was "moving into the final validation process" of its test.

9. By July 2, 2020, Defendants announced hard data they described as "excellent performance results [that] are underpinned by our unique nanorod technology", reporting that Sona's "laboratory validation studies of performance levels have resulted in a test sensitivity of 96%, test specificity of 96% and a Limit of Detection ("LOD") of 2.1 x 102 TCID50 . . . which corresponds to an ability to detect the virus in patients with 'low' viral loads in 10-15 minutes." Defendants also conveyed that Sona was conducting additional field studies with results by the end of July, "at which time [it] intend[ed] to make final submissions to regulatory authorities in multiple jurisdictions." Just six days later, on July 8, 2020, Defendant Rowles reiterated Sona's success, proclaiming that it "ha[d] achieved the extraordinary by bringing a COVID-19 rapid, point-of-care antigen test to fruition in four months."

10. Sona's message to investors was that of a success story – success in the development and validation of its antigen test and success in fast-tracking the test to the public. Those unequivocal statements to investors caused explosive growth in Sona's securities. As described by one analyst, "[i]nvestors [had] pushed an $0.11 stock to an all-time high of $16.05 a share by July 27" – yielding a "14,545% return on this best-performing COVID-19 stock in just six months."

11. Because of Defendants' overwhelmingly positive statements, investors were caught unaware when, on August 6, 2020, Sona announced a two-week delay in the results of its field validation studies. This delay, which Defendants falsely blamed on external factors rather than revealing their validation studies were fundamentally flawed, again pushed out the date of Sona's FDA and Health Canada submissions.

12. Nonetheless, by August 25, 2020, Defendants conveyed that Sona was back on track. Defendants released seemingly positive data, including that its "test achieved a sensitivity of 84.6% and a specificity of 90.0% in a study across 99 collected clinical patient samples", and informed investors that Sona "is now continuing its submission of data to both the FDA and Health Canada to support their requirements for emergency use authorization." By August 31, 2020, Defendants had "completed submissions to the FDA and Health Canada for authorizations for [Sona's] COVID-19 rapid antigen test, including responding to all follow-up questions received to date."

13. Once again, Defendants' message to investors was one of progress and success. Sona had portrayed that its all-star team of scientists and consultants had engaged in rigorous validation testing yielding positive results and submitted strong applications in the U.S. and Canada. Indeed, Regan declared on October 1, 2020 regarding Sona's antigen test, "[w]e're ***100% confident that it gets approved***. There's ***smart questions being asked***, and we have ***strong data on our test***."[1]

14. On October 29, 2020, Defendants stunned investors with the news that the FDA had declined Sona's EUA request for its antigen test. According to Defendants, "the FDA has indicated that our test is not a priority for them at this time" but "did not comment on the performance of the Sona test." The reality—as eventually revealed—was that Sona's validation studies were lacking and flawed.

[1] Unless otherwise noted, internal citations are omitted and emphasis is added.

Sona had failed to show that its test could effectively meet the public need of rapid and accurate COVID-19 screening within 0-6 days of symptom onset—as compared to the seven other antigen tests that had received EUAs to-date.

15. Instead of revealing that truth, however, Defendants continued to mislead and conceal material facts about Sona's antigen test and the FDA's reasons for the denial. Defendants pivoted away from the FDA's rejection, stating that "Health Canada continues its evaluation of the Company's application for an Interim Order ("IO") authorization for its test as a 'point-of-care' medical diagnostic device" and just "yesterday [the Company] received additional questions on its application."

16. But Defendants' concealment of their deficient submission was short-lived. On November 25, 2020, they announced that Sona, based on feedback from Health Canada, had withdrawn its application. Once again, Defendants refused to admit that Sona's validation data had been insufficient to demonstrate its test's performance. Instead, Defendant Rowles affirmed that "[w]e have confidence in our rapid COVID-19 antigen test and its ability to detect the virus, especially within the first week of symptom onset." He again blamed the failed FDA and Health Canada authorizations on generalizations that "[t]he regulatory approval path for antigen tests is new with evolving guidelines and Sona's test is unique, creating a challenging environment for test developers and regulators alike."

17. Defendants continued to vouch for the performance of Sona's test on November 30, 2020, despite disclosing that it "intends to obtain additional data and use it to augment its submission with the FDA and potentially for a resubmission to Health Canada." Defendant Regan specifically noted that "every entity that has evaluated our test has confirmed its ability to detect the COVID-19 virus and it achieved strong results from our in-field trials."

18. But the issue was not whether Sona's test detected the COVID-19 virus or that the FDA and Health Canada had trouble assessing antigen tests in general or

Sona's antigen test in particular. Indeed, the FDA issued EUAs for eleven COVID-19 antigen tests in 2020. Rather, contrary to Defendants' consistent statements to investors that Sona's antigen test was designed to meet the public need of rapid detection of COVID-19 and was supported by clinical data, the Company had failed to demonstrate that its test was reliable and effective at performing its intended use as a screening tool within 0-6 days of symptom onset.

19. Following the damning rejections by the FDA and Health Canada, Defendants continued conveying to investors throughout the rest of the Class Period that there was a pathway to commercialization and profitability for Sona's nasal swab antigen test while it was also accelerating validation of its saliva-based antigen test.

20. Specifically, on December 16, 2020, Sona announced it had successfully raised $2.26M in an unbrokered private placement, explaining that the funds would go towards "produc[ing] further clinical trial data for its rapid COVID-19 antigen nasal pharyngeal test" and "pursu[ing] a European regulatory self-certification CE Mark declaration …." By December 31, 2020, Sona had received a CE Mark for its nasal antigen test, which "declare[d] the conformity of the Sona test with [European Union (EU)] regulations and allows Sona to commercialize its test throughout Europe and potentially other territories in which the CE Mark is recognized." In other words, Sona was "now able to take firm orders in territories accepting a CE Mark."

21. But, as Defendants well knew but did not disclose to investors, Sona had a difficult, if not non-existent, path forward with its nasal swab antigen test and thus focused its efforts on its saliva-based antigen test. On March 1, 2021, Defendants finally confirmed that, after four months had passed since announcing the need for an additional clinical trial for Sona's nasal swab antigen test, it ***still*** lacked a sponsoring institution, a principal investigator, a study protocol, relevant medical ethics review board approval, and Health Canada Investigational Testing Division approval. As to the EU, Sona had ***still*** had not obtained any "firm orders" in over three months since

receiving the CE Mark. On this news, Sona's share price fell over 13%.

22. By April 12, 2021 – after the Class Period ended – Defendants confirmed that Sona was not as focused on its nasal swab antigen test.

23. In sum, Defendants made repeated misrepresentations and omissions that artificially inflated the price of Sona's securities. Specifically, during the Class Period, Defendants made false and/or misleading statements and/or failed to disclose that: (1) in initially developing its COVID-19 nasal swab antigen test, Sona was not preparing to validate the test by using live virus culture and/or patient samples as part of a formal clinical study; (2) once Sona finally began in-field evaluation testing of its COVID-19 nasal swab antigen test, it did not have adequate enrollment criteria, assessment at point of care (POC) settings, or antigen test handling procedures and thus such validation testing would take longer than a month to complete; (4) Sona's in-field testing was not designed to, and did not yield, sufficient data to demonstrate the performance of its COVID-19 nasal swab antigen test, particularly within 0-6 days of symptom onset, leading to its failure to meet the FDA's criteria for EUA, including "the public health need for the product," as well as the withdrawal of its submission to Health Canada for IO authorization in order to obtain that additional data; (5) after its in-field testing proved inadequate, Sona promised to obtain additional study data for supplemental regulatory submissions but instead focused on securing clinical trials for its COVID-19 saliva-based antigen test; (6) obtaining the CE Mark would not spur any "firm orders" as of March 1, 2021, due to the availability of numerous other antigen tests with CE Marks, many of which involved companies that had already received EUAs for their COVID-19 diagnostic tests; (7) given those facts, Sona would be unable to financially capitalize on the need for rapid detection testing that was being filled by other antigen tests; and (8) as a result, Defendants' statements about Sona's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

24. Defendants' false and/or misleading statements caused Sona securities to trade at inflated prices during the Class Period. After disclosure of Defendants' false and misleading statements and/or materialization of Defendants' concealed risks, Sona securities suffered a precipitous decline in market value, thereby causing significant losses and damages to Plaintiff and the Class.

## II. JURISDICTION AND VENUE

25. The claims asserted herein arise under §§ 10(b), 20(a) of the Exchange Act, 15 U.S.C. § 78j(b), § 78t(a); and Rule 10b-5, promulgated thereunder by the SEC, 17 C.F.R. § 240.10b.

26. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and § 27 of the Exchange Act, 15 U.S.C. § 78aa, because this is a civil action arising under the laws of the U.S.

27. Further, this Court has personal jurisdiction over Defendants because they made the alleged misrepresentations and/or omissions in, and/or directed them to persons in, this District.

28. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), (d). Acts and transactions constituting the alleged violations of law occurred and/or affected persons in this District.

29. Moreover, this Complaint is being filed in this District as the original action, *Alperstein v. Sona Nanotech, Inc. et al.*, Case No. 2:20-cv-11405-MCS-MAA, and the follow up action, *Powers v. Sona Nanotech, Inc. et al.*, Case No. 2:21-cv-00169-MCS-MAA, which were consolidated pursuant to Fed. R. Civ. P. 42(a) (ECF No. 43), were filed in this District.

30. The securities at issue in this action were traded in the U.S. Sona registered and issued securities in the U.S. on the over-the-counter ("OTC") market.

31. In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly and/or indirectly, used the means and instrumentalities of

interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities exchanges.

## III. PARTIES

32. Plaintiff, as set forth in its PSLRA Certification (ECF No. 29-1), acquired or purchased Sona securities at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

33. Defendant Sona, engaged in the research and development of gold nanorod products for diagnostic tests and medical treatments, is a Canadian corporation with its head office located at Purdy's Wharf Tower II, Suite 2001 – 1969 Upper Water Street, Halifax, Nova Scotia, Canada B3J 3R7. Sona's securities trade on the OTC under the ticker symbol "SNANF" and the Canadian Stock Exchange (CSE) under the ticker symbol "SONA".

34. Defendant Regan has served as Sona's Chief Executive Officer ("CEO") since July 8, 2020 and, for four months prior to his promotion, served as a strategic advisor to the Company.

35. Defendant Randall has served as Sona's Chief Financial Officer ("CFO") at all relevant times.

36. Defendant Rowles, Sona's founding CEO, served in this position until July 8, 2020 when he became Sona's President and Chief Scientific Officer ("CSO").

37. Each of the Individual Defendants:

- directly participated in the management of Sona;
- was directly involved in the day-to-day operations of Sona at the highest levels;
- was privy to confidential proprietary information concerning Sona and its business operations;
- was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

- was directly or indirectly involved in the oversight or implementation of Sona's internal controls;
- was aware or recklessly disregarded that the false and misleading statements alleged herein were being issued about Sona; and/or
- approved or ratified said false and misleading statements about Sona in violation of the federal securities laws.

38. As such, because of the Individual Defendants' positions with Sona, they possessed the power and authority to control the contents of all filings issued by, as well as the press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of Sona's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pled herein.

39. Defendant Sona is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Sona under *respondeat superior* and agency principles.

## IV. SUBSTANTIVE ALLEGATIONS

### A. The Emergence and Rapid Spread of COVID-19

40. In December 2019, a novel and highly contagious strain of coronavirus, "severe acute respiratory syndrome coronavirus 2" (SARS-CoV-2), and the disease it

causes "Coronavirus Disease 2019" (COVID-19), was detected in China. Since then, COVID-19 has posed a significant threat to public safety worldwide because of its ability to spread rapidly and cause debilitating symptoms. As a result, COVID-19 has led to millions of deaths worldwide, significantly impacted healthcare systems, and caused traumatic societal disruption.

41. On January 30, 2020, the World Health Organization ("WHO"), declared the COVID-19 outbreak a Public Health Emergency of International Concern. The next day, the Secretary of the Department of Health and Human Services ("HHS") declared a public health emergency pursuant to § 319 of the Public Health Services Act for the entire U.S. to aid in the nation's health care community response to the COVID-19 outbreak.

42. By early February 2020, over 101 countries, including the U.S., had reported multiple cases of COVID-19. In particular, traveler-associated cases had been identified in multiple states and community-based transmission was suspected.

43. As a result, on February 4, 2020, the HHS Secretary determined, pursuant to § 564 of the Federal Food, Drug and Cosmetic Act ("FD&C Act"), that COVID-19 presented a public health emergency and had significant potential to affect national security or the health and security of U.S. citizens living abroad.[2] Accordingly, the Secretary found that circumstances existed to justify EUA of *in vitro* diagnostics to detect and/or diagnose COVID-19 for use in the outbreak. Specifically, the Secretary declared COVID-19 a significant public health challenge requiring the Government's sustained, coordinated proactive response to contain and mitigate its spread.

44. Shortly after the U.S. reported its first COVID-19 death on February 29, 2020 (though later reports would confirm earlier deaths had occurred), state and local

---

[2] U.S. DEPT. OF HEALTH & HUMAN SERVICES, *Public Health Emergency* (Mar. 11, 2020), https://www.phe.gov/Preparedness/legal/prepact/Pages/COVID19.aspx (last visited Apr. 18, 2021).

governments began limiting business and social activities to try to stop the spread of the virus. These measures contributed to a severe economic downturn.

45. The human and economic devastation wrought by COVID-19 spurred an unprecedented campaign by regulatory agencies, clinical laboratories, and commercial manufacturers to work together to develop and commercialize novel tests for the rapid detection of COVID-19. Specifically, the FDA determined that rapid detection of cases and contacts, clinical management and infection control, and community mitigation were key to effectively responding to the COVID-19 outbreak.

**B. The FDA's Continued Commitment to Addressing COVID-19**

46. The FDA, an HHS agency, regulates clinical investigations of products in its jurisdiction, such as drugs, biological products, and medical devices.

47. Pursuant to § 564 of the FD&C Act, as amended by the Pandemic and All-Hazards Preparedness Reauthorization Act of 2013 ("PAHPRA"), once the HHS Secretary issues an EUA declaration, the FDA may use its EUA authority to allow the use of unapproved medical products, or unapproved uses of approved medical products, to diagnose, treat, or prevent serious or life-threatening diseases.[3]

48. In particular, the PAHPRA enhances the FDA's authority to support emergency preparedness and response and foster the development and availability of medical products, also referred to as "medical countermeasures" or "MCMs," for use in public health, military, and domestic emergencies involving chemical, biological, radiological, and nuclear ("CBRN") agents, including novel infectious diseases. MCMs include drugs, biological products, and devices (*e.g.*, *in vitro* diagnostics[4]).

---

[3] U.S. DEPT. OF HEALTH & HUMAN SERVICES, *Emergency Use Authorization of Medical Products and Related Authorities* (Jan. 2017), https://www.fda.gov/media/97321/download.

[4] *In vitro* diagnostic (IVD) devices are tests performed on samples taken from the human body, such as swabs of mucus from inside the nose or back of the throat, or blood from a vein or fingerstick. IVDs can detect diseases or other conditions and can

49. During the effective period of the HHS Secretary's EUA declaration, the FDA may issue an EUA if it concludes the following statutory criteria have been met:

- CBRN agent(s) in the HHS Secretary's EUA declaration must be capable of causing a ***serious or life-threatening disease or condition***.
- Candidate products "***may be effective***" to prevent, diagnose, or treat serious or life-threatening diseases that can be caused by the CBRN agent(s) in the HHS Secretary's EUA declaration. This "may be effective" standard requires less evidence than the "effectiveness" standard for FDA product approvals. The FDA assesses potential effectiveness based on circumstance-dependent and product-specific risk-benefit determinations and issues an EUA if it is reasonable to believe that a product may be effective for its specified use, based on available scientific evidence.
- The FDA determines that a product's ***known and potential benefits outweigh its known and potential risks*** when used to diagnose, prevent, or treat the identified disease or condition. For this analysis, the FDA looks at all the scientific evidence, including (but not limited to): results of clinical trials and *in vitro* data. The FDA will also assess the quality and quantity of the available evidence, given the current state of scientific knowledge.
- There must be ***no adequate, approved, and available alternative*** to the product for diagnosing, preventing, or treating the disease or condition. That said, an alternative may be considered "unavailable" if there are insufficient supplies to meet the emergency need and "inadequate" if contraindicating data exists for special circumstances or populations.

50. When processing an EUA request, the FDA establishes priorities based on a variety of factors, including (but not limited to):

- Public health need for the product and, when known, the safety and effectiveness of other potential MCMs;
- Availability and adequacy of information about whether the product is safe and effective in preventing, treating, or diagnosing the condition;

---

be used to monitor a person's overall health to help cure, treat, or prevent diseases. COVID-19 related IVDs include diagnostic tests (molecular tests and antigen tests); serology/antibody tests; and tests for management of COVID-19 patients.

- The potential role that use of the product may have in ensuring national security; and
- The extent to which the product would serve a significant unmet medical need, including what stage the emergency response is in (*e.g.*, evolving understanding of a disease/condition and/or MCMs in the context of an ongoing public health response, availability of prior authorized MCMs).

51. As part of its response to the COVID-19 pandemic, the FDA issued a new policy on February 29, 2020[5] (updated on March 16, 2020[6]), offering guidance to laboratories seeking to develop diagnostic tests to achieve more rapid testing capacity in the United States. This guidance allowed for laboratories certified to perform high-complexity testing, under the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), 42 U.S.C. § 263a, to immediately use tests they developed and validated while seeking an EUA with the FDA. In issuing this new policy, FDA Commissioner Stephen M. Hahn, M.D. said, "[w]e will continue to help to ensure sound science prior to clinical testing and follow-up with the critical independent review from the FDA, while quickly expanding testing capabilities in the U.S. ***We are not changing our standards for issuing Emergency Use Authorizations***. This action today reflects our public health commitment to addressing critical public health needs and rapidly responding and adapting to this dynamic and evolving situation."

52. On May 9, 2020, the FDA announced its authorization of the first COVID-19 antigen test, noting that "[d]iagnostic testing is one of the pillars of our

---

[5] U.S. FOOD & DRUG ADMIN., *Coronavirus (COVID-19) Update: FDA Issues New Policy to Help Expedite Availability of Diagnostics* (Feb. 29, 2020), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-issues-new-policy-help-expedite-availability-diagnostics.

[6] U.S. FOOD & DRUG ADMIN., *Coronavirus (COVID-19) Update: FDA Provides More Regulatory Relief During Outbreak, Continues to Help Expedite Availability of Diagnostics* (Mar. 16, 2020), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-provides-more-regulatory-relief-during-outbreak-continues-help.

nation's response to COVID-19 and the FDA continues to take actions to help make these critical products available, including by issuing EUAs."[7] The FDA added:

> [W]e expect more [authorizations] to follow. We also anticipate providing an EUA template for antigen tests, similar to ones we've released for other test types, to help manufacturers streamline submissions and help expedite our review and issuance of additional EUAs.
>
> Antigen tests will play a critical role in the fight against COVID-19 and we will continue to offer support and expertise to help with the development of accurate tests, and to review and monitor marketed tests to ensure accuracy, while balancing the urgent need for these critical diagnostics.

53. Former FDA Commissioner Scott Gottlieb called this FDA approval "a real game-changer."[8] Jennifer A. Dlouhy of Bloomberg likewise said it "could mark a breakthrough in screening for the virus and comes as state and local governments ease lockdown orders and businesses begin reopening across the nation – and as health professionals argue that swift screening is essential to temper new outbreaks."

54. Researchers estimate that people infected with the coronavirus can spread it 2-3 days before symptoms start and are most contagious the first week symptoms appear.[9] During this time, there are high levels of viral shedding – where the virus leaves a cell to infect other cells in the body or in other people – especially in the throat and lungs. This heavy viral load helps explain why COVID-19 is so

---

[7] U.S. FOOD & DRUG ADMIN., *Coronavirus (COVID-19) Update: FDA Authorizes First Antigen Test to Help in the Rapid Detection of the Virus that Causes COVID-19 in Patients* (May 9, 2020), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-first-antigen-test-help-rapid-detection-virus-causes.

[8] Jennifer A. Dlouhy, *Ex-FDA Chief Calls New Covid-19 Antigen Test a 'Game-Changer'*, BLOOMBERG (May 9, 2020), https://www.bloomberg.com/news/articles/2020-05-09/fda-authorizes-quidel-s-antigen-test-first-of-its-kind-in-u-s.

[9] NGB, *Virological Assessment of hospitalized patients with COVID-2019* (Mar. 2020), https://www.nature.com/articles/s41586-020-2196-x_reference.pdf.

infectious.[10] Accurate rapid diagnostic tests are thus extremely important in the first week of infection to prevent infected individuals from coming in contact with others while they are still shedding the virus at a high level.

55. Diagnostic tests currently available are RT-PCR, or molecular, tests which detect the genetic material from a virus, and antigen tests which detect specific proteins on the surface of a virus.[11] Molecular tests are more expensive, more complex and results may take up to a week.[12] Thus, the main advantages of antigen tests are speed (results in minutes), price (lower production cost), and ability to scale to millions of tests a day (simpler design).[13]

56. However, the drawback to antigen tests is that they are less reliable because they are less sensitive. In other words, positive results are highly accurate, but negative results do not rule out presence of the virus. Dr. Ashish Jha, Director of the Harvard Global Health Institute noted, "[i]t's ideal to have low false positives and false negatives, but usually you're trading off between the two. The reason you're willing to live with more false positives is you want to be able to screen people, and

---

[10] Tina Hesman Saey, *Coronavirus is most contagious before and during the first week of symptoms*, SCIENCENEWS (Mar. 13, 2020, 4:36 PM), https://www.sciencenews.org/article/coronavirus-most-contagious-before-during-first-week-symptoms.

[11] U.S. FOOD & DRUG ADMIN., *Coronavirus Testing Basics* (May 2020), https://www.fda.gov/media/138094/download.

[12] Katie Mettler, *FDA issues emergency approval of new antigen test that is cheaper, faster and simpler*, THE WASHINGTON POST (May 9, 2020, 5:26 PM EDT), https://www.washingtonpost.com/health/2020/05/09/fda-issues-emergency-approval-new-antigen-test-that-is-cheaper-faster-simpler/.

[13] U.S. FOOD & DRUG ADMIN., *Coronavirus (COVID-19) Update: FDA Authorizes First Antigen Test to Help in the Rapid Detection of the Virus that Causes COVID-19 in Patients* (May 9, 2020) https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-first-antigen-test-help-rapid-detection-virus-causes.

if they are negative you want to feel confident that they are truly negative."[14]

57. On May 11, 2020, the FDA issued revised guidance (originally issued on May 4, 2020) for its staff, clinical laboratories, and commercial manufacturers to help accelerate the development and availability of COVID-19 tests for the duration of the public health emergency.[15] The FDA declared that the policies "will help address the[] urgent public health concerns by helping to expand the number and variety of tests, as well as available testing capabilities in reference and commercial laboratories and healthcare settings, while helping ensure these tests are accurate and reliable."

58. In this guidance, the FDA explained that "[i]n the context of a public health emergency involving pandemic infectious disease, it is ***critically important that tests are validated*** because false results not only can negatively impact the individual patient but also can have broad public health impact." Accordingly, while the FDA "provide[d] recommendations regarding validation of COVID-19 tests based on the available information," it "encourage[d] test developers to discuss any alternative technological approaches to validating their test with FDA."

59. Under this guidance, testing was limited to laboratories certified under CLIA or similarly qualified non-U.S. laboratories, and as applicable, POC.

60. In addition, COVID-19 antigen tests were defined as those that "detect proteins that are part of the SARS-CoV-2 virus directly from clinical specimens." For these tests, the FDA recommended conducting the following validation studies:

- Limit of Detection (LoD)/Analytical Sensitivity
- Cross-reactivity/Analytical Specificity
- Microbial Interference

---

[14] Andrew Jacobs, *F.D.A. Approves First Antigen Test for Detecting the Coronavirus*, THE NEW YORK TIMES (May 9, 2020), https://www.nytimes.com/2020/05/09/health/antigen-testing-fda-coronavirus.html.

[15] U.S. FOOD & DRUG ADMIN., *Policy for Coronavirus Disease-2019 Tests During the Public Health Emergency (Revised)* (May 4, 2020), https://www.fda.gov/media/135659/download ("May 11 Guidance").

- Clinical Agreement Study – to establish performance characteristics (*e.g.*, sensitivity/PPA, specificity/NPA), preferably on humans

61. In addition, the FDA made available through download, a template that antigen test developers could use to facilitate the preparation, submission, and authorization of an EUA ("May 11 Template").[16] The template also included more recommendations concerning the above-referenced validation studies as well as other information that should be provided to the FDA in the pre-EUA/EUA submission process. Alternative approaches could be used, but the FDA encouraged developers to "discuss any alternative approaches to validating their test with FDA."

62. When providing additional guidance related to the Limit of Detection (LoD) – Analytical Sensitivity, the May 11 Template added that "[t]he use of ***recombinant antigen is not recommended*** for the LoD determination."

63. In addition, the May 11 Template provided guidance regarding specific information and protocols developers must demonstrate through their Clinical Evaluation. Specifically, the template provided (but was not limited to) the following:

- Use of natural clinical specimens is needed for the clinical evaluation. Use of contrived clinical specimens is not acceptable.
- Only high sensitivity EUA RT-PCR test which uses a chemical lysis step followed by solid phase extraction of nucleic acid (*e.g.*, silica bead extraction) should be used as the comparator method; and
- If the device is anticipated for near-patient testing, developer should provide any relevant information regarding user training.

64. Further, the May 11 Template provided that "if the device [wa]s intended for near patient testing or Point of Care (POC), [the developer was instructed to]

[16] *In Vitro Diagnostics EUAs - Antigen Template for Manufacturers*, FDA (May 11, 2020), https://web.archive.org/web/20200624190111/https://www.fda.gov/medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices/vitro-diagnostics-euas.

provide data to demonstrate that non-laboratory personnel c[ould] perform the test accurately in the intended use environment (*i.e.* a non-laboratorian healthcare provider accuracy study)." Developers pursuing POC testing were also asked to "provide data to demonstrate robust use of [its] device for near patient testing (*e.g.*, as applicable, studies to demonstrate the impact of adding different volumes of sample, different volumes of reagents, incorrect order of sample or reagent application, *etc.*)" – known later as Flex Studies.

65. A few months later, on July 6, 2020, the FDA announced authorization of a second antigen test which was further authorized for POC use. In the press release, FDA Commissioner Hahn stated that "[a]ntigen tests play an important role in the overall response against COVID-19, including as a point-of-care test that can potentially scale up to test millions of Americans quickly."[17]

66. Then, on July 29, 2020, the FDA issued an updated "Template for Manufacturers of Molecular and Antigen Diagnostic COVID-19 Tests for Non-Laboratory Use" ("July 29 Template") which supplemented its prior May 11 Guidance.[18] The July 29 Template provided "recommendations concerning what data and information should be submitted to FDA in support of a pre-EUA/EUA submission for a molecular or antigen diagnostic test for SARS-CoV-2 for use in a non-laboratory setting. Such settings are likely to include a person's home or certain non-traditional sites such as offices, sporting events, airports, schools etc."

67. Acceptable testing locations were expanded beyond certified laboratories

---

[17] U.S. FOOD & DRUG ADMIN, *Coronavirus (COVID-19) Update: FDA Issued Emergency Use Authorization for Point of Care Antigen Test* (July 6, 2020), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-issued-emergency-use-authorization-point-care-antigen-test.

[18] U.S. FOOD & DRUG ADMIN., *Template for Manufacturers of Molecular and Antigen Diagnostic COVID-19 Tests for Non-Laboratory Use* (July 29, 2020), https://www.fda.gov/media/140615/download.

and POC testing to include at-home testing, so the July 29 Template provided more detailed recommendations for some performance valuation studies already defined in the May 11 Template and listed additional studies to be included in an EUA request (as applicable). With respect to the FDA's recommendations regarding the following evaluation studies, the July 29 Template referred the developer to the May 11 Template: (i) Limit of Detection (LoD) – analytical sensitivity; (ii) Inclusivity (analytical sensitivity); (iii) Cross-reactivity (analytical specificity); (iv) High-dose Hook Effect Study for antigen tests; and (v) Biotin interference.

68. Adding to prior recommendations regarding evaluation of POC testing, the July 29 Template called for Flex Studies to be performed in-house by staff who have been trained in the use of the test, with pre-defined study protocols, and provided example conditions to be evaluated for potential user errors and anticipated environmental stresses. "The flex studies should evaluate the most common or likely sources of error based on the use locations and test procedure."

69. With regard to Clinical Evaluations, the July 29 Template provided additional recommendations (including but not limited to): patient enrollment criteria including, but not limited to, age range, diverse socioeconomic and educational backgrounds, and the inclusion of symptomatic and asymptomatic individuals; specified that "the comparator method selected should be one of the more sensitive EUAs on the FDA website;" and called for discrepant analysis "if a large number of discordant results are obtained in the clinical study."

70. Then, on October 26, 2020, the FDA issued its "Antigen Template for Test Developers" which laid out even more detailed recommendations for valuation studies, building upon the May 11 and July 29 Templates, and included new information related to studies necessary to support a claim that a test is capable of

screening individuals without symptoms or other reasons to suspect COVID-19.[19]

71. As of October 28, 2020, the FDA had authorized 285 tests under EUAs, including 222 molecular tests, 56 antibody tests, and 7 antigen tests.[20]

72. On November 17, 2020, the FDA announced authorization of the first COVID-19 diagnostic test that could be self-administered and provide results at home. FDA Commissioner Hahn specified that "[t]his new testing option is an important diagnostic advancement to address the pandemic and reduce the public burden of disease transmission" and "[t]oday's action underscores the FDA's ongoing commitment to expand access to COVID-19 testing."[21]

73. On December 15, 2020, the FDA announced authorization of the first OTC (*i.e.*, no prescription) at-home antigen test.[22] In the press release, Jeff Shuren, M.D., J.D., Director of FDA's Center for Devices and Radiological Health said:

> The FDA strongly supports innovation in test development, and we have worked tirelessly with test developers to support the shared goal of getting more accurate and reliable tests to Americans who need them. Today is a promising step forward and we are eager to continue advancing additional innovation in COVID-19 testing that the science supports. This test, like other antigen tests, is less sensitive and less specific than typical molecular tests run in a lab. However, the fact that

---

[19] U.S. FOOD & DRUG ADMIN., *Antigen Template for Test Developers* (Oct. 26, 2020), https://www.fda.gov/media/137907/download.

[20] U.S. FOOD & DRUG ADMIN., *Coronavirus (COVID-19) Update: October 28, 2020* (Oct. 28, 2020), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-october-28-2020.

[21] U.S. FOOD & DRUG ADMIN., *Coronavirus (COVID-19) Update: FDA Authorizes First COVID-19 Test for Self-Testing at Home* (Nov. 17, 2020), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-first-covid-19-test-self-testing-home.

[22] U.S. FOOD & DRUG ADMIN., *Coronavirus (COVID-19) Update: FDA Authorizes Antigen Test as First Over-the-Counter Fully At-Home Diagnostic Test for COVID-19* (Dec. 15, 2020), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-antigen-test-first-over-counter-fully-home-diagnostic.

> it can be used completely at home and return results quickly means that it can play an important role in response to the pandemic.

74. Then on March 16, 2021, the FDA issued its "Supplemental Template for Developers of Molecular and Antigen Diagnostic COVID-19 Tests for Screening with Serial Testing" to "provide supplemental recommendations for developers of molecular and antigen tests seeking claims for screening with serial testing without studying asymptomatic individuals prior to authorization, including for point-of-care (POC) and at-home tests."[23] As with prior templates, the FDA noted that it "reflects FDA's current thinking on the topic, and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word should mean that something is suggested or recommended, but not required."

75. As of March 30, 2021, the FDA had authorized 349 tests and sample collection devices under EUAs, including 258 molecular tests and sample collection devices, 74 antibody and other immune response tests, and 17 antigen tests.[24] Of those, 42 molecular authorizations were for home-collected samples, including a molecular prescription at-home test, two antigen prescription at-home tests, an OTC at-home antigen test, and an OTC molecular test.

76. The EUA submission process relaxed test validation requirements and dramatically shortened the timeframe in which new COVID-19 detection tests could be brought to market, but the loosening of regulatory restrictions also increased the material importance for companies developing COVID-19 screening tests to adhere

---

[23] U.S. FOOD & DRUG ADMIN., *Coronavirus (COVID-19) Update: FDA takes steps to streamline path for COVID-19 screening tools, provides information to help groups establishing testing programs* (Mar. 16, 2021), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-takes-steps-streamline-path-covid-19-screening-tools-provides.

[24] U.S. FOOD & DRUG ADMIN., *Coronavirus (COVID-19) Update: March 30, 2021* (Mar. 30, 2021), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-march-30-2021.

to industry standards and to maintain high quality in the conduct of validation studies. Screening tests are only successful if they can guarantee accurate and consistent results, and such quality and reliability is to be shown by the successful ability of laboratories and commercial manufacturers to adhere to regulatory recommendations in the development, validation and manufacturing of the tests.

### C. Sona Enters the Race to Bring a COVID-19 Antigen Test to Market

77. Sona researches and develops gold nanorod products for diagnostic test and medical treatment applications. As COVID-19 spread rapidly across the globe and governments declared a public health emergency (*see supra* ¶¶ 40-43), Sona entered the race to develop a novel test for the detection of COVID-19.

78. On February 10, 2020, Sona issued a press release announcing its plans to use its proprietary nanotechnology in the development of an antigen test for COVID-19, noting that "[s]creening tests are critical tools in dealing with rapidly evolving and large-scale outbreaks that tax the health care system, like this novel Coronavirus."[25] The Company then proceeded to obtain partners and advisors to help it develop and commercialize that test.

79. On February 13, 2020, Sona announced that The Native Antigen Company ("Native") had agreed to supply biologics for its Covid-19 antigen test.[26]

80. On February 18, 2020, Sona announced a partnership with Bond Digital Health ("Bond") to allow results from its COVID-19 test to be collected through a reader system or mobile app before being stored in the cloud.

---

[25] *Sona Develops Rapid Screening Test for Coronavirus*, SONA NANOTECH (Feb. 10, 2020) ("February 10 Press Release"), https://sonanano.com/sona-develops-rapid-screening-test-for-coronavirus/.

[26] *Sona announces key partner for Coronavirus Rapid Screening Test*, SONA NANOTECH (Feb. 13, 2020) ("February 13 Press Release"), https://sonanano.com/sona-announces-key-partner-for-coronavirus-rapid-screening-test/.

81. On March 3, 2020, Sona announced that it and GE Healthcare Life Sciences ("GE") would jointly complete test development of its "Covid-19 lateral flow test" utilizing GE's "FFHP Membrane, which is specifically designed to allow for multiple optimization techniques (potentially allowing the test to become market ready sooner) and fast flow performance (potentially allowing for faster individual test results)." Sona's "quick partnership" with GE, "a respected named in the industry, was ***strong validation***" of the Company and its antigen test.[27]

82. On March 6, 2020, Sona announced the addition of Fiona Marshall ("Marshall") and Sandy Morrison ("Morrison") as scientific advisors for the development of its COVID-19 antigen test. Defendant Rowles added that, "***our initial laboratory work is progressing well*** and as a result of our collaboration with GE, we expect to ***accelerate an aggressive pace in the development of this critical test***."[28]

83. Then, on March 12, 2020, Sona confirmed to investors that "[d]evelopment work on Sona's new test to measure the COVID-19 virus [wa]s underway in 3 separate labs in Canada, the UK and Germany" and that it "ha[d] an ongoing, open dialogue with regulators to ensure th[at] Sona's test [wa]s being developed within the parameters regulators have outlined. This approach w[ould] allow Sona to be eligible for FDA review through their Emergency Use Authorization (EUA) pathway and a fast-track to market."[29]

[27] *Sona Partners with GE Healthcare Life Sciences to Complete Coronavirus Rapid Screening Test*, SONA NANOTECH (Mar. 3, 2020) ("March 3 Press Release"), https://sonanano.com/sona-partners-with-ge-healthcare-life-sciences-to-complete-coronavirus-rapid-screening-test/.

[28] *Sona Provides Update on Coronavirus Rapid Screening Test and Announces Scientific Advisors*, SONA NANOTECH (Mar. 6, 2020) ("March 6 Press Release"), https://sonanano.com/sona-provides-update-on-coronavirus-rapid-screening-test-and-announces-scientific-advisors/.

[29] *Sona Provides Corporate Update*, SONA NANOTECH (Mar. 12, 2020) ("March 12 Press Release"), https://sonanano.com/sona-provides-corporate-update/.

84. As such, entering the Class Period on March 18, 2020, Sona presented itself as poised to enter the COVID-19 antigen testing market with an innovative, successful rapid test closely guided by the FDA.

### D. Defendants Mislead Investors Regarding the Status and Progress of Sona's Development and Validation of its COVID-19 Antigen Test

85. On March 18, 2020, Defendants began a misleading campaign touting Sona's ability and progress in developing, validating, and obtaining regulatory authorization for a COVID-19 antigen test. Over the course of the ensuing year, they convinced investors that Sona was excelling in those endeavors. Indeed, Defendants' descriptions of Sona's success with its proprietary COVID-19 antigen test drove the price of the Company's securities from less than $1 per share to over $14 per share.

86. Driving that meteoric growth, Defendants described a well-oiled machine steaming ahead with extraordinary progress on an exceptional product. When, at times, Defendants revealed setbacks, they obfuscated the true causes and seriousness of those obstacles. Specifically, Defendants conveyed that external forces had caused delays with an otherwise streamlined and robust development and validation process.

87. During the first month of the Class Period, Defendants reported that:

- <u>March 18, 2020</u>: Sona "has now commenced development of a functional prototype of the rapid-response test."
- <u>March 30, 2020</u>: "[Q]ualified laboratory technicians are working with samples of the virus' antigen and antibodies."
- <u>March 31, 2020</u>: "$4.1 million grant from NGen, Canada's Advanced Manufacturing Supercluster . . . will be used to accelerate the development of a prototype and scale manufacturing capabilities with a view to deploying this Covid-19 virus-detecting, point-of-care test with Canadian medical authorities as soon as possible" and "NGen will play a valuable role in project funding, enabling the acceleration of the development, and enhancing the scope of the Company's project to deploy its proprietary gold nanorod technology towards a credible, easy to use, rapid response, point-of-care Covid-19 test."

- April 13, 2020: Sona has "tested a working prototype in a hospital laboratory environment with live, Covid-19 patient samples, achieving positive results" and "[a]ccordingly, Sona's prototype test progressed to the optimization stage."

Those statements conveyed substantial progress and success with Sona's test.

88. In reality, Defendants were not preparing to use adequate methods to analyze or validate Sona's test. Defendants revealed that on May 12, 2020, declaring that "[i]n order to conduct sufficient validation testing for submission for use to regulators," Sona was "moving to ***test its devices with live virus culture and/or patient samples as part of a formal clinical study***." In other words, Sona's previous validation protocols were insufficient because they had lacked live virus culture and/or patient samples and had only been tested in a laboratory setting.

89. Instead of taking the opportunity to reveal that they were in over their heads, however, Defendants reaffirmed their progress toward developing—and their ability to validate—an effective and reliable COVID-19 antigen test. On the same day, they described "advanced discussions for arrangements with a leading U.S. laboratory to provide the independent clinical trial data."

90. On May 22, 2020, Defendants elaborated that Sona had engaged "MRIGlobal, a leading applied scientific research organization, to provide analytical and clinical validation studies for Sona's COVID-19 rapid detection, point-of-care, antigen test which will be used for submission to Health Canada for regulatory approval and the FDA for Emergency Use Authorization (EUA)." Defendant Rowles touted that "[w]e are delighted to be ***moving into the final validation process*** and looking forward to the potential of a test that can tangibly advance the safety and quality of life for our communities." Hence, Defendants' message to investors was that Sona was on the cusp of releasing a viable COVID-19 antigen test as it was nearly done validating that the test worked.

91. By July 2, 2020, Defendants bolstered that message with hard data they

described as "excellent performance results" that are "underpinned by our unique nanorod technology." They reported that their "rapid detection, COVID-19 antigen test's laboratory validation studies of performance levels have resulted in a test sensitivity of 96%, test specificity of 96% and a Limit of Detection ("LOD") of 2.1 x 102 TCID50 . . . which corresponds to an ability to detect the virus in patients with 'low' viral loads in 10-15 minutes."

92. Defendants further conveyed that Sona was conducting additional field studies with results by the end of July, "at which time [Sona] intend[ed] to make final submissions to regulatory authorities in multiple jurisdictions." Sona's message, therefore, was that it was succeeding with developing and validating its test.

93. Just six days later, on July 8, 2020, Defendant Rowles reiterated the success, publicizing that Sona "***has achieved the extraordinary by bringing a COVID-19 rapid, point-of-care antigen test to fruition in four months***."

94. Those unequivocal statements to investors caused explosive growth in Sona's securities. As described by one analyst, "[i]nvestors [had] pushed an $0.11 stock to an all-time high of $16.05 a share by July 27" – yielding a "14,545% return on this best-performing COVID-19 stock in just six months."[30]

95. But then on August 6, 2020, Defendants made a partial disclosure of a two-week delay they blamed on external factors, such as "ethics review board approvals and a need to make study modifications to accommodate regulatory updates, including for study enrolment criteria and assessment at point of care settings, as well as for test handling procedures." And on August 20, 2020, they revealed yet another delay of one week, without disclosing any fundamental internal problems. Once again—in the context of consistent progress and positive news—

[30] Brian Paradza, CFA, *The Best Performing COVID-19 Stock So Far This Year*, THE MOTLEY FOOL (Sept. 28, 2020), https://www.fool.ca/2020/09/28/the-best-performing-covid-19-stock-so-far-this-year/.

Defendants refused to reveal the full truth about their internal struggles and inability to validate their test.

96. By August 25, 2020, the delays ostensibly were over. Defendants released seemingly positive data, claiming that Sona's "test achieved a sensitivity of 84.6% and a specificity of 90.0% in a study across 99 collected clinical patient samples" and declaring that the Company "is now continuing its submission of data to both the FDA and Health Canada to support their requirements for emergency use authorization approvals." Finally, on August 31, 2020, Defendants "completed submissions to the FDA and Health Canada for authorizations for [Sona's] COVID-19 rapid, antigen test, including responding to all follow-up questions received to date."

97. As before, Defendants' message to investors was one of progress and success. Sona portrayed that they had put together an all-star team of scientists and consultants, engaged in rigorous validation studies yielding positive results, and completed comprehensive submissions to the FDA and Health Canada at the precise time when COVID-19 tests were vital to the U.S. and Canada.

98. Indeed, Regan declared on October 1, 2020 regarding Sona's COVID-19 antigen test, "[w]e're ***100% confident that it gets approved***. There's ***smart questions being asked***, and we have ***strong data on our test***."[31]

### E. Defendants Conceal the Truth Behind the FDA's Rejection of Sona's EUA Request and the Withdrawal of Its Health Canada Application

99. On October 29, 2020, Defendants stunned investors with the news that the FDA had declined Sona's EUA request. But Defendants continued to obfuscate and conceal material facts surrounding Sona's test and the FDA's denial.

100. According to Defendants, "the FDA has indicated that our test is not a

[31] Benjamin A. Smith, *Sona Nanotech CEO "100% Confident" Coronavirus Test Will Land Regulatory Approval*, THE DALES REPORT (Oct. 2, 2020), https://thedalesreport.com/technology/sona-nanotech-ceo-100-confident-coronavirus-test-will-land-regulatory-approval/.

priority for them at this time[.]" Defendants further represented that the FDA "did not comment on the performance of the Sona test." The reality—as eventually revealed—was that Sona's validation studies were lacking and flawed, as a result, it had failed to demonstrate that its test could effectively meet the public need of rapid and accurate COVID-19 screening within 0-6 days of symptom onset—as compared to the other seven antigen tests that had already received EUAs.

101. Instead of revealing that truth, Defendants pivoted away from the FDA's rejection, stating that "Health Canada continues its evaluation of the Company's application for an Interim Order ("IO") authorization for its test as a 'point-of-care' medical diagnostic device" and "[t]he Company yesterday received additional questions on its application."

102. But Defendants' concealment of their deficient submission was short-lived. On November 25, 2020, they announced that the Company, based on feedback from Health Canada, had withdrawn its application. Once again, Defendants refused to admit that their validation data had been insufficient, and that Sona had failed to demonstrate its test's performance. Instead, Defendant Rowles stated that "[w]e have confidence in our rapid COVID-19 antigen test and its ability to detect the virus, especially within the first week of symptom onset." He blamed the failed authorizations in the U.S. and Canada on a generalization that "[t]he regulatory approval path for antigen tests is new with evolving guidelines and Sona's test is unique, creating a challenging environment for test developers and regulators alike."

103. As of November 30, 2020, Defendants still had not admitted that their validation data was insufficient. They stated that Sona "intends to obtain additional data and use it to augment its submission with the FDA and potentially for a resubmission to Health Canada." Moreover, Defendant Regan noted that "every entity that has evaluated our test has confirmed its ability to detect the COVID-19 virus and it achieved strong results from our in-field trials."

104. He also made the telling statement that "[w]e will now seek further study data to provide sufficient substantiation of clinical performance to warrant regulatory approval." But the issue was not that the FDA and Health Canada had trouble assessing Sona's test or approving other companies' tests. Indeed, 11 COVID-19 antigen tests had been authorized by the FDA in 2020. Rather, contrary to Defendants' consistent statements to investors that Sona's antigen test was effective and supported by clinical data, Defendants had failed to demonstrate Sona's test effectively performed for its intended use as a screening tool when an individual is most contagious and more likely to spread the virus to others.

**F. Defendants Falsely Convey a Path Forward Through Additional Clinical Data and Commercialization in the European Union**

105. Following the damning rejections by the FDA and Health Canada, Defendants continued to mislead investors, conveying that there was a pathway to future regulatory approval in the U.S. and Canada through the collection of additional clinical trial data, and in the meantime, they would also work on more immediate commercialization and profitability for Sona's nasal swab antigen test in the European Union ("EU") and the development and validation of its saliva-based antigen test.

106. On December 16, 2020, the Company issued a press release titled "Sona Nanotech Closes Unbrokered Private Placement Financing for $2.26M in Gross Proceeds," declaring that it "intended to use the net proceeds of the Financing to produce further clinical trial data for its rapid COVID-19 antigen nasal pharyngeal test, pursue a European regulatory self-certification CE Mark declaration, and pursue further development and clinical trial validation work for its saliva-based prototype version of the test, as well as for general working capital purposes."[32] Sona also

[32] *Sona Nanotech Closes Unbrokered Private Placement Financing for $2.26m in Gross Proceeds*, SONA NANOTECH (Dec. 16, 2020), https://sonanano.com/sona-nanotech-closes-unbrokered-private-placement-financing-for-2-26m-in-gross-proceeds/.

confirmed that it "[wa]s currently working with several potential partners to secure a clinical trial" and "its CE Marking process in Europe commenced."

107. Then on December 31, 2020, the Company issued a press release titled "Sona Nanotech Receives CE Mark Approval for its Rapid COVID-19 Antigen," explaining that the "CE Mark declares the conformity of the Sona test with EU regulations and allows Sona to commercialize its test throughout Europe and potentially other territories in which the CE Mark is recognized."[33]

108. Accordingly, Sona was "now able to take firm orders in territories accepting a CE Mark and make corresponding manufacturing commitments from its contract manufacturer in the United Kingdom" and "[was] also in the process of technology transfer to a second manufacturer, in North America."

109. Despite receiving the CE Mark (allowing it to sell its test in territories accepting a CE Mark), on March 1, 2021, Sona revealed that in the more than three months since achieving authorization to commercialize its nasal swab antigen test in the EU, it ***still*** had not obtained ***any*** "firm orders." Sona had failed to mention many other companies had already obtained CE Marks for their antigen tests, most of whom had also obtained EUAs for their diagnostics tests, including Quidel Corporation, LumiraDX, Becton Dickinson and Company, and Ortho Clinical Diagnostics.[34]

---

[33] *Sona Nanotech Receives CE Mark Approval for its Rapid COVID-19 Antigen Test*, SONA NANOTECH (Dec. 31, 2020), https://sonanano.com/sona-nanotech-receives-ce-mark-approval-for-its-rapid-covid-19-antigen-test/.

[34] *See e.g.*, *Quidel's Sofia® SARS Antigen FIA Updates EUA Performance Data to 96.7% PPA Versus PCR; Product Supports U.S. Initiatives to Expand Access to COVID-19 Testing in Nursing Homes; Receives CE Mark for Use With Sofia® and Sofia® 2 Instruments*, BUSINESS WIRE (July 11, 2020, 11:00 AM ET), https://www.businesswire.com/news/home/20200717005579/en/Quidel%E2%80%99s-Sofia%C2%AE-SARS-Antigen-FIA-Updates-EUA; *Ortho's VITROS® SARS-CoV-2 Antigen Test Capable of Accurate Mass-Scale Testing Achieves CE Mark*, PR NEWSWIRE (Nov. 2, 2020 05:00 AM), https://markets.businessinsider.com/news/stocks/ortho-s-vitros-sars-cov-2-antigen-

110. In addition, given Defendants' inability to validate its nasal swab antigen test for its specified use as a screening tool when a person is most contagious and at the highest risk of spreading COVID-19, Sona had no pathway forward to obtaining authorization from the FDA or Health Canada. In fact, more than four months since first announcing the need for more clinical data for its nasal swab antigen test, on March 1, 2021, the Company also revealed that, it ***still*** lacked a sponsoring institution, a principal investigator, a study protocol, relevant medical ethics review board approval, and Health Canada Investigational Testing Division approval.

111. Then on April 12, 2021, Defendants confirmed investors' suspicions that Sona was not as focused on its nasal swab antigen test as previously represented when, Defendants remained silent about an additional clinical trial for that test while disclosing that Sona had secured a clinical trial for its saliva-based antigen test.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS[35]

### A. Sona's Development of Its COVID-19 Nasal Swab Antigen Test

112. The Class Period begins on March 18, 2020 when Sona issued a press release titled "Sona Achieves Significant Milestone in Covid-19 Test Development," reporting that its consortium, including GE, Native, Bond, Marshall and Morrison:

> [A]chieved a significant milestone in its test development programme by generating an active conjugate which produces a signal when exposed to Covid-19 viral antigens. ***With the achievement of the positive identification of the viral antigens, the consortium has now***

test-capable-of-accurate-mass-scale-testing-achieves-ce-mark-1029752204?op=1; Emma Court, *A 'Game-Changing' 15-Minute COVID-19 Test Was Just Cleared in Europe*, TIME (Sept. 30, 2020, 10:45 AM EDT), (https://time.com/5894722/15-minute-covid-19-test-europe/; *LumiraDx COVID-19 Antigen Test Achieves CE Mark*, LUMIRADX (Aug. 31, 2020), https://www.lumiradx.com/us-en/news-events/lumiradx-covid-19-antigen-test-achieves-ce-mark.

[35] The particular portions of the statements alleged to be false and/or misleading are bold and italicized in this Section.

> ***commenced development of a functional prototype of the rapid-response test. Sona expects its Covid-19 test to benefit from reduced regulatory and field-testing requirements as announced by several regulatory agencies including in the United States' FDA***.[36]

On this news, Sona's share price increased 23%.

113. The statements referenced in ¶112 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Sona's business, operations and prospects, which were known to Defendants or recklessly disregarded by them: despite having an ongoing, open dialogue with regulators to ensure that Sona's nasal swab antigen test was being developed within the FDA's parameters for EUA eligibility and on a fast-track to market, Sona was not, in its "development of a functional prototype," preparing to validate its nasal swab antigen test with live virus culture and/or patient samples as part of a formal clinical study.

114. On March 30, 2020, Sona issued a press release titled "Sona Nanotech Enters into a Manufacturing Service Agreement and a Sale Letter of Intent Agreement for 2mm Tests" ("March 30 Press Release") which expressly stated that:

> R&D work is being done in Germany and Scotland, with consortium partners, and at the Company's lab in Dartmouth, Nova Scotia where ***qualified laboratory technicians are working with samples of the virus' antigen and antibodies***, under the supervision of the Company's Chief Technology Officer, Head of R&D, and President and CEO. ***The Company expects to benefit from the regulatory relief offered by the FDA to expedite the availability of diagnostics associated with the Covid-19 disease, subject to certain conditions***.[37]

---

[36] *Sona Achieves Significant Milestone in Covid-19 Test Development*, SONA NANOTECH (Mar. 18, 2020) ("March 18 Press Release") P, https://sonanano.com/sona-achieves-significant-milestone-in-covid-19-test-development/.

[37] *Sona Nanotech Enters into a Manufacturing Service Agreement and a Sale Letter of Intent Agreement for 2mm Tests*, SONA NANOTECH (Mar. 30, 2020),

115. The statements referenced in ¶114 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Sona's business, operations and prospects, which were known to Defendants or recklessly disregarded by them: despite having an ongoing, open dialogue with regulators to ensure that Sona's nasal swab antigen test was being developed within the FDA's parameters for EUA eligibility and on a fast-track to market, Sona was not, while "working with samples of the virus' antigen and antibodies," preparing to validate its nasal swab antigen test with live virus culture and/or patient samples as part of a formal clinical study.

116. On March 31, 2020, Sona issued a press release announcing a non-repayable "$4.1 million grant from NGen, Canada's Advanced Manufacturing Supercluster," to "be used ***to accelerate the development of a prototype*** and scale manufacturing capabilities with a view to ***deploying this Covid-19 virus-detecting, point-of-care test with Canadian medical authorities as soon as possible***."[38] The press release also stated "NGen will play a valuable role in project funding, ***enabling the acceleration of the development, and enhancing the scope of the Company's project to deploy its proprietary gold nanorod technology towards a credible, easy to use, rapid response, point-of-care Covid-19 test*** that can be used to reduce the strain in testing laboratories and enhance the capacity of health care systems."

117. The statements referenced in ¶116 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Sona's business, operations and prospects, which were

---

https://sonanano.com/sona-nanotech-enters-into-a-manufacturing-service-agreement-and-a-sale-letter-of-intent-agreement-for-2mm-tests/.

[38] *Sona Nanotech Awarded $4.1 Million from NGen for Rapid Development and Launch of COVID-19 Antigen Test*, SONA NANOTECH (Mar. 31, 2020), https://sonanano.com/sona-nanotech-awarded-4-1-million-from-ngen-for-rapid-development-and-launch-of-covid-19-antigen-test/.

known to Defendants or recklessly disregarded by them: despite having an ongoing, open dialogue with regulators to ensure that Sona's nasal swab antigen test was being developed within the FDA's parameters for EUA eligibility and on a fast-track to market, in using the funding it obtained from NGEN to "accelerate the development of a prototype," Sona was not preparing to validate its nasal swab antigen test with live virus culture and/or patient samples as part of a formal clinical study.

118. On April 13, 2020, Sona issued a press release titled "Sona Nanotech Provides a Progress Update on its Covid-19 Antigen Test" ("April 13 Press Release"), touting that it had "***[p]rogressed from feasibility and prototype testing to the optimization stage***" and "***[c]ommenced work with two, third-party laboratories to prepare validation protocols***" during the prior week.[39]

119. Sona's April 13 Press Release also stated that it had "***tested a working prototype in a hospital laboratory environment with live, Covid-19 patient samples, achieving positive results. Accordingly, Sona's prototype test progressed to the optimization stage*** during which work will be done to ensure it attains maximum performance in both quality and accuracy."

120. In addition, Defendant Rowles is quoted in Sona's April 13 Press Release as stating that "***[d]evelopment work on our test is largely complete and we have moved to an optimization stage*** utilizing a third party for the optimization process."

121. The statements referenced in ¶¶118-20 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Sona's business, operations and prospects, which were known to Defendants or recklessly disregarded by them: despite having an ongoing, open dialogue with regulators to ensure that Sona's nasal swab antigen test was being

---

[39] *Sona Nanotech Provides a Progress Update on its Covid-19 Antigen Test*, SONA NANOTECH (Apr. 13, 2020), https://sonanano.com/sona-nanotech-provides-a-progress-update-on-its-covid-19-antigen-test/.

developed within the FDA's parameters for EUA eligibility and on a fast-track to market, as part of Sona's development and optimization of its nasal swab antigen test – including its "feasibility and prototype testing" as well as its "validation protocols" – it was not preparing to validate its nasal swab antigen test with live virus culture and/or patient samples as part of a formal clinical study.

**B. Sona's Validation Studies**

122. On May 12, 2020, Sona issued a press release titled "Sona Nanotech Provides COVID-19 Antigen Test Progress Update" ("May 12 Press Release"), stating:

> ***Ensuring tests work effectively in a*** clinical lab and ***patient setting is critical to the ultimate success*** of any test. ***In order to conduct sufficient validation testing for submission for use to regulators, Sona is moving to test its devices with live virus culture and/or patient samples as part of a formal clinical study.*** Accordingly, the Company ***is in advanced discussions for arrangements with a leading U.S. laboratory to provide the independent clinical trial data. This verification and validation work is expected to be conducted through the month of May***.
>
> The Company continues to work with regulators in anticipation of finalizing a submission to Health Canada for approval and making its formal submission to the FDA for the granting of an emergency use authorization (EUA). Once approved by regulators, the Company expects to begin accepting deposits for sales and commence manufacturing.[40]

123. The statements referenced in ¶122 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Sona's business, operations and prospects, which were known to Defendants or recklessly disregarded by them: despite having an ongoing,

[40] *Sona Nanotech Provides Covid-19 Antigen Test Progress Update*, SONA NANOTECH (May 12, 2020), https://sonanano.com/sona-nanotech-provides-covid-19-antigen-test-progress-update/.

open dialogue with regulators to ensure that Sona's nasal swab antigen test was being developed within the FDA's parameters for EUA eligibility and on a fast-track to market and the FDA's issuance of guidances and templates to support developer's with their EUA submissions, Sona's validation studies (1) did not have adequate enrollment criteria, assessment at POC settings, or antigen test handling procedures and thus the results of those studies would not be provided by the end of July and (2) were not set up to yield sufficient data to demonstrate the antigen test's performance, particularly in patients within 0-6 days of symptom onset, and thus the nasal swab antigen test would not meet the FDA's or Health Canada's criteria for authorization. As a result, despite "moving to test its devices with live virus culture and/or patient samples as part of a formal clinical study," Sona would be unable to financially capitalize on the need for rapid COVID-19 detection testing that was being filled by other antigen tests.

124. On May 22, 2020, Sona issued a press release titled "Sona Nanotech Engages MRIGlobal for COVID-19 Test Validation Studies" ("May 22 Press Release"), announcing:

> ***[T]he engagement of MRIGlobal, a leading applied scientific research organization, to provide analytical and clinical validation studies for Sona's COVID-19 rapid detection, point-of-care, antigen test which will be used for submission to Health Canada for regulatory approval and the FDA for Emergency Use Authorization (EUA). . . .*** The project work will . . . assess Sona's test using live SARS CoV-2 virus following its past, successful internal evaluation using gamma irradiated virus. ***The EUA studies will follow the FDA's guidance for antigen testing, including assessments for sensitivity, specificity, cross-reactivity and interfering substances using patient samples and contrived (live viral culture) samples***."[41]

[41] *Sona Nanotech Engages MRIGlobal for COVID-19 Test Validation Studies*, SONA NANOTECH (May 22, 2020), https://sonanano.com/sona-nanotech-engages-mriglobal-for-covid-19-test-validation-studies/.

125. Sona's May 22 Press Release also quoted Defendant Rowles as stating that "[w]e are delighted to be ***moving into the final validation process*** and looking forward to the potential of a test that can tangibly advance the safety and quality of like for our communities."

126. The statements referenced in ¶¶124-25 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Sona's business, operations and prospects, which were known to Defendants or recklessly disregarded by them: despite having an ongoing, open dialogue with regulators to ensure that Sona's nasal swab antigen test was being developed within the FDA's parameters for EUA eligibility and on a fast-track to market and the FDA's issuance of guidances and templates to support developer's with their EUA submissions, Sona's validation studies (1) did not have adequate enrollment criteria, assessment at POC settings, or antigen test handling procedures and thus the results of those studies would not be provided by the end of July and (2) were not set up to yield sufficient data to demonstrate the antigen test's performance, particularly in patients within 0-6 days of symptom onset, and thus the nasal swab antigen test would not meet the FDA's or Health Canada's criteria for EUA approval. As a result, despite "moving into the final validation process," Sona would be unable to financially capitalize on the need for rapid COVID-19 detection testing that was being filled by other antigen tests.

127. On July 2, 2020, the Company issued a press release titled "Sona Nanotech Announces Validation Results for its COVID-19 Antigen Test" ("July 2 Press Release"), stating "that ***its rapid detection, COVID-19 antigen test's laboratory validation studies of performance levels have resulted in a test sensitivity of 96%, test specificity of 96% and a Limit of Detection ("LOD") of 2.1 x*** $10^2$ ***TCID***$^{50}$ . . .

***which corresponds to an ability to detect the virus in patients with 'low' viral loads in 10-15 minutes***."[42]

128. Sona's July 2 Press Release further stated that:

> Following consultation with MRIGlobal and the FDA, ***Sona will enter into independent clinical, in-field evaluation studies to generate the data to support its analytical and clinical data as part of the submission it will make to Health Canada and the FDA for emergency use authorization ("EUA") approval.*** In-field collection of a minimum of 30 confirmed negative and 30 confirmed positive specimens and the associated data analysis is expected to be completed while technology transfer to manufacturers is still underway. ***To that end, the Company has engaged with a contract research organization ("CRO") based in the U.S. to conduct one such study and a university affiliated laboratory outside of the U.S. to conduct a second***. ***The Company has been informed that the results of these field studies should be provided by the end of July, at which time it intends to make final submissions to regulatory authorities in multiple jurisdictions.***

129. In addition, Defendant Rowles was quoted in the July 2 Press Release as stating that "[t]hese excellent performance results are underpinned by our unique nanorod technology and ***completes a further milestone achieved for Sona along our path to bring a quality rapid test to scale***."

130. The statements referenced in ¶¶127-29 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Sona's business, operations and prospects, which were known to Defendants or recklessly disregarded by them: despite having an ongoing, open dialogue with regulators to ensure that Sona's nasal swab antigen test was being developed within the FDA's parameters for EUA eligibility and on a fast-track to market, the FDA's issuance of guidances and templates to support developer's with

---

[42] *Sona Nanotech Announces Validation Results for its COVID-19 Antigen Test*, SONA NANOTECH (July 2, 2020), https://sonanano.com/sona-nanotech-engages-mriglobal-for-covid-19-test-validation-studies/.

their EUA submissions, and awareness that its antigen test was most useful in the first week an individual has COVID-19 symptoms, Sona's in-field evaluation studies (1) did not have adequate enrollment criteria, assessment at POC settings, or antigen test handling procedures and thus the results of those field studies would not be provided by the end of July and (2) were not set up to yield sufficient data to demonstrate the antigen test's performance, particularly in patients within 0-6 days of symptom onset, and thus the nasal swab antigen test would not meet the FDA's or Health Canada's criteria for EUA approval. As a result, despite the touted "milestone achieved," Sona would be unable to financially capitalize on the need for rapid COVID-19 detection testing that was being filled by other antigen tests.

131. As noted by Jay Lutz of *The Deep Dive* on July 6, 2020, Sona's equity had "heavy volume" that prior week which "appear[ed] to be the result of news published by the company last week, with Sona announcing validation results for its COVID-19 lateral flow antigen test."[43]

132. On July 8, 2020, Sona issued a press release titled "Sona Nanotech Engages Maxim Group for NASDAQ Listing and Investment Banking Services, and Announces Organizational Change" of Defendant Regan's promotion to CEO and Defendant Rowles' assumption of role as President and CSO ("July 8 Press Release").[44] The press release quoted Rowles as stating that Sona "has achieved the extraordinary by ***bringing a COVID-19 rapid, point-of-care antigen test to fruition in four months*** with an extremely focused team in the laboratory."

[43] Jay Lutz, *Market Movers: Sona Nanotech Moves On COVID-19 Antigen Test Validation*, THE DEEP DIVE (July 6, 2020, 2:24 PM), https://thedeepdive.ca/market-movers-sona-nanotech-moves-on-covid-19-antigen-test-validation/.

[44] *Sona Nanotech Engages Maxim Group for NASDAQ Listing and Investment Banking Services, and Announces Organizational Change*, SONA NANOTECH (July 8, 2020), https://sonanano.com/sona-nanotech-engages-maxim-group-for-nasdaq-listing-and-investment-banking-services-and-announces-organizational-change/.

133. The July 8 Press Release also quoted Regan as stating that "***[w]e have laid the plans to scale Sona Nanotech quickly to deliver its COVID-19 test through regulatory approval to manufacturing and into the hands of our customers in the coming months***."

134. The statements referenced in ¶¶132-33 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Sona's business, operations and prospects, which were known to Defendants or recklessly disregarded by them: despite having an ongoing, open dialogue with regulators to ensure that Sona's nasal swab antigen test was being developed within the FDA's parameters for EUA eligibility and on a fast-track to market, the FDA's issuance of guidances and templates to support developer's with their EUA submissions, and awareness that its nasal swab antigen test was most useful in the first week an individual has COVID-19 symptoms, Sona had not laid plans to "quickly…deliver its COVID-19 test through regulatory approval…" or brought its nasal swab antigen test "to fruition in four months" because its in-field evaluation testing (1) did not have adequate enrollment criteria, assessment at POC settings, or antigen test handling procedures and (2) was not set up to yield sufficient data to demonstrate the antigen test's performance, particularly in patients within 0-6 days of symptom onset, and thus the antigen test would not meet the FDA's or Health Canada's criteria for EUA approval. As a result, Sona would be unable to financially capitalize on the need for rapid COVID-19 detection testing that was being filled by other antigen tests.

135. On July 24, 2020, Braden Maccke of *The Deep Dive* pointed out that Sona's "runaway [share] price leaps really got going July 2nd, when a laboratory test contracted through MRIGolbal[sic] indicated that SONA's GNR-based lateral flow COVID test had an ability to detect low viral loads in patient samples at a 96%

sensitivity in 10-15 minutes."[45] In addition, Maccke noted that Sona was "making it clear that it is on top of arrangements for at-scale manufacturing and quality control."

136. Based on Sona's statements through July 8, the market viewed it as "a small company that could help provide essential solutions to a global pandemic."[46] As a result, "[i]nvestors [had] pushed an $0.11 stock to an all-time high of $16.05 a share by July 27" – yielding a "14,545% return on this best-performing COVID-19 stock in just six months."

137. On August 6, 2020, Sona issued a press release titled "Sona Nanotech Updates on Timing of Clinical In-Field Validation Studies for its COVID-19 Antigen Test" ("August 6 Press Release"):

> [A]nnounc[ing] that its previously announced clinical, in-field evaluation studies for its rapid detection, COVID-19 antigen test that commenced in July continue and are now expected to return their full results within two weeks. The ***delays have been due*** to ethics review board approvals and ***a need to make study modifications to accommodate regulatory updates, including for study enrollment criteria and assessment at point of care settings, as well as for test handling procedures***.[47]

138. The statements referenced in ¶137 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Sona's business, operations and prospects, which were known to Defendants or recklessly disregarded by them: despite having an ongoing,

[45] Braden Maccke, *Market Movers: SONA Nanotech, Again*, THE DEEP DIVE (July 24, 2020, 11:20 AM), https://thedeepdive.ca/market-movers-sona-nanotech-again/.

[46] Brian Paradza, CFA, *The Best Performing COVID-19 Stock So Far This Year*, THE MOTLEY FOOL (Sept. 28, 2020), https://www.fool.ca/2020/09/28/the-best-performing-covid-19-stock-so-far-this-year/.

[47] *Sona Nanotech Updates on Timing of Clinical In-Field Validation Studies for its COVID-19 Antigen Test*, SONA NANOTECH (Aug. 6, 2020), https://sonanano.com/sona-nanotech-updates-on-timing-of-clinical-in-field-validation-studies-for-its-covid-19-antigen-test/.

open dialogue with regulators to ensure that Sona's nasal swab antigen test was being developed within the FDA's parameters for EUA eligibility and on a fast-track to market, the FDA's issuance of guidances and templates to support developer's with their EUA submissions, and awareness that its nasal swab antigen test was most useful in the first week an individual has COVID-19 symptoms, Sona's in-field validation studies had not been set up to yield sufficient data to demonstrate the antigen test's performance, particularly in patients within 0-6 days of symptom onset, and thus the antigen test would not meet the FDA's or Health Canada's criteria for EUA approval even after making the stated study modifications. As a result, Sona would be unable to financially capitalize on the need for rapid COVID-19 detection testing that was being filled by other antigen tests.

139. On August 20, 2020, Sona issued a press release titled "Sona Nanotech Clinical In-Field Validation Study Results to Be Released Next Week" ("August 20 Press Release"):

> [A]nnounc[ing] that it expects to release a report on its clinical, in-field evaluation studies for its rapid detection, COVID-19 antigen test next week. This data will be used to ***support the Company's submissions to Health Canada and the FDA for emergency use authorization ("EUA") approval for its COVID-19 antigen test***."[48]

140. The statements referenced in ¶139 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Sona's business, operations and prospects, which were known to Defendants or recklessly disregarded by them: despite having an ongoing, open dialogue with regulators to ensure that Sona's nasal swab antigen test was being developed within the FDA's parameters for EUA eligibility and on a fast-track to

---

[48] *Sona Nanotech Clinical In-Field Validation Study Results to Be Released Next Week*, NEWSFILE (Aug. 20, 2020), https://www.newsfilecorp.com/release/62201/Sona-Nanotech-Clinical-InField-Validation-Study-Results-to-Be-Released-Next-Week.

market, the FDA's issuance of guidances and templates to support developer's with their EUA submissions, and awareness that its nasal swab antigen test was most useful in the first week an individual has COVID-19 symptoms, Sona's in-field validation studies had not been set up to yield sufficient data to demonstrate the antigen test's performance, particularly in patients within 0-6 days of symptom onset, and thus the antigen test would not meet the FDA's or Health Canada's criteria for EUA approval. As a result, Sona would be unable to financially capitalize on the need for rapid COVID-19 detection testing that was being filled by other antigen tests.

141. On August 25, 2020, the Company issued a press release titled "Sona Nanotech Announces Clinical Evaluation Study Results for its COVID-19 Antigen Test," stating that its:

> ***[R]apid detection COVID-19 antigen test achieved a sensitivity of 84.6% and a specificity of 90.0% in a study across 99 collected clinical patient samples,*** which included 39 positive samples and 60 negative samples, as determined by RT-PCR testing. ***The Company is now continuing its submission of data to both the FDA and Health Canada to support their requirements for emergency use authorization approvals***.[49]

142. On this news, "[t]hinly traded Sona Nanotech (OTCQB:SNANF +8.2%) is in the green, albeit on turnover of only 10K shares, on the heels of its announcement of performance data on its rapid COVID-19 antigen test."[50]

143. The statements referenced in ¶141 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following

---

[49] *Sona Nanotech Announces Clinical Evaluation Study Results for its COVID-19 Antigen Test*, SONA NANOTECH (Aug. 25, 2020) ("August 25 Press Release"), https://sonanano.com/sona-nanotech-announces-clinical-evaluation-study-results-for-its-covid-19-antigen-test/.

[50] Douglas W. House, *Sona Nanotech advances rapid COVID-19 antigen test*, SEEKING ALPHA (Aug. 15, 2020, 2:06 PM ET), https://seekingalpha.com/news/3608691-sona-nanotech-advances-rapid-covidminus-19-antigen-test.

adverse facts pertaining to Sona's business, operations and prospects, which were known to Defendants or recklessly disregarded by them: despite having an ongoing, open dialogue with regulators to ensure that Sona's nasal swab antigen test was being developed within the FDA's parameters for EUA eligibility and on a fast-track to market, the FDA's issuance of guidances and templates to support developer's with their EUA submissions, and awareness that its nasal swab antigen test was most useful in the first week an individual has COVID-19 symptoms, Sona's clinical evaluation study was not designed to and did not yield sufficient data to demonstrate the antigen test's performance, particularly in patients within 0-6 days of symptom onset, and thus the antigen test would not meet the FDA's or Health Canada's criteria for EUA approval regardless of the high sensitivity and specificity percentages achieved in Sona's study. As a result, Sona would be unable to financially capitalize on the need for rapid COVID-19 detection testing that was being filled by other antigen tests.

144. On August 31, 2020, Sona issued a press release titled "Sona Engages Sports Marketing Partner to Secure Concussion Test Development Partner" ("August 31 Press Release") stating that "***last week the Company completed submissions to the FDA and Health Canada for authorizations for its COVID-19 rapid, antigen test, including responding to all follow-up questions received to date***."[51]

145. The statements referenced in ¶144 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Sona's business, operations and prospects, which were known to Defendants or recklessly disregarded by them: despite having an ongoing, open dialogue with regulators to ensure that Sona's nasal swab antigen test was being developed within the FDA's parameters for EUA eligibility and on a fast-track to

[51] *Sona Engages Sports Marketing Partner to Secure Concussion Test Development Partner*, SONA NANOTECH (Aug. 31, 2020), https://sonanano.com/sona-engages-sports-marketing-partner-to-secure-concussion-test-development-partner/.

market, the FDA's issuance of guidances and templates to support developer's with their EUA submissions, and awareness that its nasal swab antigen test was most useful in the first week an individual has COVID-19 symptoms, Sona's clinical evaluation study was not designed to and did not yield sufficient data to demonstrate the antigen test's performance, particularly in patients within 0-6 days of symptom onset, and thus the antigen test would not meet the FDA's or Health Canada's criteria for EUA approval. As a result, Sona would be unable to financially capitalize on the need for rapid COVID-19 detection testing that was being filled by other antigen tests.

146. On October 29, 2020, Sona issued a press release titled "Sona Nanotech Receives 'Deprioritization' from FDA; Health Canada Evaluation Continues" ("October 29 Press Release"), announcing that the FDA did not grant its request for an EUA for its COVID-19 antigen test based on "current EUA request prioritization criteria as including 'the public health need for the product' and ***did not comment on the performance of the Sona test***."[52]

147. In addition, the October 29 Press Release declared that "***Health Canada continues its evaluation of the Company's application for an Interim Order ("IO") authorization for its test as a 'point-of-care' medical diagnostic device. The Company yesterday received additional questions on its application. Also, Health Canada has submitted the Company's tests to the Public Health Agency of Canada's National Microbiology Laboratory for evaluation, which is ongoing***."

148. Defendant Regan similarly stated in the October 29 Press Release that "***Sona also submitted its application to Health Canada and remains committed to working with the regulator to achieve Interim Order approval*** which could allow

[52] *Sona Nanotech Receives 'Deprioritization' from FDA; Health Canada Evaluation Continues*, SONA NANOTECH (Oct. 29, 2020) ("October 29 Press Release"), https://sonanano.com/sona-nanotech-receives-deprioritization-from-fda-health-canada-evaluation-continues/.

Sona's rapid COVID-19 antigen test to contribute to the further opening of the economy and the return to a new normal."

149. The statements referenced in ¶¶146-48 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Sona's business, operations and prospects, which were known to Defendants or recklessly disregarded by them: despite having an ongoing, open dialogue with regulators to ensure that Sona's nasal swab antigen test was being developed within the FDA's parameters for EUA eligibility and on a fast-track to market, the FDA's issuance of guidances and templates to support developer's with their EUA submissions, and awareness that its nasal swab antigen test was most useful in the first week an individual has COVID-19 symptoms, Sona's clinical evaluation study was not designed to and did not yield sufficient data to demonstrate the antigen test's performance, particularly in patients within 0-6 days of symptom onset, and thus the antigen test did not meet the FDA's criteria for EUA approval and would not meet Health Canada's criteria either. As a result, Sona would be unable to financially capitalize on the need for rapid COVID-19 detection testing that was being filled by other antigen tests. Further, the fact that the FDA "did not comment on the performance" of Sona's antigen test did not mean, as the Company implied, that the test's performance did not contribute to the FDA deprioritization of Sona's request for an EUA or that the nasal swab antigen test met the FDA's or Health Canada's criteria for authorization.

150. On November 25, 2020, Sona issued a press release titled "Sona Nanotech Withdraws Rapid COVID-19 Antigen Test Application Based On Feedback from Health Canada" in which Defendant Rowles is quoted as stating that, "[w]e have confidence in our rapid COVID-19 antigen test and its ability to detect the virus, especially within the first week of symptom onset. ***The regulatory approval path for antigen tests is new with evolving guidelines and Sona's test is unique, creating a***

***challenging environment for test developers and regulators alike.*** We are, however, committed to obtaining the data needed to successfully achieve authorizations." ("November 25 Press Release").[53]

151. The statements referenced in ¶150 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Sona's business, operations and prospects, which were known to Defendants or recklessly disregarded by them: despite having an ongoing, open dialogue with regulators to ensure that Sona's nasal swab antigen test was being developed within the FDA's parameters for EUA eligibility and on a fast-track to market, the FDA's issuance of guidances and templates to support developer's with their EUA submissions, and awareness that its nasal swab antigen test was most useful in the first week an individual has COVID-19 symptoms, Sona's clinical evaluation study was not designed to and did not yield sufficient data to demonstrate the antigen test's performance, particularly in patients within 0-6 days of symptom onset, and thus the antigen test did not meet the FDA's or Health Canada's criteria for EUA approval. As a result, Sona would be unable to financially capitalize on the need for rapid COVID-19 detection testing that was being filled by other antigen tests. But instead of admitting that it simply had not and could not show to the FDA or Health Canada that its antigen test worked, Sona blamed the regulatory agencies' "evolving guidelines" and "Sona's test [being] unique."

### C. Sona's Focus on More Clinical Data from Patients Within 0-6 Days of Symptom Onset and Commercialization Based on a CE Mark

152. On November 30, 2020, Sona issued a press release titled "Sona Nanotech Provides Corporate Update" ("November 30 Press Release"), stating that it

---

[53] *Sona Nanotech Withdraws Rapid COVID-19 Antigen Test Application Based on Feedback from Health Canada*, SONA NANOTECH (Nov. 25, 2020), https://sonanano.com/sona-nanotech-withdraws-rapid-covid-19-antigen-test-application-based-on-feedback-from-health-canada/.

"considered a withdrawal from the [IO authorization] process to be in the best interest of the business in order to ***focus on collecting further clinical data***" "and use it to ***augment its submission with the FDA and potentially for a resubmission to Health Canada***. ***The Company will also use its existing data to support a CE Mark application in Europe***[.]"[54] Specifically, it "intends to ***obtain more data on the performance of its test, including more samples from patients within 0-6 days since symptom onset***, as requested by Health Canada."

153. In addition, the November 30 Press Release quoted Defendant Regan as stating that "[w]hile our regulatory road has not been straight forward, ***every entity that has evaluated our test has confirmed its ability to detect the COVID-19 virus and it achieved strong results from our in-field trials***. ***We will now seek further study data to provide sufficient substantiation of clinical performance to warrant regulatory approval***."

154. The statements referenced in ¶¶152-53 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Sona's business, operations and prospects, which were known to Defendants or recklessly disregarded by them: (1) instead of focusing on collecting further clinical data for its nasal swab antigen test, Sona focused on securing clinical trials for its saliva-based antigen test and (2) as a result, over four months later, Sona would still not have a sponsoring institution, a principal investigator, a study protocol, relevant medical ethics review board approval, or Health Canada Investigational Testing Division approval, necessary to obtain additional clinical data for its nasal swab antigen test, and (3) despite obtaining a CE Mark, the Company would still not have any "firm orders" for its nasal test or be financially capitalizing on the need for rapid COVID-19 detection testing that was

[54] *Sona Nanotech Provides Corporate Update*, SONA NANOTECH (Nov. 30, 2020), https://sonanano.com/sona-nanotech-provides-corporate-update/.

being filled by other antigen tests.

155. On December 16, 2020, Sona issued a press release titled "Sona Nanotech Closes Unbrokered Private Placement Financing for $2.26M in Gross Proceeds" ("December 16 Press Release"), declaring that it "intends to use the net proceeds of the Financing to ***produce further clinical trial data for its rapid COVID-19 antigen nasal pharyngeal test*** [and] ***pursue a European regulatory self-certification CE Mark declaration*** …."[55]

156. The December 16 Press Release also stated that Sona "***is currently working with several potential partners to secure a clinical trial***" and "its ***CE Marking process in Europe commenced*** with the appointment of Obelis."

157. The statements referenced in ¶¶155-56 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Sona's business, operations and prospects, which were known to Defendants or recklessly disregarded by them: (1) instead of focusing on collecting further clinical data for its nasal swab antigen test, Sona focused on securing clinical trials for its saliva-based antigen test and (2) as a result, over four months later, Sona would still not have a sponsoring institution, a principal investigator, a study protocol, relevant medical ethics review board approval, or Health Canada Investigational Testing Division approval, necessary to obtain additional clinical data for its nasal swab antigen test, and (3) despite obtaining a CE Mark, the Company would still not have any "firm orders" for its nasal test or be financially capitalizing on the need for rapid COVID-19 detection testing that was being filled by other antigen tests.

---

[55] *Sona Nanotech Closes Unbrokered Private Placement Financing for $2.26m in Gross Proceeds*, SONA NANOTECH (Dec. 16, 2020), https://sonanano.com/sona-nanotech-closes-unbrokered-private-placement-financing-for-2-26m-in-gross-proceeds/.

158. Over the weekend on December 31, 2020, the Company issued a press release titled "Sona Nanotech Receives CE Mark Approval for its Rapid COVID-19 Antigen" ("December 31 Press Release"), explaining that the "***CE Mark declares the conformity of the Sona test with EU regulations and allows Sona to commercialize its test*** throughout Europe and potentially other territories in which the CE Mark is recognized."[56] Accordingly, Sona was "now able to ***take firm orders in territories accepting a CE Mark*** and make corresponding manufacturing commitments from its contract manufacturer in the United Kingdom" and "currently also in the process of technology transfer to a second manufacturer, in North America."

159. The December 31 Press Release also stated that Sona "***continues to work with several potential partners to secure an additional clinical trial to support other potential regulatory submissions***. Any trial would require a sponsoring institution, a principal investigator, a study protocol, relevant medical ethics review board approval and Health Canada Investigational Testing Division approval."

160. On these positive revelations, Sona's share price increased more than 47% to close at $2.86 on December 31, 2020.

161. The statements referenced in ¶¶158-59 were materially false and/or misleading because Defendants misrepresented and/or failed to disclose the following adverse facts pertaining to Sona's business, operations and prospects, which were known to Defendants or recklessly disregarded by them: (1) instead of focusing on collecting further clinical data for its nasal swab antigen test, Sona focused on securing clinical trials for its saliva-based antigen test and (2) as a result, over four months later, Sona would still not have a sponsoring institution, a principal investigator, a study protocol, relevant medical ethics review board approval, or

[56] *Sona Nanotech Receives CE Mark Approval for its Rapid COVID-19 Antigen Test*, SONA NANOTECH (Dec. 31, 2020), https://sonanano.com/sona-nanotech-receives-ce-mark-approval-for-its-rapid-covid-19-antigen-test/.

Health Canada Investigational Testing Division approval, necessary to obtain additional clinical data for its nasal swab antigen test, and (3) despite obtaining a CE Mark, the Company would still not have any "firm orders" for its nasal test or be financially capitalizing on the need for rapid COVID-19 detection testing that was being filled by other antigen tests.

## VI. THE TRUTH SLOWLY EMERGES

### The May 12, 2020 Partial Disclosure

162. In its May 12 Press Release, Sona revealed changes in the design of its validation studies for its COVID-19 antigen test declaring that "[i]n order to conduct sufficient validation testing for submission for use to regulators" it was "moving to ***test its devices with live virus culture and/or patient samples as part of a formal clinical study***." The Company further explained that:

> Further testing will be conducted both in-house and independently using pre-treated viral samples after recent independent testing using virus samples that were de-activated by heat did not provide a response. Exposing a virus to high heat levels can modify its characteristics, making the treated virus sample an inappropriate proxy for a live sample. These findings, coupled with previous hospital-based experiments, have suggested that testing using a live viral culture and/or patient sampling will be required for ultimate confirmation of the effectiveness of the Sona test.

163. On this news, the price of Sona shares fell $0.32 per share, or over 28%, on unusually heavy trading to close at $0.81 on May 12, 2020.

### The August 6, 2020 Partial Disclosure

164. Then, in its August 6 Press Release, Sona announced a ***two-week delay*** in the full results of "its previously announced clinical, in-field evaluation studies for its rapid detection, COVID-19 antigen test that [had] commenced in July." The Company explained that "delays have been due to ethics review board approvals and ***a need to make study modifications*** to accommodate regulatory updates, ***including for study***

***enrollment criteria and assessment at point of care settings, as well as for test handling procedures***." Notably, "[o]ne of the purposes of the in-field evaluation testing [wa]s to determine, what, if any, ***effect environmental or containment factors or human errors in sample collection ha[d] on test performance***." Sona also noted it needed "[t]he data from these studies . . . to support the Company's analytical and clinical data as part of the submission it will make to Health Canada and the FDA for emergency use authorization ("EUA") approval for its COVID-19 antigen test."

165. On this news, shares of Sona fell $3.09 per share, or over 34%, on unusually heavy trading to close at $5.91 per share on August 6, 2020.

166. As a result of the large drop in share price, in its announcement of yet another delay in its August 20 Press Release, Sona explained that it "is reliant on third parties and testing protocols with multiple complex variables, many of which are outside the control of the Company and can impact expected timing of results."

167. As Jay Lutz of *The Deep Dive* noted on August 20, 2020, "[a] tumbling share price can make companies do odd things. If you're ***Sona Nanotech (CSE: SONA)***, evidently one trick of the trade is to release news.. about releasing news." According to Lutz "[e]ffectively, it was Sona's way of saying 'if the news doesn't come next week, it's not our fault.' The announcement of an announcement comes as the company is evidently scrambling behind the scenes following a fall from grace of its share price."[57]

168. Brian Paradza of The Motley Fool also noted on September 28, 2020 that investors have sold shares of Sona "in droves since August 6. The company announced that critical validation test results would be delayed by two weeks. . . . The news ignited a wave of investor fears and triggered a downward spiral in SONA's

---

[57] Jay Lutz, *Sona Nanotech Releases News.. About Planning To Release News*, THE DEEP DIVE (Aug. 20, 2020, 10:15 AM), https://thedeepdive.ca/sona-nanotech-releases-news-about-planning-to-release-news/.

share price."[58] Further, "[t]ime may be running out for new COVID-19 test products. The need for massive testing may significantly decline, as the pandemic starts dying away." However, Paradza did point out that since "SONA's antigen test can detect the virus potentially before the onset of any symptoms," "[i]f the test is licensed in time, demand could hold well into 2021. News of FDA and Health Canada authorization can re-ignite investor interest in the near term."

**<u>The October 29, 2020 Partial Disclosure</u>**

169. In its October 29 Press Release, Sona relayed to investors receipt of "notice from the FDA that the Company's request for an emergency use authorization ("EUA") for the marketing of ***its rapid COVID-19 antigen test in the United States 'is not a priority'*** and consequently such authorization will not be issued at this time. The FDA cited current EUA request prioritization criteria as including 'the public health need for the product' and did not comment on the performance of the Sona test." Sona also quoted Defendant Regan as noting that "the FDA has indicated that ***our test is not a priority for them*** at this time[.]"

170. On this news, shares of Sona fell $2.77 per share, or over 48%, on unusually heavy trading to close at $3.00 per share on October 29, 2020.

171. As Lutz noted after reviewing the October 29 Press Release, "the ruling is certainly a setback for" Sona as reflected in its share price on the CSE being "down 61.59% on this mornings development" even though "[t]he performance of the test was apparently not commented on."[59] Further, "[d]espite the massive setback from the FDA, the company has continued with its manufacturing scale-up activities,

---

[58] Brian Paradza, CFA, *The Best Performing COVID-19 Stock So Far This Year*, THE MOTLEY FOOL (Sept. 28, 2020), https://www.fool.ca/2020/09/28/the-best-performing-covid-19-stock-so-far-this-year/.

[59] Jay Lutz, *Sona Nanotech Rejected By FDA For Emergency Use Authorization*, THE DEEP DIVE (Oct. 29, 2020, 9:37 AM), https://thedeepdive.ca/sona-nanotech-rejected-by-fda-for-emergency-use-authorization/.

although the potential market size has significantly been reduced in the near term."

172. And as explained by Aaron Wolko of The Dales Report on November 9, 2020, the deprioritization "blow to hopeful shareholders caused many to rush to the door, with the share price falling off a cliff, shaving almost 50% of it's value," but based on Defendants' positive statements:

> [M]any investors are holding their positions awaiting ***favorable result in the medium term from the United States FDA, or in the shorter term from Health Canada*** and a slew of other countries who could independently declare the pregnancy-test-like device a useful and impactful product for the prevention of Covid19. Since the company has already sold these devices for "research use only", ***there is still upside to the stock and the potential for a decently sized country, like Saudi Arabia, to grant expedited approval of the testing kit and lead to huge purchase orders for Sona***.[60]

**<u>The November 25, 2020 Partial Disclosure</u>**

173. In its November 25 Press Release, Sona disclosed that it "***withdrew its application for an Interim Order ("IO") authorization from Health Canada*** for the marketing of its rapid, COVID-19 antigen test in order ***to obtain more clinical data to augment its submission***."

174. On this news, shares of Sona fell $1.56 per share, or over 67%, on unusually heavy trading to close at $0.74 per share on November 25, 2020.

175. This news, as Lutz declared on November 25, 2020, was "a major blow to shareholders" of Sona.[61]

---

[60] Aaron Wolko, *The Tale of Sona Nanotech – An Essential Covid Test That Was Deprioritized*, THE DALES REPORT (Nov. 9, 2020), https://thedalesreport.com/psychedelics/the-tale-of-sona-nanotech-an-essential-covid-test-that-was-deprioritized/.

[61] Jay Lutz, *Sona Nanotech Withdraws Health Canada Application For COVID-19 Test Due To Feedback From Regulator*, The Deep Dive (Nov. 25, 2020, 2:31 PM), https://thedeepdive.ca/sona-nanotech-withdraws-health-canada-application-for-covid-19-test-due-to-feedback-from-regulator/.

176. Then, in its November 30 Press Release, Sona revealed that it had "received further feedback from Health Canada, subsequent to its withdrawal of its application for an Interim Order authorization ("IO") for the marketing of its rapid, COVID-19 antigen test. As part of its review, Health Canada [had] commissioned an evaluation from ***the National Microbiology Laboratory (NML)*** whose ***evaluation produced discordant results to the Company's prior analytical and clinical studies conducted by MRIGlobal and SaudiVax***."

177. In reiterating its need "to obtain additional data and use it to augment its submission with the FDA and potentially for a resubmission to Health Canada" in the November 30 Press Release, Sona detailed that "***[w]ith a view to reconciling the discordancy, the Company intends to obtain more data on the performance of its test, including more samples from patients within 0-6 days since symptom onset***, as requested by Health Canada. While the test showed 100% sensitivity with such samples in its SaudiVax Clinical Evaluation Study, ***only seven such positive samples were obtained in that study of 39 positive samples***."

178. The November 30 Press Release further quoted Defendant Regan as stating that "***[w]e will now seek further study data to provide sufficient substantiation of clinical performance to warrant regulatory approval***."

179. As Lutz noted after reviewing the November 30 Press Release, "core" to Sona's "decision to withdraw its antigen test" was that "testing results from Health Canada were 'discordant' with results from the firms prior analytical and clinical studies conducted by that of MRIGlobal and SaudiVax – essentially, the results didn't match."[62]

---

[62] Jay Lutz, *Sona Nanotech: Health Canada Evaluation Results Did Not Match Prior Analytical And Clinical Study Data*, THE DEEP DIVE (Nov. 30, 2020, 9:16 AM), https://thedeepdive.ca/sona-nanotech-health-canada-evaluation-results-did-not-match-prior-analytical-and-clinical-study-data/.

**The Class Period Ending Disclosure on March 1, 2021**

180. Any hope of a positive turn around was shattered when on March 1, 2021, Sona issued its annual financial statement for the years ended October 31, 2020 and 2019.[63] In the Management Discussion and Analysis section of its financial statement, Sona revealed that it ***"continues to work with several potential partners to secure an additional clinical trial to support other potential regulatory submissions.*** Any trial would require a sponsoring institution, a principal investigator, a study protocol, relevant medical ethics review board approval and Health Canada Investigational Testing Division approval." Accordingly, after more than four months since withdrawing its Health Canada application and purportedly having more clarity on what more was needed for FDA and Health Canada authorization, Sona was nowhere closer to achieving either.

181. In addition, despite securing its CE Mark in December 2020, Sona had yet to secure any "firm orders" as of March 1, 2021:

> [T]he Company is able to take firm orders in territories accepting a CE Mark and is able to make corresponding manufacturing commitments from its contract manufacturer in the United Kingdom. The Company is currently also in the process of technology transfer to a second manufacturer, in North America. ***The Company continues to solicit sales*** and will update the market as material developments occur.[64]

182. On this news, shares of Sona fell $0.22 price per share, or over 13%, to close at $1.37 on March 3, 2021, after two days of heavy trading.

183. On April 12, 2021, Sona issued a press release titled "Sona Secures Clinical Trial Authorization and Hospital Partner" ("April 12 Press Release"), announcing "it has been granted Health Canada Investigational Testing Authorization

---

[63] Sona Nanotech Inc., Financial Statements (Feb. 26, 2021).

[64] Sona Nanotech Inc., Annual Information Form (Feb. 26, 2021).

for a clinical trial of the Sona Saliva C-19 Rapid Test, a saliva sample-based rapid COVID-19 antigen test, with the Humber River Hospital in Toronto."

184. But as of the filing of this Complaint, Sona has still not announced an additional clinical trial for its COVID-19 nasal swab antigen test.

## VII. ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

185. As alleged herein, Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the Company's name were materially false and misleading and that such statements or documents would be issued or disseminated to the investing public. Defendants substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants – by virtue of their receipt of information reflecting the true facts regarding Sona; their control over, receipt, and/or modification of Sona's allegedly materially misleading misstatements; and/or their associations with the Company, which made them privy to confidential proprietary information concerning Sona – participated in the fraudulent scheme alleged herein.

186. Based on their hands-on involvement from the beginning of the Class Period, the Individual Defendants had actual knowledge of Sona's development, validation, and commercialization efforts relating to the Company's COVID-19 antigen test. As noted in the March 30 Press Release, Sona's "R&D work is being done…under the supervision of the Company's Chief Technology Officer, Head of R&D, and ***President and CEO*** [Rowles]."

187. In addition, the Individual Defendants had "an ***ongoing, open dialogue with regulators to ensure the Sona's test is being developed within the parameters regulators have outlined***. ***This approach will allow Sona*** to be eligible for FDA review through their Emergency Use Authorisation[sic] (EUA) pathway and ***a fast-track to market***." (March 12 Press Release). Based on that ongoing, open dialogue

with the FDA, Regan boasted during an October 1, 2020 "interview with Todd Veinotte of 95.7 News Talk radio Halifax centered around the pending approval of Sona Nanotech's rapid antigen test" that "[w]e're ***100% confident that it gets approved***. There's ***smart questions being asked***, and we have ***strong data on our test***. And the timeline is unclear as to what the time is… Typically, something like this takes a year in normal context. Right now, we're hopeful that it can be very soon."[65]

188. Furthermore, leading up to and during the Class Period, based on its own statements, Sona was primarily focused on developing and commercializing its COVID-19 antigen test based on its gold nanotechnology:

- "***Sona's primary objective*** will be the ***development and production of its own lateral flow tests utilizing Sona's unique gold nanotechnology*** as the core reagent to help drive better performance from the outset and minimize time to market." (Pre-Class Period and Class Period Management Discussion and Analyses; Class Period Annual Information Forms)[66]
- "In the past several weeks, Sona has been ***focused on work related to the development of a rapid response COVID-19 lateral flow test***." (March 12 Press Release).
- "The ***commercialization of its COVID-19 rapid, antigen test continues to be the top near-term priority*** for the Company." (August 31 Press Release).

189. Moreover, since February 10, 2020, when Sona first announced its plan to develop a COVID-19 antigen test, the Individual Defendants knew such tests were

---

[65] Benjamin A. Smith, *Sona Nanotech CEO "100% Confident" Coronavirus Test Will Land Regulatory Approval*, THE DALES REPORT (Oct. 2, 2020), https://thedalesreport.com/technology/sona-nanotech-ceo-100-confident-coronavirus-test-will-land-regulatory-approval/.

[66] Sona Nanotech Inc., Management Discussion and Analysis (Feb. 28, 2020); Sona Nanotech Inc., Management Discussion and Analysis (Apr. 3, 2020); Sona Nanotech Inc., Management Discussion and Analysis (June 29, 2020); Sona Nanotech Inc., Annual Information Form (Mar. 18, 2020); Sona Nanotech Inc., Annual Information Form (Mar. 1, 2021).

considered vital to public health given the nature of the COVID-19 pandemic and, as such, authorization and commercialization were extremely time sensitive:

- Rowles: "Screening tests are ***critical tools*** in dealing with rapidly evolving and large-scale out-breaks that tax the health care system, like this novel Coronavirus." (February 10 Press Release).
- "GE Healthcare Life Sciences will support Sona through their studies as they work to get their rapid-response Covid-19 lateral flow test introduced into markets ***as quickly as possible***." (March 3 Press Release).
- Rowles: "With [GE's] help, we will be able to ***accelerate*** our work and hopefully bring this ***critical test*** to the market ***quicker***." (March 3 Press Release).
- Rowles: "We are also pleased to report that our initial laboratory work is progressing well and as a result of our collaboration with GE, we expect to ***accelerate an aggressive pace*** in the development of this ***critical test***." (March 6 Press Release).
- "The Company expects to benefit from the regulatory relief offered by the FDA to ***expedite*** the availability of diagnostics associated with the Covid-19 disease, subject to certain conditions." (March 30 Press Release).
- "Rapid, point-of-care, antigen tests can make a ***significant contribution*** to reducing the spread of COVID- 19 by detecting the presence of the virus in individuals, potentially before the onset of symptoms." (August 6 Press Release).

190. Throughout the Class Period, Sona and the Individual Defendants also touted the significant experience of Sona's management, including that of Rowles, Regan and Randall, in developing and commercializing diagnostic tests:

- "***The Company's management***, scientific and board representatives ***include significant experience*** in lateral flow test development, commercialization and medicine." (March 30 Press Release).
- Rowles: "The change [to President and CSO] provides me with the opportunity to ***focus on my passion for science and driving innovation*** through the company. I'm delighted to welcome David [Regan] to

Sona's leadership team and continuing the ***partnership with him to capitalize on the efforts made to get these tests authorized, manufactured and in to as many hands as possible*** around the world***.***" (July 8 Press Release).

- Regan: "The business will also build on the ***culture of innovation instituted by Darren [Rowles] to develop and bring new tests to market*** that leverage Sona's proprietary detection technology." (July 8 Press Release).

191. Based on FDA and CDC guidelines and advice, therefore, the Individual Defendants knew or recklessly disregarded that the quality of clinical testing protocols was key to receiving regulatory approval: "***Clinical testing protocols are paramount*** as the CDC advises that ***proper collection of specimens is the most important step*** in the laboratory diagnosis of infectious diseases, whether the collection be for RT-PCR or rapid antigen tests, as ***swab application technique can strongly influence results***."[67]

192. Further, leading up to and throughout the Class Period, Sona and the Individual Defendants knew that the intended use of the Company's COVID-19 antigen test was rapid detection of infected individuals with the highest risk of spreading the virus. In other words, the intended use was to detect COVID-19 within 0-6 days of symptom onset in a patient:

- Rowles: "Screening tests ***rapidly identify at-risk patients***, which allows the medical community to focus its resources on the patients that need help the most." (February 10 Press Release).
- Rowles: "Rapid screening tests are commonly used in the field as a front-line triage test. This is often the ***best way to determine which individuals require more medical attention, and which show no sign of infection*** and therefore may not require immediate medical care and quarantine, thus allowing the medical community to focus their resources as efficiently as possible." (February 13 Press Release).

---

[67] *Sona Nanotech Announces Clinical Evaluation Study Results for its COVID-19 Antigen Test*, SONA NANOTECH (Aug. 25, 2020), https://sonanano.com/sona-nanotech-announces-clinical-evaluation-study-results-for-its-covid-19-antigen-test/.

- "When complete, the Sona Covid-19 rapid screening test could be ideal for use in a variety of scenarios, such as: [a]n in-home test and monitoring; ***[t]o identify if patients require further testing or treatment in a clinical setting***; [t]o verify if patients are ready for release from quarantine; [and] ***[t]o screen individuals prior to entering closed public venues*** such as cruise ships and airplane."[68]
- "Sona's COVID-19 rapid response test is designed for use as an on-site screening tool for front line tests to: stream-line efforts of the medical community[;] ***avoid unnecessary quarantine***[;] [and] ***to screen individuals entering closed environments*** such as cruise ships, planes, tradeshows, factories, schools, universities or large gathering events such as concerts and sporting events." (March 12 Press Release).
- "Sona's Covid-19 test will offer a ***unique advantage over other lateral flow tests as it detects the presence of the Covid-19 virus***… Sona's test is being developed to indicate a positive result only when the Covid-19 virus is present, allowing for direct and clear interpretation." (March 18 Press Release).
- "Sona's Covid-19 test will offer a ***unique advantage over many other point-of-care tests as it detects the presence of the Covid-19 virus***. Recently, many serological lateral flow tests, which are designed to identify IgM and IgG antibodies present post-infection, have been announced." (March 30 Press Release).
- "Sona's rapid COVID-19 antigen test is a device designed to be used at point-of-care to ***detect the presence of the SARS-Cov2 virus in a patient within 10-15 minutes*** which could make it a critical component of testing protocols being considered by governments as they devise plans to relax social distancing measures. The Company's test will not require either specialized equipment or lab based professionals to interpret its test results." (May 12 Press Release).
- "[T]he Sona Covid-19 rapid screening test could be ideal for use in a variety of scenarios [], such as***: [t]o identify if patients require further testing or treatment in a clinical setting***; [t]o verify if patients are ready for release from quarantine; [and] ***[t]o screen individuals prior to***

[68] Sona Nanotech Inc., Management Discussion and Analysis (Feb. 28, 2020); and Sona Nanotech Inc., Management Discussion and Analysis (Apr. 3, 2020).

***entering closed public venues*** such as cruise ships and airplane."[69]

- Rowles: "These excellent performance results are underpinned by our unique nanorod technology and completes a further milestone achieved for Sona along our path to bring a quality rapid test to market at scale. This will allow expansion of testing by governments, help ease the burden on healthcare systems, keep healthcare workers safe by allowing them to ***know their status on a daily basis*** and assist in softening restrictions by providing ***a quick and simple means to screen individuals***." (July 2 Press Release).

- "Rapid, point-of-care, antigen tests can make a significant contribution to reducing the spread of COVID- 19 by ***detecting the presence of the virus in individuals, potentially before the onset of symptoms***." (August 6 Press Release).

- Rowles: "Rapid, point-of care, antigen tests can make a significant contribution to reducing the spread of COVID-19 by ***detecting the presence of the virus, potentially before the onset of symptoms***." (August 25 Press Release).

- *"*Sona's rapid COVID-19 antigen test is a device designed to be used at point-of-care to ***detect the presence of the SARS-Cov2 virus in a patient within 15 minutes*** which could make it a critical component of testing protocols being considered by governments as they devise plans to relax social distancing measures."[70]

- "Potential programs envision having employees that ***test positive with the Sona rapid test designated 'presumed positive', removed from congested work environments and referred to medical professionals for confirmatory testing***. This process would ***allow employers to remove affected staff from the workplace, reduce potential spread*** and help businesses remain open in pandemic conditions." (October 29 Press Release).

- Regan: "Large companies, employing thousands of people, are telling us that they cannot source ***rapid antigen tests*** which they view as critical to their business continuity and for the safety of their employees. Sona's rapid COVID-19 antigen test is perfectly suited to

[69] Sona Nanotech Inc., Management Discussion and Analysis (June 29, 2020); Sona Nanotech Inc., Management Discussion and Analysis (Sept. 29, 2020).
[70] Sona Nanotech Inc., Management Discussion and Analysis (Sept. 29, 2020).

provide this ***screening function*** and thereby help support the normal operation of the economy." (October 29 Press Release).

193. Thus, Sona and the Individual Defendants knew or recklessly disregarded that the focus of the in-field studies should have been on patients within 0-6 days of symptom onset – when an individual is most contagious. Only that focus could have produced sufficient data to demonstrate the antigen test's performance for its intended use – to prevent or stop the spread of COVID-19.

## VIII.LOSS CAUSATION

194. The false and misleading misrepresentations and material omissions, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class members it represents.

195. During the Class Period, Plaintiff and Class members purchased Sona securities at artificially inflated prices and were damaged thereby. The price of the Company's securities declined significantly when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were disseminated and publicly revealed.

196. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Sona securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Sona's business, operations, and prospects, as alleged herein.

197. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. Defendants made or caused to be made materially false and/or misleading

statements about Sona's business, operations and future prospects. These material misstatements and/or omissions had the cause and effect of creating in the market a false positive assessment of the Company and its business and operational performance and related well-being, thus causing its securities to be overvalued and the price of its securities to be artificially inflated at all relevant times. Defendants' materially false and/or misleading statements, as alleged herein, resulted in Plaintiff and other members of the Class in purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed in part on May 12, 2020, August 6, 2020, October 29, 2020, and November 25, 2020, and in full on March 1, 2021, causing the trading price of Sona securities to materially decline and removing the previously embedded artificial inflation.

## IX. CLASS ACTION ALLEGATIONS

198. Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of a class consisting of all person and entities that purchased, or otherwise acquired, Sona securities during the Class Period, and were damaged by the conduct asserted herein. Excluded from the Class are Defendants and their immediate families and legal representatives, heirs, successors or assigns and any entity in which the Defendants named herein have, or had, a controlling interest.

199. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are hundreds, if not thousands, of members in the proposed Class. Throughout the Class Period, millions of Sona securities were outstanding, owned and/or publicly traded on the OTC by hundreds, if not thousands, of persons.

200. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the Class that predominate over those that may affect individual class members include whether:

- Defendants violated the federal securities laws;
- Defendants omitted and/or misrepresented material facts;
- Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- Defendants knowingly or with deliberate recklessness, disregarded or turned a blind eye toward the fact that their Class Period statements were false and misleading;
- Individual Defendants caused Sona to issue false and misleading filings during the Class Period;
- The price of Sona securities was artificially inflated because of the Defendants' conduct complained of herein; and
- The Class members have sustained damages and, if so, the appropriate measure of damages.

201. Plaintiff's claims are typical of those of the Class members because they each were similarly damaged by Defendants' wrongful conduct in violation of the federal securities laws.

202. Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced in securities class action litigation. Plaintiff has no interests that conflict with those of the Class.

203. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulties in the management of this action that would preclude its maintenance as a class action.

## X. PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET

204. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made

public misrepresentations or failed to disclose material facts; (b) the omissions and misrepresentations were material; (c) the Company's securities traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and (e) Plaintiff and the other members of the Class purchased Sona securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

205. At all relevant times, the market for Sona securities was efficient for the following reasons, among others: (a) Sona securities met the listing requirements for, and were listed and actively traded on the OTC, a highly efficient market; (b) during the Class Period, Sona shares were actively traded, supporting a strong presumption of efficiency; (c) as an SEC regulated issuer, Sona issued *via* the OTC periodic public reports; (d) Sona regularly communicated with public investors, including via regular disseminations of press releases on major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (e) unexpected material news about Sona was rapidly reflected in and incorporated into the price of its securities during the Class Period.

206. As a result, the market for Sona securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of Sona's shares. Under these circumstances, all purchasers or acquirers of Sona securities during the Class Period suffered similar injury through their purchase or acquisition of Sona securities at artificially inflated prices, and a presumption of reliance applies.

207. In addition, Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

## XI. INAPPLICABILITY OF SAFE HARBOR

208. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. All of the specific statements pleaded herein were not identified as, and/or were not "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Company and the Individual Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Sona named under the Exchange Act who knew that those statements were materially false and misleading when made.

## XII. CLAIMS FOR RELIEF

### COUNT I
### Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)

209. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10(b)-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants.

210. Defendants, carried out a plan, scheme, and course of conduct which was intended to, and did, deceive the investing public, including Plaintiff and the other Class members, as alleged herein, and caused Plaintiff and the other Class members to purchase Sona securities at artificially inflated prices. In furtherance of this

unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

211. During the Class Period, Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew, or deliberately disregarded as, or turned a blind eye to being, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

212. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statement made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers or acquirers of Sona securities in an effort to maintain artificially high market prices for Sona securities in violation of § 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

213. Defendants, individually and together, directly and/or indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Sona's business, operations, and future prospects as specified herein.

214. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Sona's value and performance and continued substantial growth, which included the preparation of and/or dissemination or approval of untrue statements of material facts and/or omitting to state material facts necessary in order to make statements made about Sona and its business operations and further prospects, in light of the

circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and course of business which operated as a fraud and deceit upon the purchasers and acquirers of Sona securities during the Class Period.

215. Defendants had motive and opportunity to perpetrate the fraudulent scheme and course of conduct described herein. Defendants acted with scienter in that they knew that the public documents and statements prepared, issued and/or disseminated in the name of Sona were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants by virtue of their receipt of information reflecting the true facts of Sona, their control over, and/or receipt and/or modification of Sona's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Sona, participated in the fraudulent scheme alleged herein.

216. The Individual Defendants are the most high-level executives and/or directors at Sona and members of its management team or had control thereof. By virtue of their responsibilities and activities as senior officers, the Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material fact set forth herein and intended to deceive Plaintiff and other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed to obtain such knowledge by deliberately refraining from taking steps necessary to discover whether the statements alleged herein, were false and/or misleading, or turned a blind eye toward the true facts available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the

purpose and effect of concealing the Company's true prospects from the investing public and supporting the artificially inflated price of Sona securities.

217. As a result of the dissemination of the materially false and/or misleading information and failure to disclose material facts, as set forth herein, the market price of Sona securities was artificially inflated. In ignorance of the fact that market price of Sona securities was artificially inflated during the Class Period, and relying directly or indirectly on Defendants' false and misleading statements, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or recklessly disregarded, by Defendants, but not disclosed in public statements by Defendants, Plaintiff and the other Class members acquired Sona securities at artificially high prices and were, or will be, damaged thereby.

218. At the time of said misrepresentation and omissions, Plaintiff and the other Class members were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class, and the marketplace known the truth regarding the Company's business, which was not disclosed by Defendants, Plaintiff and the other member of the Class would not have purchased or acquired Sona securities, of if they had purchased or acquired such securities, they would not have done so at the artificially inflated prices that they paid.

219. By virtue of the foregoing, the Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

220. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Sona securities during the Class Period.

221. This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of securities giving rise to the cause of action.

## COUNT II
## Violations of § 20(a) of the Exchange Act
## (Against the Individual Defendants)

222. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. As members of Sona's executive team and/or the Company's board of directors, the Individual Defendants acted as controlling persons of Sona within the meaning of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

223. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Sona's operations and/or intimate knowledge of the false information disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Sona, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with, or had unlimited access to Sona's reports, press releases, public filings and other statements, alleged by Plaintiff to have been misleading, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

224. In particular, each of the Individual Defendants had direct and supervisory involvement in the Company's day-to-day operations and, therefore, are presumed to have had the power to control and/or influence the particular transactions giving rise to the securities violations, as alleged herein, and exercised the same.

225. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Sona's business operations and prospects, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

226. As set forth above, Sona and the Individual Defendants each violated § 10(b) and Rule 10b-5, promulgated thereunder, by their acts and omissions as alleged in this Complaint and the Class was damaged thereby. By virtue of their positions as "controlling persons", the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.

227. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with their purchase or acquisition of Sona securities during the Class Period.

228. This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of securities giving rise to the cause of action.

**XIII.PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of Plaintiff and the Class, prays for relief and judgment, as follows:

A. Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of the Class defined herein;

B. Awarding Plaintiff and the members of the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' conduct, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D. Awarding such other equitable/injunctive or further relief as this Court may deem just and proper.

## XIV. DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 19, 2021

Respectfully Submitted,

**ROCHE FREEDMAN LLP**

*/s/ Ivy T. Ngo*
Ivy T. Ngo (249860)
Velvel (Devin) Freedman (*pro hac vice*)
Constantine P. Economides (*pro hac vice*)
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 971-5943
Emails: ingo@rcfllp.com
vel@rcfllp.com
ceconomides@rcfllp.com

*Counsel for Plaintiff and the Class*

**THE SCHALL LAW FIRM**
Brian Schall (290685)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on April 19, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

By: *<u>/s/ Ivy T. Ngo</u>*
Ivy T. Ngo