**ROCHE FREEDMAN LLP**
Constantine P. Economides (*pro hac vice*)
Ivy T. Ngo (249860)
Velvel (Devin) Freedman (*pro hac vice*)
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 971-5943
Facsimile: (646) 392-8842
Email:  ceconomides@rcfllp.com
       ingo@rcfllp.com
       vel@rcfllp.com

*Lead Counsel for the Class*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re SONA NANOTECH INC. SECURITIES LITIGATION | Case No.:  2:20-cv-11405-MCS-MAA |
| | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT** |
| This Document Relates To: ALL ACTIONS. | Hearing Date: July 12, 2021<br>Hearing Time: 9:00 a.m.<br>Courtroom:  7C<br>JUDGE:  Mark C. Scarsi |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

I.  INTRODUCTION ..................................................................................... 1

II. SUMMARY OF PLAINTIFF'S ALLEGATIONS ................................... 3

III. LEGAL STANDARDS ............................................................................ 9

IV. ARGUMENT ........................................................................................... 9

    A.  The Complaint adequately alleges that Defendants made material misstatements and omissions about Sona's COVID Test. ....................... 10

        1.  Even if technically correct, Defendants' representations were misleading and thus are actionable. ................................................. 12

        2.  Defendants' misrepresentations and omissions were material. ........ 15

        3.  No safe harbor applies. .................................................................. 16

        4.  The Complaint alleges deceptive conduct sufficient for scheme liability. ........................................................................................ 17

    B.  The Complaint raises a strong inference of scienter. ............................. 18

        1.  Defendants Rowles's and Regan's detailed statements about Sona's development and validation of the COVID Test support scienter. ....................................................................................... 19

        2.  The Individual Defendants' direct responsibility for managing the development and validation of Sona's COVID Test supports scienter. ....................................................................................... 20

        3.  Defendants' challenges to scienter fail. .......................................... 22

V. CONCLUSION ....................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) ...................................................................................... 18

*Berson v. Applied Signal Tech., Inc.,*
  527 F.3d 982 (9th Cir. 2008)..................................................................... 10, 22

*Boston Ret. Sys. v. Uber Techs., Inc.,*
  2020 WL 4569846 (N.D. Cal. Aug. 7, 2020)................................................... 18, 21

*Brennan v. Zafgen, Inc.,*
  853 F.3d 606 (1st Cir. 2017) ............................................................................. 30

*Brown v. China Integrated Energy, Inc.,*
  875 F. Supp. 2d 1096 (C.D. Cal. 2012)............................................................ 18

*Constr. Laborers Pension Tr. of Greater St. Louis v. Neurocrine Biosciences, Inc.,*
  No. 07-cv-1111-IEG-RBB, 2008 WL 4370010 (S.D. Cal. Sep. 23, 2008)............. 23

*Corban v. Sarepta Therapeutics, Inc.,*
  No. 14-cv-10201-IT, 2015 WL 1505693 (D. Mass. Mar. 31, 2015) ..................... 16

*Evanston Police Pension Fund v. McKesson Corp.,*
  411 F. Supp. 3d 580 (N.D. Cal. 2019) ................................................................ 27

*Feyko v. Yuhe Int'l., Inc.,*
  2013 WL 816409 (C.D. Cal. Mar. 5, 2013) ................................................... 11, 19

*In re Amarin Corp. PLC,*
  No. 13-CV-6663 (FLW)(TJB), 2015 WL 3954190 (D.N.J. June 29, 2015)........... 16

*In re Amylin Pharms., Inc. Sec. Litig.,*
  No. 01CV1455 BTM (NLS), 2003 WL 21500525 (S.D. Cal. May 1, 2003).......... 12

*In re Apple Inc. Sec. Litig.,*
  No. 19-cv-02033-YGR, 2020 WL 2857397  (N.D. Cal. June 2, 2020) ............ 15, 29

*In re Aqua Metals, Inc. Sec. Litig.,*
  No. 17-CV-07142-HSG, 2019 WL 3817849 (N.D. Cal. Aug. 14, 2019) ............... 22

*In re Columbia Labs., Inc. Sec. Litig.*,
  No. 12-614, 2013 WL 5719500 (D.N.J. Oct. 21, 2013), *aff'd*, 602 F. App'x 80 (3d
  Cir. 2015) ....................................................................................................... 30

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008)...................................................................... 21

*In re Dura Pharms., Inc. Sec. Litig.*,
  548 F. Supp. 2d 1126 (S.D. Cal. 2008) ..................................................................... 12

*In re EDAP TMS S.A. Sec. Litig.*,
  No. 14 Civ. 6069, 2015 WL 5326166 (S.D.N.Y. Sep. 14, 2015) .......................... 16

*In re Forest Labs. Sec. Litig.*,
  No. 05 Civ. 2827 (RMB), 2006 WL 5616712, (S.D.N.Y. July 21, 2006) .............. 24

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008)..................................................................................... 10

*In re Immune Response Sec. Litig.*,
  375 F. Supp. 2d 983 (S.D. Cal. 2005) ................................................................. 12, 15

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
  No. CV 17-341, 2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) .............................. 24

*In re MannKind Sec. Actions*,
  835 F. Supp. 2d 797 (C.D. Cal. 2011)............................................................... 23, 26

*In re Merit Med. Sys., Inc. Sec. Litig.*,
  No. 8:19-02326 DOC (ADSx), 2021 WL 1258590 (C.D. Cal. Mar. 16, 2021)...... 14

*In re Myriad Genetics, Inc.*,
  No. 2:19- CV-00707-DBB-DBP, 2021 WL 977770 (D. Utah Mar. 16, 2021)....... 24

*In re Nat'l Golf Props., Inc.*,
  2003 WL 23018761 (C.D. Cal. Mar. 19, 2003) ...................................................... 19

*In re Nuvelo, Inc. Sec. Litig.*,
  No. C 07-4056 VRW, 2008 WL 5114325 (N.D. Cal. Dec. 4, 2008) ...................... 16

*In Re PTC Therapeutics, Inc. Sec. Litig.*,
  No. 16-1124(KM)(MAH), 2017 WL 3705801 (D.N.J. Aug. 28, 2017) ................ 13

*In re Qualcomm Inc. Sec. Litig.*,
  No. 17-cv-00121 JAH-WVG, 2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) ........ 25

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) .............................................................................. 20

*In re Questcor Sec. Litig.*,
  No. SA CV 12-01623 DMG, 2013 WL 5486762 (C.D. Cal. Oct. 1, 2013) ............ 16

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ................................................................................ 16

*In re Sanofi Sec. Litig.*,
  87 F. Supp. 3d 510 (S.D.N.Y. 2015*)* ........................................................................ 16

*In re STEC Inc. Sec. Litig.*,
  No. SACV 09-1304 JVS (MLGx),
  2011 WL 2669217 (C.D. Cal. June 17, 2011) ................................................. 11, 20

*In re Transkaryotic Therapies, Inc. Sec. Litig.*,
  319 F. Supp. 2d 152 (D. Mass. 2004) ..................................................................... 13

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ................................................................................ 25

*In re Viropharma Inc. Sec. Litig.*,
  21 F. Supp. 3d 458 (E.D. Pa. 2014) ....................................................................... 13

*Jun Shi v. Ampio Pharms., Inc.*,
  No. 2:18-cv-07476-RGK-RAO, 2020 WL 5092910 (C.D. Cal. June 19, 2020) .... 30

*Karinski v. Stamps.com, Inc.*,
  No. CV 19-1828-MWF (SKx), 2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ......... 25

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988, 999 (9th Cir. 2018) .............................................................. 3, 4, 15

*Lake v. Zogenix, Inc.*,
  No. 19-cv-10975-RS, 2020 WL 3820424 (N.D. Cal. Jan. 27, 2020) ...................... 16

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27, 45 n.12 (2011). ......................................................................... 10, 29

*Mausner v. Marketbyte LLC*,
  2013 WL 12073832 (S.D. Cal. Jan. 4, 2013) ......................................................... 18

*Miller v. Thane Int'l, Inc.*,
  519 F.3d 879 (9th Cir. 2008) .................................................................................. 14

*Mulquin v. Nektar Therapeutics*,
  No. 18-cv-06607-HSG, 2020 WL 7773580 (N.D. Cal. Dec. 30, 2020) ................. 15

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020) .................................................................................. 29

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ................................................................................................ 21

*Ratner v. Ovascience, Inc.*,
  No. 14-12412-WGY, 2015 WL 5684068 (D. Mass. Sept. 28, 2015) ..................... 30

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) .................................................................................. 25

*Roberti v. OSI Sys., Inc.*,
  No. CV 13-9174-MWF (VBKx), 2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ... 20

*S. Ferry LP #2 v. Killinger*,
  687 F. Supp. 2d 1248 (W.D. Wash. 2009) ....................................................... 25, 27

*Sanders v. AVEO Pharm., Inc.*,
  No. 13-11157-DJC, 2015 WL 1276824 (D. Mass. Mar. 20, 2015) ....................... 30

*Sarafin v. BioMimetic Therapeutics, Inc.*,
  No. 3:11-0653, 2013 WL 139521 (M.D. Tenn. Jan. 10, 2013) .............................. 17

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ...................................................................... 11, 17, 29

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) .................................................................. 28

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) ................................................................................ 21

*Skiadas v. Acer Therapeutics Inc.,*
  No. 1:19-CV-6137-GHW, 2020 WL 4208442 (S.D.N.Y. July 21, 2020) .............. 24

*South Ferry LP No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008)................................................................. 23, 26

*Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*,
  552 U.S. 148 (2008) ................................................................................... 9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007) ................................................................. 9, 23, 28, 29

*Tongue v. Sanofi,*
  816 F.3d 199 (2d Cir. 2016)........................................................................ 16

*Turocy v. El Pollo Loco Holdings, Inc.,*
  No. SACV 15-1343-DOC (KESx), 2017 WL 3328543 (C.D. Cal. Aug. 4, 2017) . 11

*Union Asset Mgmt. Holding AG v. SanDisk LLC,*
  No. 15-cv-01455-VC, 2017 WL 3097184 (N.D. Cal. June 22, 2017) ................... 27

*Voulgaris v. Array Biopharma Inc.,*
  No. 17-CV-02789-KLM, 2020 WL 8367829 (D. Colo. Nov. 24, 2020) ............... 24

*Warshaw v. Xoma Corp.,*
  74 F.3d 955 (9th Cir. 1996)................................................................. 12, 29

*Westley v. Oclaro, Inc.*,
  897 F. Supp. 2d 902 (N.D. Cal. Sept. 21, 2012) .................................................. 19

*Yanek v. Staar Surgical Co.,*
  388 F. Supp. 2d 1110 (C.D. Cal. 2005)................................................................. 24

*Zak v. Chelsea Therapeutics Int'l, Ltd.,*
  780 F.3d 597 (4th Cir. 2015)................................................................. 24

*Zhu v. Taronis Techs. Inc.,*
  No. CV-19-04529-PHX-GMS, 2020 WL 1703680 (D. Ariz. Apr. 8, 2020) .......... 22

## I.    INTRODUCTION[1]

Defendants mischaracterize the Complaint, elevate the pleading standards, and seek dismissal of allegations that do not exist. Plaintiff acknowledges that Sona is a real biotech company, not a sham to facilitate a Ponzi scheme or funnel money. Plaintiff acknowledges that Defendants attempted to develop a viable, widespread, and profitable COVID-19 nasal swab antigen test (the "COVID Test" or "Test") that was capable of detecting the virus within 0 to 6 days of symptom onset in a point-of-care setting. Plaintiff also acknowledges that Defendants wanted to succeed in that endeavor, which involved risks to Sona and investors in exchange for a potentially high reward. Indeed, investors generally know that biotech companies operate in a risky environment where clinical results may be lackluster and regulatory approval may prove untenable. Those risks, however, do not give biotech companies, like Sona, license to present investors with materially misleading information. With respect to developmental progress and milestones, companies and their executives can remain silent. But if they choose to speak—*e.g.*, to tout their abilities, progress, success, and prospects and, in turn, encourage investments—they must provide full, accurate updates. They cannot provide half-truths or otherwise misleadingly portray the true state of affairs. Likewise, biotech companies should not be excused from liability just because the underlying product could potentially meet a public need.

Here, Defendants are liable for securities fraud because—regardless of the sincerity of their goals and efforts—they misled investors about Sona's abilities and progress in developing, validating, and obtaining regulatory authorization for its COVID Test. And Defendants did so recklessly, if not knowingly. In touting Sona's developmental milestones for the Test, Defendants repeatedly confirmed that Sona

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed in the Complaint. Citations to "¶" refer to the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint"), ECF No. 51. Unless otherwise noted, internal citations are omitted and emphasis is added.

had the team, expertise, protocols, resources, and data to meet regulatory parameters in the U.S. and Canada. Defendants gave investors the impression that Sona was on the verge of regulatory authorization and commercialization of an accurate and reliable antigen test. By May 2020, for example, Defendants announced that they were "moving into the **final validation process**." As of July 2020, Defendant Rowles (CEO and then President/CSO) touted that Sona "ha[d] achieved the extraordinary by bringing a COVID-19 rapid, point-of-care antigen test **to fruition** in four months." After a series of delays, Defendant Regan (CEO) publicly boasted in October 2020 that "**[w]e're 100% confident that it gets approved**."

Defendants' Class Period marketing to investors succeeded. Investors distinguished Sona from other biotech companies developing products for COVID-19. As acknowledged by analysts, Defendants' messaging—of successful milestones in developing the COVID Test – pushed the "$0.11 stock to an all-time high of $16.05 a share by July 27," yielding a "**14,545% return on this best-performing COVID-19 stock in just six months**."

Unfortunately for investors, Defendants' Class Period statements obfuscated the Company's subpar abilities, inadequate efforts, and consistent shortfalls. The Test was not in a "final validation process" in May and had not come to "fruition" by July. Sona did not even submit its applications to the FDA and Health Canada for the Test until August 31, 2020. Then, on October 29, 2020, the FDA denied Sona's application for an EUA. By November 25, 2020, Sona had withdrawn its application from Health Canada after receiving notification that the Test's clinical results were "discordant." As eventually disclosed by Defendants, Sona's clinical study consisted of **only 7 patients** within the range of 0 to 6 days of symptom onset, providing insufficient validation data necessary for approval by the FDA and Health Canada. Worse yet, Health Canada could not even reproduce the same results Sona had purportedly yielded for those 7 patient samples.

As Defendants slowly revealed those facts throughout the Class Period, Sona's

share price plummeted 28%, 34%, 48%, 67% and 13%, respectively, after each disclosure. Those titanic drops confirmed that investors viewed the disclosures as negative material information that contradicted the earlier reports about Sona.

Despite those well-pleaded allegations, Defendants raise a series of fact-based disputes. They contend that their portrayal of Sona's progress in developing and validating its COVID Test was not misleading and that any alleged omission did not involve material information. Defendants also contend that the alleged facts do not show recklessness or knowledge. But Defendants' primary objective during the Class Period was achieving regulatory approval of the COVID Test, and approval depended primarily on the validation data collected from Sona's laboratory studies and clinical trial. Defendants purposefully made public statements about those subjects, prompting Sona's share price to skyrocket, while competing biotech companies made accurate statements and, in turn, had less success securing investments. Thus, as elaborated below, Plaintiff has adequately pleaded the requisite elements for a § 10(b) claim, and Defendants' motion to dismiss must be denied in its entirety.

## II.    SUMMARY OF PLAINTIFF'S ALLEGATIONS

Defendants' purported "Summary of Plaintiffs' Factual Allegations" is 14 pages long, distorts the Complaint, and adds unsubstantiated "facts" in an improper attempt to raise questions of fact at the pleading stage. Mot. at 11:18-25:4.[2] A fair review of the alleged facts establishes that the Complaint states claims for securities fraud.[3]

[2] *See* Defs.' Mot. to Dismiss Am. Class Action Compl. and Supporting Mem. of P. & A. ("Motion" or "Mot."), ECF No. 56.

[3] Attaching 174 pages of exhibits to their Motion, Defendants misuse the doctrine of judicial notice. *See* ECF Nos. 56-1, 56-2. "Judicial notice under Rule 201 permits a court to notice an adjudicative **fact** if it is 'not subject to reasonable dispute.'" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (quoting Fed. R. Evid. 201(b)). Once judicially noticed, a fact is conclusively established. Fed. R. Evid. 201(f) ("In a civil case, the court must instruct the jury to accept the noticed fact as conclusive."). Defendants ask that the Court "take judicial notice of Exhibits 1-14,"

Sona is a Canadian company engaged in the research and development of gold nanorod products for diagnostic tests and medical treatments. ¶¶ 4, 77. As COVID-19 spread rapidly across the globe and governments declared a public health emergency (*see* ¶¶ 40-43), Sona entered the race to develop a novel test for detecting the virus. ¶ 77. More specifically, Sona's COVID Test would detect the virus within 0 to 6 days of symptom onset. *See* ¶¶ 3, 5, 14, 18.

Beginning on March 18, 2020, Defendants steadily conveyed that they had made progress and reached milestones in that endeavor. ¶ 85. From March 18, 2020, through April 13, 2020, for example, Defendants announced that they had:

- "generat[ed] an active conjugate which produce[d] a signal when exposed to Covid-19 viral antigens;"
- secured a distributer which intended to buy 2,000,000 test kits;
- employed "qualified laboratory technicians ... working with samples of the virus' antigen and antibodies;"
- successfully "tested a working prototype in a hospital laboratory environment with live, Covid-19 patient samples;" and
- "progressed to the optimization stage," including "[c]ommenc[ing] work with two, third-party laboratories to prepare validation protocols."

¶¶ 6, 87.

Even at the early stage, however, Sona had undisclosed problems in developing the COVID Test. On May 12, 2020, Defendants revealed that they had been using virus samples deactivated by heat, not live virus cultures or patient samples. ¶¶ 7-8,

---

but the exhibits contain hundreds, if not thousands, of potential "facts," without any identification from Defendants of which facts they seek to be established. *See Khoja*, 899 F.3d at 999 ("A court must also consider—and identify—which fact or facts it is noticing from such [an investor call] transcript. Just because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth."). Thus, the Court should not consider Defendants' extraneous exhibits. *See id.* ("[T]he unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery.").

88. Therefore, Sona had to change the design of its validation studies and delay its submissions to the FDA and Health Canada. ¶¶ 7, 122. Nonetheless, instead of taking the opportunity to reveal that they were in over their heads, Defendants reaffirmed their progress toward developing—and their ability to validate—an effective and reliable COVID-19 antigen test. ¶¶ 89, 124.

By July 2, 2020, Defendants bolstered that message with hard data they described as "excellent performance results" "underpinned by our unique nanorod technology." ¶ 91. They reported that their "rapid detection, COVID-19 antigen test's laboratory validation studies of performance levels have resulted in a test sensitivity of 96%, test specificity of 96% ... which corresponds to an ability to detect the virus in patients with 'low' viral loads in 10-15 minutes." *Id.* Defendants further conveyed that Sona "intend[ed] to make final submissions to regulatory authorities in multiple jurisdictions" by the end of July. ¶ 92. On July 8, 2020, moreover, Defendant Rowles stated that Sona "has achieved the extraordinary by bringing a COVID-19 rapid, point-of-care antigen test **to fruition** in four months." ¶ 93.

Those unequivocal statements to investors caused explosive growth in Sona's securities. As described by one analyst, "[i]nvestors [had] pushed an $0.11 stock to an all-time high of $16.05 a share by July 27" – yielding a "14,545% return on this best-performing COVID-19 stock in just six months." ¶ 94. That growth reflected that Sona had succeeded in creating a viable test. ¶¶ 92-94. In other words, there was less risk to the Company and investors, with a clear path to Sona's profitability. *See id.*

But by August, Defendants had encountered delays, causing trepidation amongst investors. ¶¶ 95-96. Once again—instead of admitting that Sona was faltering in its development and validation of a viable test—Defendants reiterated their progress and blamed external factors for the delays. ¶¶ 95-97. Finally, on August 31, 2020, Defendants "completed submissions to the FDA and Health Canada for authorizations for [Sona's] COVID-19 rapid, antigen test, including responding to all follow-up questions received to date." ¶ 96.

Then, on October 1, 2020, while the submissions were pending approval, Defendant Regan assured investors again that, Sona had created a viable, effective test supported by sufficient data: "**We're 100% confident that it gets approved**. There's smart questions being asked, and we have strong data on our test." ¶ 98.

However, as Defendants revealed through a series of partial disclosures, Sona's validation data were insufficient to meet regulatory standards, and its applications to the FDA and Health Canada would **not** be approved. On October 29, 2020, Defendants revealed that the FDA had rejected Sona's EUA request for the COVID Test. ¶¶ 99-100. The truth was that Sona's clinical trial was flawed by design, and as a result, Sona had failed to demonstrate that its Test could effectively meet the public need of rapid and accurate COVID-19 screening within 0-6 days of symptom onset—as compared to the other seven antigen tests that had already received EUAs. ¶ 100. On this news, shares of Sona fell $2.77 per share, or over 48%. ¶ 170. In other words, the news was so out of line with Defendants' previous statements to investors that, in a single day, Sona lost nearly half its value as a company.

But Defendants continued to mislead investors. Instead of revealing that its application for the COVID Test lacked sufficient data establishing efficacy, Defendants pivoted away from the FDA's rejection and described a purportedly viable path forward. ¶ 101. They stated that "Health Canada continues its evaluation of the Company's application for an Interim Order ("IO") authorization for its test as a 'point-of-care' medical diagnostic device" and "[t]he Company yesterday received additional questions on its application." *Id*.

Defendants' concealment of their deficient submission proved to be short-lived. On November 25, 2020, they announced that the Company, based on feedback from Health Canada, had withdrawn its application. ¶ 102. Once again, this news contradicted Defendants' statements to investors, causing a 67% drop in the share price on the same day. ¶¶ 173-75.

Yet, Defendants still refused to admit that their validation data had been

insufficient and that Sona's clinical trial, as designed, had failed to demonstrate the Test's ability to perform as intended. Instead, Defendant Rowles stated that "[w]e have confidence in our rapid COVID-19 antigen test and its ability to detect the virus, especially within the first week of symptom onset," and he blamed the failed authorizations on a generalization that "[t]he regulatory approval path for antigen tests is new with evolving guidelines and Sona's test is unique, creating a challenging environment for test developers and regulators alike." ¶ 102.

Defendants provided the damning details five days later, on November 30, 2020. Defendants admitted that Health Canada had commissioned the National Microbiology Laboratory (NML) to evaluate Sona's Test and the evaluation produced "**discordant results** to the Company's prior analytical and clinical studies conducted by MRIGlobal and SaudiVax." ¶ 176. Furthermore, Defendants' study had included only 7 samples "from patients within 0-6 days since symptom onset." ¶ 177. In other words, Defendants had been touting their creation, validation, and imminent approval of their COVID Test focused on detecting the virus in people within 0-6 days of since symptom onset, yet **before seeking approval from the FDA and Health Canada, Defendants had used the COVID Test on only 7 total patient samples in those parameters**. ¶¶ 177-78.

Once again, Defendants continued to misrepresent to investors that there was a viable path forward to regulatory approval and commercialization of the COVID Test. Defendants stated that Sona "intends to obtain additional data and use it to augment its submission with the FDA and potentially for a resubmission to Health Canada." ¶ 103. Defendant Regan noted that "every entity that has evaluated our test has confirmed its ability to detect the COVID-19 virus and it achieved strong results from our in-field trials." *Id.*

On December 16, 2020, Defendants obtained $2.26 million in financing "to produce further clinical trial data" for the COVID Test. ¶ 106. Sona also confirmed that it "[wa]s currently working with several potential partners to secure a clinical

trial" and "its CE Marking process in Europe commenced." *Id*. On December 31, 2020, the Company issued a press release titled "Sona Nanotech Receives CE Mark Approval for its Rapid COVID-19 Antigen," explaining that the "CE Mark declares the conformity of the Sona Test with EU regulations and allows Sona to commercialize its test throughout Europe and potentially other territories in which the CE Mark is recognized." ¶ 107. Defendants touted that Sona was "now able to take firm orders in territories accepting a CE Mark and make corresponding manufacturing commitments from its contract manufacturer in the United Kingdom" and was "in the process of technology transfer to a second manufacturer, in North America." ¶ 108.

Just like every other milestone Defendants had announced throughout the Class Period, those purported accomplishments were illusory. Many other companies had already obtained CE Marks for their antigen tests, and most of those companies had also obtained EUAs, including Quidel Corporation, LumiraDX, Becton Dickinson and Company, and Ortho Clinical Diagnostics. ¶ 109. Therefore, Sona's CE Mark did not position it to commercialize the COVID Test. ¶¶ 109-10.

On March 1, 2021, Defendants finally revealed an assortment of facts confirming that there was no hope for commercializing the COVID Test. Sona still had not obtained any "firm orders" and still lacked a sponsoring institution, a principal investigator, a study protocol, medical ethics review board approval, and Health Canada Investigational Testing Division approval. ¶¶ 109-10, 180-81. Consequently, Sona's stock fell another 13%.

Thus, throughout the Class Period (March 18, 2020 to February 28, 2021), Defendants Sona, Regan (CEO since July 2020), Randall (CFO), and Rowles (founding CEO until July 2020) created a false impression of Sona's success in developing and validating its COVID Test. ¶ 23. Defendants' misleading statements and omissions artificially inflated Sona's stock price. ¶¶ 23-24. After the truth leaked out in part on May 12, 2020; August 6, 2020; October 29, 2020; November 25, 2020; and March 1, 2021, Sona's share price dropped drastically, causing millions in losses

for Plaintiff and the Class, who had relied on Defendants' statements. ¶¶ 194-97. Based on those facts, Plaintiff raises claims against Defendants for violations of §§ 10(b) and 20(a) of the Securities Exchange Act. ¶¶ 209-28.

## III.   LEGAL STANDARDS

"To establish a violation of Section 10(b), a plaintiff must plead: (1) a material misrepresentation or omission made by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1090 (N.D. Cal. 2017) (citing *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta*, 552 U.S. 148, 157 (2008)). In assessing a Rule 12(b)(6) motion to dismiss, courts consider the complaint in its entirety, "accept all factual allegations ... as true," and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). A "court ruling on a motion to dismiss is not sitting as a trier of fact" and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). Thus, at the pleading stage, a plaintiff "need only allege enough facts to state a claim for relief that is **plausible** on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011).

Because Plaintiff's claims are also subject to the PSLRA, the Complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief ... all facts on which the belief is formed." 15 U.S.C. § 78u-4(b)(1). Plaintiff's fraud-based claims under the Exchange Act are also subject to Rule 9(b), which requires that "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

## IV.   ARGUMENT

Defendants challenge only falsity and scienter. Mot. at 27:2-31:15. For the following reasons, both challenges fail.

**A.     The Complaint adequately alleges that Defendants made material misstatements and omissions about Sona's COVID Test.**

"A statement or omission is misleading under the PSLRA and Section 10(b) of the Exchange Act 'if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.'" *Wells Fargo*, 282 F. Supp. 3d at 1090 (quoting *Berson v. Applied Signal Tech., Inc*., 527 F.3d 982, 985 (9th Cir. 2008)). "Even a statement of opinion or an expression of corporate optimism may be deemed actionable[.]" *Id.* (noting that "the line between puffery and a misleading statement is often indistinct, and requires an analysis of the context in which the statements were made"). Moreover, if Defendants choose to "tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including by disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016).

"[W]hether a ... statement is misleading ... is appropriately resolved as a matter of law only if the adequacy of the disclosure ... is so obvious that reasonable minds [could] not differ." *In re STEC Inc. Sec. Litig.*, No. SACV 09-1304 JVS (MLGx), 2011 WL 2669217, at *7-*9 (C.D. Cal. June 17, 2011). Otherwise, "at the motion to dismiss stage the Court draws a reasonable inference that Plaintiffs' interpretation of [a statement] is correct." *Turocy v. El Pollo Loco Holdings, Inc.*, No. SACV 15-1343-DOC (KESx), 2017 WL 3328543, at *14 n.2 (C.D. Cal. Aug. 4, 2017). A plaintiff "can survive a motion to dismiss by alleging a single material misrepresentation." *Feyko v. Yuhe Int'l., Inc.*, No. CV 11-05511 DDP (PJWX), 2013 WL 816409, at *4 n.2 (C.D. Cal. Mar. 5, 2013).

In the context of statements regarding drug development and the FDA evaluation process, moreover, "courts have allowed securities fraud claims to go forward where the drug [or product] manufacturer allegedly made 'misleading,

optimistic public statements that the drug's [or product's] FDA-approval process was progressing positively,' even though clinical studies indicated that the drug 'might not work and would never be approved by the FDA.'" *In re Dura Pharms., Inc. Sec. Litig.,* 548 F. Supp. 2d 1126 (S.D. Cal. 2008) (finding materially false statements that failed to explain that the FDA was requiring submission of new clinical data in letter of rejection) (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)); *see In re Immune Response Sec. Litig.,* 375 F. Supp. 2d 983, 1019 (S.D. Cal. 2005) ("Plaintiffs' criticism is not that what was said was inaccurate, but that it was incomplete, thus portraying the results of the clinical trial in an unduly optimistic light."); *In re Amylin Pharms., Inc. Sec. Litig.,* No. 01CV1455 BTM (NLS), 2003 WL 21500525, at *8 (S.D. Cal. May 1, 2003) (holding that a company cannot represent that its trial results met the FDA's requirements for approval where, in fact, "the FDA expresse[d] significant concerns regarding the sufficiency of the trials").[4]

Plaintiff specifically identifies Defendants' misrepresentations that inaccurately portrayed Sona's success in developing and validating its COVID Test. ¶¶ 112-61. For each misrepresentation, Plaintiff specifies when it was made, by whom, and why it was misleading. *Id*. The truth about Sona's validation data, development progress, and prospects materially differed from the impression that Defendants provided to investors. ¶¶ 49-76, 78-111. Defendants' Class Period statements obfuscated the Company's subpar abilities, inadequate efforts, and

---

[4] *See also In Re PTC Therapeutics, Inc. Sec. Litig.,* No. 16-1124(KM)(MAH), 2017 WL 3705801, at *14 (D.N.J. Aug. 28, 2017) (noting that defendant's statements were misleading where it told investors that it had proven that its drug was effective at treating a type of muscular dystrophy knowing it failed to meet FDA approval standards); *In re Viropharma Inc. Sec. Litig*., 21 F. Supp. 3d 458, 465 (E.D. Pa. 2014) (defendants submitted application to FDA without components required by statute); *In re Transkaryotic Therapies, Inc. Sec. Litig.*, 319 F. Supp. 2d 152, 156 (D. Mass. 2004) (defendants made public statements that the FDA merely had asked for "further explanation in several areas and requested additional data," where FDA's letter made clear new trials were necessary and submission of additional data from extant studies would be "unable to address this deficiency").

consistent shortfalls in developing and validating its COVID Test. Those representations triggered a gain of over 14,000% in Sona's stock price.

The reality was that Sona's laboratory studies and clinical trial were flawed by design, and unlike the 7 other antigen tests that received EUAs from the FDA, Sona could not meet the relaxed, expedited standards the FDA and Health Canada had permitted in response to the COVID-19 pandemic. ¶¶ 66-68, 71, 176-77. Specifically, in the early stages, Sona had used virus samples deactivated by heat, not live virus cultures or patient samples. ¶¶ 7-8, 88. Then, Sona's clinical study included only 7 patients in the 0 to 6 days of symptom onset timeframe. ¶¶ 176-77. Moreover, Health Canada's researchers could not recreate the results Sona had submitted. *Id.* Those allegations show that Defendants' misrepresentations and omissions of material information misled Sona's investors. Nothing more is required to plead falsity. *See, e.g.*, *In re Merit Med. Sys., Inc. Sec. Litig.*, No. 8:19-02326 DOC (ADSx), 2021 WL 1258590, at *9 (C.D. Cal. Mar. 16, 2021) ("Plaintiffs have sufficiently met [Rule 9(b)'s] heightened pleading standard" where they "specifically identify the allegedly false statement, when it was made, by whom, and why it was misleading"), report and recommendation adopted, 2021 WL 1192133 (C.D. Cal. Mar. 29, 2021), and report and recommendation adopted, 2021 WL 1753612 (C.D. Cal. May 3, 2021).

Seeking to bypass those well-pleaded allegations, Defendants raise four falsity arguments: (1) the alleged misrepresentations were technically correct; (2) the alleged misrepresentations and omissions were immaterial as a matter of law; (3) Defendants' statements are protected by the PSLRA safe harbor; and (4) Plaintiff's allegations do not support scheme liability. Mot. at 27:2-29:13. Each of these arguments fails.

### 1. Even if technically correct, Defendants' representations were misleading and thus are actionable.

Defendants contend that Plaintiff has not pled any actionable misstatements because it does not allege that any of the data Sona reported were incorrect. Mot. at 27:4-28:2. Defendants are wrong.

"[L]iteral truth is not the standard for determining whether statements ... are misleading." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Even if a statement is "technically accurate," a company must disclose additional known "adverse information that cuts against the positive information." *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018) (finding that although a biotechnology firm's statements about its interim clinical study "results were still technically accurate," its continued promotion of the results after "learn[ing] new information that diminished the weight of those results" was misleading).

Thus, statements regarding a company's progress with product validation through studies and clinical trials can be actionable where "Plaintiff['s] criticism is not that what was said was inaccurate, but that it was incomplete, thus portraying the results of the clinical trial in an unduly optimistic light." *Immune Response Sec. Litig.*, 375 F. Supp. 2d at 1019-20. "Thus, the question is whether defendants affirmatively placed any facts at issue to require disclosure of additional information to prevent creating a misleading impression for investors." *In re Apple Inc. Sec. Litig.*, No. 19-cv-02033-YGR, 2020 WL 2857397, at *10 (N.D. Cal. June 2, 2020) (finding statements touting high upgrade rates "affirmatively misleading because they create the impression that the upgrade rate for the throttled phone was the result of 'ordinary' factors that 'bode[ ] well' for future sales").[5]

---

[5] Defendants have mischaracterized Plaintiff's allegations as a disagreement over the methodology of testing. *See Mulquin v. Nektar Therapeutics*, No. 18-cv-06607-HSG, 2020 WL 7773580 (N.D. Cal. Dec. 30, 2020); *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 878 (9th Cir. 2012); *Lake v. Zogenix, Inc.*, No. 19-cv-10975-RS, 2020 WL 3820424 (N.D. Cal. Jan. 27, 2020); *In re Nuvelo, Inc. Sec. Litig.*, No. C 07-4056 VRW, 2008 WL 5114325, at *6, *16 (N.D. Cal. Dec. 4, 2008). Plaintiff does not allege "false study," "statistically false p-values," or "inaccurate and improper statistical analysis" (*In re Rigel Pharms., Inc. Sec. Litig.*, 679 F.3d at 878); rather, Plaintiff asserts that the clinical studies were flawed because they failed to meet the FDA's minimum standards for producing validation data to support the Test's intended purpose. In other words, the issue is not about Sona's interpretation of the data; rather, Sona's study created inherently flawed data, regardless of interpretation.

Defendants cannot hide behind the assertion that some of their misleading statements may have been literally true. When Defendants touted their "positive identification of the viral antigens" and "a functional prototype of the rapid-response test," for example, they provided a misleading picture to investors. ¶ 112. In truth, Defendants had not used live virus culture and/or patient samples, as required to validate a viable test. ¶ 162. When they released "excellent performance results" with "test sensitivity of 96%, test specificity of 96%" and confirmed that the Test had come "to fruition" (¶¶ 127-29, 132-34), Defendants had *validated* the Test with only 7 total samples from the target population (patients within the range of 0-6 days of symptom onset). ¶¶ 176-77. When Defendant Regan assured investors that "[w]e're 100% confident that it gets approved" (¶ 187), Sona lacked the clinical results, feedback from the FDA or Health Canada, or other internal data supporting that confidence. ¶¶ 146-51. When Defendants assured investors that "Health Canada continues its evaluation of [the Test]" and that Sona had received "additional questions," Health Canada had actually stated that it could not recreate the results from Sona's meager clinical study. ¶¶ 152-57. When Defendants conveyed that Sona was "now able to take firm orders in territories accepting a CE Mark," (¶¶ 158-59), they omitted that many other companies had EUAs and CE Marks for COVID tests, meaning there was not a market for Sona's test.

*See In re Questcor Sec. Litig.,* No. SA CV 12-01623 DMG, 2013 WL 5486762, at *11 (C.D. Cal. Oct. 1, 2013) (distinguishing case from *Rigel* where "Plaintiffs do not challenge [the Company's] interpretation of data-they challenge the efficacy of the data itself"). For the same reasons, the remaining cases cited by Defendants are inapposite. *See In re Sanofi Sec. Litig.,* 87 F. Supp. 3d 510, 549 (S.D.N.Y. 2015*), aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016); *In re EDAP TMS S.A. Sec. Litig.*, No. 14 Civ. 6069, 2015 WL 5326166, at *15 (S.D.N.Y. Sep. 14, 2015); *In re Amarin Corp. PLC*, No. 13-CV-6663 (FLW)(TJB), 2015 WL 3954190, at *3 (D.N.J. June 29, 2015); *Corban v. Sarepta Therapeutics, Inc.,* No. 14-cv-10201-IT, 2015 WL 1505693, at *7 (D. Mass. Mar. 31, 2015); and *Sarafin v. BioMimetic Therapeutics, Inc.*, No. 3:11-0653, 2013 WL 139521, at *14 (M.D. Tenn. Jan. 10, 2013).

Throughout the Class Period, therefore, Defendants painted a misleading picture of Sona's abilities and progress in developing and commercializing a viable COVID-19 test. Once Defendants chose to tout literal truths or half-truths about Sona's Test, they had a duty to disclose the stream of adverse facts surrounding the Test's development, approval, and commercialization. *See Schueneman*, 840 F.3d at 707–08 ("[O]nce defendants chose to tout [the drug's likely approval by referencing allegedly positive studies], they were bound to do so in a manner that wouldn't mislead investors as to [potentially negative information in their possession].").

### 2. Defendants' misrepresentations and omissions were material.

Defendants claim that the misrepresentations and omissions were not material. Mot. at 28:3-18. But that claim relies on a distortion of Plaintiff's allegations.

Generally, "[a] misleading statement is material under § 10(b) and Rule 10b-5 if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Mausner v. Marketbyte LLC*, No. 3:12-cv-2461-JM (WLS), 2013 WL 12073832, at *7 (S.D. Cal. Jan. 4, 2013) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). In other words, an "omission or misrepresentation" is "material" where it "would have misled a reasonable investor about the nature of his or her investment." *Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1103 (C.D. Cal. 2012).

"[M]ateriality is a mixed question of law and fact and [p]roof of that sort is a matter for trial," not for a motion to dismiss. *Boston Ret. Sys. v. Uber Techs., Inc.*, No. 19-cv-06361-RS, 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020). Thus, "[m]ateriality is rarely appropriate to decide at the motion to dismiss stage." *Feyko*, 2013 WL 816409, at *5.

For three reasons, therefore, Defendants' challenge to materiality fails. First, materiality is a premature factual issue that should not be decided on the pleadings.

Second, the Complaint sufficiently alleges facts showing materiality. As set

forth above, Defendants created a false impression of the key product that Sona was developing during the Class Period. ¶¶ 78-84, 87-94, 96, 98, 101, 103-04, 106-08. They repeatedly spoke to investors about the COVID Test, given its importance to the Company. ¶¶ 78-83, 87-93, 96, 98-104, 106-07. Accordingly, a reasonable investor viewed news about the Test to alter the total mix of information about Sona.

Finally, the substantial declines of Sona's share price when the truth was revealed—*e.g.*, drops of 28%, 34%, 48%, 67%, and 13% (*see* ¶¶ 162-84)—confirm that investors viewed the undisclosed information as material. *See Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 914 (N.D. Cal. Sept. 21, 2012) ("decline in stock price after a disclosure supports a finding of materiality"); *In re Nat'l Golf Props., Inc.*, No. CV 02-1383GHK(RZX), 2003 WL 23018761, at \*5 (C.D. Cal. Mar. 19, 2003) ("[Defendant]'s shares suffered a one-day decline in value of 13%" after the revelations and, so, "[i]t cannot be said, at least at the pleading stage, that these disparities would not be material to a reasonable investor").

### 3. *No safe harbor applies.*

Identifying a single statement—"We're 100% confident that it gets approved"—Defendants argue that the safe harbor shields them from liability. Mot. at 28:19-29:6. As a threshold matter, Defendants ignore that the safe harbor applies only if they meet the burden to establish several substantive and procedural requirements. *See In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at \*9 ("Defendants bear the burden of demonstrating that their statements are protected by the safe harbor."). For three separate reasons, moreover, Defendants have failed to meet their burden as to the single statement they claim is forward looking.

First, the identified statement is part of Plaintiff's allegations of "scheme liability" allegations, not a false statement *per se*. *See* § IV.A.4., *infra*. Therefore, Defendants' safe harbor argument is inapposite.

Second, "to the extent Plaintiffs [ ] challenge Defendants' alleged omission of present facts with respect to the challenged statements, the PSLRA's safe harbor does

not apply." *Roberti v. OSI Sys., Inc.*, No. CV 13-9174-MWF (VBKx)X, 2015 WL 1985562, at *9 (C.D. Cal. Feb. 27, 2015); *see also In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017) (regarding "mixed statements containing non-forward-looking statements as well as forward-looking statements, the non-forward-looking statements are not protected by the safe harbor of the PSLRA.").

When Defendants touted the progress and prospect for approval and commercialization of their COVID Test, they omitted numerous material facts. They concealed that they had first tested the wrong types of samples, their subsequent clinical trial included only 7 patients in the range of 0 to 6 days of symptom onset, they lacked the necessary validation data to support the intended use of the COVID Test, and they had no other encouraging information from the FDA or Health Canada. ¶¶ 49-76, 112-84. Those omissions are actionable. *See Uber Techs., Inc.*, 2020 WL 4569846, at *8 (finding falsity where plaintiff pleads "facts that 'call into question the [speaker]'s basis for offering the opinion'" (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015))).

<u>Finally</u>, Sona's boilerplate "cautionary language" never disclosed the omitted facts, which continued unabated throughout the Class Period. *See Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181-82 (9th Cir. 2009) (finding misleading "risk factors" actionable), *aff'd*, 563 U.S. 27 (2011); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1178 n.62 (C.D. Cal. 2008) ("[C]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired[.]").

### 4. *The Complaint alleges deceptive conduct sufficient for scheme liability.*

Defendants claim that Plaintiff has not alleged additional deceptive conduct for its scheme liability claim. Mot. at 29:7-13. But they ignore Plaintiff's allegations.

"[A] scheme liability claim cannot be based solely on false or misleading statements, but must instead involve deceptive conduct 'beyond those

misrepresentations or omissions.'" *In re Aqua Metals, Inc. Sec. Litig.*, No. 17-CV-07142-HSG, 2019 WL 3817849, at *8 (N.D. Cal. Aug. 14, 2019). For example, sufficient allegations could include "orchestrat[ed] on-site visits and demonstrations that deliberately concealed problems concerning the commercialization of the Company's ... process" where "Defendants used these invitational site visits to assuage analysts' concerns." *Id.* at *9.

Here, beyond alleging Defendants' misstatements and omissions, Plaintiff alleges that Defendant Regan appeared on a radio talk show and boasted that "[w]e're **100% confident that [Sona's antigen test] gets approved**. There's **smart questions being asked**, and we have **strong data on our test**." ¶ 187. In other words, Defendant Regan chose to appear in media, outside of the standard press releases, SEC filings, and quarterly conference calls that public companies typical use to communicate to investors. And on the radio show, he effectively guaranteed to investors that Sona's sole product would be approved. The only purpose of that conduct was to generate additional hype for Sona's COVID Test that had struggled up to that point (and that ultimately did not obtain approval). These allegations suffice for scheme liability.[6]

> **B.    The Complaint raises a strong inference of scienter.**

To plead scienter, a plaintiff "must state with particularity facts giving rise to a strong inference that defendants acted with the intent to deceive **or** with deliberate recklessness as to the possibility of misleading investors." *Berson*, 527 F.3d at 987. "The inference ... need not be irrefutable ... or even the most plausible of competing inferences;" nor is a "smoking-gun" required. *Tellabs,* 551 U.S. at 324-26. Instead, "[w]hen the allegations are accepted as true and taken collectively," a court need only find that a reasonable person would "deem the inference of scienter at least as strong as any opposing inference." *Id.* at 326. And "[i]n assessing the allegations holistically

---

[6] Because Plaintiff alleges that Defendants did more to further the alleged scheme than make misstatements, Defendants' reliance on *Zhu v. Taronis Techs. Inc.*, No. CV-19-04529-PHX-GMS, 2020 WL 1703680 (D. Ariz. Apr. 8, 2020), is misplaced.

as required by *Tellabs*, [] courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

"Indeed, case law addressing misstatements relating to FDA approval lends support to Plaintiff['s] use of [the alleged] statements to demonstrate scienter." *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 811 (C.D. Cal. 2011) (finding that "taken alone, Defendants' statements concerning 'approval' by or an 'agreement' with the FDA are sufficient to demonstrate a strong inference of scienter"); *see also Constr. Laborers Pension Tr. of Greater St. Louis v. Neurocrine Biosciences, Inc.*, No. 07-cv-1111-IEG-RBB, 2008 WL 4370010, at *4 (S.D. Cal. Sep. 23, 2008) ("When the FDA tells a company about the problems with a product, and the company nonetheless continues to make confident statements about the product, courts have inferred scienter and falsity.") (citing *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1130 (C.D. Cal. 2005) ("These statements necessarily implied that there would be no serious impediments to timely FDA approval. Thus, Defendants' omission of facts suggesting a possible delay in approval was misleading."))[7] The Complaint readily satisfies this standard.

### 1. Rowles's and Regan's detailed statements about Sona's development and validation of its COVID Test support scienter.

As the Ninth Circuit has explained, where defendants make specific misstatements about specific matters they purport to know, "[i]t is unclear what further facts plaintiffs would need to plead to create a stronger inference that

---

[7] *See also In re Myriad Genetics, Inc.,* No. 2:19- CV-00707-DBB-DBP, 2021 WL 977770 (D. Utah Mar. 16, 2021); *Voulgaris v. Array Biopharma Inc.*, No. 17-CV-02789-KLM, 2020 WL 8367829 (D. Colo. Nov. 24, 2020); *Skiadas v. Acer Therapeutics Inc.*, No. 1:19-CV-6137-GHW, 2020 WL 4208442 (S.D.N.Y. July 21, 2020); *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, No. CV 17-341, 2020 WL 1479128 (E.D. Pa. Mar. 25, 2020); *Zak v. Chelsea Therapeutics Int'l, Ltd.,* 780 F.3d 597 (4th Cir. 2015); *In re Forest Labs. Sec. Litig.,* No. 05 Civ. 2827 (RMB), 2006 WL 5616712, (S.D.N.Y. July 21, 2006).

[defendants] had access to [the] information [they] discussed publicly." *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) (finding scienter based on defendants' "public statements celebrating the merger as an unprecedented success"); *Karinski v. Stamps.com, Inc.*, No. CV 19-1828-MWF (SKx), 2020 WL 281716, at *15 (C.D. Cal. Jan. 17, 2020) (finding scienter supported where defendants "regularly referenced [relevant] conversations they had").

Defendants Rowles and Regan repeatedly spoke about the COVID Test underlying the alleged misrepresentations and omissions. *See* ¶¶ 120, 125, 129, 132, 150, 189-90, 192 (Rowles); ¶¶ 133, 148, 153, 169, 178, 187, 190, 192 (Regan). Those statements indicate that they had knowledge of (or were reckless as to) the true facts surrounding Sona's development of the Test. Nothing more is required to allege scienter. *See In re Qualcomm Inc. Sec. Litig.*, No. 17-cv-00121 JAH-WVG, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019) (finding scienter supported where defendants "issued specific [statements] ... in response to questions from analysts and investors"); *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009) (finding scienter where defendant "repeatedly reassured investors [ ] in the face of direct questioning," evidencing "knowledge of the" undisclosed problems).[8]

### 2. The Individual Defendants' direct responsibility for managing Sona's development and validation of its COVID Test supports scienter.

"[A]llegations regarding management's role in a company … may independently satisfy the PSLRA [scienter requirement] where they are particular and suggest that defendants had actual access to the disputed information." *Killinger*, 542 F.3d at 785-86; *Berson*, 527 F.3d at 988 (finding Plaintiffs adequately pled scienter

---

[8] Accordingly, Defendants' claim that Plaintiff did not allege with particularity that they "possessed any specific information contradicting their disclosures" (Mot. at 29-30) simply ignores the Complaint's well-pleaded allegations. ¶¶ 186-93.

as to the company's CEO and CFO because they were "directly responsible for [its] day-to-day operations."); *MannKind*, 835 F. Supp. 2d at 814 ("Defendants' purported access to certain information contradicting their public statements provides additional support for finding a strong inference of scienter.").

As the chief officers of a small company primarily focused on a COVID-19 diagnostic test during a global pandemic, the Individual Defendants were directly aware of that Test's development and validation. Sona told investors that "R&D work is being done … under the supervision of ... President and CEO [Rowles]" and that the Individual Defendants "had an ongoing, open dialogue with regulators to ensure the Sona's test is being developed within the parameters regulators have outlined." ¶¶ 186-87. Indeed, Sona's primary objective was developing the Test, meaning its executives were focused on that subject. *See* ¶ 188 ("Sona's primary objective will be the development and production of its own lateral flow tests."); *id.* ("Sona has been focused on work related to the development of a rapid response COVID-19 lateral flow test."); *id.* ("[C]ommercialization of its COVID-19 rapid, antigen test continues to be the top near-term priority for the Company."). And those executives had significant experience in diagnostic tests, as Sona touted to investors. *See* ¶ 190.

Thus, Defendants' suggestion that they were in the dark about Sona's progress in developing the Test vis-à-vis the applicable regulatory requirements (Mot. at 29:16-31:15) is neither plausible nor credible. *See Union Asset Mgmt. Holding AG v. SanDisk LLC*, No. 15-cv-01455-VC, 2017 WL 3097184, at *1-*2 (N.D. Cal. June 22, 2017) ("If the defendants were aware of the undisclosed information, the most logical explanation for their failure to disclose it ... was that they intended to conceal it.").

Finally, even if Defendants were totally in the dark, then they acted recklessly by speaking about those issues without first investigating or otherwise amassing knowledge. *See S. Ferry*, 687 F. Supp. 2d at 1260 (finding scienter where defendant "displayed an intimate knowledge ... and ... represented to investors that he had all of the information necessary to make accurate predictions about [the company]'s risk"

and "[i]f he did not in fact have such knowledge, it would be at least actionably reckless to reassure the public about these matters at all"); *see also Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 602 (N.D. Cal. 2019) (touting "intimate knowledge" on subject "was at least deliberately reckless not to investigate the accuracy of their statements").

In sum, viewed collectively, these facts and the additional facts in the Complaint establish a strong inference that the Individual Defendants–while running Sona–knew or should have known the undisclosed and misrepresented facts about its development of, progress with, and potential for commercializing its COVID-19 test.[9]

### 3. Defendants' challenges to scienter fail.

Seeking to sidestep the "holistic" analysis required by *Tellabs* – which establishes scienter here – Defendants raise three primary challenges to scienter: (1) Plaintiff does not allege that the Defendants sold stock at inflated prices (or were otherwise motivated to commit fraud); (2) there is an innocent explanation for failing to disclose specific details about Sona's Test; and (3) Plaintiff alleges "fraud by hindsight." Mot. at 29:15-31:15. Each argument is unpersuasive.

<u>First</u>, "insider trading is not required to establish scienter." *Sudunagunta v. NantKwest, Inc.*, No. CV 16-1947-MWF (JEMx), 2017 WL 8810760, at *12 (C.D. Cal. Sept. 20, 2017); *see also Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1149 (N.D. Cal. 2017) (finding a lack of stock sales not dispositive as to scienter).

Furthermore, the allegations reflect Defendants' motivation to obtain financing to continue their operations and R&D. As a fledgling biotech company, Sona required sufficient investor confidence to continue its R&D and operations. Defendants' misleading representations drove a meteoric rise in Sona's stock price and market cap to over $16 per share as of July 27, 2020. ¶ 94. Those circumstances permitted Defendants to continue their R&D and operations. After Sona's failure to obtain

---

[9] Because Plaintiff pleads more than simple negligence, Defendants' cases which find only negligence and/or errors are inapposite. *See* Mot. 25-26, n. 39.

approval for the COVID Test, for example, Defendants had to continue making misleading statements about a pathway to commercializing the Test just to obtain a meager $2.26 million in private placement financing to fund additional testing and "for general working capital purposes." ¶¶ 105-06, 153-55.

Moreover, Defendants' reliance on *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020) is misplaced. "*Nguyen* presents an unusual case because both the Supreme Court and the Ninth Circuit have found scienter on fairly similar allegations." *In re Apple Inc. Sec. Litig.,* No. 19-CV-02033-YGR, 2020 WL 6482014, at *12 (N.D. Cal. Nov. 4, 2020).[10] The holding in *Nguyen* has thus been limited to its precise facts:

> [T]he Court does not interpret *Nguyen* to require a specific theory of defendants' motives at the pleading stage. Instead, the Court considers *Nguyen* on its facts; defendants there apparently failed to plead sufficient facts to show the 'intractable' issues would lead the FDA to withhold approval.…Without stronger allegations of contemporaneous facts contradicting defendants' statements, the 'more plausible inference' was that 'defendants made promising statements about the timing of FDA approval based on the initial results of the U.S. clinical trial, but then modulated their optimism when the results began to raise questions.' Thus, while lack of obvious motive presented a challenge, the deeper concern stemmed from lack of data of contemporaneous falsity.

---

[10] *See Matrixx*, 563 U.S. at 48-49 (the Supreme Court found a strong inference of scienter where defendant failed to disclose reports linking its drug product to loss of smell because plaintiff alleged that defendant was concerned about the reports and affirmatively misrepresented available studies); *Schueneman*, 840 F.3d at 707-08 (the Ninth Circuit found a strong inference of scienter where defendants "made positive public statements about [a drug's] safety" and "told investors about their confidence in [the drug's] approval being based on" a clinical trial conducted as part of the FDA approval process, despite knowing that the trial had presented adverse side effects); *Warshaw*, 74 F.3d at 959-60 (the Ninth Circuit found securities fraud sufficiently pled where a company represented that FDA approval was "going fine," even though it knew that approval was unlikely). Notably, none of these cases involved an obvious motive for fraud, and each expressly held that motive allegations are *not* required. *See Matrixx*, 563 U.S. at 48; *Schuenemann*, 840 F.3d at 709 n.8; *accord Tellabs*, 551 U.S. at 325 (rejecting argument that lack of pecuniary motive is dispositive for scienter).

*Id.* at \*13.

Here, Defendants knew or recklessly disregarded that Sona first validated its Test through a study using the wrong type of viral samples and then designed a trial to include only 7 patients within the 0 to 6 days of symptom onset range (the Test's intended purpose) before submitting applications to the FDA and Health Canada. Despite their flawed protocols and sparse data, they made positive public statements about the success of Sona's laboratory studies and clinical trials; assured investors that Sona's submissions to the FDA and Health Canada had sufficient validation data; and expressed 100% confidence in the Test's approval. Defendants made statements driving a 14,000% gain in a COVID biotech stock that had insufficient validation data and inferior applications compared to every other company that actually obtained approval for a COVID-19 test. Those facts establish scienter.[11]

Second, Defendants fail to raise a more compelling inference that explains how they acted innocently, rather than at least recklessly, when misleading investors. For example, there is not a compelling inference that they did not know that they had utilized only 7 samples from the target use population to validate the COVID Test— *i.e.*, Sona's "top near-term priority during the Class Period" (¶ 188). Even if they lacked that knowledge, then it was reckless for them to remain ignorant and ignore Sona's actual progress and then make positive statements to investors about the Company's validation data, the Test's fruition, and 100% confidence in approval.

Third, Defendants baldly claim that Plaintiff alleges "fraud by hindsight." Mot. at 31:13-15. The case they cite involves §§ 14(e) and 14(d)(4) claims, not § 10(b)

---

[11] These allegations distinguish this case from Defendants' example cases that were dismissed for failure to plead scienter (Mot. at 26-27 n.42). *See Sanders v. AVEO Pharm., Inc.,* No. 13-11157-DJC, 2015 WL 1276824, at \*10 (D. Mass. Mar. 20, 2015); *Jun Shi v. Ampio Pharms., Inc.,* No. 2:18-cv-07476-RGK-RAO, 2020 WL 5092910, at \*2 (C.D. Cal. June 19, 2020); *Brennan v. Zafgen, Inc.,* 853 F.3d 606, 609 (1st Cir. 2017); *Ratner v. Ovascience, Inc.,* No. 14-12412-WGY, 2015 WL 5684068, at \*8 (D. Mass. Sept. 28, 2015); *In re Columbia Labs., Inc. Sec. Litig.,* No. 12-614, 2013 WL 5719500 (D.N.J. Oct. 21, 2013), *aff'd*, 602 F. App'x 80 (3d Cir. 2015).

claims.[12] Moreover, contrary to Defendants' case, Plaintiff alleges contemporaneous facts showing the Individual Defendants knew their statements were false when made. The issue is not that Defendants submitted robust, encouraging data to the FDA or Health Canada only to receive a denial based on unpredictable external factors. Defendants undertook an effective PR campaign to promote their COVID Test which focused on subjects within 0 to 6 days of symptom onset. Defendants portrayed their data as unequivocally confirming the Test's efficacy and even went so far as to express 100% confidence in its approval. But Defendants' submissions for regulatory approval proved to be one of the worst. While many other tests were granted EUAs, under exigent circumstances with lower-than-normal criteria given the necessity for COVID tests, Defendants submitted data for only 7 positive samples in the use population, and even those results were discordant. It may not be misleading to be a frontrunner expressing confidence in prevailing. But stated optimism becomes misleading when the worst applicant in a group is the most vocal about success.

Thus, when considered holistically, Plaintiff's allegations support a strong inference that Defendants acted at least recklessly—not innocently or unwittingly—when portraying Sona's development and validation of its COVID Test in an unduly optimistic light.[13]

## V.    CONCLUSION

For the stated reasons above, Plaintiff respectfully requests that the Court deny Defendants' Motion or grant leave to amend if the Court grants the Motion.

---

[12] Furthermore, *Varjabedian v. Emulex Corp.* does not support Defendants' request for dismissal with prejudice. In that case, the parties had been litigating for nearly five years and plaintiff had already been given leave to amend twice. No. SACV 15-00554-CJC(JCGx), 2020 WL 1847708, at *12 n. 10 (C.D. Cal. Feb. 25, 2020).

[13] Defendants' § 20(a) control person challenges rely on their § 10(b) primary liability arguments and thus fail for the same reasons stated herein. *See* Mot. at 31:17-32:1.

DATED: June 9, 2021

Respectfully Submitted,

**ROCHE FREEDMAN LLP**

*/s/ Constantine P. Economides*

Constantine P. Economides (*pro hac vice*)
Ivy T. Ngo (249860)
Velvel (Devin) Freedman (*pro hac vice*)
200 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 971-5943
Emails: ceconomides@rcfllp.com
                ingo@rcfllp.com
                vel@rcfllp.com

*Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall (290685)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on June 9, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

By:    */s/ Constantine P. Economides*
         Constantine P. Economides