UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SONA NANOTECH, INC. SECURITIES LITIGATION | Case No. 2:20-cv-11405-MCS-MAA<br><br>**ORDER GRANTING MOTION TO DISMISS AND GRANTING LEAVE TO AMEND** |

Before the Court is a motion to dismiss by Defendants Robert Randall, David Regan, Darren Rowles, and Sona Nanotech, Inc. (ECF No. 56.) Lead Plaintiff Meridian Media Ventures Inc. filed an opposition to the motion to dismiss. (ECF No. 60.) Defendants Replied. (ECF No. 62.) The Court deemed the matter appropriate for decision without oral argument and vacated the hearing. *See* Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15. The motion to dismiss is granted with leave to amend.

**I. PLAINTIFFS' ALLEGATIONS**

This securities fraud matter stems from Sona Nanotech, Inc., "a Canadian company engaged in the research and development of gold nanorod products for diagnostic tests and medical treatments." First Amended Compl. ("FAC") ¶ 4. (ECF No. 51.) Sona tried and failed to develop an antigen nasal swab test to detect the

COVID-19 virus. Plaintiffs allege several "fraudulent misrepresentations made by Defendant Sona and its top executives with respect to [Sona's] ability and progress in developing, validating, and obtaining regulatory authorization for its COVID-19 nasal swab antigen test." *Id.* These top executives are: David Regan, Sona's Chief Executive Officer since July 8, 2020, and a strategic advisor prior to his promotion to CEO; Robert Randall, Sona's Chief Financial Officer; and Darren Rowles, Sona's founding CEO and President, and Chief Scientific Officer since July 8, 2020. *Id.* ¶¶ 34–36. Plaintiffs allege that Defendants made material misrepresentations for over a year about the progress of the development of its antigen nasal swab COVID-19 tests that caused stock prices to rise 14,545% before falling again precipitously. *Id.* ¶ 94.

On February 10, 2020, Sona issued a press release announcing that it would use its proprietary nanotechnology to develop an antigen test to detect COVID-19. *Id.* ¶ 78. During the rest of February and early March, Sona announced it would be partnering with The Native Antigen Company, Bond Digital Health, and GE Healthcare Life Sciences to aid in the development of Sona's COVID-19 test. *Id.* ¶¶ 79–81. Sona finally announced the development of its antigen test was underway on March 12. *Id.* ¶ 83.

Sona operated in a complicated and swiftly changing regulatory environment. In response to the COVID-19 pandemic, the Food and Drug Administration ("FDA") and Secretary of Health and Human Services began a process to allow Emergency Use Authorizations ("EUAs") for various drugs to fight COVID-19. This included antigen tests to detect COVID-19. The FDA can issue an EUA for a drug if the drug may be effective at preventing a certain disease, if the known and potential benefits outweigh the known and potential risks, and if there is no adequate, approved, and available alternative. *Id.* ¶ 49. The FDA prioritizes EUA applications based on public health need and safety, the effectiveness and safety of the drug, the potential role in national security, and the significance of any unmet need. *Id.* ¶ 50.

On May 9, 2020, the FDA announced it had approved its first antigen COVID-19 test and stated it expected more approvals to follow. *Id.* ¶ 52. On May 11, 2020, the

FDA announced revised guidance for the development of COVID-19 tests seeking EUA approval. *Id.* ¶ 57. The FDA stressed the importance of properly validating the tests, *id.* ¶ 58, and it recommended four validation approaches: limit of detection/analytical sensitivity, cross-reactivity/analytical specificity, microbial interference, and clinical agreement study (preferably on humans). *Id.* ¶ 60. The FDA also stressed the importance of live clinical specimens and did not recommend using recombinant antigen for the limit of detection determination. *Id.* ¶¶ 62–63. The FDA authorized 7 antigen tests by October 28, 2020, and 17 total antigen tests by March 30, 2021. *Id.* ¶¶ 71, 75.

Canada and the European Union had similar emergency regulatory approval processes. Health Canada, the Canadian regulator, operated under an Interim Order to approve COVID-19 tests, *id.* ¶ 15, and the European Union granted CE marks[1] to allow companies to sell COVID-19 tests throughout Europe. *Id.* ¶ 20.

Plaintiffs claim Sona's misleading statements began on March 18, 2020. These misleading statements centered around Sona's progress of developing a COVID-19 test for eventual EUA and Health Canada approval. The alleged misrepresentations are as follows:

- March 18, 2020: Sona announced it had commenced development of a functional prototype of its rapid-response COVID-19 test. *Id.* ¶ 112.
- March 30, 2020: Sona announced qualified laboratory technicians were working with samples of COVID-19 antigen and antibodies and stated it expected to benefit from the regulatory relief offered by the FDA. *Id.* ¶ 114.
- March 31, 2020: Sona announced it had received a $4.1 million grant from "NGen, Canada's Advanced Manufacturing Supercluster," to be used to

---

[1] A CE mark signifies that products sold in the European Economic Area have been assessed to meet high safety, health, and environmental protection requirements. *CE marking*, European Commission (Oct. 25, 2021), https://ec.europa.eu/growth/single-market/ce-marking_en.

accelerate the development of the Sona prototype with a view of toward deploying point-of-care testing with Canadian authorities as soon as possible. *Id.* ¶ 116.

- April 13, 2020: Sona announced it had progressed from feasibility and prototype testing of its antigen test to the optimization stage, including testing a working prototype in a hospital laboratory environment with live patient samples. *Id.* ¶¶ 118–20.
- May 12, 2020: Sona announced it had moved to conducting validation testing with live virus testing for submission to regulators. Sona indicated it was in "advanced discussions" to partner with a U.S. laboratory to conduct this testing through the month of May. *Id.* ¶ 122. Sona also announced in the same press release that the antigen test did not respond to de-activated viruses. *Id.* ¶ 162. After this announcement, Sona's share price fell 28%. *Id.* ¶ 163.
- May 22, 2020: Sona announced it partnered with MRIGlobal to perform validation studies for the antigen test and that these studies would follow the FDA's guidance for antigen testing. *Id.* ¶ 124.
- July 2, 2020: Sona announced validation results for its antigen test with a test sensitivity of 96%, a test specificity of 96%, and a "Limit of Detection of 2.1 x $10^2$ $TCID^{50}$." *Id.* ¶ 127. Sona further expressed plans to enter into independent clinical, in-field evaluation studies to generate data to support its FDA and Health Canada submissions, *id.* ¶ 128, which Sona touted as a "further milestone achieved for Sona along [its] path to bring a quality rapid test to scale." *Id.* ¶ 129.
- July 8, 2020: Sona announced it had "achieved the extraordinary by bringing a COVID-19 rapid, point-of-care antigen test to fruition in four months" and had laid the groundwork to quickly deliver its COVID-19 test through regulatory approval and into customers' hands in the coming months. *Id.* ¶ 132–133.
- August 6, 2020: Sona announced delays in its COVID-19 clinical studies due to ethics review board approvals and needing to make study modifications to

accommodate regulatory updates. *Id.* ¶ 137. Sona also explained it was performing clinical, in-field testing to determine the effect environmental or containment factors or human error have on test performance. *Id.* ¶ 164. After this announcement, share prices fell over 34%. *Id.* ¶ 165.

- August 20, 2020: Sona announced it expected to release a report on its clinical, in-field evaluation studies for the antigen test in the next week and stated it would use this data to support regulatory submissions to the FDA and Health Canada. *Id.* ¶ 139.
- August 25, 2020: Sona announced the result of its clinical, in-field evaluation as achieving a sensitivity of 84.6% and a specificity of 90% across 99 clinical samples, including 39 positive samples and 60 negative samples. Sona also announced it was continuing its submission of data to the FDA and Health Canada. *Id.* ¶ 141.
- August 31, 2020: Sona announced that the previous week it completed its submissions to the FDA and Health Canada for authorizations for the Sona COVID-19 antigen test. *Id.* ¶ 144.
- October 1, 2020: Regan gave a radio interview where he stated that Sona is 100% confident that the nasal swab will get approved even though the timeline for approval is unclear. *Id.* ¶ 187.
- October 29, 2020: Sona announced the FDA did not grant an EUA for the Sona COVID-19 antigen test and stated the FDA had deprioritized continuing the EUA approval process for Sona's test. *Id.* ¶ 146. Sona claimed that the FDA only deprioritized the EUA application and stated the FDA did not comment on the performance of Sona's antigen test. *Id.* ¶¶ 146, 169. Sona also announced that it continued seek approval of its antigen test in Canada. *Id.* ¶ 147–148. Sona's share price fell 48% upon this announcement. *Id.* ¶ 170.
- November 25, 2020: Sona announced it withdrew its application for authorization for its antigen test from Health Canada. *Id.* ¶¶ 150, 173. Sona noted the evolving

regulatory landscape made a challenging environment for both test developers and regulators evaluating the submissions. *Id.* ¶ 150. Sona's share price fell 67% upon this announcement. *Id.* ¶ 174.

- November 30, 2020: Sona announced it would collect further data to support FDA and Health Canada submissions and would use past trial data to obtain a CE mark in Europe. *Id.* ¶ 152. Sona also announced that although every testing partner confirmed the ability of the Sona antigen test to detect COVID-19 with strong results from its in-field trials, *id.* ¶ 153, Health Canada stated the internal verification Sona's antigen test reached very different results, with the test detecting only 7 out of 39 positive samples in the 0–6 days from symptom onset range. *Id.* ¶ 177.
- December 16, 2020: Sona announced it closed an unbrokered private placement for $2.26 million in gross proceeds to finance further clinical data for its antigen test and the pursuit of a CE mark in Europe. *Id.* ¶ 155.
- December 31, 2020: Sona announced it received a CE mark from the European Union for the Sona antigen test and could begin taking firm orders in territories accepting a CE mark. *Id.* ¶ 158.
- March 1, 2021: Sona announced it was continuing to work with several potential partners to secure additional clinical trial support for other potential regulatory submissions. *Id.* ¶ 180. Sona also disclosed that it had not yet received any firm orders after obtaining a CE mark. *Id.* ¶ 181. On this news, Sona's share price fell over 13%. *Id.* ¶ 182.

In addition to these identified misrepresentations, Plaintiffs also pleaded general allegations supporting scienter. For the individual Defendants,[2] Plaintiffs identify

---

[2] Plaintiffs' allegations for scienter apply equally to Sona and its high level officers. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 998 (9th Cir. 2008) (holding that a plaintiff alleges both the company and its high level officers have the same scienter when the plaintiff alleges that high level managers are responsible for day-to-

several statements from Sona press releases that amount to the various Defendants confirming their role in overseeing the development of the COVID-19 test and the regulatory approval process. *Id.* ¶¶ 185–93.

Based on these allegations, Plaintiffs brought claims against Sona and three Sona executives for violating section 10(b) of the Exchange Act and SEC Rule 10b-5, as well as for violations of section 20(a) of the Exchange Act against the three executives. *Id.* ¶¶ 209–28. The Amended Complaint is brought on behalf of Plaintiffs and a putative class "of all persons and entities that purchased, or otherwise acquired, Sona securities during the Class Period" of March 18, 2020 to March 1, 2021 subject to enumerated exclusions. *Id.* ¶ 198.

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Generally, a court must accept the factual allegations in the pleadings as true and view them in the light most favorable to the plaintiff. *Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017); *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

"[C]laims under section 10(b) and Rule 10b-5 must not only meet the requirements of Rule 8, but must satisfy the heightened pleading requirements of both

---

day operations of the company).

Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act" ("PSLRA"). *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012); *see also Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014) ("Rule 9(b) applies to all elements of a securities fraud action."). Under Rule 9(b), Plaintiffs must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The complaint must identify the "who, what, when, where, and how" of the fraudulent misconduct, "as well as what is false or misleading about" the fraud, and "why it is false." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotation marks omitted).

## III. DISCUSSION

Section 10(b) forbids the "use or employ, in connection with the purchase or sale of any security… [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements section 10(b) by declaring it unlawful:

a. To employ any device, scheme, or artifice to defraud,

b. To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, or

c. To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under section 10(b) and Rule 10b-5, a plaintiff must adequately allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Nguyen v. Endologix, Inc.*, 962

F.3d 405, 413 (9th Cir. 2020). To state a claim under section 20(a), a plaintiff must adequately allege: (1) a primary violation of federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Thus, if the underlying primary violation of federal securities law is insufficiently alleged, the section 20(a) claim fails as well. *Nguyen*, 962 F.3d at 419.

Defendants argue that Plaintiffs' claims under section 10(b) and Rule 10b-5 fail because the underlying claims are not a misrepresentation or omission of material information and because Plaintiffs insufficiently allege scienter. Defendants also argue the section 20(a) claims fail because the primary section 10(b) and Rule 10b-5 claims fail.

**A. Misrepresentation**

A public company has a duty not to mislead a reasonable investor through its statements. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008). Though the securities laws impose no affirmative duty to disclose any and all material information, once a company chooses to bring positive information to the market, it must also disclose adverse information that cuts against the positive information. *See Schueneman v. Arena Pharmaceuticals*, 840 F.3d 698, 705–06 (9th Cir. 2018).

Plaintiffs argue that Sona misrepresented the success of its test to the public in several ways. First, they claim Sona did not disclose it had not completed live clinical trials when it announced the commencement of creating a functional prototype on March 18, 2020. FAC ¶¶ 113, 115, 117, 121. Second, they argue Sona did not disclose that its clinical trials did not have "adequate enrollment criteria, assessment at POC settings, or antigen test procedures" and were not set up to yield sufficient data to meet the FDA's or Health Canada's criteria for EUA approval. *Id.* ¶¶ 123, 126, 130, 133. Third, they allege Sona was aware that its "in-field validation studies had not been set up to yield sufficient data to demonstrate the antigen test's performance" in a way that

would meet FDA or Health Canada criteria. *Id.* ¶¶ 137, 140, 143, 145, 149. Fourth, Plaintiffs claim Sona's statement that the FDA did not comment on the deprioritization of Sona's EUA application omitted that Sona's bad clinical test performance affected the FDA's deprioritization determination. *Id.* ¶ 149. Fifth, they allege that Sona did not reveal it was or would focus on securing clinical trials for a saliva-based antigen test instead of its existing nasal swab antigen test and that it would not have any firm orders for selling its nasal swab antigen test after obtaining a CE mark. *Id.* ¶¶ 154, 157, 161. Plaintiffs also claim each statement Sona made during the class period identified above is misrepresentative.

Defendants argue there were no misrepresentations or omissions and that none of Sona's statements were false. Defendants are correct on both grounds.

Under Rule 9(b), it is not sufficient to meet the requirement that "[a]verments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged" by copying verbatim or almost verbatim the reason why different statements on different topics are fraudulent. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). The PSLRA and Rule 9(b) demand more. A plaintiff must specifically allege why each statement meets each element of section 10(b) and Rule 10b-5, including the misrepresentation made. *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 605 ("Rule 9(b) applies to all elements of a securities fraud action, including loss causation."). Plaintiffs, by giving the duplicative misrepresentation explanations for sixteen different statements, *see* FAC ¶¶ 113-161, fail to *specifically* allege why each statement constitutes a misrepresentation. *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 605.

Regarding the statements during the class period, none of these statements were untrue. The March 18, 2020, statement that Sona had commenced the development of a prototype was literally true, as were Sona's statements on March 30 and 31 about partnerships it made to perform the testing. Thus, "[b]ecause the complaint does not allege that Defendants falsely represented their actual . . . plans and expectations, the

allegations are insufficient to plead falsity." *In re Rigel Pharms., Inc. Secs. Litig.*, 697 F.3d 869, 882 (9th Cir. 2012). Plaintiffs also plead nothing indicating that the statements from April 16 to July 2 were untrue, which either report how Sona was conducting testing of its nasal swab or results of its nasal swab testing.

Plaintiffs make much of Sona's statement that it brought a rapid antigen COVID-19 test "to fruition" on July 8, but this argument leaves much to be desired. The most plausible interpretation of this statement is that Sona created a rapid antigen test that works—which, after Sona's July 2 statement touting excellent test results from its live virus testing, is again literally true. *See Berson*, 527 F.3d at 986 (holding that the most plausible interpretation of any company's statements governs the misrepresentation analysis). Plaintiffs' argument that this is a misrepresentation because "to fruition" meant that Sona had an FDA ready test strains plausibility for two reasons. First, the most plausible meaning of this statement is that Sona merely created a test that works. Because Sona touted excellent results on July 2, this is a true statement. Second, about a week earlier on July 2, Sona stated it was moving forward to start clinical, in-field evaluation studies. A reasonable investor would not think that the clinical, in-field testing announced on July 2 would be finished in a week after live virus testing took two months, FAC ¶¶ 124-29, so this statement does not plausibly imply that Sona created an FDA ready test.

The statements all throughout August about the antigen test delays, the antigen test clinical trial results, and Sona's FDA submissions are also literally true, and Plaintiffs plead no information alleging otherwise. The next statement Plaintiffs focus on is the October 1, 2020, interview where Regan said he is 100% confident the nasal swab would get FDA approval. Plaintiffs claim this statement is a misrepresentation because the statement presented a falsely optimistic picture for FDA submission when the metrics of the clinical testing should have indicated otherwise. But this statement is just a hopeful statement by Regan that did not come true. "Vague, optimistic

statements" are "not actionable," so this statement cannot qualify as a misrepresentation. *Lloyd v. CVB Financial Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016). *See also Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021) ("[I]t is not enough to plead that a challenged statement rests on subsidiary premises about how various future events will play out over the timeframe defined by the forward-looking statement."). Additionally, Plaintiffs plead no specific allegations indicating that Regan believed or knew this statement was false.[3]

Plaintiffs' five other general misrepresentation arguments listed above are premised on selectively withholding negative information that when later released caused stock prices to fall. The arguments related to the failure to meet FDA and Health Canada standards fail as a matter of pleading. Plaintiffs nowhere allege how any of Sona's trials failed to meet the FDA testing requirements, the same testing requirements Plaintiffs detail in the First Amended Complaint. FAC ¶ 49–75. This is insufficient under Rule 9(b) because Plaintiffs did not plead how the tests failed to meet FDA requirements. *Cafasso*, 637 F.3d at 1055 (The complaint must identify the "who, what, when, where, and how" of the fraudulent misconduct.). The Plaintiffs' claim that Sona misrepresented why the FDA deprioritized its EUA application fails for a similar failure to allege what the FDA actually communicated to Sona.

Plaintiffs' alleged misrepresentation regarding Sona omitting any mention of seeking clinical trials for a saliva antigen test fails because Plaintiffs allege no information that Sona could not proceed with clinical trials for both a saliva-based test and a nasal swab test. Thus, Plaintiffs have not alleged Sona made statements that would mislead a reasonable investor. *Berson*, 527 F.3d at 986.

---

[3] This mirrors Defendants' argument that many of the statements are protected by the PSLRA safe harbor provision. See 15 U.S.C. § 78u-5, Mot. to Dismiss, at 28 n. 43. The Court declines to resolve this question because other grounds suffice to resolve the motion to dismiss.

Plaintiffs' other omission-based argument mirrors the specific factual misrepresentations Plaintiffs claim Sona made. These misrepresentations include that Sona did not disclose until May 12 it was not using live virus culture or patient samples up to that point, FAC ¶ 162, that Sona did not disclose until August 6 that there was a two week delay in its clinical, in-field evaluation studies, *id.* ¶ 164, that Sona did not disclose until October 29 that the FDA deprioritized Sona's EUA application, *id.* ¶ 169, that Sona did not disclose until November 25 that it withdrew its application for an Interim Order from Health Canada, *id.* ¶ 173, and that Sona did not disclose that the Health Canada internal study only found 7 positive samples in a study of 39 positive samples. *Id.* ¶ 177.

To start, the only allegations Plaintiffs bring to substantiate these omissions come directly from Sona's own press releases. A plaintiff is "hard-pressed to build a fraud case" from publicly disclosed information. *Nguyen*, 962 F.3d at 416 (declining to find misrepresentation or omission from information disclosed on an investor call). To state a plausible claim of omission with the particularity required by Rule 9(b) and the PSLRA, Plaintiffs would likely have to allege that Sona hid the information for a long time and only released the negative information after investors would have made investment decisions based on the solely positive information. But the Ninth Circuit has recognized that "the subsequent release of more extensive information was not actionable" in another setting, so even that may not suffice here. *In re Rigel*, 697 F.3d at 881 (holding it is not a misleading omission to later report additional cases of harmful side effects after an initial release of information about side effects).

Plaintiffs cite two cases for the proposition that a company must disclose any negative information the company possesses whenever the company releases good news. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1010 (9th Cir. 2018) ("[O]nce Orexigen chose to tout the apparently positive 25 percent interim results, Orexigen had the obligation to disclose that they were likely unreliable."); *Schueneman*, 840 F.3d at 708 (holding a plaintiff adequately alleged misrepresentation when a

company affirmatively said all studies completed supported a case for FDA approval when the company knew one study did not). That is all well and good, but the facts Plaintiffs allege show Sona followed that requirement. Sona made all of these supposed revelations public in its own press statements, and there is no allegation that Sona deliberately sat on any of this information before delayed public disclosure or had this information when making earlier rosy projections. Rule 9(b) and the PSLRA require more to sufficiently allege misrepresentation.

Thus, Plaintiffs fail to identify any actionable misrepresentations or omissions in their First Amended Complaint.

**B. Scienter**

A plaintiff can establish scienter "by showing deliberate recklessness or 'some degree of intentional or conscious misconduct.'" *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016) (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008)). "'Deliberate recklessness is an *extreme* departure from the standards of ordinary care which presents a danger of misleading… that is either known to the defendant or is so *obvious* that the actor must have been aware of it.'" *Webb v. SolarCity Corp.*, 884 F.3d 844, 851 (9th Cir. 2018) (citations omitted) (emphasis in original).

The PSLRA requires that the inference of scienter be "strong" and that the Court "take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007). "The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegation holistically."). Allegations of scienter also have to pass the hurdle of Rule 9(b) and PSLRA pleading requirements. *Nguyen*, 962 F.3d at 414.

Defendants make two arguments for why Plaintiffs insufficiently pleaded scienter: that the pleading does not meet the standards of Rule 9(b) and the PSLRA and

that there is no motive that is "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. The Defendants are correct on both points.

Plaintiffs only allegations supporting scienter for both Sona and the individual Defendants are a series of allegations that amount to describing that the individual Defendants, in their roles as corporate officers, run Sona. Thus, Plaintiffs only offer a general inference that Defendants knew Sona's statements were incorrect based on an apparent possession of contradictory information. This is woefully insufficient. A plaintiff cannot rely on generalizations devoid of any specific statements of intent or deliberate recklessness. *Or. Pub. Empls. Ret. Fund*, 774 F.3d at 608. Rule 9(b) and the PSLRA require far more.

Even if Plaintiffs' allegations fail on an individual basis, though, *Tellabs* requires that courts consider the entire complaint as a whole and compare the inferences urged by Plaintiffs with the inferences rationally drawn from the facts alleged. 551 U.S. at 314. In this task, a recent case from the Ninth Circuit, *Nguyen v. Endologix, Inc.*, is instructive. In *Nguyen*, the plaintiff sued after Endologix, Inc. made promising statements about FDA approval of a medical device that ultimately failed to receive FDA approval. The Ninth Circuit affirmed the dismissal of the complaint for failure to allege scienter, noting that "[u]nder the facts alleged, plaintiff's core theory—that the company invested in a U.S. clinical trial and made promising statements about FDA approval, yet knew from its experience in Europe that the FDA would eventually reject the product—has no basis in logic or common experience." *Nguyen*, 962 F.3d at 408. Instead, "the more plausible inference [was] that the company made optimistic statements about its prospects for FDA approval because its U.S. testing looked promising, not because the company was quixotically seeking FDA approval for a medical device application it knew was destined for defeat." *Id*. Given the intense factual similarity to the situation here, *Nguyen* governs the Court's analysis.

The apparent inferences Plaintiffs ask the Court to draw is that Sona and its

executives concealed false information to raise the stock price of Sona. What is missing is the motive for doing so or how the executives would benefit. Although it is not automatically fatal to scienter to fail to allege a personal financial motive in the fraudulent scheme, personal financial motive matters in the balancing analysis. *Tellabs*, 551 U.S. at 325. *See also Prodanova v. Panthera Investment Fund, L.P.*, 993 F.3d 1097, 1107 (9th Cir. 2021) ("Generally we expect that a financial motive for securities fraud will be clear; for example, someone inside a company stands to gain a substantial profit by engaging in deceptive behavior, such as selling shares before the company discloses negative information."). Additionally, alleging solely access to information by the individual Defendants in their roles as corporate officers is insufficient to allege scienter. See *DSAM Global Value Fund v. Altris Software, Inc*., 288 F.3d 385, 390 (9th Cir. 2002).

The more plausible inference that arises from the entire complaint is that Sona simply did a bad job in developing a nasal swab antigen test for COVID-19. Though Plaintiffs try, "[f]aulting a company for poor business decisions does not equal scienter." *In re Jones Soda Co. Secs. Litig*., 393 Fed. App'x 507, 509 (9th Cir. 2010). When even gross negligence does not suffice to allege scienter, *DSAM*, 288 F.3d at 387, this inference comes nowhere close to meeting the strict requirements of *Tellabs*. Plaintiffs urge the Court to adopt the unreasonable inference that Defendants sought for some unspecified reason to inflate stock prices by withholding bad information it later released at specific times in pursuit of some unspecified strategy to accrue some unspecified benefit. The much more reasonable inference is like the one in *Nguyen*—that a company tried and failed to get FDA approval for a product after optimistic predictions that just did not pan out.

Thus, the Plaintiffs fail to allege scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

## IV. CONCLUSION

Plaintiffs fail to allege misrepresentation and scienter. Thus, Plaintiffs fail to meet

all the elements necessary to allege a section 10(b) and Rule 10b-5 violation. Since Plaintiffs fail to allege primary section 10(b) claims, their derivative section 20(a) claims against the individual Defendants fail as well. *Nguyen*, 962 F.3d at 419.

Defendants ask the Court to dismiss with prejudice, but many of the pleading deficiencies identified in this Order appear to be curable. Given the Ninth Circuit policy of granting leave to amend with "extreme liberality," *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020) (internal quotation marks omitted), the Court gives Plaintiffs leave to amend. Thus, Defendants' motion to dismiss (ECF No. 56) is granted with leave to amend.[4]

Plaintiff may file an amended complaint no later than 14 days from the date of this Order, if it can do so consistent with Federal Rule of Civil Procedure 11(b) and this Order. Failure to file a timely amended complaint will waive the right to do so. Leave to add new defendants or claims must be sought by a separate, properly noticed motion.

**IT IS SO ORDERED.**

Dated: October 28, 2021

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE

[4] Because the Court grants Defendants' motion to dismiss entirely on the basis of the complaint, the Court denies Defendant's Request for Judicial Notice (Mem. Req. for Jud. Not., ECF No. 56) as moot.