**ROCHE FREEDMAN LLP**
Ivy T. Ngo (249860)
Velvel (Devin) Freedman (*pro hac vice*)
Constantine P. Economides (*pro hac vice*)
1 SE 3rd Avenue, Suite 1240
Miami, Florida 33131
Telephone: (786) 924-2900
Facsimile: (646) 392-8842
ingo@rochefreedman.com
vel@rochefreedman.com
ceconomides@rochefreedman.com

*Lead Counsel for the Class*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re SONA NANOTECH INC. SECURITIES LITIGATION | Case No.:  2:20-cv-11405-MCS-MAA |
| | **SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| This Document Relates To: ALL ACTIONS. | <u>CLASS ACTION</u> JUDGE: Mark C. Scarsi |

# TABLE OF CONTENTS

I.     NATURE OF THE ACTION .............................................................. 1

II.    JURISDICTION AND VENUE ....................................................... 12

III.   PARTIES .......................................................................................... 13

IV.    SUBSTANTIVE ALLEGATIONS ................................................. 16

     A.   The Emergence and Rapid Spread of COVID-19 ................. 16

     B.   The FDA's Continued Commitment to Addressing COVID-19 ........... 17

     C.   Sona Enters the Race to Bring a COVID-19 Antigen Test to Market... 29

     D.   Defendants Mislead Investors Regarding the Adequacy of Sona's Optimization and Validation of its Nasal Swab Test............................ 32

     E.   Defendants Conceal the Truth Behind the FDA's Rejection of Sona's EUA Request and the Withdrawal of Its Health Canada Application ........... 36

     F.   Defendants Misleadingly Convey a Path Forward Via More Clinical Data, Commercialization in the EU, and a COVID-19 Saliva Test ...... 38

V.     DEFENDANTS' MISLEADING STATEMENTS ......................... 42

     A.   Sona's "Validation" Studies ............................................... 42

     B.   Sona's "Focus" on the FDA and Health Canada's Request for More Clinical Data from Patients Within 0-6 Days of Symptom Onset and Commercialization Based on a CE Mark ............................... 54

VI.    THE TRUTH SLOWLY EMERGES ............................................. 58

     The August 6, 2020 Partial Disclosure ...................................58

     The October 29, 2020 Partial Disclosure ................................59

     The November 25, 2020 Partial Disclosure .............................60

     The March 1, 2021 Partial Disclosure .....................................62

VII.   ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER .... 63

VIII.  LOSS CAUSATION ...................................................................... 78

IX.    CLASS ACTION ALLEGATIONS ............................................... 79

X.     PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET ........... 81

XI.    INAPPLICABILITY OF SAFE HARBOR ................................... 82

XII.   CLAIMS FOR RELIEF ................................................................. 82

i

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

COUNT I ................................................................................... 82

COUNT II .................................................................................. 86

XIII.  PRAYER FOR RELIEF ...................................................... 87

XIV.  DEMAND FOR TRIAL BY JURY ......................................... 87

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff Meridian Media Ventures Inc. ("Meridian" or "Plaintiff"), by and through its attorneys, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to its own acts and on information and belief as to all other matters. Plaintiff bases this information and belief on, among other things, the investigation conducted by its counsel, which included, among other things, a review of public filings made by Sona Nanotech, Inc. ("Sona" or the "Company") and the U.S. Food and Drug Administration ("FDA"); press releases, analyst reports, public statements, news articles and other publications disseminated by or concerning Sona; independent factual sources; and other publicly available information. Counsel's investigation into the matters alleged herein is ongoing, and many relevant facts are known only to Defendants or are exclusively within their custody or control. Plaintiff's investigation indicates substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.   This is a federal securities class action brought on behalf of a Class consisting of all persons and entities that purchased or otherwise acquired the publicly traded securities of Sona between May 12, 2020 and June 10, 2021, inclusive (the "Class Period"), against Sona and corporate insiders, David Regan ("Regan"), Robert Randall ("Randall"), and Darren Rowles ("Rowles") (collectively, "Individual Defendants") (together with Sona, "Defendants"), pursuing remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission ("SEC").

2.   The ongoing COVID-19 pandemic has caused massive social and economic disruption. It has led to the largest global recession since the Great Depression, widespread supply shortages, the postponement and cancellation of events, including businesses and schools, agricultural and food shortages, and

1

massive strains on healthcare systems, grinding global society to a halt for most of the year 2020, and we continue to feel the effects of COVID-19 today. Early in the pandemic, it became clear that diagnosing individuals during the acute phase of infection (*i.e.*, within 0-6 days following infection or symptom onset) would be key to slowing or preventing outbreaks, critical to restoring society to some semblance of normal. The World Health Organization stated: "You cannot fight a fire blindfolded. And we cannot stop this pandemic if we don't know who is infected. We have a simple message for all countries: test, test, test."[1]

3.      To clarify, "acute" refers to a period of elevated biological infectivity following infection. As the days from symptom onset increases, the biological infectivity (*i.e.*, the viral load) decreases. During the acute phase of COVID-19, generally defined as 0-6 days following infection, SARS-CoV-2 is shed *via* the nose and throat. Put simply, during the first 6 six days of onset of COVID-19 symptoms an infected individual is most contagious, and the viral antigens of SARS-CoV-2 are generally detectable through a nose swab or saliva test. Therefore, to address the public need of detecting COVID-19 as soon as possible, as quickly as possible, and in as many settings as possible, developers and manufacturers began seeking regulatory authorization for the emergency use of antigen tests.

4.      To address the need for COVID-19 diagnostic tests, the FDA utilized its emergency use authorization ("EUA") authority to relax validation requirements for companies developing screening tests, dramatically shortening the timeframe in which new tests could be brought to market. These loosened regulatory restrictions put the onus on companies developing COVID-19 diagnostic tests to adhere to industry standards regarding proper validation and submission requirements. While

---

[1] *WHO Director-General's opening remarks at the media briefing on COVID-19*, WORLD HEALTH ORGANIZATION (Mar. 16, 2020), https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---16-march-2020 (last visited Nov. 10, 2021).

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the EUA submission process allowed for a fast-track to market, developers had to ensure that their tests were accurate, reliable and capable of performing their intended use – to help stop the spread of COVID-19.

5.     The FDA may issue an EUA if it concludes that certain statutory criteria have been met, including, but not limited to: (i) it is ***reasonable to believe that a product may be effective for its specified use***, based on available scientific evidence; and (ii) a product's ***known and potential benefits outweigh its known and potential risks*** when used to diagnose, prevent, or treat the identified disease or condition. When weighing the benefits and risks, the FDA looks at all the scientific evidence, including, but not limited to, ***results of clinical trials*** and in vitro data. The FDA will also assess the quality and quantity of the available evidence.

6.     Further, when processing an EUA request, the FDA establishes priorities based on a variety of factors, including, but not limited to: (i) the ***public need*** for that product; (ii) the ***availability and adequacy of information about whether the product is safe and effective*** in preventing, treating, or diagnosing the condition; and (iii) the potential role ***that use*** of the product ***may have in ensuring national security***.

7.     As part of its response to the COVID-19 pandemic, the FDA issued guidances and templates to laboratories, manufacturers, and developers to help accelerate the development of COVID-19 tests to address the ongoing public health emergency. On May 11, 2020, the FDA issued a revised guidance (originally issued on May 4, 2020) explaining that, "[i]n the context of a public health emergency involving pandemic infectious disease, it is critically important that tests are validated because false results not only can negatively impact the individual patient but also can have broad public health impact."[2] As part of the May 11 guidance, the FDA provided a template, available through download as a *[fill-in-the-blank]* word

---

[2] Unless otherwise noted, internal citations are omitted and emphasis is added.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

document, specific for antigen test developers called the "Antigen Template for Manufacturers" ("May 11 Template").

8.     One subsection of the May 11 Template was the "Proposed Intended Use", providing developers pre-set paragraphs with guidance on what information to fill in specific to its test. The second paragraph under the Proposed Intended Use section included the following sentence, "Antigen is generally detectable in *[specimen type] **during the acute phase of infection**.*"

9.     Further, the May 11 Template gave instructions on best practices for each recommended validation study, including the use of live specimens for the Limit of Detection (LoD)/Analytical Sensitivity study, and detailed the Clinical Study data and protocols a developer would need to show in their EUA applications. Specifically, the May 11 Template provided that "if the device [wa]s intended for near patient testing or Point-of-Care (POC), [the developer was instructed to] provide data to demonstrate that non-laboratory personnel c[ould] perform the test accurately in the intended use environment (*i.e.* a non-laboratorian healthcare provider accuracy study)."

10.     This case arises from fraudulent statements made by Defendants which omitted material facts with respect to the Company's ability to successfully validate, optimize, and obtain regulatory authorization for its COVID-19 antigen, nasal swab test ("Nasal Swab Test" or "Test"), and its saliva test ("Saliva Test") (collectively, "COVID-19 Antigen Tests") designed for a POC setting.

11.     Defendants conveyed to investors that Sona – a Canadian company engaged in the research and development of gold nanorod particles for diagnostic tests and medical treatments, on the brick of extinction prior to COVID-19, with nothing more than years of operating at a loss and mounting debt – was succeeding at every step of optimizing and validating its COVID-19 Antigen Tests pursuant to regulatory requirements. Defendants assured investors that Sona had the team, expertise, protocols, and resources to meet those parameters and rapidly commercialize.

4

Throughout the Class Period, Defendants touted developmental milestones, making it seem as though Sona was on the verge of regulatory authorization and commercialization of an accurate and reliable antigen test. Indeed, regarding Sona's Nasal Swab Test, Defendant Regan even assured investors that ***"[w]e're 100% confident that it gets approved***."

12.    In reality, Defendants' abilities, efforts, and success were subpar. They initially planned to use the wrong type of virus samples and hence were not prepared to properly conduct the in-field clinical evaluations necessary for use in a POC setting. They used inadequate enrollment criteria and improper antigen test handling procedures. Their in-field testing was not properly designed to yield sufficient data to demonstrate the efficacy of Sona's Nasal Swab Test within 0-6 days of symptom onset – its intended use – because the majority of the patients they enrolled in their clinical study were outside that range. And their submission for authorization to the FDA (and Health Canada) was inferior to those of the at least 14 other antigen tests that received EUAs during the Class Period. Relying on Defendants' statements, Sona's shareholders thought they had invested in a sophisticated all-star team developing a leading antigen test. Instead, shareholders had invested in a team that was struggling at every turn and would ultimately abandon their pursuit of regulatory approval themselves.

13.    In the three months leading up to the announcement of Sona's plans to develop a COVID-19 antigen test, its stock was trading on the Canadian Stock Exchange ("CSE") in a market range of $0.01 to $0.21 per share, on trading volumes of no more than 320,500 shares. Then, in February 2020, following Defendants February 10th announcement of Sona's COVID-19 antigen test development and subsequent disclosures of its industry partnerships, as detailed below, the Company's market price range and trading volumes saw a significant rise to a monthly high of $0.64 per share on trading volumes of 4,989,214 shares, on the CSE. In the week

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

leading up to the start of the Class Period, Sona's securities traded between $2.04 and $1.39 on the CSE, and $1.43 and $0.98 on the OTC.

14.   Defendants capitalized on this intense investor interest, obtaining much-needed governmental funding. On March 31, 2020, Sona announced that it had been awarded a $4.1 million grant from NGen, Canada's Advanced Manufacturing Supercluster, to develop and commercialize its COVID-19 antigen test.

15.   On the first day of the Class Period, May 12, 2020, following the release of the FDA's May 11 guidance and corresponding antigen template, Defendants announced that "Sona [wa]s moving to test its devices with live virus culture and/or patient samples as part of a **_formal clinical study_**," describing "**_advanced discussions for arrangements with a leading U.S. laboratory to provide the independent clinical trial data._**" Defendants added that "**_[e]nsuring tests work effectively in a clinical lab and patient setting is critical to the ultimate success_** of any test" and stated that the Company "**_continues to work with regulators_** in anticipation of finalizing a submission to Health Canada for approval and making its formal submission to the FDA for the granting of an [EUA]." Sona informed investors that this verification and validation work would be conducted through the month of May. Then on May 22, 2020, Defendants boasted that Sona was "moving into the **_final validation process_**" of its Nasal Swab Test.

16.   By July 2, 2020, Defendants announced hard data they described as "excellent performance results [that] are underpinned by our unique nanorod technology," reporting that Sona's "laboratory validation studies of performance levels have resulted in a test sensitivity of 96%, test specificity of 96% and a Limit of Detection (LoD) of 2.1 x 102 TCID50 ... which corresponds to **_an ability to detect the virus in patients with 'low' viral loads_** in 10-15 minutes." Defendants also conveyed that Sona was conducting additional field studies with results by the end of July, "at which time [it] intend[ed] to make final submissions to regulatory authorities in

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

multiple jurisdictions." Just six days later, on July 8, 2020, Defendant Rowles reiterated Sona's success, proclaiming that it "ha[d] achieved the extraordinary by bringing a COVID-19 rapid, ***point-of-care*** antigen test to fruition in four months."

17.   Sona's message to investors was that of a success story – because the clinical results showed the Nasal Swab Test worked when the viral load was low, the Company succeeded in validating it worked for its intended use of detecting COVID-19 antigens within 0-6 days of symptom onset when the viral load is high. Those unequivocal statements to investors caused explosive growth in Sona's securities. As described by one analyst, "[i]nvestors [had] pushed an $0.11 stock to an all-time high of $16.05 a share by July 2[8]" – yielding a "14,545% return on this best-performing COVID-19 stock in just six months."

18.   Because of Defendants' overwhelmingly positive statements, investors were caught unaware when, on August 6, 2020, Sona announced a two-week delay in the results of its field validation studies. This delay, which Defendants misleadingly blamed on external factors rather than revealing their validation studies were fundamentally flawed, again pushed out the date of Sona's FDA and Health Canada submissions.

19.   Nonetheless, by August 25, 2020, Defendants conveyed that Sona was back on track. Defendants released seemingly positive data, including that its "test achieved a sensitivity of 84.6% and a specificity of 90.0% in a study across 99 collected clinical patient samples," and informed investors that Sona "is now continuing its submission of data to both the FDA and Health Canada to support their requirements for emergency use authorization."

20.   Once again, Defendants' message to investors was one of adequacy and success. Sona had portrayed that its all-star team of scientists and consultants had engaged in rigorous validation testing yielding positive results and submitted strong applications in the U.S. and Canada. Indeed, Regan declared on October 1, 2020,

7

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

regarding Sona's Nasal Swab Test, "[w]e're **100% confident that it gets approved**. There's smart questions being asked, and we have **strong data on our test**."

21.    However, on October 29, 2020, Defendants stunned investors with the news that the FDA had declined Sona's EUA request for its Nasal Swab Test. According to Defendants, "the FDA has indicated that our test is not a priority for them at this time" but "did not comment on the performance of the Sona test." The reality—as eventually revealed—was that Sona's validation studies were lacking and flawed. Sona had failed to demonstrate that its Test would satisfy an emergency public need, or in other words, it failed to show that its Nasal Swab Test worked for its intended use of rapid and accurate COVID-19 screening **within 0-6 days of symptom onset in a POC setting**—as compared to the seven other antigen tests that had received EUAs to-date.

22.    Instead of revealing that truth, however, Defendants continued to mislead and conceal material facts about Sona's Test and the FDA's reasons for the denial. Defendants pivoted away from the FDA's rejection, stating that "Health Canada continues its evaluation of the Company's application for an Interim Order ("IO") authorization for its test as a 'point-of-care' medical diagnostic device" and just "yesterday [the Company] received additional questions on its application."

23.    But Defendants' concealment of their deficient submission was short-lived. On November 25, 2020, they announced that Sona, based on feedback from Health Canada, had withdrawn its application. Once again, Defendants refused to admit that Sona's validation data had been insufficient to demonstrate its test's intended use. Instead, Defendant Rowles affirmed that "[w]e have confidence in our rapid COVID-19 antigen test and its ability to detect the virus, especially within the first week of symptom onset." He again blamed the failed FDA and Health Canada authorizations on generalizations that "[t]he regulatory approval path for antigen tests is new with evolving guidelines and Sona's test is unique, creating a challenging

8

environment for test developers and regulators alike."

24.    Defendants continued to vouch for the performance of Sona's test on November 30, 2020, despite disclosing that it "intends to obtain additional data and use it to augment its submission with the FDA and potentially for a resubmission to Health Canada." Defendant Regan specifically noted that "every entity that has evaluated our test has confirmed its ability to detect the COVID-19 virus and it achieved strong results from our in-field trials."

25.    But the issue was not whether Sona's test detected the COVID-19 virus or that the FDA and Health Canada had trouble assessing antigen tests in general, or Sona's Test, in particular. Indeed, the FDA issued EUAs for eleven COVID-19 antigen tests in 2020. Rather, contrary to Defendants' consistent statements to investors that Sona's Test was supported by clinical data demonstrating that the test met the public need of detecting of COVID-19 in its acute phase, the Company had failed to enroll enough individuals in its clinical trial whose symptom onset was within 0-6 days to be able to show that the Test was a reliable and effective screening tool for that population.

26.    Following the damning rejections by the FDA and Health Canada, Defendants continued conveying to investors that there was a pathway to commercialization and profitability for Sona's Nasal Swab Test while it was also accelerating validation of its Saliva Test. Specifically, on December 16, 2020, while announcing the closing of a $2.26M unbrokered private placement, Defendants provided that the funds would go towards "produc[ing] further clinical trial data for its rapid COVID-19 antigen nasal pharyngeal test" and "pursu[ing] a European regulatory self-certification CE Mark declaration …."

27.    By December 31, 2020, Sona had received a CE Mark for its Nasal Swab Test, which "declare[d] the conformity of the Sona test with [European Union (EU)] regulations and allow[ed] Sona to commercialize its test throughout Europe and

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

potentially other territories in which the CE Mark [wa]s recognized." In other words, Sona was "now able to take firm orders in territories accepting a CE Mark."

28.    But Defendants knew, and failed to disclose to investors, that Sona had a difficult, if not non-existent, path forward with its Nasal Swab Test and thus the Company focused its efforts on its Saliva Test.

29.    On March 1, 2021, Defendants finally confirmed that, after four months had passed since announcing the need for an additional clinical trial for Sona's Nasal Swab Test, it *still* lacked a sponsoring institution, a principal investigator, a study protocol, relevant medical ethics review board approval, and Health Canada Investigational Testing Division approval. As to the EU, Sona *still* had not obtained any "firm orders" in over three months since receiving the CE Mark for its Nasal Swab Test. On this news, Sona's share price fell over 13%.

30.    In attempt to capitalize on what was left of the Company's artificially inflated securities price, on March 23, 2021, Sona announced the filing of a preliminary short form base self-prospectus (the "Shelf Prospectus") in Canada. In fact, the stated purpose of the Shelf Prospectus was "to provide the Company with the financial flexibility to take advantage of financing opportunities and favorable market conditions, if and when desired, once the filing is made final." Sona filed the Prospectus Supplement to the Shelf Prospectus, on April 9, 2021, finalized by its execution of an equity distribution agreement with Canaccord Genuity Corporation, allowing the Company to sell, from time to time, capital of the Company through an At-the-Market Common Share Offering ("ATM Offering").

31.    Shortly thereafter, on April 12, 2021, Defendants confirmed investors' suspicions that Sona was not as focused on its Nasal Swab Test as previously represented when, Defendants remained silent about an additional clinical trial for that test but touted that Sona had secured a clinical trial for its Saliva Test. While the Nasal Swab Test was lost cause, for the rest of the Class Period, Defendants reassured

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

investors that Sona had a viable path to profitability through its Saliva Test.

32.    However, the full truth was revealed just before the markets opened on June 11, 2021, when Defendants announced Sona was halting its clinical trial for its Saliva Test. Sona had once again failed to design and conduct a successful clinical trial. Based on the revelation that the Company had no path forward with either of its COVID-19 Antigen Tests, its share price plummeted over **70%**.

33.    In sum, Defendants repeatedly omitted material facts that artificially inflated and/or maintained the artificial price of Sona's securities. Specifically, during the Class Period, Defendants made materially misleading statements and failed to disclose that: (1) Sona's in-field clinical evaluation of its Nasal Swab Test did not have adequate enrollment criteria, failed to demonstrate assessment in a point of care (POC) setting, and/or lacked proper antigen test handling procedures; (2) as a result, such validation testing would take longer than a month to complete; (3) Sona's validation testing specifically did not include a sufficient number of patients whose symptom onset was within 0-6 days and did not produce sufficient data for use in a POC setting; (4) as a result, Sona's regulatory submissions failed to demonstrate the Test's intended use of meeting a public need of detecting COVID-19 in its acute phase; (5) as a result, Sona's EUA application failed to meet the FDA's criteria for EUA, including "the public health need for the product," and forced the Company to withdraw its submission to Health Canada for IO authorization in order to obtain that additional data; (6) after its in-field clinical evaluation proved inadequate, Sona did not obtain additional study data for supplemental regulatory submissions for its Nasal Swab Test, despite promising to do so; (7) despite obtaining the CE Mark, it would not spur any "firm orders" as of March 1, 2021, due to the abundant availability of competing antigen tests, many of which had not only received a CE Mark, but also had already received EUAs for their COVID-19 diagnostic tests; (8) despite the significant decrease in individuals with COVID-19 after vaccines began rolling out

11

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

in Canada in December 2020, Sona proceeded to design and conduct a clinical study for its Saliva Test in Toronto despite struggling to ensure its technology could work for the Saliva Test just in a laboratory setting; (9) as a result, the Company would ultimately halt its clinical trial for its Saliva Test; (10) given these facts, Sona would be unable to financially capitalize on the need for rapid detection of COVID-19 in its acute phase, a need that was being fulfilled by numerous other antigen tests; and (11) as a result, Defendants' statements about Sona's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

34.    Defendants' misleading statements caused Sona securities to trade at inflated prices during the Class Period. After disclosure of Defendants' material omissions and/or materialization of the risks they concealed, Sona securities suffered a precipitous decline in market value, thereby causing significant losses and damages to Plaintiff and the Class.

## II.    JURISDICTION AND VENUE

35.    The claims asserted herein arise under §§ 10(b), 20(a) of the Exchange Act, 15 U.S.C. § 78j(b), § 78t(a); and Rule 10b-5, promulgated thereunder by the SEC, 17 C.F.R. § 240.10b.

36.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and § 27 of the Exchange Act, 15 U.S.C. § 78aa, because this is a civil action arising under the laws of the U.S.

37.    Further, this Court has personal jurisdiction over Defendants because they made the alleged materially misleading statements which omitted material facts in, and/or directed them to persons in, this District.

38.    Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), (d). Acts and transactions constituting the alleged violations of law occurred and/or affected persons in this District.

39.    Moreover, this Complaint is being filed in this District as the original

12

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

action, *Alperstein v. Sona Nanotech, Inc. et al.*, Case No. 2:20-cv-11405-MCS-MAA, and the follow up action, *Powers v. Sona Nanotech, Inc. et al.*, Case No. 2:21-cv-00169-MCS-MAA, which were consolidated pursuant to Fed. R. Civ. P. 42(a) (ECF No. 43), were filed in this District.

40.   The securities at issue in this action were traded in the U.S. Sona registered and issued securities in the U.S. on the over-the-counter ("OTC") market.

41.   In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the facilities of the national securities exchanges.

## III.   PARTIES

42.   Plaintiff, as set forth in its PSLRA Certification (ECF No. 29-1), acquired or purchased Sona securities at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations alleged herein.

43.   Defendant Sona, engaged in the research and development of gold nanorod products for diagnostic tests and medical treatments, is a Canadian corporation with its head office located at Purdy's Wharf Tower II, Suite 2001 – 1969 Upper Water Street, Halifax, Nova Scotia, Canada B3J 3R7. Sona's securities trade on the OTC under the ticker symbol "SNANF" and the CSE under the ticker symbol "SONA".

44.   Defendant Regan has served as Sona's Chief Executive Officer ("CEO") since July 8, 2020 and, for four months prior to his promotion, served as a strategic advisor to the Company. The Company touted that Regan brought to the position more than 15 years of experience with capital markets, mergers and acquisitions, and international business, having served as an officer and director of public companies, and previously as a management consultant in both New York and London. Regan is currently serving as a director for Katalyst Wind, Inc. and Norvista Capital

13

Corporation and Chairman-Atlantic Canada Chapter at Ernest C. Manning Innovation Awards Foundation. Prior to joining Sona, Regan served as Executive Vice President-Corporate Development at WildBrain Ltd., a Canadian media, production, and brand licensing company, and held a Principal position at Export Development Canada, Canada's export credit agency responsible for facilitating trade between Canada and other countries. Regan received an undergraduate degree from St. Francis Xavier University and an MBA from INSEAD.

45.     Defendant Randall has served as Sona's Chief Financial Officer ("CFO") and Secretary at all relevant times. Randall also serves as CFO for Torrent Capital Ltd., Antler Gold, Inc., and CFO and Secretary for eXeBlock Technology Corp. In addition, he is a Member of Canadian Institute of Chartered Accountants, the Institute of Chartered Accountants of Nova Scotia, and Chartered Professional Accountants of Canada. Prior to his role at Sona, Randall served as Chairman for Nova Scotia Sport Hall of Fame, CFO for NSGold Corp., kneat.com, Inc., Fortune Bay Corp., Ceylon Graphite Corp., NWest Energy Corp., and Metallum Resources, Inc.; CFO and Secretary for G6 Materials Corp. and Duckworth Capital Corp.; CFO and Vice President for Stockport Exploration, Inc.; Secretary for Canabo Medical, Inc.; Principal at Coopers & Lybrand International and PricewaterhouseCoopers LLP; and Controller for NovaGold Resources, Inc., Etruscan Resources, Inc. and Endeavour Mining Corp. Randall received an undergraduate degree from Saint Mary's University.

46.     Defendant Rowles, Sona's founding CEO, served in this position until July 8, 2020 when he became Sona's President and Chief Scientific Officer ("CSO"). Rowles also serves as President and CEO of Sona Nanotech Ltd., a subsidiary of Sona. The Company described Rowles as a commercially minded scientist with 14 years of experience in the diagnostic and nanoparticle market, specializing in product manufacturing and development in the area of noble metal nanoparticles and lateral

14

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

flow diagnostics. The Company claimed that Rowles is a key opinion leader at industry seminars and conference and acts as an Advisory Board Member to the World Gold Council. Prior to joining Sona, Rowles was the Product Marketing Manager at BBI Solutions OEM Ltd., a leading diagnostic manufacturer and developer, serving the global diagnostics industry with gold nanoparticles, production of immune-diagnostics reagents, antibody development, lateral flow services, and mobile diagnostics. Rowles received an undergraduate degree from Cardiff Metropolitan University and an MBA from the University of Bath.

47.    Each of the Individual Defendants:

- directly participated in the management of Sona;

- was directly involved in the day-to-day operations of Sona at the highest levels;

- was privy to confidential proprietary information concerning Sona and its business operations;

- was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the misleading statements and information alleged herein;

- was directly or indirectly involved in the oversight or implementation of Sona's internal controls;

- was aware or recklessly disregarded that the misleading statements alleged herein were being issued about Sona; and/or

- approved or ratified said misleading statements about Sona in violation of the federal securities laws.

48.    As such, because of the Individual Defendants' positions with Sona, they possessed the power and authority to control the contents of all filings issued by, as well as the press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of Sona's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially misleading. The Individual Defendants are liable for the misleading statements pled herein.

49.     Defendant Sona is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Sona under *respondeat superior* and agency principles.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.     The Emergence and Rapid Spread of COVID-19

50.     In December 2019, a novel and highly contagious strain of coronavirus, "severe acute respiratory syndrome coronavirus 2" (SARS-CoV-2), and the disease it causes "Coronavirus Disease 2019" (COVID-19), was detected in China. Since then, COVID-19 has posed a significant threat to public safety worldwide because of its ability to spread rapidly and cause debilitating symptoms. As a result, COVID-19 has led to millions of deaths worldwide, significantly impacted healthcare systems, and caused traumatic societal disruption.

51.     On January 30, 2020, the World Health Organization ("WHO"), declared the COVID-19 outbreak a Public Health Emergency of International Concern. The next day, the Secretary of the Department of Health and Human Services ("HHS") declared a public health emergency pursuant to § 319 of the Public Health Services Act for the entire U.S. to aid in the nation's health care community response to the COVID-19 outbreak.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

52.   By early February 2020, over 101 countries, including the U.S., had reported multiple cases of COVID-19. In particular, traveler-associated cases had been identified in multiple states and community-based transmission was suspected.

53.   As a result, on February 4, 2020, the HHS Secretary determined, pursuant to § 564 of the Federal Food, Drug and Cosmetic Act ("FD&C Act"), that COVID-19 presented a public health emergency and had significant potential to affect national security or the health and security of U.S. citizens living abroad.[3] Accordingly, the Secretary found that circumstances existed to justify EUA of *in vitro* diagnostics to detect and/or diagnose COVID-19 for use in the outbreak. Specifically, the Secretary declared COVID-19 a significant public health challenge requiring the Government's sustained, coordinated proactive response to contain and mitigate its spread.

54.   Shortly after the U.S. reported its first COVID-19 death on February 29, 2020 (though later reports would confirm earlier deaths had occurred), state and local governments began limiting business and social activities to try to stop the spread of the virus. These measures contributed to a severe economic downturn.

55.   The human and economic devastation wrought by COVID-19 spurred an unprecedented campaign by regulatory agencies, clinical laboratories, and commercial manufacturers to work together to develop and commercialize novel tests for the rapid detection of COVID-19. Specifically, the FDA determined that rapid detection of cases and contacts, clinical management and infection control, and community mitigation were key to effectively responding to the COVID-19 outbreak.

**B.    The FDA's Continued Commitment to Addressing COVID-19**

56.   The FDA, an HHS agency, regulates clinical investigations of products in its jurisdiction, such as drugs, biological products, and medical devices.

---

[3] U.S. DEPT. OF HEALTH & HUMAN SERVICES, *Public Health Emergency* (Mar. 11, 2020),  https://www.phe.gov/Preparedness/legal/prepact/Pages/COVID19.aspx  (last visited Apr. 18, 2021).

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

57.    Pursuant to § 564 of the FD&C Act, as amended by the Pandemic and All-Hazards Preparedness Reauthorization Act of 2013 ("PAHPRA"), once the HHS Secretary issues an EUA declaration, the FDA may use its EUA authority to allow the use of unapproved medical products, or unapproved uses of approved medical products, to diagnose, treat, or prevent serious or life-threatening diseases.[4]

58.    In particular, the PAHPRA enhances the FDA's authority to support emergency preparedness and response and foster the development and availability of medical products, also referred to as "medical countermeasures" or "MCMs," for use in public health, military, and domestic emergencies involving chemical, biological, radiological, and nuclear ("CBRN") agents, including novel infectious diseases. MCMs include drugs, biological products, and devices (*e.g.*, *in vitro* diagnostics[5]).

59.    During the effective period of the HHS Secretary's EUA declaration, the FDA may issue an EUA if it concludes the following statutory criteria have been met:

- CBRN agent(s) in the HHS Secretary's EUA declaration must be capable of causing a ***serious or life-threatening disease or condition***.

- Candidate products "***may be effective***" to prevent, diagnose, or treat serious or life-threatening diseases that can be caused by the CBRN agent(s) in the HHS Secretary's EUA declaration. This "may be effective" standard requires less evidence than the "effectiveness" standard for FDA product approvals. The ***FDA assesses potential effectiveness based on circumstance-dependent and product-specific risk-benefit determinations and issues an EUA if it is reasonable to***

---

[4] U.S. DEPT. OF HEALTH & HUMAN SERVICES, *Emergency Use Authorization of Medical Products and Related Authorities* (Jan. 2017), https://www.fda.gov/media/97321/download.

[5] *In vitro* diagnostic (IVD) devices are tests performed on samples taken from the human body, such as swabs of mucus from inside the nose or back of the throat, or blood from a vein or fingerstick. IVDs can detect diseases or other conditions and can be used to monitor a person's overall health to help cure, treat, or prevent diseases. COVID-19 related IVDs include diagnostic tests (molecular tests and antigen tests); serology/antibody tests; and tests for management of COVID-19 patients.

18

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*believe that a product may be effective for its specified use*, *based on available scientific evidence*.

- The FDA determines that a product's known and potential benefits outweigh its known and potential risks when used to diagnose, prevent, or treat the identified disease or condition. For this analysis, the *FDA looks at all the scientific evidence, including (but not limited to): results of clinical trials and in vitro data. The FDA will also assess the quality and quantity of the available evidence*, given the current state of scientific knowledge.

- There must be *no adequate, approved, and available alternative* to the product for diagnosing, preventing, or treating the disease or condition. That said, an alternative may be considered "unavailable" if there are insufficient supplies to meet the emergency need and "inadequate" if contraindicating data exists for special circumstances or populations.

60.   When processing an EUA request, the FDA establishes priorities based on a variety of factors, including (but not limited to):

- *Public health need for the product* and, when known, the safety and effectiveness of other potential MCMs;

- Availability and adequacy of information about *whether the product is safe and effective in preventing, treating, or diagnosing the condition*;

- The *potential role that use of the product may have in ensuring national security*; and

- The *extent to which the product would serve a significant unmet medical need*, including what stage the emergency response is in (*e.g.*, evolving understanding of a disease/condition and/or MCMs in the context of an ongoing public health response, availability of prior authorized MCMs).

61.   As part of its response to the COVID-19 pandemic, the FDA issued new guidance to laboratories seeking to develop diagnostic tests to achieve more rapid testing capacity in the United States through a new policy on February 29, 2020[6]

---

[6] U.S. Food & Drug Admin., *Coronavirus (COVID-19) Update: FDA Issues New Policy to Help Expedite Availability of Diagnostics* (Feb. 29, 2020), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-

19

(updated on March 16, 2020[7]). This guidance allowed for laboratories certified to perform high-complexity testing, under the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), 42 U.S.C. § 263a, to immediately use tests they developed and validated while seeking an EUA with the FDA. In issuing this new policy, FDA Commissioner Stephen M. Hahn, M.D. said, "[w]e will continue to help to ensure sound science prior to clinical testing and follow-up with the critical independent review from the FDA, while quickly expanding testing capabilities in the U.S. *We are not changing our standards for issuing Emergency Use Authorizations*. This action today reflects our public health commitment to addressing critical public health needs and rapidly responding and adapting to this dynamic and evolving situation."

62.   On May 9, 2020, the FDA announced its authorization of the first COVID-19 antigen test, noting that "[d]iagnostic testing is one of the pillars of our nation's response to COVID-19 and the FDA continues to take actions to help make these critical products available, including by issuing EUAs."[8] The FDA added:

> [W]e expect more [authorizations] to follow. We also anticipate providing an EUA template for antigen tests, similar to ones we've released for other test types, to help manufacturers streamline submissions and help expedite our review and issuance of additional EUAs.

---

update-fda-issues-new-policy-help-expedite-availability-diagnostics.

[7] U.S. FOOD & DRUG ADMIN., *Coronavirus (COVID-19) Update: FDA Provides More Regulatory Relief During Outbreak, Continues to Help Expedite Availability of Diagnostics* (Mar. 16, 2020), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-provides-more-regulatory-relief-during-outbreak-continues-help.

[8] U.S. FOOD & DRUG ADMIN., *Coronavirus (COVID-19) Update: FDA Authorizes First Antigen Test to Help in the Rapid Detection of the Virus that Causes COVID-19 in Patients* (May 9, 2020), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-first-antigen-test-help-rapid-detection-virus-causes.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Antigen tests will play a critical role in the fight against COVID-19 and we will continue to offer support and expertise to help with the development of accurate tests, and to review and monitor marketed tests to ensure accuracy, while balancing the urgent need for these critical diagnostics.

63.     Former FDA Commissioner Scott Gottlieb called this FDA approval "a real game-changer."[9] Jennifer A. Dlouhy of Bloomberg likewise said it "could mark a breakthrough in screening for the virus and comes as state and local governments ease lockdown orders and businesses begin reopening across the nation – and as health professionals argue that swift screening is essential to temper new outbreaks."

64.     Researchers estimate that people infected with the coronavirus can spread it 2-3 days before symptoms start and are most contagious the first week symptoms appear.[10] During this time, there are high levels of viral shedding – where the virus leaves a cell to infect other cells in the body or in other people – especially in the throat and lungs. This heavy viral load helps explain why COVID-19 is so infectious.[11] Accurate rapid diagnostic tests are thus extremely important in the first week of infection to prevent infected individuals from coming in contact with others while they are still shedding the virus at a high level.

65.     Diagnostic tests currently available are RT-PCR, or molecular, tests which detect the genetic material from a virus, and antigen tests which detect specific

---

[9] Jennifer A. Dlouhy, *Ex-FDA Chief Calls New Covid-19 Antigen Test a 'Game-Changer'*, BLOOMBERG (May 9, 2020), https://www.bloomberg.com/news/articles/2020-05-09/fda-authorizes-quidel-s-antigen-test-first-of-its-kind-in-u-s.

[10] NGB, *Virological Assessment of hospitalized patients with COVID-2019* (Mar. 2020), https://www.nature.com/articles/s41586-020-2196-x_reference.pdf.

[11] Tina Hesman Saey, *Coronavirus is most contagious before and during the first week of symptoms*, SCIENCENEWS (Mar. 13, 2020, 4:36 PM), https://www.sciencenews.org/article/coronavirus-most-contagious-before-during-first-week-symptoms.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

proteins on the surface of a virus.[12] Molecular tests are more expensive, more complex and results may take up to a week.[13] Thus, the main advantages of antigen tests are speed (results in minutes), price (lower production cost), and ability to scale to millions of tests a day (simpler design).[14]

66.    However, the drawback to antigen tests is that they are less reliable because they are less sensitive. In other words, positive results are highly accurate, but negative results do not rule out presence of the virus. Dr. Ashish Jha, Director of the Harvard Global Health Institute noted, "[i]t's ideal to have low false positives and false negatives, but usually you're trading off between the two. The reason you're willing to live with more false positives is you want to be able to screen people, and if they are negative you want to feel confident that they are truly negative."[15]

67.    On May 11, 2020, the FDA issued revised guidance (originally issued on May 4, 2020) for its staff, clinical laboratories, and commercial manufacturers to help accelerate the development and availability of COVID-19 tests for the duration of the

---

[12] U.S. FOOD & DRUG ADMIN., *Coronavirus Testing Basics* (May 2020), https://www.fda.gov/media/138094/download.

[13] Katie Mettler, *FDA issues emergency approval of new antigen test that is cheaper, faster and simpler*, THE WASHINGTON POST (May 9, 2020, 5:26 PM EDT), https://www.washingtonpost.com/health/2020/05/09/fda-issues-emergency-approval-new-antigen-test-that-is-cheaper-faster-simpler/.

[14] U.S. FOOD & DRUG ADMIN., *Coronavirus (COVID-19) Update: FDA Authorizes First Antigen Test to Help in the Rapid Detection of the Virus that Causes COVID-19 in Patients* (May 9, 2020) https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-first-antigen-test-help-rapid-detection-virus-causes.

[15] Andrew Jacobs, *F.D.A. Approves First Antigen Test for Detecting the Coronavirus*, THE NEW YORK TIMES (May 9, 2020), https://www.nytimes.com/2020/05/09/health/antigen-testing-fda-coronavirus.html.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

public health emergency.[16] The FDA declared that the policies "will help address the[] urgent public health concerns by helping to expand the number and variety of tests, as well as available testing capabilities in reference and commercial laboratories and healthcare settings, while helping ensure these tests are accurate and reliable."

68.     In this guidance, the FDA explained that "[i]n the context of a public health emergency involving pandemic infectious disease, it is ***critically important that tests are validated*** because false results not only can negatively impact the individual patient but also can have broad public health impact." Accordingly, while the FDA "provide[d] recommendations regarding validation of COVID-19 tests based on the available information," it "encourage[d] test developers to discuss any alternative technological approaches to validating their test with FDA."

69.     Under this guidance, testing was limited to laboratories certified under CLIA or similarly qualified non-U.S. laboratories, and as applicable, POC.

70.     In addition, COVID-19 antigen tests were defined as those that "detect proteins that are part of the SARS-CoV-2 virus directly from clinical specimens." For these tests, the FDA recommended conducting the following validation studies:

- Limit of Detection (LoD)/Analytical Sensitivity
- Cross-reactivity/Analytical Specificity
- Microbial Interference
- Clinical Agreement Study – to establish performance characteristics (*e.g.*, sensitivity/PPA, specificity/NPA), preferably on humans

71.     In addition, the FDA made available through download, a template that antigen test developers could use to facilitate the preparation, submission, and authorization of an EUA ("May 11 Template").[17] The template also included more

---

[16] U.S. FOOD & DRUG ADMIN., *Policy for Coronavirus Disease-2019 Tests During the Public Health Emergency (Revised)* (May 4, 2020) ("May 11 Guidance"), https://www.fda.gov/media/135659/download.

[17] *In Vitro Diagnostics EUAs - Antigen Template for Manufacturers*, FDA (May 11,

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

recommendations concerning the above-referenced validation studies as well as other information that should be provided to the FDA in the pre-EUA/EUA submission process. Alternative approaches could be used, but the FDA encouraged developers to "discuss any alternative approaches to validating their test with FDA."

72.   One subsection of the May 11 Template was "Proposed Intended Use", providing developers with pre-set paragraphs describing antigen tests' intended use with blanks to provide specific information relevant to the test being presented for review. The second paragraph under the Proposed Intended Use section included the following sentence, "Antigen is generally detectable in *[specimen type]* **during the acute phase of infection**."

73.   When providing additional guidance related to the Limit of Detection (LoD) – Analytical Sensitivity, the May 11 Template added that "[t]he use of **recombinant antigen is not recommended** for the LoD determination."

74.   In addition, the May 11 Template provided guidance regarding specific information and protocols developers must demonstrate through their Clinical Evaluation. Specifically, the template provided (but was not limited to) the following:

- Use of natural clinical specimens is needed for the clinical evaluation. Use of contrived clinical specimens is not acceptable.
- Only high sensitivity EUA RT-PCR test which uses a chemical lysis step followed by solid phase extraction of nucleic acid (*e.g.*, silica bead extraction) should be used as the comparator method; and
- If the device is anticipated for near-patient testing, developer should provide any relevant information regarding user training.

75.   Further, the May 11 Template provided that "if the device [wa]s intended for near patient testing or Point of Care (POC), [the developer was instructed to]

_____

2020), https://web.archive.org/web/20200624190111/https://www.fda.gov/medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices/vitro-diagnostics-euas.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

provide data to demonstrate that non-laboratory personnel c[ould] perform the test accurately in the intended use environment (*i.e.* a non-laboratorian healthcare provider accuracy study)." Developers pursuing POC testing were also asked to "provide data to demonstrate robust use of [its] device for near patient testing (*e.g.*, as applicable, studies to demonstrate the impact of adding different volumes of sample, different volumes of reagents, incorrect order of sample or reagent application, *etc.*)" – known later as Flex Studies.

76.    A few months later, on July 6, 2020, the FDA announced authorization of a second antigen test which was further authorized for POC use. In the press release, FDA Commissioner Hahn stated that "[a]ntigen tests play an important role in the overall response against COVID-19, including as a point-of-care test that can potentially scale up to test millions of Americans quickly."[18]

77.    Then, on July 29, 2020, the FDA issued an updated "Template for Manufacturers of Molecular and Antigen Diagnostic COVID-19 Tests for Non-Laboratory Use" ("July 29 Template") which supplemented its prior May 11 Guidance.[19] The July 29 Template provided "recommendations concerning what data and information should be submitted to FDA in support of a pre-EUA/EUA submission for a molecular or antigen diagnostic test for SARS-CoV-2 for use in a non-laboratory setting. Such settings are likely to include a person's home or certain non-traditional sites such as offices, sporting events, airports, schools etc."

78.    Acceptable testing locations were expanded beyond certified laboratories

---

[18] U.S. FOOD & DRUG ADMIN, *Coronavirus (COVID-19) Update: FDA Issued Emergency Use Authorization for Point of Care Antigen Test* (July 6, 2020), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-issued-emergency-use-authorization-point-care-antigen-test.

[19] U.S. FOOD & DRUG ADMIN., *Template for Manufacturers of Molecular and Antigen Diagnostic COVID-19 Tests for Non-Laboratory Use* (July 29, 2020), https://www.fda.gov/media/140615/download.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and POC settings, to include at-home testing, so the July 29 Template provided more detailed recommendations for some performance valuation studies already defined in the May 11 Template and listed additional studies to be included in an EUA request (as applicable). With respect to the FDA's recommendations regarding the following evaluation studies, the July 29 Template referred the developer to the May 11 Template: (i) Limit of Detection (LoD) – analytical sensitivity; (ii) Inclusivity (analytical sensitivity); (iii) Cross-reactivity (analytical specificity); (iv) High-dose Hook Effect Study for antigen tests; and (v) Biotin interference.

79.    Adding to prior recommendations regarding evaluation of a test to be used in a POC setting, the July 29 Template called for Flex Studies to be performed in-house by staff who have been trained in the use of the test, with pre-defined study protocols, and provided example conditions to be evaluated for potential user errors and anticipated environmental stresses. "The flex studies should evaluate the most common or likely sources of error based on the use locations and test procedure."

80.    With regard to Clinical Evaluations, the July 29 Template provided additional recommendations (including but not limited to): patient enrollment criteria including, but not limited to, age range, diverse socioeconomic and educational backgrounds, and the inclusion of symptomatic and asymptomatic individuals; specified that "the comparator method selected should be one of the more sensitive EUAs on the FDA website;" and called for discrepant analysis "if a large number of discordant results are obtained in the clinical study."

81.    Then, on October 26, 2020, the FDA issued its "Antigen Template for Test Developers" which laid out even more detailed recommendations for valuation studies, building upon the May 11 and July 29 Templates, and included new information related to studies necessary to support a claim that a test is capable of

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

screening individuals without symptoms or other reasons to suspect COVID-19.[20]

82.   As of October 28, 2020, the FDA had authorized 285 tests under EUAs, including 222 molecular tests, 56 antibody tests, and 7 antigen tests.[21]

83.   On November 17, 2020, the FDA announced authorization of the first COVID-19 diagnostic test that could be self-administered and provide results at home. FDA Commissioner Hahn specified that "[t]his new testing option is an important diagnostic advancement to address the pandemic and reduce the public burden of disease transmission" and "[t]oday's action underscores the FDA's ongoing commitment to expand access to COVID-19 testing."[22]

84.   On December 15, 2020, the FDA announced authorization of the first OTC (*i.e.*, no prescription) at-home antigen test.[23] In the press release, Jeff Shuren, M.D., J.D., Director of FDA's Center for Devices and Radiological Health said:

> The FDA strongly supports innovation in test development, and we have worked tirelessly with test developers to support the shared goal of getting more accurate and reliable tests to Americans who need them. Today is a promising step forward and we are eager to continue advancing additional innovation in COVID-19 testing that the science

---

[20] U.S. FOOD & DRUG ADMIN., *Antigen Template for Test Developers* (Oct. 26, 2020), https://www.fda.gov/media/137907/download.

[21] U.S. FOOD & DRUG ADMIN., *Coronavirus (COVID-19) Update: October 28, 2020* (Oct. 28, 2020), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-october-28-2020.

[22] U.S. FOOD & DRUG ADMIN., *Coronavirus (COVID-19) Update: FDA Authorizes First COVID-19 Test for Self-Testing at Home* (Nov. 17, 2020), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-first-covid-19-test-self-testing-home.

[23] U.S. FOOD & DRUG ADMIN., *Coronavirus (COVID-19) Update: FDA Authorizes Antigen Test as First Over-the-Counter Fully At-Home Diagnostic Test for COVID-19* (Dec. 15, 2020), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-authorizes-antigen-test-first-over-counter-fully-home-diagnostic.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

supports. This test, like other antigen tests, is less sensitive and less specific than typical molecular tests run in a lab. However, the fact that it can be used completely at home and return results quickly means that it can play an important role in response to the pandemic.

85.   Then on March 16, 2021, the FDA issued its "Supplemental Template for Developers of Molecular and Antigen Diagnostic COVID-19 Tests for Screening with Serial Testing" to "provide supplemental recommendations for developers of molecular and antigen tests seeking claims for screening with serial testing without studying asymptomatic individuals prior to authorization, including for point-of-care (POC) and at-home tests."[24] As with prior templates, the FDA noted that it "reflects FDA's current thinking on the topic, and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word should mean that something is suggested or recommended, but not required."

86.   As of March 30, 2021, the FDA had authorized 349 tests and sample collection devices under EUAs, including 258 molecular tests and sample collection devices, 74 antibody and other immune response tests, and 17 antigen tests.[25] Of those, 42 molecular authorizations were for home-collected samples, including a molecular prescription at-home test, two antigen prescription at-home tests, an OTC at-home antigen test, and an OTC molecular test.

87.   The EUA submission process relaxed test validation requirements and dramatically shortened the timeframe in which new COVID-19 detection tests could

_____

[24] U.S. FOOD & DRUG ADMIN., *Coronavirus (COVID-19) Update: FDA takes steps to streamline path for COVID-19 screening tools, provides information to help groups establishing testing programs* (Mar. 16, 2021), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-fda-takes-steps-streamline-path-covid-19-screening-tools-provides.

[25] U.S. FOOD & DRUG ADMIN., *Coronavirus (COVID-19) Update: March 30, 2021* (Mar. 30, 2021), https://www.fda.gov/news-events/press-announcements/coronavirus-covid-19-update-march-30-2021.

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

be brought to market, but the loosening of regulatory restrictions also increased the material importance for companies developing COVID-19 screening tests to adhere to industry standards and to maintain high quality in the conduct of validation studies. Screening tests are only successful if they can guarantee accurate and consistent results, and such quality and reliability is to be shown by the successful ability of laboratories and commercial manufacturers to adhere to regulatory recommendations in the development, validation, and manufacturing of the tests.

**C.    Sona Enters the Race to Bring a COVID-19 Antigen Test to Market**

88.    Sona researches and develops gold nanorod products for diagnostic test and medical treatment applications. As COVID-19 spread rapidly across the globe and governments declared a public health emergency (*see supra* ¶¶50-53), Sona entered the race to develop a novel test for the detection of COVID-19 antigens in its acute phase.

89.    On February 10, 2020, Sona issued a press release announcing its plans to use its proprietary nanotechnology in the development of an antigen test for COVID-19, noting that "[s]creening tests are critical tools in dealing with rapidly evolving and large-scale outbreaks that tax the health care system, like this novel Coronavirus."[26] The Company then proceeded to obtain partners and advisors to help it develop and commercialize that test.

90.    On February 13, 2020, Sona announced that The Native Antigen Company ("Native") had agreed to supply biologics for its Nasal Swab Test.[27]

---

[26] *Sona Develops Rapid Screening Test for Coronavirus*, SONA NANOTECH (Feb. 10, 2020) ("February 10 Press Release"), https://sonanano.com/sona-develops-rapid-screening-test-for-coronavirus/.

[27] *Sona announces key partner for Coronavirus Rapid Screening Test*, SONA NANOTECH (Feb. 13, 2020) ("February 13 Press Release"), https://sonanano.com/sona-announces-key-partner-for-coronavirus-rapid-screening-test/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

91.    On February 18, 2020, Sona announced a partnership with Bond Digital Health ("Bond") to allow results from its Nasal Swab Test to be collected through a reader system or mobile app before being stored in the cloud.

92.    On March 3, 2020, Sona announced that it and GE Healthcare Life Sciences ("GE") would jointly complete test development of its "Covid-19 lateral flow test" utilizing GE's "FFHP Membrane, which is specifically designed to allow for multiple optimization techniques (potentially allowing the test to become market ready sooner) and fast flow performance (potentially allowing for faster individual test results)." Sona's "quick partnership" with GE, "a respected named in the industry, was **strong validation**" of the Company and its Nasal Swab Test.[28]

93.    On March 6, 2020, Sona announced the addition of Fiona Marshall ("Marshall") and Sandy Morrison ("Morrison") as scientific advisors for the development of its Nasal Swab Test. Defendant Rowles added that, "our initial laboratory work is progressing well and as a result of our collaboration with GE, we expect to **accelerate an aggressive pace in the development of this critical test**."[29]

94.    On March 12, 2020, Sona confirmed to investors that "[d]evelopment work on Sona's new test to measure the COVID-19 virus [wa]s underway in 3 separate labs in Canada, the UK and Germany" and that it "ha[d] an ongoing, open dialogue with regulators to ensure th[at] Sona's test [wa]s being developed within the parameters regulators have outlined. This approach w[ould] allow Sona to be eligible

---

[28] *Sona Partners with GE Healthcare Life Sciences to Complete Coronavirus Rapid Screening Test*, Sona Nanotech (Mar. 3, 2020) ("March 3 Press Release"), https://sonanano.com/sona-partners-with-ge-healthcare-life-sciences-to-complete-coronavirus-rapid-screening-test/.

[29] *Sona Provides Update on Coronavirus Rapid Screening Test and Announces Scientific Advisors*, Sona Nanotech (Mar. 6, 2020) ("March 6 Press Release"), https://sonanano.com/sona-provides-update-on-coronavirus-rapid-screening-test-and-announces-scientific-advisors/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

for FDA review through their Emergency Use Authorization (EUA) pathway and a fast-track to market."[30]

95.   On March 18, 2020, Sona confirmed that it had "commenced development of a functional prototype of the rapid-response test."[31] On this news, Sona's share price increased 23%. And on March 30, 2020, Sona assured investors that "[Q]ualified laboratory technicians are working with samples of the virus' antigen and antibodies."[32]

96.   Then, on March 31, 2020, Sona announced that it had received a "$4.1 million grant from NGen, Canada's Advanced Manufacturing Supercluster" and the Company planned to use the grant "to accelerate the development of a prototype and scale manufacturing capabilities with a view to deploying this Covid-19 virus-detecting, point-of-care test with Canadian medical authorities as soon as possible." Sona added that, "NGen will play a valuable role in project funding, enabling the acceleration of the development, and enhancing the scope of the Company's project to deploy its proprietary gold nanorod technology towards a credible, easy to use, rapid response, point-of-care Covid-19 test."[33]

---

[30] *Sona Provides Corporate Update*, SONA NANOTECH (Mar. 12, 2020) ("March 12 Press Release"), https://sonanano.com/sona-provides-corporate-update/.

[31] *Sona Achieves Significant Milestone in Covid-19 Test Development*, SONA NANOTECH (Mar. 18, 2020) ("March 18 Press Release"), https://sonanano.com/sona-achieves-significant-milestone-in-covid-19-test-development/.

[32] *Sona Nanotech Enters into a Manufacturing Service Agreement and a Sale Letter of Intent Agreement for 2mm Tests*, SONA NANOTECH (Mar. 30, 2020), https://sonanano.com/sona-nanotech-enters-into-a-manufacturing-service-agreement-and-a-sale-letter-of-intent-agreement-for-2mm-tests/.

[33] *Sona Nanotech Awarded $4.1 Million from NGen for Rapid Development and Launch of COVID-19 Antigen Test*, SONA NANOTECH (Mar. 31, 2020), https://sonanano.com/sona-nanotech-awarded-4-1-million-from-ngen-for-rapid-development-and-launch-of-covid-19-antigen-test/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

97. By April 13, 2020, Sona had "tested a working prototype in a hospital laboratory environment with live, Covid-19 patient samples, achieving positive results" and "[p]rogressed from feasibility and prototype testing to the optimization stage….during which work will be done to ensure it attains maximum performance in both quality and accuracy." The prior week, Sona had "[c]ommenced work with two, third-party laboratories to prepare validation protocols."[34]

98. As such, leading up to the Class Period, Sona presented itself as poised to enter the COVID-19 antigen testing market with an innovative, successful rapid test closely guided by the FDA.

## D. Defendants Mislead Investors Regarding the Adequacy of Sona's Optimization and Validation of its Nasal Swab Test

99. On May 12, 2020, Defendants began a misleading campaign touting Sona's ability and success in validating and obtaining regulatory authorization for its Nasal Swab Test. Over the course of the ensuing year, they convinced investors that Sona was excelling in those endeavors. Indeed, Defendants' descriptions of Sona's success with its proprietary Nasal Swab Test drove the price of the Company's securities from less than $1 per share to over $14 per share.

100. Driving that meteoric growth, Defendants described a well-oiled machine steaming ahead with extraordinary success on an exceptional product. When, at times, Defendants revealed setbacks, they obfuscated the true causes and seriousness of those obstacles. Specifically, Defendants conveyed that external forces were to blame for the delays of an otherwise streamlined and robust optimization and validation process.

101. On the first day of the Class Period, May 12, 2020, Defendants reported

---

[34] *Sona Nanotech Provides a Progress Update on its Covid-19 Antigen Test*, SONA NANOTECH (Apr. 13, 2020) ("April 13 Press Release"), https://sonanano.com/sona-nanotech-provides-a-progress-update-on-its-covid-19-antigen-test/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

that "[i]n order to conduct sufficient validation testing for submission for use to regulators," Sona was "moving to *test its devices with live virus culture and/or patient samples as part of a formal clinical study*."[35] Defendants also affirmed their ability to optimize and validate Sona's Nasal Swab Test, describing "advanced discussions for arrangements with a leading U.S. laboratory to provide the independent clinical trial data."

102. On May 22, 2020, Defendants elaborated that Sona had engaged "MRIGlobal, a leading applied scientific research organization, to provide analytical and clinical validation studies for Sona's COVID-19 rapid detection, point-of-care, antigen test which will be used for submission to Health Canada for regulatory approval and the FDA for Emergency Use Authorization (EUA)."[36] Defendant Rowles touted that "[w]e are delighted to be *moving into the final validation process* and looking forward to the potential of a test that can tangibly advance the safety and quality of life for our communities." Hence, Defendants' message to investors was that Sona was well equipped to produce the necessary validation data for its regulatory submissions and was on the cusp of successfully obtaining EUA approval.

103. By July 2, 2020, Defendants bolstered that message with hard data they described as "excellent performance results" that are "underpinned by our unique nanorod technology."[37] They reported that their "rapid detection, COVID-19 antigen

[35] *Sona Nanotech Provides Covid-19 Antigen Test Progress Update*, SONA NANOTECH (May 12, 2020) ("May 12 Press Release"), https://sonanano.com/sona-nanotech-provides-covid-19-antigen-test-progress-update/.

[36] *Sona Nanotech Engages MRIGlobal for COVID-19 Test Validation Studies*, SONA NANOTECH (May 22, 2020) ("May 22 Press Release"), https://sonanano.com/sona-nanotech-engages-mriglobal-for-covid-19-test-validation-studies/.

[37] *Sona Nanotech Announces Validation Results for its COVID-19 Antigen Test*, SONA NANOTECH (July 2, 2020) ("July 2 Press Release"), https://sonanano.com/sona-nanotech-engages-mriglobal-for-covid-19-test-validation-studies/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

test's laboratory validation studies of performance levels have resulted in a test sensitivity of 96%, test specificity of 96% and a Limit of Detection ("LOD") of 2.1 x 102 TCID50 ... which corresponds to ***an ability to detect the virus in patients with 'low' viral loads*** in 10-15 minutes."

104.  Defendants further conveyed that Sona was conducting additional field studies with results by the end of July, "at which time [Sona] intend[ed] to make final submissions to regulatory authorities in multiple jurisdictions." Sona's message again, was that it was succeeding with optimizing and validating its test.

105.  Just six days later, on July 8, 2020, Defendant Rowles reiterated the success, publicizing that Sona "has achieved the extraordinary by ***bringing a COVID-19 rapid, point-of-care antigen test to fruition*** in four months."

106.  Those unequivocal statements to investors caused explosive growth in Sona's securities. As described by one analyst, "[i]nvestors [had] pushed an $0.11 stock to an all-time high of $16.05 a share by July 2[8]" – yielding a "14,545% return on this best-performing COVID-19 stock in just six months."[38]

107.  But then on August 6, 2020, Defendants made a partial disclosure of a two-week delay they blamed on external factors, such as "ethics review board approvals and a need to make study modifications to accommodate regulatory updates, including for study enrolment criteria and assessment at point of care settings, as well as for test handling procedures."[39] And on August 20, 2020, they revealed yet another delay of one week, without disclosing any fundamental internal

---

[38] Brian Paradza, CFA, *The Best Performing COVID-19 Stock So Far This Year*, THE MOTLEY FOOL (Sept. 28, 2020), https://www.fool.ca/2020/09/28/the-best-performing-covid-19-stock-so-far-this-year/.

[39] *Sona Nanotech Updates on Timing of Clinical In-Field Validation Studies for its COVID-19 Antigen Test*, SONA NANOTECH (Aug. 6, 2020) ("August 6 Press Release"), https://sonanano.com/sona-nanotech-updates-on-timing-of-clinical-in-field-validation-studies-for-its-covid-19-antigen-test/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

problems.[40] Once again—in the context of consistent success and positive news—Defendants refused to reveal the full truth about their internal struggles and inability to validate their Nasal Swab Test.

108.  By August 25, 2020, the delays ostensibly were over. Defendants released seemingly positive data, claiming that Sona's "test achieved a sensitivity of 84.6% and a specificity of 90.0% in a study across 99 collected clinical patient samples" and declaring that the Company "is now continuing its submission of data to both the FDA and Health Canada to support their requirements for emergency use authorization approvals."[41] Finally, on August 31, 2020, Defendants "completed submissions to the FDA and Health Canada for authorizations for [Sona's] COVID-19 rapid, antigen test, including responding to all follow-up questions received to date."[42]

109.  As before, Defendants' message to investors was one of adequacy and success. Sona portrayed that they had put together an all-star team of scientists and consultants, engaged in rigorous validation studies yielding positive results, and completed comprehensive submissions to the FDA and Health Canada at the precise time when COVID-19 tests were vital to the U.S. and Canada.

110.  Indeed, Regan declared on October 1, 2020 regarding Sona's Nasal Swab

---

[40] *Sona Nanotech Clinical In-Field Validation Study Results to Be Released Next Week*, NEWSFILE (Aug. 20, 2020) ("August 20 Press Release"), https://www.newsfilecorp.com/release/62201/Sona-Nanotech-Clinical-InField-Validation-Study-Results-to-Be-Released-Next-Week.

[41] *Sona Nanotech Announces Clinical Evaluation Study Results for its COVID-19 Antigen Test*, SONA NANOTECH (Aug. 25, 2020) ("August 25 Press Release"), https://sonanano.com/sona-nanotech-announces-clinical-evaluation-study-results-for-its-covid-19-antigen-test/.

[42] *Sona Engages Sports Marketing Partner to Secure Concussion Test Development Partner* ("August 31 Press Release"), SONA NANOTECH (Aug. 31, 2020), https://sonanano.com/sona-engages-sports-marketing-partner-to-secure-concussion-test-development-partner/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Test, "[w]e're **100% confident that it gets approved**. There's **smart questions being asked**, and we have **strong data on our test**."[43]

### E. Defendants Conceal the Truth Behind the FDA's Rejection of Sona's EUA Request and the Withdrawal of Its Health Canada Application

111. On October 29, 2020, Defendants stunned investors with the news that the FDA had declined Sona's EUA request. But Defendants continued to obfuscate and conceal material facts surrounding Sona's Test and the FDA's denial.

112. According to Defendants, "the FDA has indicated that our test is not a priority for them at this time[.]"[44] Defendants further represented that the FDA "did not comment on the performance of the Sona test." The reality—as eventually revealed—was that Sona's validation studies were lacking and flawed, as a result, it had failed to demonstrate that its Nasal Swab Test worked for its intended use of detecting COVID-19 in its acute phase (within 0-6 days of symptom onset) in a POC setting—as compared to the other seven antigen tests that had already received EUAs.

113. Instead of revealing that truth, Defendants pivoted away from the FDA's rejection, stating that "Health Canada continues its evaluation of the Company's application for an Interim Order ("IO") authorization for its test as a 'point-of-care' medical diagnostic device" and "[t]he Company yesterday received additional questions on its application."

114. But Defendants' concealment of their deficient submission was short-

---

[43] Benjamin A. Smith, *Sona Nanotech CEO "100% Confident" Coronavirus Test Will Land Regulatory Approval*, THE DALES REPORT (Oct. 2, 2020), https://thedalesreport.com/technology/sona-nanotech-ceo-100-confident-coronavirus-test-will-land-regulatory-approval/.

[44] *Sona Nanotech Receives 'Deprioritization' from FDA; Health Canada Evaluation Continues*, SONA NANOTECH (Oct. 29, 2020) ("October 29 Press Release"), https://sonanano.com/sona-nanotech-receives-deprioritization-from-fda-health-canada-evaluation-continues/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

lived. On November 25, 2020, they announced that the Company, based on feedback from Health Canada, had withdrawn its application.[45] Once again, Defendants refused to admit that their validation data had been insufficient, and that Sona had failed to demonstrate its Test's intended use. Instead, Defendant Rowles stated that "[w]e have confidence in our rapid COVID-19 antigen test and its ability to detect the virus, ***especially within the first week of symptom onset***." He blamed the failed authorizations in the U.S. and Canada on a generalization that "[t]he regulatory approval path for antigen tests is new with evolving guidelines and Sona's test is unique, creating a challenging environment for test developers and regulators alike."

115.  As of November 30, 2020, Defendants still had not admitted that their validation data was insufficient. They stated that Sona "intends to obtain additional data and use it to augment its submission with the FDA and potentially for a resubmission to Health Canada."[46] Moreover, Defendant Regan noted that "every entity that has evaluated our test has confirmed its ability to detect the COVID-19 virus and it achieved strong results from our in-field trials."

116.  He also made the telling statement that "[w]e will now seek further study data to provide sufficient substantiation of clinical performance to warrant regulatory approval." But the issue was not that the FDA and Health Canada had trouble assessing Sona's Test or approving antigen tests. Indeed, 11 COVID-19 antigen tests had been authorized by the FDA in 2020. Rather, contrary to Defendants' consistent statements to investors that Sona's clinical data showed that its Test worked for its

---

[45] *Sona Nanotech Withdraws Rapid COVID-19 Antigen Test Application Based on Feedback from Health Canada*, SONA NANOTECH (Nov. 25, 2020) ("November 25 Press Release"), https://sonanano.com/sona-nanotech-withdraws-rapid-covid-19-antigen-test-application-based-on-feedback-from-health-canada/.

[46] *Sona Nanotech Provides Corporate Update*, SONA NANOTECH (Nov. 30, 2020) ("November 30 Press Release"), https://sonanano.com/sona-nanotech-provides-corporate-update/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

intended use, its valuation studies had failed to demonstrate that the Test was an effective screening tool for COVID-19 antigens during the designated acute phase of infection, when an individual is most contagious and more likely to spread the virus to others. Further, the Company had failed to provide sufficient data supporting the Test's use in a POC setting.

### F. Defendants Misleadingly Convey a Path Forward *via* More Clinical Data, Commercialization in the EU, and a COVID-19 Saliva Test

117. Following the damning rejections by the FDA and Health Canada, Defendants continued to mislead investors, conveying that there was a pathway to future regulatory approval in the U.S. and Canada through the collection of additional clinical trial data, and in the meantime, they would also work on more ixmmediate commercialization and profitability for Sona's Nasal Swab Test in the European Union ("EU") and the development and validation of its Saliva Test.

118. On December 16, 2020, the Company issued a press release announcing the closing of its unbrokered private placement for $2.26M, declaring that it "intended to use the net proceeds of the Financing to produce further clinical trial data for its rapid COVID-19 antigen nasal pharyngeal test, pursue a European regulatory self-certification CE Mark declaration, and pursue further development and clinical trial validation work for its saliva-based prototype version of the test, as well as for general working capital purposes."[47] Sona also confirmed that it "[wa]s currently working with several potential partners to secure a clinical trial" and "its CE Marking process in Europe commenced."

119. Then on December 31, 2020, the Company issued a press release titled

---

[47] *Sona Nanotech Closes Unbrokered Private Placement Financing for $2.26m in Gross Proceeds*, SONA NANOTECH (Dec. 16, 2020) ("December 16 Press Release"), https://sonanano.com/sona-nanotech-closes-unbrokered-private-placement-financing-for-2-26m-in-gross-proceeds/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

"Sona Nanotech Receives CE Mark Approval for its Rapid COVID-19 Antigen," explaining that the "CE Mark declares the conformity of the Sona test with EU regulations and allows Sona to commercialize its test throughout Europe and potentially other territories in which the CE Mark is recognized."[48]

120. Accordingly, Sona was "now able to take firm orders in territories accepting a CE Mark and make corresponding manufacturing commitments from its contract manufacturer in the United Kingdom" and "[was] also in the process of technology transfer to a second manufacturer, in North America."

121. Despite receiving the CE Mark (allowing it to sell its Nasal Swab Test in territories accepting a CE Mark), on March 1, 2021, Sona revealed that in the more than three months since achieving authorization to commercialize its Nasal Swab Test in the EU, it *still* had not obtained *any* "firm orders." Sona had failed to mention many other companies had already obtained CE Marks for their antigen tests, most of whom had also obtained EUAs for their diagnostics tests, including Quidel Corporation, LumiraDX, Becton Dickinson and Company, and Ortho Clinical Diagnostics.[49]

---

[48] *Sona Nanotech Receives CE Mark Approval for its Rapid COVID-19 Antigen Test*, SONA NANOTECH (Dec. 31, 2020) ("December 31 Press Release"), https://sonanano.com/sona-nanotech-receives-ce-mark-approval-for-its-rapid-covid-19-antigen-test/.

[49] *See e.g.*, *Quidel's Sofia® SARS Antigen FIA Updates EUA Performance Data to 96.7% PPA Versus PCR; Product Supports U.S. Initiatives to Expand Access to COVID-19 Testing in Nursing Homes; Receives CE Mark for Use With Sofia® and Sofia® 2 Instruments*, BUSINESS WIRE (July 11, 2020, 11:00 AM ET), https://www.businesswire.com/news/home/20200717005579/en/Quidel%E2%80%99 9s-Sofia%C2%AE-SARS-Antigen-FIA-Updates-EUA; *Ortho's VITROS® SARS-CoV-2 Antigen Test Capable of Accurate Mass-Scale Testing Achieves CE Mark*, PR NEWSWIRE (Nov. 2, 2020 05:00 AM), https://markets.businessinsider.com/news/stocks/ortho-s-vitros-sars-cov-2-antigen-test-capable-of-accurate-mass-scale-testing-achieves-ce-mark-1029752204?op=1; Emma Court, *A 'Game-Changing' 15-Minute COVID-19 Test Was Just Cleared in Europe*, TIME (Sept. 30, 2020, 10:45 AM EDT), (https://time.com/5894722/15-

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

122.  In addition, given Defendants' inability to validate its Nasal Swab Test for its specified use as a screening tool, in a POC setting, when a person is most contagious and at the highest risk of spreading COVID-19, Sona had no pathway forward to obtaining authorization from the FDA or Health Canada. In fact, more than four months since first announcing the need for more clinical data for its Nasal Swab Test, on March 1, 2021, the Company also revealed that, it *still* lacked a sponsoring institution, a principal investigator, a study protocol, relevant medical ethics review board approval, and Health Canada Investigational Testing Division approval.

123.  Then on April 12, 2021, Defendants confirmed investors' suspicions that Sona was not as focused on its Nasal Swab Test as previously represented, while remaining silent about an additional clinical trial for that test, when announcing that the Company "has been granted Health Canada Investigational Testing Authorization for a clinical trial of the Sona Saliva C-19 Rapid Test, a saliva sample-based rapid COVID-19 antigen test, with the Humber River Hospital in Toronto."[50] Based on Defendants' statements, investors still believed the Company had a viable path to profitability through its Saliva Test, particularly based on what they learned about the development and regulatory process through its Nasal Swab Test.

124.  This belief was confirmed on April 22, 2021 when Defendants confirmed that Sona had "received research ethics board approval for its clinical trial of the Sona Saliva C-19 Rapid Test[,]"[51] which was to begin the following week.

minute-covid-19-test-europe/; *LumiraDx COVID-19 Antigen Test Achieves CE Mark*, LUMIRADX (Aug. 31, 2020), https://www.lumiradx.com/us-en/news-events/lumiradx-covid-19-antigen-test-achieves-ce-mark.

[50] *Sona Secures Clinical Trial Authorization and Hospital Partner*, SONA NANOTECH (April 12, 2021) ("April 12 Press Release"), https://sonanano.com/sona-secures-clinical-trial-authorization-and-hospital-partner/.

[51] *Sona to Commence Clinical Trial for COVID-19 Rapid Saliva Test*, SONA NANOTECH (April 22, 2021) ("April 22 Press Release"), https://sonanano.com/sona-

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

125. Therefore, investors were caught completely by surprise when, before markets opened on June 11, 2021, Sona announced it was discontinuing its Saliva Test "after a review of the interim results data, due to inadequate test sensitivity with clinical saliva samples and challenges with patient recruitment and enrollment into the study."[52] On this news, the Company's share price tanked over 70%.

126. Then on November 8, 2021, Defendants confirmed investor suspicion that Sona was never going to achieve FDA or Health Canada approval for either its Nasal Swab Test or its Saliva Test when they announced that Sona had entered into a binding licensing agreement with FDA registered Arlington Scientific Inc. ("ASI"), an in-vitro diagnostics developer, manufacturer, and distributor, to "bring Sona's rapid saliva COVID-19 test to market." Per the terms of the agreement, Sona maintained its intellectual property related to the Saliva Test, but ASI took over all further action related to the Saliva Test. Specifically, ASI undertook all responsibility related to securing FDA EUA for POC and at-home use and "any necessary associated activities, including medical ethics review board approval, the coordination and underwriting of US-based clinical and any other studies, and FDA EUA application submissions and follow-up." If the FDA grants an EUA for the Saliva Test, ASI would be responsible for "coordinat[ing] manufacturing and distribution of the [Saliva] Test in the U.S. exclusively on a profit-sharing basis by which it would also earn a share of any of Sona's profits from international sales." Unsurprisingly, the Company continued to be silent about its Nasal Swab Test.

_____

to-commence-clinical-trial-for-covid-19-rapid-saliva-test/.

[52] *Sona Discontinues Clinical Trial for COVID-19 Rapid Saliva Test*, SONA NANOTECH (June 11, 2021) ("June 11 Press Release"), https://sonanano.com/sona-discontinues-clinical-trial-for-covid-19-rapid-saliva-test/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## V.    DEFENDANTS' MISLEADING STATEMENTS[53]

### A.    Sona's "Validation" Studies

127. Following the release of the FDA's controlling May 11 Template, the Class Period begins on May 12, 2020, when Sona announced *via* a press release, before markets opened:

> ***Ensuring tests work effectively in a clinical lab and patient setting is critical to the ultimate success of any test. In order to conduct sufficient validation testing for submission for use to regulators***, Sona is moving to test its devices with live virus culture and/or patient samples as part of ***a formal clinical study.*** Accordingly, ***the Company is in advanced discussions for arrangements with a leading U.S. laboratory to provide the independent clinical trial data.*** This verification and validation work is expected to be conducted through the month of May.
>
> The Company ***continues to work with regulators*** in anticipation of finalizing a submission to Health Canada for approval and making its formal submission to the FDA for the granting of an emergency use authorization (EUA).
>
> \* \* \*
>
> As many countries prepare for a re-opening of their economies, there is a growing consensus that an increase in testing will be required to keep economies open while still protecting the population. ***Sona's rapid COVID-19 antigen test is a device designed to be used at point-of-care*** to detect the presence of the SARS-Cov2 virus in a patient within 10-15 minutes which could make it a critical component of testing protocols being considered by governments as they devise plans to relax social distancing measures. ***The Company's test will not require either specialized equipment or lab based professionals*** to interpret its test results.

128. The statements referenced in ¶127 were materially misleading because despite having an ongoing, open dialogue with regulators to ensure that Sona's Test

---

[53] The particular portions of the statements giving rise to an alleged duty to disclose material facts in order for the statements to not be misleading are bold and italicized in this Section.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

was being developed within the FDA's parameters for EUA eligibility, in addition to, the FDA's issuance of detailed guidances and templates to support developers with their EUA submissions, Defendants failed to disclose the following adverse facts pertaining to Sona's validation studies of its Nasal Swab Test, which were known to Defendants or recklessly disregarded by them: (1) Sona's in-field clinical evaluation of its Test did not have adequate enrollment criteria, failed to demonstrate assessment in a POC setting, and/or lacked proper antigen test handling procedures; (2) as a result, such validation testing would take longer than a month to complete; (3) Sona's validation testing specifically did not include a sufficient number of patients whose symptom onset was within 0-6 days and would not produce sufficient data for use in a POC setting; (4) as a result, Sona's regulatory submissions would fail to demonstrate the Test's intended use of meeting a public need of detecting COVID-19 in its acute phase; and (5) as a result, Sona's EUA application would fail to meet the FDA's criteria for EUA, including "the public health need for the product," and would force the Company to withdraw its submission to Health Canada for IO authorization in order to obtain that additional data. Therefore, despite "moving to test its devices with live virus culture and/or patient samples as part of a formal clinical study," Sona was not following regulatory standards and supplemental FDA guidance – unlike other antigen test developers – and would not receive EUA approval or be able to financially capitalize on the need for detecting COVID-19 antigen in its acute phase, a need that other antigen tests were filling.

129.  On May 22, 2020, Sona announced *via* a press release:

> [T]he engagement of MRIGlobal, a leading applied scientific research organization, to provide ***analytical and clinical validation studies for Sona's COVID-19 rapid detection, point-of-care, antigen test which will be used for submission to Health Canada for regulatory approval and the FDA for Emergency Use Authorization (EUA)....*** The project work will ... assess Sona's test using live SARS CoV-2 virus following its past, successful internal evaluation using gamma irradiated virus.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*The EUA studies will follow the FDA's guidance for antigen testing, including assessments for sensitivity, specificity, cross-reactivity and interfering substances using patient samples and contrived (live viral culture) samples.*"

130. Sona's May 22 Press Release also quoted Defendant Rowles as stating that "[w]e are delighted to be moving into **the final validation process** and looking forward to the potential of a test that can tangibly advance the safety and quality of like for our communities."

131. The statements referenced in ¶¶129-30 were materially misleading because despite having an ongoing, open dialogue with regulators to ensure that Sona's Test was being developed within the FDA's parameters for EUA eligibility, in addition to, the FDA's issuance of detailed guidances and templates to support developers with their EUA submissions, Defendants failed to disclose the following adverse facts pertaining Sona's validation studies of its Nasal Swab Test, which were known to Defendants or recklessly disregarded by them: (1) Sona's in-field clinical evaluation of its Test did not have adequate enrollment criteria, failed to demonstrate assessment in a POC setting, and/or lacked proper antigen test handling procedures; (2) as a result, such validation testing would take longer than a month to complete; (3) Sona's validation testing specifically did not include a sufficient number of patients whose symptom onset was within 0-6 days and would not produce sufficient data for use in a POC setting; (4) as a result, Sona's regulatory submissions would fail to demonstrate the Test's intended use of meeting a public need of detecting COVID-19 in its acute phase; and (5) as a result, Sona's EUA application would fail to meet the FDA's criteria for EUA, including "the public health need for the product," and would force the Company to withdraw its submission to Health Canada for IO authorization in order to obtain that additional data. Therefore, despite "moving into the final validation process," Sona was not following regulatory standards and supplemental FDA guidance – unlike other antigen test developers – and would not

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

receive EUA approval or be able to financially capitalize on the need for detecting COVID-19 antigen in its acute phase, a need that other antigen tests were filling.

132. On July 2, 2020, Sona announced *via* a press release "that its rapid detection, COVID-19 antigen test's **laboratory validation studies of performance levels** have resulted in a test sensitivity of 96%, test specificity of 96% and a Limit of Detection ("LOD") of 2.1 x $10^2$ $TCID^{50}$ ... which **corresponds to an ability to detect the virus in patients with 'low' viral loads** in 10-15 minutes."

133. Sona's July 2 Press Release further stated that:

> Following consultation with MRIGlobal and the FDA, Sona will enter into **independent clinical, in-field evaluation studies to generate the data to support its analytical and clinical data as part of the submission it will make to Health Canada and the FDA for emergency use authorization ("EUA") approval. In-field collection of a minimum of 30 confirmed negative and 30 confirmed positive specimens** and the associated data analysis is expected to be completed while technology transfer to manufacturers is still underway. To that end, the Company has engaged with a contract research organization ("CRO") based in the U.S. to conduct one such study and a university affiliated laboratory outside of the U.S. to conduct a second. The Company has been informed that **the results of these field studies should be provided by the end of July**, at which time it intends to make final submissions to regulatory authorities in multiple jurisdictions.

134. In addition, Defendant Rowles was quoted in the July 2 Press Release as stating that "[t]hese excellent performance results are underpinned by our unique nanorod technology and **completes a further milestone achieved for Sona** along our path to bring a quality rapid test to scale."

135. The statements referenced in ¶¶132-34 were materially misleading because despite having an ongoing, open dialogue with regulators to ensure that Sona's Test was being developed within the FDA's parameters for EUA eligibility, in addition to, the FDA's issuance of detailed guidances and templates to support developers with their EUA submissions, Defendants failed to disclose the following

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

adverse facts pertaining Sona's validation studies of its Nasal Swab Test, which were known to Defendants or recklessly disregarded by them: (1) Sona's in-field clinical evaluation of its Test did not have adequate enrollment criteria, failed to demonstrate assessment in a POC setting, and/or lacked proper antigen test handling procedures; (2) as a result, such validation testing would take longer than a month to complete; (3) Sona's validation testing specifically did not include a sufficient number of patients whose symptom onset was within 0-6 days and would not produce sufficient data for use in a POC setting; (4) as a result, Sona's regulatory submissions would fail to demonstrate the Test's intended use of meeting a public need of detecting COVID-19 in its acute phase; and (5) as a result, Sona's EUA application would fail to meet the FDA's criteria for EUA, including "the public health need for the product," and would force the Company to withdraw its submission to Health Canada for IO authorization in order to obtain that additional data. Therefore, despite the touted "milestone achieved," Sona was not following regulatory standards and supplemental FDA guidance – unlike other antigen test developers – and would not receive EUA approval or be able to financially capitalize on the need for detecting COVID-19 antigen in its acute phase, a need that other antigen tests were filling.

136. As noted by Jay Lutz of *The Deep Dive* on July 6, 2020, Sona's equity had "heavy volume" that prior week which "appear[ed] to be the result of news published by the company last week, with Sona announcing validation results for its COVID-19 lateral flow antigen test."[54]

137. On July 8, 2020, the Company issued a press release titled "Sona Nanotech Engages Maxim Group for NASDAQ Listing and Investment Banking Services, and Announces Organizational Change" of Defendant Regan's promotion

---

[54] Jay Lutz, *Market Movers: Sona Nanotech Moves On COVID-19 Antigen Test Validation*, THE DEEP DIVE (July 6, 2020, 2:24 PM), https://thedeepdive.ca/market-movers-sona-nanotech-moves-on-covid-19-antigen-test-validation/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

to CEO and Defendant Rowles' assumption of role as President and CSO ("July 8 Press Release").[55] The press release quoted Rowles as stating that Sona "has achieved the extraordinary by **bringing a COVID-19 rapid, point-of-care antigen test to fruition in four months** with an extremely focused team in the laboratory."

138. The July 8 Press Release also quoted Regan as stating that "**[w]e have laid the plans to scale Sona Nanotech quickly to deliver its COVID-19 test through regulatory approval** to manufacturing and into the hands of our customers in the coming months."

139. The statements referenced in ¶¶137-38 were materially misleading because despite having an ongoing, open dialogue with regulators to ensure that Sona's Test was being developed within the FDA's parameters for EUA eligibility, in addition to, the FDA's issuance of detailed guidances and templates to support developers with their EUA submissions, Defendants failed to disclose the following adverse facts pertaining to how quickly Sona had developed its Nasal Swab Test and the adequacy of its Test validation data, which were known to Defendants or recklessly disregarded by them: (1) Sona's in-field clinical evaluation of its Test did not have adequate enrollment criteria, failed to demonstrate assessment in a POC setting, and/or lacked proper antigen test handling procedures; (2) as a result, it did not include a sufficient number of patients whose symptom onset was within 0-6 days and would not produce sufficient data for use in a POC setting; (3) as a result, Sona's regulatory submissions would fail to demonstrate the Test's intended use of meeting a public need of detecting COVID-19 in its acute phase; and (4) as a result, Sona's EUA application would fail to meet the FDA's criteria for EUA, including "the public

---

[55] *Sona Nanotech Engages Maxim Group for NASDAQ Listing and Investment Banking Services, and Announces Organizational Change*, SONA NANOTECH (July 8, 2020), https://sonanano.com/sona-nanotech-engages-maxim-group-for-nasdaq-listing-and-investment-banking-services-and-announces-organizational-change/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

health need for the product," and would force the Company to withdraw its submission to Health Canada for IO authorization in order to obtain that additional data. Therefore, Sona was not following regulatory standards and supplemental FDA guidance – unlike other antigen test developers – and would not receive EUA approval or be able to financially capitalize on the need for detecting COVID-19 antigen in its acute phase, a need that other antigen tests were filling.

140.  On July 24, 2020, Braden Maccke of *The Deep Dive* pointed out that Sona's "runaway [share] price leaps really got going July 2nd, when a laboratory test contracted through MRIGolbal[sic] indicated that SONA's GNR-based lateral flow COVID test had an ability to detect low viral loads in patient samples at a 96% sensitivity in 10-15 minutes."[56] In addition, Maccke noted that Sona was "making it clear that it is on top of arrangements for at-scale manufacturing and quality control."

141.  Based on Sona's statements through July 8, the market viewed it as "a small company that could help provide essential solutions to a global pandemic."[57] As a result, "[i]nvestors [had] pushed an $0.11 stock to an all-time high of $16.05 a share by July 2[8]" – yielding a "14,545% return on this best-performing COVID-19 stock in just six months."

142.  On August 6, 2020, Sona announced *via* a press release that:

> [I]ts previously announced clinical, in-field evaluation studies for its rapid detection, COVID-19 antigen test that commenced in July continue and are now expected to return their full results within two weeks. The ***delays have been due*** to ethics review board approvals and ***a need to make study modifications to accommodate regulatory updates, including for study enrollment criteria and assessment at***

---

[56] Braden Maccke, *Market Movers: SONA Nanotech, Again*, THE DEEP DIVE (July 24, 2020, 11:20 AM), https://thedeepdive.ca/market-movers-sona-nanotech-again/.

[57] Brian Paradza, CFA, *The Best Performing COVID-19 Stock So Far This Year*, THE MOTLEY FOOL (Sept. 28, 2020), https://www.fool.ca/2020/09/28/the-best-performing-covid-19-stock-so-far-this-year/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*point of care settings, as well as for test handling procedures*.

143. The statements referenced in ¶142 was materially misleading because despite having an ongoing, open dialogue with regulators to ensure that Sona's Test was being developed within the FDA's parameters for EUA eligibility, in addition to, the FDA's issuance of detailed guidances and templates to support developers with their EUA submissions, Defendants failed to disclose the following adverse facts pertaining to Sona's validation studies of its Nasal Swab Test, which were known to Defendants or recklessly disregarded by them: (1) Sona's in-field clinical evaluation of its Test did not have adequate enrollment criteria, failed to demonstrate assessment in a POC setting, and/or lacked proper antigen test handling procedures; (2) as a result, it did not include a sufficient number of patients whose symptom onset was within 0-6 days and would not produce sufficient data for use in a POC setting; (3) as a result, Sona's regulatory submissions would fail to demonstrate the Test's intended use of meeting a public need of detecting COVID-19 in its acute phase; and (4) as a result, Sona's EUA application would fail to meet the FDA's criteria for EUA, including "the public health need for the product," and would force the Company to withdraw its submission to Health Canada for IO authorization in order to obtain that additional data. Therefore, Sona was not following regulatory standards and supplemental FDA guidance – unlike other antigen test developers – and would not receive EUA approval or be able to financially capitalize on the need for detecting COVID-19 antigen in its acute phase, a need that other antigen tests were filling.

144. On August 20, 2020, Sona announced *via* a press release that:

> [I]t expects to release a report on its ***clinical, in-field evaluation studies for its rapid detection, COVID-19 antigen test*** next week. This data will be used to ***support the Company's submissions to Health Canada and the FDA for emergency use authorization ("EUA") approval for its COVID-19 antigen test***."

145. The statements referenced in ¶144 were materially misleading because

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

despite having an ongoing, open dialogue with regulators to ensure that Sona's Test was being developed within the FDA's parameters for EUA eligibility, in addition to, the FDA's issuance of detailed guidances and templates to support developers with their EUA submissions, Defendants failed to disclose the following adverse facts pertaining Sona's validation studies of its Nasal Swab Test, which were known to Defendants or recklessly disregarded by them: (1) Sona's in-field clinical evaluation of its Test did not have adequate enrollment criteria, failed to demonstrate assessment in a POC setting, and/or lacked proper antigen test handling procedures; (2) as a result, it did not include a sufficient number of patients whose symptom onset was within 0-6 days and would not produce sufficient data for use in a POC setting; (3) as a result, Sona's regulatory submissions would fail to demonstrate the Test's intended use of meeting a public need of detecting COVID-19 in its acute phase; and (4) as a result, Sona's EUA application would fail to meet the FDA's criteria for EUA, including "the public health need for the product," and would force the Company to withdraw its submission to Health Canada for IO authorization in order to obtain that additional data. Therefore, Sona was not following regulatory standards and supplemental FDA guidance – unlike other antigen test developers – and would not receive EUA approval or be able to financially capitalize on the need for detecting COVID-19 antigen in its acute phase, a need that other antigen tests were filling.

146. On August 25, 2020, Sona announced *via* a press release:

> [R]apid detection COVID-19 antigen test achieved a sensitivity of 84.6% and a specificity of 90.0% in ***a study across 99 collected clinical patient samples, which included 39 positive samples and 60 negative samples***, as determined by RT-PCR testing. The Company is now continuing its submission of ***data to both the FDA and Health Canada to support their requirements for emergency use authorization approvals***.

147. On this news, "[t]hinly traded Sona Nanotech (OTCQB:SNANF +8.2%) is in the green, albeit on turnover of only 10K shares, on the heels of its announcement

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of performance data on its rapid COVID-19 antigen test."[58]

148. The statements referenced in ¶¶146-47 were materially misleading because because despite having an ongoing, open dialogue with regulators to ensure that Sona's Test was being developed within the FDA's parameters for EUA eligibility, in addition to, the FDA's issuance of detailed guidances and templates to support developers with their EUA submissions, Defendants failed to disclose the following adverse facts pertaining Sona's validation studies of its Nasal Swab Test, which were known to Defendants or recklessly disregarded by them: (1) Sona's in-field clinical evaluation of its Test did not have adequate enrollment criteria, failed to demonstrate assessment in a POC setting, and/or lacked proper antigen test handling procedures; (2) as a result, it did not include a sufficient number of patients whose symptom onset was within 0-6 days and would not produce sufficient data for use in a POC setting; (3) as a result, Sona's regulatory submissions would fail to demonstrate the Test's intended use of meeting a public need of detecting COVID-19 in its acute phase; and (4) as a result, Sona's EUA application would fail to meet the FDA's criteria for EUA, including "the public health need for the product," and would force the Company to withdraw its submission to Health Canada for IO authorization in order to obtain that additional data. Therefore, Sona was not following regulatory standards and supplemental FDA guidance – unlike other antigen test developers – and would not receive EUA approval or be able to financially capitalize on the need for detecting COVID-19 antigen in its acute phase, a need that other antigen tests were filling.

149. On October 29, 2020, Sona announced *via* a press release that the FDA

---

[58] Douglas W. House, *Sona Nanotech advances rapid COVID-19 antigen test*, SEEKING ALPHA (Aug. 25, 2020, 2:06 PM ET), https://seekingalpha.com/news/3608691-sona-nanotech-advances-rapid-covidminus-19-antigen-test.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

did not grant its request for an EUA for its Nasal Swab Test based on "current EUA request prioritization criteria as including 'the public health need for the product' and ***did not comment on the performance of the Sona test***."

150.  In addition, the October 29 Press Release declared that "Health Canada continues its evaluation of the Company's application for an Interim Order ("IO") authorization for its test as a 'point-of-care' medical diagnostic device. ***The Company yesterday received additional questions on its application. Also, Health Canada has submitted the Company's tests to the Public Health Agency of Canada's National Microbiology Laboratory for evaluation, which is ongoing***."

151.  The statements referenced in ¶¶149-50 were materially misleading because despite having an ongoing, open dialogue with regulators to ensure that Sona's Test was being developed within the FDA's parameters for EUA eligibility, in addition to, the FDA's issuance of detailed guidances and templates to support developers with their EUA submissions, Defendants failed to disclose the following adverse facts pertaining to what the FDA and Health Canada conveyed to Sona about its Nasal Swab Test, which were known to Defendants or recklessly disregarded by them: (1) Sona's in-field clinical evaluation of its Test did not have adequate enrollment criteria, failed to demonstrate assessment in a point of care setting, and/or lacked proper antigen test handling procedures; (2) as a result, it did not include a sufficient number of patients whose symptom onset was within 0-6 days and would not produce sufficient data for use in a POC setting; (3) as a result, Sona's regulatory submissions failed to demonstrate the Test's intended use of meeting a public need of detecting COVID-19 in its acute phase; (4) as a result, Sona's EUA application failed to meet the FDA's criteria for EUA; (5) as a result, Sona would be forced to withdraw its submission to Health Canada for IO authorization in order to obtain that additional data; and (6) as a result, Sona would not be able to financially capitalize on the need for detecting COVID-19 antigen in its acute phase, a need that other antigen tests

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

were filling. Further, the fact that the FDA "did not comment on the performance" of Sona's Test did not mean, as the Company implied, that its clinical results related to performance met the FDA's or Health Canada's criteria for authorization or did not contribute to the FDA's deprioritization of Sona's EUA request.

152. On November 25, 2020, Defendant Rowles was quoted in a Company press release stating that, "[w]e have confidence in our rapid COVID-19 antigen test and its ability to detect the virus, especially within the first week of symptom onset. ***The regulatory approval path for antigen tests is new with evolving guidelines and Sona's test is unique, creating a challenging environment for test developers and regulators alike.*** We are, however, committed to obtaining the data needed to successfully achieve authorizations."

153. The statements referenced in ¶152 were materially misleading because despite having an ongoing, open dialogue with regulators to ensure that Sona's Test was being developed within the FDA's parameters for EUA eligibility, in addition to, the FDA's issuance of detailed guidances and templates to support developers with their EUA submissions, Defendants failed to disclose the following adverse facts pertaining to what the FDA and Health Canada had been conveying to Sona about its Nasal Swab Test, which were known to Defendants or recklessly disregarded by them: (1) Sona's in-field clinical evaluation of its Test did not have adequate enrollment criteria, failed to demonstrate assessment in a point of care setting, and/or lacked proper antigen test handling procedures; (2) as a result, it did not include a sufficient number of patients whose symptom onset was within 0-6 days and would not produce sufficient data for use in a POC setting; (3) as a result, Sona's regulatory submissions failed to demonstrate the Test's intended use of meeting a public need of detecting COVID-19 in its acute phase; (4) as a result, Sona's EUA application failed to meet the FDA's criteria for EUA; (5) as a result, Sona would be forced to withdraw its submission to Health Canada for IO authorization in order to obtain that additional

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

data; and (6) as a result, Sona would not be able to financially capitalize on the need for detecting COVID-19 antigen in its acute phase, a need that other antigen tests were filling. Instead of admitting that Sona simply had not and could not demonstrate to the FDA or Health Canada that its Test could produce accurate and reliable results in a POC setting during the acute phase of COVID-19, Sona blamed the regulatory agencies' "evolving guidelines" and "[it]s test [being] unique."

**B. Sona's "Focus" on the FDA and Health Canada's Request for More Clinical Data from Patients Within 0-6 Days of Symptom Onset and Commercialization Based on a CE Mark**

154. On November 30, 2020, Sona stated *via* a press release titled that it was going "to *focus on collecting further clinical data*" "*to augment its submission with the FDA and potentially for a resubmission to Health Canada*. The Company will also use its existing data to support a *CE Mark application in Europe*[.]" Specifically, it "intends to *obtain more data on the performance of its test, including more samples from patients within 0-6 days since symptom onset*, as requested by Health Canada."

155. In addition, the November 30 Press Release quoted Defendant Regan as stating that "[w]hile our regulatory road has not been straight forward, *every entity that has evaluated our test has confirmed its ability to detect the COVID-19 virus and it achieved strong results from our in-field trials*. We will now seek *further study data to provide sufficient substantiation of clinical performance to warrant regulatory approval*."

156. The statements referenced in ¶¶154-55 were materially misleading because Defendants failed to disclose the following adverse facts pertaining to Sona's efforts towards obtaining more clinical data and a CE Mark for its Nasal Swab Test, which were known to Defendants or recklessly disregarded by them: (1) Sona was not focusing on collecting further clinical data for its Test, and as a result, over four

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

months later, it would still not have a sponsoring institution, a principal investigator, a study protocol, relevant medical ethics review board approval, or Health Canada Investigational Testing Division approval – all of which was necessary to obtain additional clinical data; and (2) obtaining a CE Mark would prove meaningless to Sona's goal of commercialization due to the abundant availability of competing antigen tests, many of which had not only received a CE Mark, but also had already received EUAs for their COVID-19 diagnostic tests.

157. On December 16, 2020, while announcing the closing of its Private Financing, Sona declared *via* a press release that it "intends to use the net proceeds of the [Private] Financing to produce ***further clinical trial data for its rapid COVID-19 antigen nasal pharyngeal test*** [and] pursue ***a European regulatory self-certification CE Mark declaration*** …."

158. The December 16 Press Release also stated that Sona "is currently working with several potential partners to secure ***a clinical trial***" and "its ***CE Marking process in Europe*** commenced with the appointment of Obelis."

159. The statements referenced in ¶¶157-58 were materially misleading because Defendants failed to disclose the following adverse facts pertaining to Sona's efforts towards obtaining more clinical data and a CE Mark for its Nasal Swab Test, which were known to Defendants or recklessly disregarded by them: (1) Sona was not focusing on collecting further clinical data for its Test and as a result, over four months later, it would still not have a sponsoring institution, a principal investigator, a study protocol, relevant medical ethics review board approval, or Health Canada Investigational Testing Division approval – all of which was necessary to obtain additional clinical data, and (2) obtaining a CE Mark would prove meaningless to Sona's goal of commercialization due to the abundant availability of competing antigen tests, many of which had not only received a CE Mark, but also had already received EUAs for their COVID-19 diagnostic tests.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

160.  Over the weekend on December 31, 2020, the Company explained *via* a press release that a "***CE Mark declares the conformity of the Sona test with EU regulations and allows Sona to commercialize its test*** throughout Europe and potentially other territories in which the CE Mark is recognized." Accordingly, Sona was "now able to ***take firm orders in territories accepting a CE Mark*** and make corresponding manufacturing commitments from its contract manufacturer in the United Kingdom" and "currently also in the process of technology transfer to a second manufacturer, in North America."

161.  The December 31 Press Release also stated that Sona "continues to work with several potential partners to secure ***an additional clinical trial to support other potential regulatory submissions***."

162.  On these positive revelations, Sona's share price increased more than 47% to close at $2.86 on December 31, 2020.

163.  The statements referenced in ¶¶160-61 were materially misleading because Defendants failed to disclose the following adverse facts pertaining to Sona's efforts towards obtaining more clinical data and a CE Mark for its Nasal Swab Test, which were known to Defendants or recklessly disregarded by them: (1) Sona was not focusing on collecting further clinical data for its Test and as a result, over four months later, it would still not have a sponsoring institution, a principal investigator, a study protocol, relevant medical ethics review board approval, or Health Canada Investigational Testing Division approval – all of which was necessary to obtain additional clinical data for its Test, and (2) obtaining a CE Mark would prove meaningless to Sona's goal of commercialization due to the abundant availability of competing antigen tests, many of which had not only received a CE Mark, but also had already received EUAs for their COVID-19 diagnostic tests.

## C.   Sona's Clinical Trial of its Saliva Test

164.   On April 12, 2021, Sona announced *via* a press release "that it has been granted Health Canada Investigational Testing Authorization for a ***clinical trial*** of the Sona Saliva C-19 Rapid Test, a saliva sample-based rapid COVID-19 antigen test, with the ***Humber River Hospital in Toronto***."

165.   The April 12 Press Release also quoted Defendant Regan as stating that:

New, less invasive rapid tests are needed to support frequent testing and a test that works with saliva would make regular testing for everyone much more accessible and tolerable.… ***Sona has invested several months in the laboratory to adapt and optimize the performance of its test to enable it to work with saliva samples*** and we look forward to working with the Humber River Hospital on this trial of our saliva test.

166.   On April 22, 2021, Sona confirmed *via* a press release "that it has received research ethics board approval for its ***clinical trial*** of the Sona Saliva C-19 Rapid Test. The trial, which will seek to test up to ***500 emergency room patients suspected of having COVID-19***, is expected to commence next week."

167.   The statements referenced in ¶¶164-66 were materially misleading because Defendants failed to disclose the following adverse facts pertaining to Sona's clinical study for its Saliva Test, which were known to Defendants or recklessly disregarded by them: (1) despite the significant decrease in individuals with COVID-19 after vaccines began rolling out in Canada in December 2020, Sona proceeded to design and conduct a clinical study for its Saliva Test in Toronto; (2) Sona struggled to ensure its technology could work for the Saliva Test even in a laboratory setting; (3) as a result, the Company would be forced to halt its clinical trial for its Saliva Test; and (4) Sona would be unable to financially capitalize on the need for rapid detection of COVID-19 in its acute phase, a need that was being fulfilled by other antigen tests.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## VI.   THE TRUTH SLOWLY EMERGES

### <u>The August 6, 2020 Partial Disclosure</u>

168.  In its August 6 Press Release, Sona announced a ***two-week delay*** in the full results of "its previously announced clinical, in-field evaluation studies for its rapid detection, COVID-19 antigen test that [had] commenced in July." The Company explained that "delays have been due to ethics review board approvals and ***a need to make study modifications*** to accommodate regulatory updates, ***including for study enrollment criteria and assessment at point of care settings, as well as for test handling procedures***." Notably, "[o]ne of the purposes of the in-field evaluation testing [wa]s to determine, what, if any, ***effect environmental or containment factors or human errors in sample collection ha[d] on test performance***." Sona also noted it needed "[t]he data from these studies ... to support the Company's analytical and clinical data as part of the submission it will make to Health Canada and the FDA for emergency use authorization ("EUA") approval for its COVID-19 antigen test."

169.  On this news, shares of Sona fell $3.09 per share, or over 34%, on unusually heavy trading to close at $5.91 per share on August 6, 2020.

170.  As a result of the large drop in share price, in its announcement of yet another delay in its August 20 Press Release, Sona explained that it "is reliant on third parties and testing protocols with multiple complex variables, many of which are outside the control of the Company and can impact expected timing of results."

171.  As Jay Lutz of *The Deep Dive* noted on August 20, 2020, "[a] tumbling share price can make companies do odd things. If you're ***Sona Nanotech (CSE: SONA)***, evidently one trick of the trade is to release news.. about releasing news." According to Lutz "[e]ffectively, it was Sona's way of saying 'if the news doesn't come next week, it's not our fault.' The announcement of an announcement comes as the company is evidently scrambling behind the scenes following a fall from grace of

its share price."[59]

172.  Brian Paradza of The Motley Fool also noted on September 28, 2020 that investors have sold shares of Sona "in droves since August 6. The company announced that critical validation test results would be delayed by two weeks.... The news ignited a wave of investor fears and triggered a downward spiral in SONA's share price."[60] Further, "[t]ime may be running out for new COVID-19 test products. The need for massive testing may significantly decline, as the pandemic starts dying away." However, Paradza did point out that since "SONA's antigen test can detect the virus potentially before the onset of any symptoms," "[i]f the test is licensed in time, demand could hold well into 2021. News of FDA and Health Canada authorization can re-ignite investor interest in the near term."

### The October 29, 2020 Partial Disclosure

173. In its October 29 Press Release, Sona relayed to investors receipt of "notice from the FDA that the Company's request for an emergency use authorization ("EUA") for the marketing of *its rapid COVID-19 antigen test in the United States 'is not a priority'* and consequently such authorization will not be issued at this time. The FDA cited current EUA request prioritization criteria as including 'the public health need for the product' and did not comment on the performance of the Sona test." Sona also quoted Defendant Regan as noting that "the FDA has indicated that *our test is not a priority for them* at this time[.]"

174. On this news, shares of Sona fell $2.77 per share, or over 48%, on unusually heavy trading to close at $3.00 per share on October 29, 2020.

---

[59] Jay Lutz, *Sona Nanotech Releases News.. About Planning To Release News*, THE DEEP DIVE (Aug. 20, 2020, 10:15 AM), https://thedeepdive.ca/sona-nanotech-releases-news-about-planning-to-release-news/.

[60] Brian Paradza, CFA, *The Best Performing COVID-19 Stock So Far This Year*, THE MOTLEY FOOL (Sept. 28, 2020), https://www.fool.ca/2020/09/28/the-best-performing-covid-19-stock-so-far-this-year/.

59

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

175.  As Lutz noted after reviewing the October 29 Press Release, "the ruling is certainly a setback for" Sona as reflected in its share price on the CSE being "down 61.59% on this mornings development" even though "[t]he performance of the test was apparently not commented on."[61] Further, "[d]espite the massive setback from the FDA, the company has continued with its manufacturing scale-up activities, although the potential market size has significantly been reduced in the near term."

176.  And as explained by Aaron Wolko of The Dales Report on November 9, 2020, the deprioritization "blow to hopeful shareholders caused many to rush to the door, with the share price falling off a cliff, shaving almost 50% of it's value," but based on Defendants' positive statements:

> [M]any investors are holding their positions awaiting ***favorable result in the medium term from the United States FDA, or in the shorter term from Health Canada*** and a slew of other countries who could independently declare the pregnancy-test-like device a useful and impactful product for the prevention of Covid19. Since the company has already sold these devices for "research use only", ***there is still upside to the stock and the potential for a decently sized country, like Saudi Arabia, to grant expedited approval of the testing kit and lead to huge purchase orders for Sona***.[62]

### The November 25, 2020 Partial Disclosure

177.  In its November 25 Press Release, Sona disclosed that it "***withdrew its application for an Interim Order ("IO") authorization from Health Canada*** for the marketing of its rapid, COVID-19 antigen test in order ***to obtain more clinical data***

---

[61] Jay Lutz, *Sona Nanotech Rejected By FDA For Emergency Use Authorization*, THE DEEP DIVE (Oct. 29, 2020, 9:37 AM), https://thedeepdive.ca/sona-nanotech-rejected-by-fda-for-emergency-use-authorization/.

[62] Aaron Wolko, *The Tale of Sona Nanotech – An Essential Covid Test That Was Deprioritized*, THE DALES REPORT (Nov. 9, 2020), https://thedalesreport.com/psychedelics/the-tale-of-sona-nanotech-an-essential-covid-test-that-was-deprioritized/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*to augment its submission*."

178. On this news, shares of Sona fell $1.56 per share, or over 67%, on unusually heavy trading to close at $0.74 per share on November 25, 2020.

179. This news, as Lutz declared on November 25, 2020, was "a major blow to shareholders" of Sona.[63]

180. Then, in its November 30 Press Release, Sona revealed that it had "received further feedback from Health Canada, subsequent to its withdrawal of its application for an Interim Order authorization ("IO") for the marketing of its rapid, COVID-19 antigen test. As part of its review, Health Canada [had] commissioned an evaluation from *the National Microbiology Laboratory (NML)* whose *evaluation produced discordant results to the Company's prior analytical and clinical studies conducted by MRIGlobal and SaudiVax*."

181. In reiterating its need "to obtain additional data and use it to augment its submission with the FDA and potentially for a resubmission to Health Canada" in the November 30 Press Release, Sona detailed that "*[w]ith a view to reconciling the discordancy, the Company intends to obtain more data on the performance of its test, including more samples from patients within 0-6 days since symptom onset*, as requested by Health Canada. While the test showed 100% sensitivity with such samples in its SaudiVax Clinical Evaluation Study, *only seven such positive samples were obtained in that study of 39 positive samples*."

182. The November 30 Press Release further quoted Defendant Regan as stating that "*[w]e will now seek further study data to provide sufficient substantiation of clinical performance to warrant regulatory approval*."

---

[63] Jay Lutz, *Sona Nanotech Withdraws Health Canada Application For COVID-19 Test Due To Feedback From Regulator*, THE DEEP DIVE (Nov. 25, 2020, 2:31 PM), https://thedeepdive.ca/sona-nanotech-withdraws-health-canada-application-for-covid-19-test-due-to-feedback-from-regulator/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

183. As Lutz noted after reviewing the November 30 Press Release, "core" to Sona's "decision to withdraw its antigen test" was that "testing results from Health Canada were 'discordant' with results from the firms prior analytical and clinical studies conducted by that of MRIGlobal and SaudiVax – essentially, the results didn't match."[64]

**The March 1, 2021 Partial Disclosure**

184. Any hope of a positive turn around was shattered when on March 1, 2021, Sona issued its annual financial statement for the years ended October 31, 2020 and 2019.[65] In the Management Discussion and Analysis section of its financial statement, Sona revealed that it ***"continues to work with several potential partners to secure an additional clinical trial to support other potential regulatory submissions.*** Any trial would require a sponsoring institution, a principal investigator, a study protocol, relevant medical ethics review board approval and Health Canada Investigational Testing Division approval." Accordingly, after more than four months since withdrawing its Health Canada application and purportedly having more clarity on what more was needed for FDA and Health Canada authorization, Sona was nowhere closer to achieving either.

185. In addition, despite securing its CE Mark in December 2020, Sona had yet to secure any "firm orders" as of March 1, 2021:

> [T]he Company is able to take firm orders in territories accepting a CE Mark and is able to make corresponding manufacturing commitments from its contract manufacturer in the United Kingdom. The Company is currently also in the process of technology transfer to a second manufacturer, in North America. ***The Company continues to solicit***

---

[64] Jay Lutz, *Sona Nanotech: Health Canada Evaluation Results Did Not Match Prior Analytical And Clinical Study Data*, THE DEEP DIVE (Nov. 30, 2020, 9:16 AM), https://thedeepdive.ca/sona-nanotech-health-canada-evaluation-results-did-not-match-prior-analytical-and-clinical-study-data/.

[65] Sona Nanotech Inc., Financial Statements (Feb. 26, 2021).

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*sales* and will update the market as material developments occur.[66]

186.  On this news, shares of Sona fell $0.22 price per share, or over 13%, to close at $1.37 on March 3, 2021, after two days of heavy trading.

### **The June 11, 2021 Class Period Ending Disclosure**

187.  Before markets opened on June 11, 2021, Sona announced it was "discontinuing its previously announced clinical trial of its COVID-19 rapid, antigen saliva test after a review of the interim results data, due to inadequate test sensitivity with clinical saliva samples and challenges with patient recruitment and enrollment into the study."[67]

188.  On this news, shares of Sona fell $0.584 per share, or over 70%, to close at $0.248 on June 14, 2021, after two days of heavy trading.

189.  As Peter Moreira noted on June 13, 2021, Sona's shares had fallen "68 percent on Friday after the Halifax life sciences company announced it had ended the clinical trials of its saliva-based rapid test for COVID-19 due to disappointing results."[68]

## VII.  ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

190.  In addition to the facts alleged above, the following facts provide additional indicia of scienter: (i) the omissions alleged herein involved the most important aspect of Sona's business and operations; and (ii) the omissions alleged herein resulted in unprecedented business opportunities for Sona, which the Defendants leveraged in their favor.

---

[66] Sona Nanotech Inc., Annual Information Form (Feb. 26, 2021).

[67] *Sona Discontinues Clinical Trial for COVID-19 Rapid Saliva Test*, SONA NANOTECH (June 11, 2021) ("June 11 Press Release"), https://sonanano.com/sona-discontinues-clinical-trial-for-covid-19-rapid-saliva-test/.

[68] Peter Moreira, *Sona Nano Ends COVID Trials*, ENTREVESTOR.COM (June 13, 2021), https://entrevestor.com/home/entry/sona-nano-ends-covid-trials.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

191.  <u>First</u>, the adverse developments at issue impacted the most central aspect, or the core, of the Company's business, operations, and revenue. Due to its prior financial struggles described herein, Sona was particularly incentivized to take advantage of the unprecedented demand for COVID-19 tests, and quickly adapted its pre-existing gold nanorod technology to its Nasal Swab Test, and then, its Saliva Test, effectively abandoning its other "various products and services."

192.  As described above, at the start of the Class Period, Sona was entirely focused on the Nasal Swab Test. Then, once it failed to achieve governmental emergency use approval for its Nasal Swab Test, Sona turned its entire focus to the Saliva Test. As a result, Sona's COVID-19 Antigen Tests' performance and prospects were highly material to its business during the Class Period. If Sona was not able to validate and commercialize its main products in the United States, Canada, or elsewhere, it would have a material impact on its profits and operations – for the simple reason that the COVID-19 Antigen Tests were, at least during the relevant time period, the Company's sole focus. Indeed, as detailed above, during the Class Period, Sona shifted all of its manufacturing and product marketing, and bought on additional personnel, to support the validation and commercialization of its COVID-19 Antigen Tests.

193.  Prior to the Class Period, Sona's business of researching and developing gold nanorod products for diagnostic tests and medical treatments was not reaping substantial rewards. The Company had incurred significant operating losses since its inception and had an accumulated deficit of $9,349,205 as of the year ended October 31, 2019 ("FY 2019"), compared to $6,828,496 as of the year ended October 31, 2018 ("FY 2018"), and for FY 2019, the Company incurred a net loss of $2,520,709.

194.  Indeed, just before the Class Period began, Sona issued a Management's Report for FY 2019 and FY 2018 indicating "as a going concern[,]" Management's evaluation of "alternative[] [means] to secure additional financing so that the

64

Company can continue to operate." Sona indicated that its operations, to date, were financed, in part, through the sale of common shares and government funding. Yet, during the FY 2019, Sona reported $0.00 non-repayable government assistance (FY 2018 - $72,052), and $194,078 in repayable government loans (FY 2018 - $163,331). In addition, in the months leading up to announcement of its plan to develop a COVID-19 antigen test, Sona's stock was trading on the CSE in a market range of $0.14 to $0.10 per share in the month of January 2020 at trading volumes of 161,768 shares; $0.15 to $0.01 per share in the month of December 2019 at trading volumes of 320,500 shares; and $0.21 to $0.13 per share in the month of November 2019 at trading volumes of 50,225.

195. Second, the Defendants' fraudulent statements concerning the development, validation and commercialization of Sona's COVID-19 Antigen Tests greatly increased its share price, driving its securities price to a Class Period high of $16.05 per share by July 28, 2020, yielding a 14,545% return.

196. This rise was clear from the start. For the month of February 2020, when Defendants announced Sona's plans and industry partnerships, as detailed above, its market price range and trading volumes saw a significant rise to $0.64 per share for the monthly high at trading volumes of 4,989,214 shares on the CSE.

197. Conveniently, less than one month prior to Sona's announcement of its plan to develop a COVID-19 antigen test, on January 14, 2020, it announced that it had converted notes payable of $95,000 and accrued interest of $67,322 owed to "non-arm's length" note holders and notes payable of $200,000 and accrued interest of $141,732 owed to certain "arm's length" note holders. The notes payable were settled in full by the issuance of an aggregate of 2,520,270 common shares, of which **1,655,942 were issued to related parties**, at a deemed price of $0.20 per share. While these shares were subject to resale restrictions prohibiting their resale until May 14, 2020, the Company's stock price closed at $1.32 per share on that day.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

198.  As Sona continued to release positive news regarding the development of its Nasal Swab Test through the month of March 2020, the market price range increased to $0.94 per share at the months high and $0.475 per share at the low, on trading volumes of 12,392,367 shares. Specifically, on March 18, 2020, Sona confirmed that it had begun developing a functional prototype of its Nasal Swab Test. On this news, the Company's share price increased 23% on the OTC and nearly 29% on the CSE.

199.  Defendants capitalized on investor's heightened interest in the Company and its positive statements to date, obtaining much needed governmental funding. For example, on March 31, 2020, Sona announced that it had been awarded a **$4.1 million grant** from NGen, Canada's Advanced Manufacturing Supercluster, to develop and commercialize its COVID-19 antigen test, stating that, "[t]his non-repayable grant will be used to accelerate the development of a prototype and scale manufacturing capabilities with a view to deploying this Covid-19 virus-detecting, point-of-care test with Canadian medical authorities as soon as possible."

200.  In the week leading up to the start of the Class Period, Sona's stock traded between $2.04 and $1.39 on the CSE and $1.43 and $0.98 on the OTC.

201.  On May 12, 2020, the start of the Class Period, Sona announced mixed news, stating that it had received confirmation that its Nasal Swab Test "achieved a positive response to a recombinant whole spoke protein control reagent specific to [COVID-19,]" but added that "[i]n order to conduct sufficient validation testing for submission for use to regulators, Sona [would be] moving to test its [Nasal Swab Test] with live virus culture and/or patient samples as part of a formal clinical study." On this news, Sona's stock price closed that day at $0.81 per share on the OTC and at $1.20 per share on the CSE – maintaining an increase of 91% and 83%, respectively.

202.  As described above, prior to the May 12 Press Release, despite having an ongoing, open dialogue with regulators to ensure that Sona's Test was being

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

developed within the FDA's parameters for EUA eligibility, in addition to, the FDA's issuance of detailed guidances and templates to support developers with their EUA submissions, Defendants knew or recklessly disregarded that: (1) Sona's in-field clinical evaluation of its Nasal Swab Test did not have adequate enrollment criteria, failed to demonstrate assessment in a point of care setting, and/or lacked proper antigen test handling procedures; (2) as a result, such validation testing would take longer than a month to complete; (3) Sona's validation testing specifically did not include a sufficient number of patients whose symptom onset was within 0-6 days and would not produce sufficient data for use in a POC setting; and (4) as a result, Sona's Test would not meet the FDA's or Health Canada's criteria for authorization.

203.  Following Sona's November 25 Press Release, disclosing the withdrawal of its application with Health Canada to obtain more clinical data, the Company's securities were still trading at an artificially inflated price, with an average closing price of $0.97 per share on the OTC and $1.24 per share on the CSE through the end of 2020.

204.  Maximizing this continued market manipulation, on December 3, 2020, Sona announced its plans to raise up to **$2,000,000 through a non-brokered private placement** of up to 2,000,000 units at $1.00 per unit. Each unit consisted of one common share and one-half of a common share purchase warrant. The announcement added that "Sona intends to use the net proceeds [ ] to produce further clinical trial data for its rapid COVID-19 antigen nasal [ ] test, pursue a European regulatory self-certification CE Mark declaration, and pursue further development and clinical trial validation work for its saliva-based prototype version of the test, as well as for general working capital purposes." Sona announced the closing of this private placement on December 16, 2020 with the issuance of 2,259,200 units at $1.00 per unit.

205.  Leading into the new year on a positive note, Defendants announced Sona had received CE Mark Approval on December 31, 2020. However, as detailed above,

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Defendants' December 31 Press Release was materially misleading as it failed to disclose the following adverse facts pertaining to Sona's efforts towards obtaining more clinical data and a CE Mark for its Nasal Swab Test, which were known to Defendants or recklessly disregarded by them: (1) Sona was not focusing on collecting further clinical data for its Test and as a result, over four months later, it would still not have a sponsoring institution, a principal investigator, a study protocol, relevant medical ethics review board approval, or Health Canada Investigational Testing Division approval – all of which was necessary to obtain additional clinical data for its Test, and (2) obtaining a CE Mark was meaningless for commercialization due to the abundant availability of competing antigen tests, many of which had not only received a CE Mark, but also had already received EUAs for their COVID-19 diagnostic tests.

206. Because of Defendants' fraudulent Class Period statements through December 31, 2020, during the months of January 2021 and February 2021, Sona saw significantly high securities prices and trading volumes, with a monthly price range of $4.44 to $1.60 per share on a volume of 17,068,442, and $2.34 to $1.20 per share on a volume of 12,688,108, respectively.

207. By March 1, 2021, following the partial revelations on August 6, 2020, October 29, 2020, and November 25, 2020, Defendants finally confirmed that, after four months had passed since announcing the need for an additional clinical trial for Sona's Nasal Swab Test, it *still* lacked a sponsoring institution, a principal investigator, a study protocol, relevant medical ethics review board approval, and Health Canada Investigational Testing Division approval. As to the EU, Sona *still* had not obtained any "firm orders" in over three months since receiving the CE Mark. On this news, Sona's share price fell over 13%.

208. Therefore, on March 23, 2021, to capitalize on what was left of Sona's artificially inflated securities price while they still could, Defendants announced the

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

filing of a Shelf Prospectus. The stated purpose of which was "to provide the Company with the financial flexibility to take advantage of financing opportunities and favorable market conditions, if and when desired, once the filing is made final."

209. The Shelf Prospectus, when made final, would enable Sona to **offer up to $20,000,000 of common shares, debt securities, warrants, subscription receipts and units** (collectively, the "Securities"), or any combination of such Securities from time to time, during the 25-month period that the Shelf Prospectus was in effect. The Shelf Prospectus provided that:

> **Securities may be sold under this Prospectus by way of secondary offering by or for the account of certain of the Company's securityholders**. In connection with any secondary offering, in respect of any selling securityholder that is resident outside of Canada, the Company will file a non-issuer's submission to jurisdiction form on behalf of such selling securityholder with the corresponding Prospectus Supplement.

210. On April 9, 2021, Sona announced an At-the-Market Common Share Offering (ATM Offering) pursuant to the Shelf Prospectus, Prospectus Supplement and Equity Distribution Agreement with Canaccord Genuity Corporation. The Company's press release went on to add that, "[t]he volume and timing of sales, if any, will be determined at the sole discretion of the Company's management and in accordance with the terms of the Equity Distribution Agreement."

211. Shortly thereafter, on April 12, 2021, Defendants generated investor buzz with the news that Sona had secured a clinical trial for its Saliva Test. On this news, the stock price closed at $1.32 per share on the OTC and $1.65 per share on the CSE.

212. At the time of the ATM Offering, the Individual Defendants, personally, maintained the following interest in the Company:

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| Defendant | Common Shares | Options | Warrants |
|---|---|---|---|
| Randall | 232,500 | 290,000 | 12,500 |
| Regan | 25,000 | 750,000 | 12,500 |
| Rowles | 0 | 900,000 | 0 |

213. During the period ended July 31, 2021, Sona sold 1,312,400 common shares pursuant to the ATM for gross proceeds of $2,271,427. Costs of the shares sold under the ATM during this time-period were $359,147, for net proceeds to the Company of $1,912,280.

214. The primary eligibility requirement for a company to be able to offer an ATM Offering is that the aggregate market value of the company's voting and non-voting common equity held by non-affiliates be at least $75 million.[69] Sona still had a market value of $112.45 million on the CSE as of April 30, 3031, but by July 31, 2021, after the truth had been fully revealed, its value had dropped to $23.77 million because its securities were back to trading at their pre-COVID levels. Therefore, Defendants knew that in order to raise any more money from their COVID run, they had to initiate an ATM Offering while investors were still in the dark.

215. In addition to the financial opportunities discussed above, the Individual Defendants also benefited throughout the Class Period through increased salaries and benefits, and compensation paid by Sona to related parties. For the year ended October 31, 2020 ("FY 2020"), salaries and benefits increased 150% to $940,638, from $376,503 for FY 2019. Likewise, for the nine months ended July 31, 2021 ("3Q 2021"), salaries and benefits increased 74% and 140%, respectively, to $967,099, from $555,978 for the nine months ended July 31, 2020 ("3Q 2020"), and $403,074 for the nine months ended July 31, 2019 ("3Q 2019").

---

[69] Rob Lando, Jason Comerford, Jie Chai, *At-the-market (ATM) offerings using the Multijurisdictional Disclosure System (MJDS)*, OSLER (Apr. 30, 2018), https://www.osler.com/en/resources/cross-border/2018/at-the-market-atm-offerings-using-the-multijurisdictional-disclosure-system-mjds.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

216. Similarly, expenses involving related party transactions and fees – specifically Professional and consulting fees comprised of "Key Management Compensation" and portions of "Related Party Transactions" – increased throughout the Class Period:

| Expenses | FY 2020 | FY 2019 | 3Q 2021 | 3Q 2020 | 3Q 2019 |
|---|---|---|---|---|---|
| Professional & consulting fees | $940,638 | $376,503 | $373,154 | $594,589 | $285,345 |
| Management services | $228,000 | $228,000 | $171,000 | $171,000 | $171,000 |
| Rent and related costs | $47,961 | $52,248 | $37,806 | $36,739 | $36,229 |
| **Total:** | **$1,216,599** | **$656,751** | **$581,960** | **$802,328** | **$492,574** |

217. Key management included Sona's directors, CEO, CFO, and CSO. Key management compensation consisted of salaries and consulting fees earned, and share-based compensation expense. In addition to the salaries and benefits noted above, Key management earned $353,410 in fees in FY 2020, versus $191,529 in FY 2019. Likewise, Key management earned $437,076 in fees in 3Q 2021, versus $206,712 in 3Q 2020 and $149,529 in 3Q 2019.

218. In addition to portions of Professional and Consulting Fees, "Related Party Transactions" included Management Services and Rent and Related Costs.

219. During FY 2020, Sona incurred costs of $228,000 (FY 2019 - $228,000) in service fees, $47,500 (FY 2019 - $30,000) in controller services fees, and $30,600 (FY 2019 - $30,603) in rent and administrative costs to related party, Numus Financial Inc. ("Numus"), which was controlled by significant shareholders, including the Company's Director, Wade K. Dawe. During 3Q 2021, Sona incurred costs of $171,000 (3Q 2020 - $171,000; 3Q 2019 – $171,000) in services from Numus, $23,750 (3Q 2020 - $32,500; 3Q 2019 - $22,500) in controller services, and $22,950 (3Q 2020 - $22,950; 3Q 2019 – $22,953) in rent and administrative costs. As of 3Q 2021, Sona owed Numus $217,700 (3Q 2020 - $492,286; 3Q 2019 – $263,250).

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

220. Further, as of 3Q 2021, the Company owed Randall Consulting Inc. ("RCI"), a company controlled by Defendant Randall, an amount of $67,225 (FY 2020 - $131,294; 3Q 2019 - $43,646).

221. As alleged herein, Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the Company's name were materially misleading and that such statements or documents would be issued or disseminated to the investing public. Defendants substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants – by virtue of their receipt of information reflecting the true facts regarding Sona; their control over, receipt, and/or modification of Sona's allegedly materially misleading statements; and/or their associations with the Company, which made them privy to confidential proprietary information concerning Sona – participated in the fraudulent scheme alleged herein.

222. Based on their hands-on involvement from the beginning of the Class Period, the Individual Defendants had actual knowledge of the Company's optimization, validation, and commercialization efforts relating to its Nasal Swab Test and Saliva Test. As noted in the March 30 Press Release, Sona's "R&D work is being done…under the supervision of the Company's Chief Technology Officer, Head of R&D, and *President and CEO* [Rowles]."

223. In addition, the Individual Defendants had "an *ongoing, open dialogue with regulators to ensure the Sona's test is being developed within the parameters regulators have outlined*. *This approach will allow Sona* to be eligible for FDA review through their Emergency Use Authorisation[sic] (EUA) pathway and *a fast-track to market*." (March 12 Press Release). Based on that ongoing, open dialogue with the FDA, Defendant Regan boasted during an October 1, 2020 "interview with Todd Veinotte of 95.7 News Talk radio Halifax centered around the pending approval

72

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

of Sona Nanotech's rapid antigen test" that "[w]e're **100% confident that it gets approved**. There's **smart questions being asked**, and we have **strong data on our test**. And the timeline is unclear as to what the time is… Typically, something like this takes a year in normal context. Right now, we're hopeful that it can be very soon."[70]

224.  Furthermore, leading up to and during the Class Period, based on its own statements, Sona was primarily focused on developing and commercializing its Nasal Swab Test based on its gold nanotechnology:

- "**Sona's primary objective** will be the **development and production of its own lateral flow tests utilizing Sona's unique gold nanotechnology** as the core reagent to help drive better performance from the outset and minimize time to market." (Pre-Class Period and Class Period Management Discussion and Analyses; Class Period Annual Information Forms)[71]

- "In the past several weeks, Sona has been **focused on work related to the development of a rapid response COVID-19 lateral flow test**." (March 12 Press Release).

- "The **commercialization of its COVID-19 rapid, antigen test continues to be the top near-term priority** for the Company." (August 31 Press Release).

225.  Moreover, since February 10, 2020, when Sona first announced its plan to develop a COVID-19 antigen test, the Individual Defendants knew such tests were considered vital to public health given the nature of the COVID-19 pandemic and, as such, authorization and commercialization were extremely time sensitive:

---

[70] Benjamin A. Smith, *Sona Nanotech CEO "100% Confident" Coronavirus Test Will Land Regulatory Approval*, THE DALES REPORT (Oct. 2, 2020), https://thedalesreport.com/technology/sona-nanotech-ceo-100-confident-coronavirus-test-will-land-regulatory-approval/.

[71] Sona Nanotech Inc., Management Discussion and Analysis (Feb. 28, 2020); Sona Nanotech Inc., Management Discussion and Analysis (Apr. 3, 2020); Sona Nanotech Inc., Management Discussion and Analysis (June 29, 2020); Sona Nanotech Inc., Annual Information Form (Mar. 18, 2020); Sona Nanotech Inc., Annual Information Form (Mar. 1, 2021).

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- <u>Rowles</u>: "Screening tests are ***critical tools*** in dealing with rapidly evolving and large-scale out-breaks that tax the health care system, like this novel Coronavirus." (February 10 Press Release).

- "GE Healthcare Life Sciences will support Sona through their studies as they work to get their rapid-response Covid-19 lateral flow test introduced into markets ***as quickly as possible***." (March 3 Press Release).

- <u>Rowles</u>: "With [GE's] help, we will be able to ***accelerate*** our work and hopefully bring this ***critical test*** to the market ***quicker***." (March 3 Press Release).

- <u>Rowles</u>: "We are also pleased to report that our initial laboratory work is progressing well and as a result of our collaboration with GE, we expect to ***accelerate an aggressive pace*** in the development of this ***critical test***." (March 6 Press Release).

- "The Company expects to benefit from the regulatory relief offered by the FDA to ***expedite*** the availability of diagnostics associated with the Covid-19 disease, subject to certain conditions." (March 30 Press Release).

- "Rapid, point-of-care, antigen tests can make a ***significant contribution*** to reducing the spread of COVID- 19 by detecting the presence of the virus in individuals, potentially before the onset of symptoms." (August 6 Press Release).

226.  Given the incredible importance of its COVID-19 tests to the Company's financial performance, there is no doubt that the Individual Defendants would immediately have been aware of any concerns raised by the FDA or Health Canada regarding Sona's clinical study and/or EUA submission.

227.  Throughout the Class Period, Sona and the Individual Defendants also touted the significant experience of Sona's management, including that of Rowles, Regan and Randall, in developing and commercializing diagnostic tests:

- "***The Company's management***, scientific and board representatives ***include significant experience*** in lateral flow test development, commercialization and medicine." (March 30 Press Release).

74

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- <u>Rowles</u>: "The change [to President and CSO] provides me with the opportunity to *focus on my passion for science and driving innovation* through the company. I'm delighted to welcome David [Regan] to Sona's leadership team and continuing the *partnership with him to capitalize on the efforts made to get these tests authorized, manufactured and in to as many hands as possible* around the world." (July 8 Press Release).

- <u>Regan</u>: "The business will also build on the *culture of innovation instituted by Darren [Rowles] to develop and bring new tests to market* that leverage Sona's proprietary detection technology." (July 8 Press Release).

228.  Based on FDA and CDC guidelines and advice, therefore, the Individual Defendants knew or recklessly disregarded that the quality of clinical testing protocols was key to receiving regulatory approval: "*Clinical testing protocols are paramount* as the CDC advises that *proper collection of specimens is the most important step* in the laboratory diagnosis of infectious diseases, whether the collection be for RT-PCR or rapid antigen tests, as *swab application technique can strongly influence results*."[72]

229.  Further, leading up to and throughout the Class Period, Sona and the Individual Defendants knew that the intended use of the Company's Nasal Swab Test was rapid detection of infected individuals, in a point-of-care setting, with the highest risk of spreading the virus. In other words, the intended use was to detect COVID-19 in its acute phase, *i.e.*, within 0-6 days of symptom onset in a patient:

- <u>Rowles</u>: "*Rapid screening tests* are commonly used in the field as a front-line triage test. This *is often the best way to determine which individuals* require more medical attention, and which *show no sign of infection* and therefore may not require immediate medical care and quarantine, thus allowing the medical community to focus their resources as efficiently as possible." (February 13 Press Release).

---

[72] *Sona Nanotech Announces Clinical Evaluation Study Results for its COVID-19 Antigen Test*, SONA NANOTECH (Aug. 25, 2020), https://sonanano.com/sona-nanotech-announces-clinical-evaluation-study-results-for-its-covid-19-antigen-test/.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- "Sona's Covid-19 test will offer a ***unique advantage over other lateral flow tests as it detects the presence of the Covid-19 virus*** … Sona's test is being developed to indicate a positive result only when the Covid-19 virus is present, allowing for direct and clear interpretation." (March 18 Press Release).

- "Sona's Covid-19 test will offer a ***unique advantage over many other point-of-care tests as it detects the presence of the Covid-19 virus***. Recently, many serological lateral flow tests, which are designed to identify IgM and IgG antibodies present post-infection, have been announced." (March 30 Press Release).

- "The Company is working with a consortium of international and Canadian partners to develop a functional prototype for an ***antigen detecting, rapid-response, lateral flow test that is expected to provide in-field test results in minutes, without the use of specialized laboratory equipment or technicians***." (March 31 Press Release)

- "Sona's rapid COVID-19 antigen test is a device designed to be used at point-of-care to ***detect the presence of the SARS-Cov2 virus*** in a patient within 10-15 minutes which could make it a critical component of testing protocols being considered by governments as they devise plans to relax social distancing measures. The Company's test will not require either specialized equipment or lab based professionals to interpret its test results." (May 12 Press Release).

- "Rapid, point-of-care, antigen tests can make a significant contribution to reducing the spread of COVID- 19 by ***detecting the presence of the virus in individuals, potentially before the onset of symptoms***." (August 6 Press Release).

- Rowles: "Rapid, point-of care, antigen tests can make a significant contribution to reducing the spread of COVID-19 by ***detecting the presence of the virus, potentially before the onset of symptoms***." (August 25 Press Release).

- *"Sona's rapid COVID-19 antigen test is a device designed to be used at point-of-care to **detect the presence of the SARS-Cov2 virus** in a patient within 15 minutes which could make it a critical component of testing protocols being considered by governments as they devise plans to relax social distancing measures."*[73]

---

[73] Sona Nanotech Inc., Management Discussion and Analysis (Sept. 29, 2020).

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- "Potential programs envision having employees that ***test positive with the Sona rapid test designated 'presumed positive', removed from congested work environments and referred to medical professionals for confirmatory testing***. This process would ***allow employers to remove affected staff from the workplace, reduce potential spread*** and help businesses remain open in pandemic conditions." (October 29 Press Release).

230.  Thus, Sona and the Individual Defendants knew or recklessly disregarded that the focus of the in-field studies should have been on demonstrating the use of its COVID-19 Antigen Tests in a POC setting, on patients within 0-6 days of symptom onset (when an individual is most contagious) in order to produce sufficient data to demonstrate the Tests' intended use – to prevent or stop the spread of COVID-19.

231.  As alleged herein, Defendants acted with scienter in that they knew, or deliberately disregarded, misleading public documents and statements were issued or disseminated in the name of the Company and they failed to disclose material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading. Defendants knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents and in actions intended to manipulate the market price of Sona securities as primary violations of the federal securities laws.

232.  As set forth herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Sona, their control over, and/or receipt or modification of, Sona's material fraudulent statements, and/or their associations with the Company that made them privy to confidential proprietary information concerning Sona, participated in the fraudulent scheme alleged herein.

233.  As a result, the Individual Defendants knew, or were reckless in not knowing, of the undisclosed facts herein.

234.  The allegations above also establish a strong inference that Sona as an

77

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

entity, acted with corporate scienter throughout the Class Period, as its officers, management, and agents, including, but not limited to, the Individual Defendants, had actual knowledge of the material misstatements and/or omissions set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the Company's shortcomings from the investing public. Indeed, the FDA and other regulatory personnel would have only communicated with senior individuals at Sona regarding the submission requirements and concerns raised following review of its application. Thus, the Individual Defendants would have been in a position to establish Sona's scienter. By concealing these material facts from investors, Sona maintained and/or increased its artificially inflated securities prices throughout the Class Period.

## VIII. LOSS CAUSATION

235. The materially misleading statements and material omissions, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class members it represents.

236. During the Class Period, Plaintiff and Class members purchased Sona securities at artificially inflated prices and were damaged thereby. The price of the Company's securities declined significantly when the information alleged herein to have been concealed from the market, and/or the effects thereof, were disseminated and publicly revealed.

237. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Sona securities, by publicly issuing misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not misleading. The statements and omissions were

78

materially misleading because they failed to disclose material adverse information about Sona's business, operations, and prospects, as alleged herein.

238. At all relevant times, the material omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. Defendants made or caused to be made misleading statements about Sona's business, operations and future prospects. These material omissions had the cause and effect of creating in the market a misleadingly positive assessment of the Company and its business and operational performance and related well-being, thus causing its securities to be overvalued and the price of its securities to be artificially inflated at all relevant times. Defendants' materially misleading statements, as alleged herein, resulted in Plaintiff and other members of the Class in purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed in part on August 6, 2020, October 29, 2020, and November 25, 2020, March 1, 2021, and in full on June 1, 2021, causing the trading price of Sona securities to materially decline and removing the previously embedded artificial inflation.

## IX.   CLASS ACTION ALLEGATIONS

239. Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of a class consisting of all person and entities that purchased, or otherwise acquired, Sona securities during the Class Period, and were damaged by the conduct asserted herein. Excluded from the Class are Defendants and their immediate families and legal representatives, heirs, successors or assigns and any entity in which Defendants have, or had, a controlling interest.

240. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

discovery, Plaintiff believes there are hundreds, if not thousands, of members in the proposed Class. Throughout the Class Period, millions of Sona securities were outstanding, owned and/or publicly traded on the OTC by hundreds, if not thousands, of persons.

241.  There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the Class that predominate over those that may affect individual class members include whether:

- Defendants violated the federal securities laws;

- Defendants omitted material facts;

- Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- Defendants knowingly or with deliberate recklessness, disregarded or turned a blind eye toward the fact that their Class Period statements were misleading;

- Individual Defendants caused Sona to issue misleading filings during the Class Period;

- The price of Sona securities was artificially inflated because of Defendants' conduct complained of herein; and

- The Class members have sustained damages and, if so, the appropriate measure of damages.

242.  Plaintiff's claims are typical of those of the Class members because they each were similarly damaged by Defendants' wrongful conduct in violation of the federal securities laws.

243.  Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced in securities class action litigation. Plaintiff has no interests that conflict with those of the Class.

244.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulties in the

80

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

management of this action that would preclude its maintenance as a class action.

## X. PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET

245. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants failed to disclose material facts to the public; (b) the omissions were material; (c) the Company's securities traded in an efficient market; (d) the alleged omissions would tend to induce a reasonable investor to misjudge the value of the Company's securities; and (e) Plaintiff and the other members of the Class purchased Sona securities between the time Defendants failed to disclose material facts and the time the true facts were disclosed, without knowledge of the omitted facts.

246. At all relevant times, the market for Sona securities was efficient for the following reasons, among others: (a) Sona securities met the listing requirements for, and were listed and actively traded on the OTC, a highly efficient market; (b) during the Class Period, Sona shares were actively traded, supporting a strong presumption of efficiency; (c) as an SEC regulated issuer, Sona issued *via* the OTC periodic public reports; (d) Sona regularly communicated with public investors, including *via* regular disseminations of press releases on major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (e) unexpected material news about Sona was rapidly reflected in and incorporated into the price of its securities during the Class Period.

247. As a result, the market for Sona securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of Sona's shares. Under these circumstances, all purchasers or acquirers of Sona securities during the Class Period suffered similar injury through their purchase or acquisition of Sona securities at artificially inflated prices, and a presumption of reliance applies.

248. In addition, Plaintiff is entitled to a presumption of reliance under

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

## XI.  INAPPLICABILITY OF SAFE HARBOR

249.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly misleading statements pleaded in this Complaint. All of the specific statements pleaded herein were not identified as, and/or were not "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Sona and the Individual Defendants are liable for those misleading forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of Sona named under the Exchange Act who knew that those statements were materially misleading when made.

## XII.  CLAIMS FOR RELIEF

### COUNT I
### Violations of § 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

250.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10(b)-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants.

251. Defendants, carried out a plan, scheme, and course of conduct which was intended to, and did, deceive the investing public, including Plaintiff and the other Class members, as alleged herein, and caused Plaintiff and the other Class members to purchase Sona securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

252. During the Class Period, Defendants participated in the preparation of and/or disseminated or approved the misleading statements specified above, which they knew, or deliberately disregarded as, or turned a blind eye to being, misleading in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

253. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statement made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers or acquirers of Sona securities in an effort to maintain artificially high market prices for Sona securities in violation of § 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

254. Defendants, individually and together, directly and/or indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Sona's business, operations, and future prospects as specified herein.

255. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Sona's value and performance and continued substantial growth, which included the

83

preparation of and/or dissemination or approval of untrue statements of material facts and/or omitting to state material facts necessary in order to make statements made about Sona and its business operations and further prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and course of business which operated as a fraud and deceit upon the purchasers and acquirers of Sona securities during the Class Period.

256. Defendants had motive and opportunity to perpetrate the fraudulent scheme and course of conduct described herein. Defendants acted with scienter in that they knew that the public documents and statements prepared, issued and/or disseminated in the name of Sona were materially misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants by virtue of their receipt of information reflecting the true facts of Sona, their control over, and/or receipt and/or modification of Sona's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Sona, participated in the fraudulent scheme alleged herein.

257. The Individual Defendants are the most high-level executives and/or directors at Sona and members of its management team or had control thereof. By virtue of their responsibilities and activities as senior officers, the Individual Defendants had actual knowledge of the omissions of material fact set forth herein and intended to deceive Plaintiff and other members of the Class, or, in the alternative, acted with reckless disregard for the truth in that they failed to obtain such knowledge by deliberately refraining from taking steps necessary to discover whether the statements alleged herein, were misleading, or turned a blind eye toward the true facts

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

available to them. Defendants' material omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's true prospects from the investing public and supporting the artificially inflated price of Sona securities.

258.  As a result of the dissemination of the materially misleading information and failure to disclose material facts, as set forth herein, the market price of Sona securities was artificially inflated. In ignorance of the fact that market price of Sona securities was artificially inflated during the Class Period, and relying directly or indirectly on Defendants' misleading statements, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or recklessly disregarded, by Defendants, but not disclosed in public statements by Defendants, Plaintiff and the other Class members acquired Sona securities at artificially high prices and were, or will be, damaged thereby.

259.  At the time of said omissions, Plaintiff and the other Class members were ignorant of their misleading and believed them to be true. Had Plaintiff and the other members of the Class, and the marketplace known the truth regarding the Company's business, which was not disclosed by Defendants, Plaintiff and the other member of the Class would not have purchased or acquired Sona securities, of if they had purchased or acquired such securities, they would not have done so at the artificially inflated prices that they paid.

260.  By virtue of the foregoing, Defendants have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

261.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Sona securities during the Class Period.

262.  This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of securities giving rise to the cause of action.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## COUNT II
### Violations of § 20(a) of the Exchange Act
### (Against the Individual Defendants)

263. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. As members of Sona's executive team and/or the Company's board of directors, the Individual Defendants acted as controlling persons of Sona within the meaning of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

264. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Sona's operations and/or intimate knowledge of the misleading information disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Sona, including the content and dissemination of the various statements that Plaintiff contends are misleading. The Individual Defendants were provided with, or had unlimited access to Sona's reports, press releases, public filings and other statements, alleged by Plaintiff to have been misleading, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

265. In particular, each of the Individual Defendants had direct and supervisory involvement in the Company's day-to-day operations and, therefore, are presumed to have had the power to control and/or influence the particular transactions giving rise to the securities violations, as alleged herein, and exercised the same.

266. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Sona's business operations and prospects, and to correct promptly any public statements issued by the Company which had become materially misleading.

267. As set forth above, Sona and the Individual Defendants each violated §

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

10(b) and Rule 10b-5, promulgated thereunder, by their acts and omissions as alleged in this Complaint and the Class was damaged thereby. By virtue of their positions as "controlling persons", the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.

268.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with their purchase or acquisition of Sona securities during the Class Period.

269.  This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of securities giving rise to the cause of action.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Plaintiff and the Class, prays for relief and judgment, as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of the Class defined herein;

B.     Awarding Plaintiff and the members of the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' conduct, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D.     Awarding such other equitable/injunctive or further relief as this Court may deem just and proper.

## XIV. DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: November 12, 2021                 Respectfully Submitted,

                                          **ROCHE FREEDMAN LLP**

                                          */s/ Ivy T. Ngo*
                                          Ivy T. Ngo (249860)

87

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Velvel (Devin) Freedman (*pro hac vice*)
Constantine P. Economides *(pro hac vice)*
1 SE 3rd Avenue, Suite 1240
Miami, Florida 33131
Telephone: (786) 924-2900
Facsimile: (646) 392-8842
ingo@rochefreedman.com
vel@rochefreedman.com
ceconomides@rochefreedman.com

*Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall (290685)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Plaintiff*

88

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on November 12, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

By:   */s/ Ivy T. Ngo*
      Ivy T. Ngo

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS