**ROCHE FREEDMAN LLP**
Constantine P. Economides (*pro hac vice*)
Ivy T. Ngo (249860)
Velvel (Devin) Freedman (*pro hac vice*)
1 SE 3rd Avenue, Suite 1240
Miami, Florida 33131
Telephone: (786) 924-2900
Facsimile: (646) 392-8842
ceconomides@rochefreedman.com
ingo@rochefreedman.com
vel@rochefreedman.com

*Lead Counsel for the Class*

*[Additional Counsel on Signature Page]*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re SONA NANOTECH INC. SECURITIES LITIGATION | Case No.:  2:20-cv-11405-MCS-MAA |
| | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT** |
| This Document Relates To: | |
| ALL ACTIONS. | Hearing Date: January 10, 2022 |
| | Hearing Time: 9:00 a.m. |
| | Courtroom:     7C |
| | JUDGE:         Mark C. Scarsi |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................ii

I.    INTRODUCTION ..................................................................................... 1

II.   SUMMARY OF PLAINTIFF'S ALLEGATIONS............................................. 2

III.  LEGAL STANDARDS ................................................................................ 7

IV.   ARGUMENT............................................................................................. 8

    A.  The SAC Adequately Alleges Material Omissions About the Tests........... 8

        1.  Securities fraud involving material omissions often involves
literally true statements. ...................................................................... 8

        2.  Defendants made literally true statements that omitted material
information and misled investors about Sona's Tests.......................... 9

        3.  Defendants' falsity arguments fail. .................................................... 12

        4.  The SAC's omissions allegations do not have the deficiencies
previously found by the Court............................................................ 13

    B.  The SAC Raises a Strong Inference of Scienter. ...................................... 16

        1.  The Individual Defendants made detailed statements about the
Tests.................................................................................................. 18

        2.  The Individual Defendants had direct responsibility for the Tests.... 18

        3.  Sona's Tests were core to the Company's operations. ...................... 20

        4.  Defendants' challenges to scienter fail. ............................................ 21

V.    CONCLUSION....................................................................................... 26

# TABLE OF AUTHORITIES

## Cases

*Azar v. Yelp, Inc.*,
2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) ................................................................20, 21

*Berson v. Applied Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ................................................................17, 19

*Boston Ret. Sys. v. Uber Techs., Inc.*,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ................................................................12, 13

*Brendon v. Allegiant Travel Co.*,
412 F. Supp. 3d 1244 (D. Nev. 2019)................................................................21

*Brennan v. Zafgen, Inc.*,
853 F.3d 606 (1st Cir. 2017)................................................................24

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002)................................................................8

*Carr v. Zosano Pharma Corp.*,
2021 WL 3913509 (N.D. Cal. Sept. 1, 2021) ................................................................24

*Constr. Laborers Pension Tr. of Greater St. Louis v. Neurocrine Biosciences, Inc.*,
2008 WL 4370010 (S.D. Cal. Sep. 23, 2008)................................................................17

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019) ................................................................19, 20

*Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*,
2021 WL 3748325 (N.D. Cal. Aug. 24, 2021) ................................................................14

*Hefler v. Wells Fargo & Co.*,
2018 WL 1070116 (N.D. Cal. Feb. 27, 2018) ................................................................21

*Hunt v. Bloom Energy Corp.*,
2021 WL 4461171 (N.D. Cal. Sept. 29, 2021) ................................................................14

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ................................................................22

*In re Apple Inc. Sec. Litig.*,
2020 WL 2857397 (N.D. Cal. Jun. 2, 2020)................................................................9

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ................................................................20, 21, 23

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ................................................................15

*In re Columbia Labs., Inc. Sec. Litig.*,
2013 WL 5719500 (D.N.J. Oct. 21, 2013),
*aff'd*, 602 F. App'x 80 (3d Cir. 2015)................................................................24

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................13

*In re Forest Labs. Sec. Litig.*,
    2006 WL 5616712, (S.D.N.Y. July 21, 2006) ...........................................................18

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ...............................................................................8

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005)........................................................................12

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
    2020 WL 1479128 (E.D. Pa. Mar. 25, 2020)................................................................18

*In re MannKind Sec. Actions*,
    835 F. Supp. 2d 797 (C.D. Cal. 2011) ..............................................................17, 19

*In re Myriad Genetics, Inc.*,
    2021 WL 977770 (D. Utah Mar. 16, 2021) ...............................................................17

*In re Obalon Therapeutics, Inc.*,
    2019 WL 4729461 (S.D. Cal. Sept. 25, 2019)..............................................................8

*In re Qualcomm Inc. Sec. Litig.*,
    2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) .............................................................18

*In re Syntex Corp. Sec. Litig*,
    95 F.3d 922 (9th Cir. 1996) .................................................................................24

*In re Tesla, Inc. Sec. Litig.*,
    477 F. Supp. 3d 903 (N.D. Cal. 2020) .......................................................................9

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) ...............................................................................18

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
    282 F. Supp. 3d 1074 (N.D. Cal. 2017) .....................................................................7

*Ingram v. VIVUS, Inc.*,
    591 F. App'x 592 (9th Cir. 2015) ..........................................................................24

*Jun Shi v. Ampio Pharms., Inc.*,
    2020 WL 5092910 (C.D. Cal. Jun. 19, 2020)...............................................................24

*Karinski v. Stamps.com, Inc.*,
    2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ...............................................................18

*Kendall v. Odonate Therapeutics, Inc.*,
    2021 WL 3406271 (S.D. Cal. Aug. 4, 2021) ................................................................8

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ...............................................................................12

*Kovtun v. VIVUS, Inc.*,
    2012 WL 4477647 (N.D. Cal. Sept. 27, 2012) .............................................................24

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ..............................................................................14

*Longo v. OSI Sys., Inc.*,
    2021 WL 1232678 (C.D. Cal. Mar. 31, 2021)...............................................................21

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)..................................................................................................8, 23

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ........................................................................................9

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015).....................................................................................................13

*Ortiz v. Canopy Growth Corp.*,
    2021 WL 1851933 (D.N.J. May 7, 2021) ....................................................................21

*Ratner v. Ovascience, Inc.*,
    2015 WL 5684068 (D. Mass. Sept. 28, 2015) .............................................................24

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) ......................................................................................18

*Roberti v. OSI Sys., Inc.*,
    2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)......................................................13, 21

*S. Ferry LP #2 v. Killinger*,
    687 F. Supp. 2d 1248 (W.D. Wash. 2009).............................................................18, 20

*S. Ferry LP, No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ................................................................................17, 19

*Sanders v. AVEO Pharm., Inc.*,
    2015 WL 1276824 (D. Mass. Mar. 20, 2015)............................................................24

*Schueneman v. Arena Pharm., Inc.*,
    840 F.3d 698 (9th Cir. 2016) .................................................................................8, 23

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) .....................................................................22

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009),
    *aff'd*, 563 U.S. 27 (2011) ...........................................................................................13

*Skiadas v. Acer Therapeutics Inc.*,
    2020 WL 4208442 (S.D.N.Y. July 21, 2020) ............................................................17

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
    552 U.S. 148 (2008)......................................................................................................7

*Sudunagunta v. NantKwest, Inc.*,
    2017 WL 8810760 (C.D. Cal. Sept. 20, 2017) ..........................................................22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................................7, 17, 23

*Union Asset Mgmt. Holding AG v. SanDisk LLC*,
    2017 WL 3097184 (N.D. Cal. Jun. 22, 2017).............................................................19

*Voulgaris v. Array Biopharma Inc.*,
    2020 WL 8367829 (D. Colo. Nov. 24, 2020) ............................................................17

*Warshaw v. Xoma Corp.*,
74 F.3d 955 (9th Cir. 1996) .........................................................................................23

*Westley v. Oclaro, Inc.*,
897 F. Supp. 2d 902 (N.D. Cal. Sept. 21, 2012) ..........................................................13

*Yanek v. Staar Surgical Co.*,
388 F. Supp. 2d 1110 (C.D. Cal. 2005) ........................................................................17

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
780 F.3d 597 (4th Cir. 2015) ........................................................................................18

**Other Authorities**

15 U.S.C. § 78u-4(b)(1) ...................................................................................................8

Fed. R. Civ. P. 9(b) ...........................................................................................................8

## I.    INTRODUCTION[1]

The truth is that Defendants developed a COVID-19 nasal antigen test ("Nasal Test") that has never been properly shown to work on the target population: patients within 0 to 6 days of infection or symptom onset, or the acute phase of infection—in a point-of-care ("POC") setting. When seeking approval of the test from the FDA and Health Canada ("HC"), Defendants had analyzed the Nasal Test on **only 7** positive COVID-19 samples from that target population. In other words, Defendants had only 7 data points—not thousands or hundreds or dozens—yet, instead of amassing more data, Defendants sought approval from the FDA and HC. Nonetheless—despite the extremely low chance of obtaining approval based on the limited data presented—investors should have been free to make the **informed** decision to invest in Sona and its risky endeavor, but Defendants robbed investors of that opportunity.

When repeatedly speaking about the Nasal Test, Defendants portrayed it as proven to work for its intended use, yet they omitted the material information that such "proof" consisted of validation data from just 7 patients in the target population. Defendants also omitted that the risks of non-approval by the FDA or HC were much higher, given that approval of the intended use specified in Sona's applications depended on this very limited data—as required pursuant to regulatory standards. Consequently, the investors who drove the meteoric 14,545% gain in Sona's stock were not given the full picture of Sona's test, its validation efforts, or the surrounding risks. Needless to say, the FDA denied emergency use authorization (EUA) for Sona's Nasal Test, despite approving several other similar tests, and the Company abandoned its HC application due to a lack of supporting data. Sona then pivoted to focusing on the Saliva Test as a viable path to profitability, which appeared promising particularly based on what Defendants had learned in developing the Nasal Test. To date, Sona

---

[1] Citations to "¶" refer to the Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("SAC"), ECF No. 67. Capitalized terms used but not defined herein shall have the meanings ascribed in the SAC. Unless otherwise noted, internal citations are omitted and emphasis is added.

has not successfully commercialized any COVID-19 antigen test, and it is still an open question as to whether the Nasal Test actually works for its intended use.

Those facts—which are largely indisputable—are alleged in the SAC and must be taken as true. Accordingly, the primary question for the Court, as to falsity, is whether it is plausible that Defendants' public statements during the Class Period would have misled a reasonable investor as to those undisclosed facts. In other words, would an investor who closely listened to Defendants' statements understand those facts and the concomitant risks? At this stage, the allegations show that a reasonable investor would have been misled.

The allegations also give rise to the requisite scienter. The SAC alleges that the Individual Defendants—based on their own statements and direct responsibilities and the Tests' utmost importance to Sona's business, operations, and future prospects (¶¶190-94)—knew or should have known that the Company lacked proper validation data, and as a result, its submissions were deficient, and it would be unable to successfully commercialize either of its COVID-19 antigen tests. The SAC asserts also that the alleged omissions resulted in unprecedented business opportunities for Sona, which Defendants leveraged in their favor (¶¶190, 195-220). Those allegations establish that this case should proceed past the pleading stage and into discovery.

## II.    SUMMARY OF PLAINTIFF'S ALLEGATIONS

At the start of 2019, Sona – a Canadian company researching and developing gold nanorod products for diagnostic tests and medical treatments – was trading between $0.01 and $0.21 on the Canadian Stock Exchange (CSE) and appeared to be on the brink of extinction. ¶¶11, 13, 193-94. As COVID-19 spread rapidly across the globe and governments were declaring public health emergencies (*see* ¶¶50-53), Sona entered the race to develop a test able to detect the virus during the acute phase of infection. ¶¶88-89. More specifically, Sona intended for its Nasal Test to detect the COVID-19 virus within 0 to 6 days of infection or symptom onset. ¶¶88, 229.

Leading up to the Class Period, Defendants steadily conveyed that they were

making progress and reaching milestones in that endeavor, generating investor interest, and causing Sona's share price to trade as high as $2.04 on the CSE and $1.43 on the OTC. ¶¶13, 200. In addition to well-established regulatory standards (¶¶5-6, 59-60), in an effort to help test developers, like Sona, the FDA issued guidance and a template on May 11, 2020, specifically laying out what was required for validation of COVID-19 antigen tests to receive EUA approval. ¶¶7, 67, 71. Based on FDA standards and the supporting May 11 guidance, Defendants knew or should have known that they had to show that the Nasal Test was capable of detecting COVID-19 antigens "during the acute phase of infection." ¶¶8, 72.

Beginning on May 12, 2020, Defendants not only conveyed their understanding that "*[e]nsuring tests work effectively in a clinical lab and patient setting is critical to the ultimate success of any test[,]*" but confirmed that Sona was poised to generate that requisite validation data:

> Sona is moving to test its devices with live virus culture and/or patient samples as part of *a formal clinical study*. Accordingly, the Company is in *advanced discussions for arrangements with a leading U.S. laboratory to provide the independent clinical trial data*.

¶127. On July 2, 2020, they bolstered that message with hard data, reporting that their in-lab "validation studies of performance levels have resulted in a test sensitivity of 96%, test specificity of 96% ... which corresponds to an ability to detect the virus in patients with 'low' viral loads in 10-15 minutes." ¶¶16, 132. In addition, they stated that Sona was conducting field studies with results by the end of July, "at which time [it] intend[ed] to make final submissions to" the FDA and HC. Just six days later, on July 8, 2020, Defendant Rowles proclaimed Sona "ha[d] achieved the extraordinary by *bringing a COVID-19 rapid, [POC] antigen test to fruition* in four months." ¶¶16, 105, 137. Based on Defendants' statements touting Sona's success in showing that its Nasal Test worked when the viral load is low, investors understood that it had thus also validated the Test for its intended use of detecting COVID-19 antigens within 0-6 days of symptom onset when the viral load is high. ¶¶2-3, 8, 23, 88, 229.

Those unequivocal statements to investors caused explosive growth in Sona's share price. As described by one analyst, "[i]nvestors [had] pushed an $0.11 stock to an all-time high of $16.05 a share by July 27" – yielding a "14,545% return on this best-performing COVID-19 stock in just six months." ¶¶17, 106, 141. That growth reflected investors' belief that Sona had succeeded in showing its Nasal Test worked for its intended use and there was a clear path to profitability. ¶¶20, 106.

On August 25, 2020, Defendants announced the in-field study results, stating that the "test achieved a sensitivity of 84.6% and a specificity of 90.0% in a study across 99 collected clinical patient samples, which included 39 positive samples and 60 negative samples[.]" ¶¶108, 146. By August 31, 2020, Defendants had "completed submissions to the FDA and H[C] for authorizations for [Sona's] COVID-19 rapid, antigen test, including responding to all follow-up questions received to date." ¶108. And on October 1, 2020, while the submissions were pending approval, Defendant Regan reassured investors, that, Sona had created a viable, effective test supported by sufficient data: "We're 100% confident that it gets approved. There's smart questions being asked, and we have strong data on our test." ¶¶20, 110, 223.

However, as Defendants revealed through a series of partial disclosures, Sona's validation data was insufficient to meet regulatory standards. The truth was Sona's clinical trial was flawed by design. Sona failed to enroll a sufficient number of patients in the acute phase and, as a result, was unable to demonstrate that its Nasal Test could effectively meet the public need of rapid and accurate COVID-19 screening test—as compared to the 7 other antigen tests that had already received EUA approval (¶21). Sona's applications to the FDA and HC were thus deficient and would not be approved. On October 29, 2020, Defendants revealed that the FDA had rejected the EUA request for the Nasal Test. ¶¶21, 111, 149-50, 173. On this news, shares of Sona fell $2.77 per share, or over 48%. ¶174. In other words, the news was so out of line with Defendants' previous statements that, in a single day, Sona lost nearly half its value as a company. But Defendants continued to mislead investors.

Instead of revealing that Sona's EUA application lacked sufficient data to support the intended use of its Nasal Test, Defendants pivoted away from the FDA's rejection and described a purportedly viable path forward. ¶¶22, 113, 150. They stated that "H[C] continues its evaluation of the Company's application for an Interim Order ("IO") authorization for its test as a '[POC]' medical diagnostic device" and "[t]he Company yesterday received additional questions on its application." *Id*. However, concealment of the Company's deficient submissions proved to be short-lived. On November 25, 2020, Defendants' announced that Sona, based on feedback from HC, had withdrawn its application. ¶¶23, 114, 177. Once again, this news contradicted Defendants' prior statements, causing Sona's share price to drop 67%, that day. ¶178.

Yet, Defendants still refused to admit that their validation data had been insufficient and that Sona's clinical trial, as designed, had failed to demonstrate its Nasal Test's ability to perform as intended. Instead, Defendant Rowles blamed the failed authorizations generally on "[t]he regulatory approval path for antigen tests [being] new with evolving guidelines and Sona's test [being] unique, creating a challenging environment for test developers and regulators alike." ¶¶23, 114, 152.

Defendants provided the damning details five days later, on November 30, 2020, disclosing that their study had included only 7 samples "from patients within 0-6 days since symptom onset." ¶181. In other words, Defendants had been touting their validation process and imminent approval of a COVID-19 antigen test intended to detect the virus during the acute phase of infection in a POC setting, yet **Defendants were seeking approval from the FDA and HC, based on data collected from only 7 total patient samples in the target population**. ¶¶181-82.

At the same time, Defendants once again made incomplete and misleading statements about Sona's path forward, stating that it "intends to obtain additional data and use it to augment its submission with the FDA and potentially for a resubmission to H[C]." ¶¶24, 115, 154, 181. Defendant Regan also noted that "every entity that has evaluated our test has confirmed its ability to detect the COVID-19 virus and it

achieved strong results from our in-field trials." ¶¶24, 115, 155.

Then, on December 16, 2020, Defendants announced that they had obtained $2.26 million in financing purportedly "to produce further clinical trial data" for Sona's Nasal Test, obtain "a European regulatory self-certification CE Mark[,]" and conduct "further development and clinical trial validation work for its" Saliva Test. ¶¶26, 118, 157-58, 204. And on December 31, 2020, Defendants touted Sona's receipt of a CE Mark, which "declares the conformity of the Sona Test with EU regulations and allows Sona to commercialize its test throughout Europe and potentially other territories." ¶¶27, 119, 160. Defendants explained that Sona was "now able to take firm orders in territories accepting a CE Mark and make corresponding manufacturing commitments from its contract manufacturer" and was "in the process of technology transfer to a second manufacturer, in North America." ¶¶27, 120, 160, 185.

Just like every other milestone Defendants had announced throughout the Class Period, those purported accomplishments were illusory. Several others had already obtained CE Marks for their antigen tests, most of whom had also obtained EUAs for their diagnostics tests, including Quidel Corporation, LumiraDX, Becton Dickinson and Company, and Ortho Clinical Diagnostics. ¶121. Therefore, as Defendants well knew, the CE Mark did not position Sona to successfully commercialize its Nasal Test. ¶¶121-22. As a result, unbeknownst to investors, Sona had been putting its resources into developing its technology for a Saliva Test instead. ¶¶28, 31, 123, 192.

On March 1, 2021, Defendants revealed facts indicating that they had not been trying to commercialize the Nasal Test, including that Sona still had no "firm orders" in the EU, or a sponsoring institution, a principal investigator, a study protocol, or approval from the HC Investigational Testing Division or medical ethics review board. ¶¶29, 121, 184-85. As a result, Sona's share price fell 13%. ¶186.

On April 12, 2021, Defendants confirmed investors' suspicions that Sona had not been focused on the Nasal Test by remaining silent about it while announcing that the Company "ha[d] been granted H[C] Investigational Testing Authorization for a

clinical trial of the Sona … saliva sample-based rapid COVID-19 antigen test, with the Humber River Hospital in Toronto." ¶123. Investors still believed Sona had a viable path to profitability through its Saliva Test, particularly based on what Defendants learned about the development and regulatory process from the Nasal Test. *Id*. This belief was supported on April 22, 2021 when Defendants announced that Sona had "received research ethics board approval for its clinical trial of the Sona Saliva C-19 Rapid Test[,]" set to begin the following week. ¶124.

Therefore, investors were caught completely by surprise when, pre-market open on June 11, 2021, Sona announced it was discontinuing its Saliva Test "after a review of the interim results data, due to inadequate test sensitivity with clinical saliva samples and challenges with patient recruitment and enrollment into the study." ¶125. On this news, the Company's share price tanked over 70%. *Id*. Defendants confirmed investor suspicion that Sona no longer had a viable path to profitability when, on November 8, 2021, they disclosed that the Company had entered into a binding licensing agreement with Arlington Scientific Inc., a developer and manufacturer of in-vitro diagnostics, to "bring Sona's rapid saliva COVID-19 test to market." ¶126.

Based on these facts, Plaintiff raises claims against Defendants for violations of §§10(b) and 20(a) of the Securities Exchange Act. ¶¶250-69.

## III.   LEGAL STANDARDS

"To establish a violation of Section 10(b), a plaintiff must plead: (1) a material misrepresentation or omission made by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *In re Wells Fargo & Co. S'holder Derivative Litig*., 282 F. Supp. 3d 1074, 1090 (N.D. Cal. 2017) (citing *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008)). In assessing a Rule 12(b)(6) motion to dismiss, courts consider the complaint in its entirety, "accept all factual allegations ... as true," and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).

A "court ruling on a motion to dismiss is not sitting as a trier of fact" and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). Thus, at the pleading stage, a plaintiff "need only allege enough facts to state a claim to relief that is **plausible** on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011).

Pursuant to the PSLRA, the SAC must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the … omission is made on information and belief ... all facts on which the belief is formed." 15 U.S.C. § 78u-4(b)(1). Under Rule 9(b), the SAC must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).

## IV.   ARGUMENT

Defendants challenge only falsity and scienter. ECF No. 68 ("Motion" or "Mot.") at 29:2-33:7. For the following reasons, both challenges fail.

### A.   The SAC Adequately Alleges Material Omissions About the Tests.

1. <u>Securities fraud involving material omissions often involves literally true statements.</u>

Under an omissions theory, "'a statement that is literally true can be misleading and thus actionable under the securities laws.'" *Kendall v. Odonate Therapeutics, Inc.*, 2021 WL 3406271, at *6 (S.D. Cal. Aug. 4, 2021) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). In other words, "statements that are literally true can nevertheless be misleading in their context and manner of presentation." *In re Obalon Therapeutics, Inc.*, 2019 WL 4729461, at *8 (S.D. Cal. Sept. 25, 2019). Accordingly, if a company and its employees choose to "tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including by disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). Simply put, an omission is actionable where a statement "affirmatively create[s] an

impression of a state of affairs that differs in a material way from the one that actually exists." *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 922 (N.D. Cal. 2020).

Under those standards, finding that alleged misstatements are literally true does not end the analysis. Rather, the Court must consider whether it is plausible that those statements, by omitting information, painted a misleading picture to investors. *See In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *10 (N.D. Cal. Jun. 2, 2020) ("[T]he question is whether defendants affirmatively placed any facts at issue to require disclosure of additional information to prevent creating a misleading impression for investors."); *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008) ("[L]iteral truth is not the standard for determining whether statements ... are misleading.").

> 2. <u>Defendants made literally true statements that omitted material information and misled investors about Sona's Tests.</u>

Throughout the Class Period, Defendants stated that they were following FDA standards and guidance for EUA approval, obtaining clinical trial data to demonstrate that Sona's antigen test worked as intended: for the detection of COVID-19 antigens during the acute phase (within 0-6 days) of infection in a POC setting. ¶¶2-3, 11, 15-16, 19-20, 24, 55, 59-64, 88, 101-10, 127, 129, 132-34, 146, 223, 229. From a public health perspective, detection during those early days is critical so that contagious individuals can be diagnosed swiftly and precautions can be taken to protect non-infected individuals. ¶¶2-3, 55, 62, 64, 76, 83-84. As acknowledged by analysts, the commercial benefit was that "SONA's antigen test can detect the virus potentially before the onset of any symptoms." ¶172.

Defendants repeatedly spoke to investors about Sona's progress in validating and obtaining EUA approval for its Nasal Test:

- "***In order to conduct sufficient validation testing for submission for use to regulators***, Sona is moving to test its devices with live virus culture and/or patient samples as part of ***a formal clinical study.*** Accordingly, ***the Company is in advanced discussions for arrangements with a leading U.S. laboratory to provide the independent clinical trial data.***" (¶127);

- "***Sona's rapid COVID-19 antigen test is a device designed to be used at [POC]*** to detect the presence of the SARS-Cov2 virus in a patient within 10-15 minutes" (*id*.);

- "***The EUA studies will follow the FDA's guidance for antigen testing, including assessments for sensitivity, specificity, cross-reactivity and interfering substances using patient samples and contrived (live viral culture) samples***" (¶129).

Defendants made literally true statements conveying that Sona had reached milestones in that process, with successful results. ¶¶11, 15-16, 19-20, 22, 24, 103, 110, 127, 129, 132-34, 146, 223. By July 2, 2020, for example, Sona had conducted in-lab validation studies of the Nasal Test, "result[ing] in a test sensitivity of 96%, test specificity of 96% and a Limit of Detection ("LOD") of 2.1 x $10^2$ TCID$^{50}$ ... which corresponds to an ability to detect the virus in patients with 'low' viral loads in 10-15 minutes." ¶¶16, 103, 132. That same day, Defendants announced Sona was moving to in-field validation studies using "a minimum of 30 confirmed negative and 30 confirmed positive specimens." ¶133. On August 25, 2020, Defendants announced promising results from those studies, which included "39 positive samples and 60 negative samples," yielding "a sensitivity of 84.6% and a specificity of 90.0%." ¶146.

Defendants' steadfast message was that Sona had attained success at every milestone towards validating its Nasal Test and meeting the EUA requirements. ¶¶11, 15-16, 19-20, 22, 24, 103, 110, 115, 127, 129, 132-34, 146, 155, 223. Even when encountering delays in publicly disclosing data, Defendants indicated that Sona was not to blame. Rather, "[t]he delays [were] due to ethics review board approvals and a need to make study modifications to accommodate regulatory updates, including for study enrollment criteria and assessment at point of care settings, as well as for test handling procedures." ¶¶18, 107, 142, 168. In other words, Defendants communicated that Sona was diligently and successfully adapting to the shifted regulatory guidance, while also establishing robust validation data pursuant to regulatory standards.

Those literally true statements caused explosive growth in Sona's share price. As described by one analyst, "[i]nvestors [had] pushed an $0.11 stock to an all-time

high of $16.05 a share by July 2[8]" – yielding a "14,545% return on this best-performing COVID-19 stock in just six months." ¶¶17, 106, 141. That growth was reasonable, considering the publicly available information. Although all bio-tech companies face substantial risk prior to FDA approval, there was a lower risk that the FDA would deny an EUA for a COVID-19 test, supported by robust and auspicious validation data, intended for use in the acute phase of infection, in the middle of a global pandemic. As summarized by Defendant Regan, the primary risk faced by Sona was one of timing, not approval itself: "[w]e're 100% confident that it gets approved[;] [ ] smart questions [are] being asked, and we have strong data on our test. And the timeline is unclear … Typically, something like this takes a year in normal context. Right now, we're hopeful that it can be very soon." ¶¶20, 110, 223.

**These representations, in context, were misleading because Defendants omitted material information related to the topics.** After the FDA denied the EUA and HC requested additional data, for example, Defendants disclosed to investors that, to date, Sona's submissions were supported by validation data collected from only **7 positive samples in the acute phase**. ¶¶181-82. In other words, Defendants repeatedly chose to speak about the progress of validating Sona's Nasal Test through lab and in-field testing, stating that "we have strong data on our test," we have "excellent performance results . . . underpinned by our unique nanorod technology," the in-field validation data show "a sensitivity of 84.6% and a specificity of 90.0%," and "[w]e're 100% confident that it gets approved." ¶¶11, 16, 19-20, 103, 108, 110, 134, 146, 223. Even if literally accurate, Defendants' statements concealed that Sona's clinical trial only collected validation data for 7 patients in the target population. By concealing that material fact, they misled investors about the risks related to obtaining EUA approval. Thereafter, they continued to mislead investors by failing to provide accurate information about their efforts to commercialize the Nasal Test and to develop the Saliva Test. ¶¶26, 118, 123-24, 154-67, 184-89. The risk was high that they were not going to be able to show that the Nasal Test worked

as intended or to develop the Saliva Test, yet Defendants concealed that reality and continued describing a viable path to profitability. *See id.*

Simply put, it is plausible that a reasonable investor's impression of the state of affairs surrounding Sona's Nasal Test would differ in a material way after learning that the data, as submitted to the FDA and HC, as required to establish its intended use pursuant to regulatory standards, included only 7 samples from the target population. No more is required to plead falsity based on an omissions theory. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018) (finding that while a firm's statements about its study "results were still technically accurate," its promotion of the results after "learn[ing] new information that diminished the weight of those results" was misleading); *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1019-20 (S.D. Cal. 2005) (statements regarding a company's progress with validation through studies and clinical trials actionable where "Plaintiff['s] criticism is not that what was said was inaccurate, but that it was incomplete, thus portraying the results of the clinical trial in an unduly optimistic light").

### 3. Defendants' falsity arguments fail.

With minimal exposition (*see* Mot. at 29-31), Defendants challenge the sufficiency of Plaintiff's falsity allegations. Those challenges fail for <u>four</u> reasons.

<u>First</u>, Defendants' arguments relating to affirmative misstatements are misplaced. *See* Mot. at 29. Plaintiffs are proceeding under an omissions theory.

<u>Second</u>, to the extent Defendants challenge materiality, that argument fails as well. Materiality is a factual issue that should not be decided prematurely on the pleadings. *Boston Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *6 (N.D. Cal. Aug. 7, 2020) ("[M]ateriality is a mixed question of law and fact and [p]roof of that sort is a matter for trial[.]"). Moreover, the substantial declines in Sona's share price as the truth emerged—*e.g.*, drops of 34%, 48%, 67%, 13% and 60% (*see* ¶¶168-69, 173-74, 177-78, 184-88)—indicate that investors viewed the undisclosed information as material. *See Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 914 (N.D. Cal. Sept.

21, 2012) ("decline in stock price after a disclosure supports a finding of materiality").

Third, Defendants' omissions are not protected by the PSLRA safe harbor. *See Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at \*9 (C.D. Cal. Feb. 27, 2015) ("[T]o the extent Plaintiffs [ ] challenge Defendants' alleged omission of present facts with respect to the challenged statements, the PSLRA's safe harbor does not apply."); *see Uber*, 2020 WL 4569846, at \*8 (finding falsity where plaintiff pleads "facts that 'call into question the [speaker]'s basis for offering the opinion'" (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015))).

Finally, Sona's boilerplate "cautionary language" never disclosed the omitted facts, which continued throughout the Class Period. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1178 n.62 (C.D. Cal. 2008) ("[C]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired[.]"); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181-82 (9th Cir. 2009) (finding misleading "risk factors" actionable), *aff'd*, 563 U.S. 27 (2011).

In sum, Defendants did not hesitate to provide status updates, coupled with rosy prognostications, at every step on the path towards an EUA. And then they reaped the reward of a 14,000+ % gain in Sona's share price. Yet they omitted that their EUA submission was supported by use of the Nasal Test on no more than 7 patients in the target population. And, contrary to Defendants' argument (*see* Mot. 26:1-6), presumptions that a test will work in the acute phase, just because it works after the acute phase, do not constitute sufficient data warranting an EUA and release to the public. Thus, the alleged omissions are actionable.

### 4. The SAC's omissions allegations do not have the deficiencies previously found by the Court.

On October 28, 2021, the Court held, with respect to the alleged omissions, that "Sona made all of these supposed revelations public in its own press statements, and there is no allegation that Sona deliberately sat on any of this information before delayed public disclosure or had this information when making earlier rosy projections." ECF No. 66 ("Order") at 14:3-6. The SAC contains the allegations that

the Court previously found lacking.

Notably, alleging securities fraud under § 10(b) requires a public disclosure of new information that was previously misrepresented or withheld, triggering a stock price drop. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) ("[P]leading loss causation is typically satisfied by allegations that the **defendant** revealed the truth through corrective disclosures which caused the company's stock price to drop and investors to lose money."); *Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 2021 WL 3748325, at *25 (N.D. Cal. Aug. 24, 2021) ("When the truth regarding the fraud or misstatement is finally revealed through a corrective disclosure, such as a press release, **SEC filing**, or some other announcement, the disclosure of the truth causes the stock price to drop, thereby causing the plaintiff to lose money.").

In some instances, a third-party—for example, a short seller—makes the corrective disclosure, but in those instances, the defendant frequently argues that the disclosure is not true or is not new information. *See, e.g.*, *Hunt v. Bloom Energy Corp.*, 2021 WL 4461171, at *19 (N.D. Cal. Sept. 29, 2021) ("Defendants contend that the Hindenburg report did not constitute a corrective disclosure because it is based on publicly available information."). In many cases, the defendants (the company and its executives) make the corrective disclosure, meaning they publicly released new information that was inconsistent with previous information they had released. The Ninth Circuit has described the "ground rules" for corrective disclosures as follows:

> Although deciding what qualifies as a corrective disclosure has proved more challenging than might have been expected, a few basic ground rules can be sketched out. First, a corrective disclosure need not consist of an admission of fraud by the defendant or a formal finding of fraud by a government agency. A corrective disclosure can instead come from any source, including knowledgeable third parties such as whistleblowers, analysts, or investigative reporters. Second, a corrective disclosure need not reveal the full scope of the defendant's fraud in one fell swoop; the true facts concealed by the defendant's misstatements may be revealed over time through a series of partial disclosures. Third, to be corrective, a disclosure need not precisely mirror the earlier

> misrepresentation. It is enough if the disclosure reveals new facts that, taken as true, render some aspect of the … prior statements … misleading.

*In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020).

Here, Defendants revealed new information, causing share drops, from August 6, 2020 through June 11, 2021. ¶¶168-89. Of course, if the new information was something that Defendants did not know and could not have known prior to the public disclosure, there could be no actionable fraud—either *via* affirmative misstatements or omissions. But, if the allegations show that Defendants had access to, but recklessly or knowingly omitted, that information, then they do face liability for securities fraud.

As alleged, Defendants disclosed that they had validated Sona's test on 99 patient samples, with excellent test sensitivity and specificity. Thereafter, Defendants disclosed that the FDA rejected the EUA (and that Sona withdrew its application from HC). Defendants did not disclose precisely why the FDA had rejected Sona's test; instead, they intimated that the rejection was based on internal FDA priorities, not the deficiency of Sona's submission. In reality—as slowly revealed through piecemeal disclosures—because Sona's submission was based on just 7 positive samples in the target population, the FDA reasonably and predictably would not presume the Test worked and grant an EUA based on such sparse data. HC likewise provided feedback which led Sona to withdraw its application (which relied on the same sparse data). Thus, Defendants possessed, but withheld from investors, the knowledge that Sona did not have enough data to support the Nasal Test's efficacy in the target population.

Needless to say, investors knew that Sona (and their investment) faced risks. Other tests, with some superiority or lower price points, could come to market. COVID-19 could mutate and require different types of tests. Or the FDA could determine, as a policy, to cease EUAs for COVID-19 tests. But, based on Defendants' statements, investors knew that, in facing those risks, they were armed with a Nasal Test supported by very strong validation data (*e.g.*, sensitivity of 84.6% and specificity of 90.0% from an in-field study across 99 patient samples), and subsequently, experience with the regulatory process in turning to the Saliva Test.

But that knowledge was incomplete. Sona's status was sub-par, and the risks were greater. Sona did not have sufficient in-field validation data for a COVID-19 diagnostic test for which the FDA was issuing EUAs. Simply put, investors had thought they were betting on commercial success for a test that had been validated against a substantial number of positive COVID-19 samples from the target patient population. In reality, investors were betting on commercial success for a test that had not been sufficiently validated for its intended use. Further, when Defendants pivoted to a Saliva Test, the number of individuals with COVID-19 was decreasing as vaccines were rolling out and Sona's technology was not working for the Saliva Test in the laboratory setting. Because of Defendants' statements and omissions, investors had a misapprehension about the risks associated with their Sona investments.

Worse yet, Defendants did not subsequently admit these deficiencies or their effect on Sona's business. They simply noted that they would seek more data, and work on commercializing the Nasal Test in the EU, and accelerate development of the Saliva Test. But, by the end of the Class Period, Sona still lacked proper validation data and commercial activity. Those allegations, if true, show that Defendants omitted material information about Sona's antigen tests and its prospects.

**B.    The SAC Raises a Strong Inference of Scienter.**

In analyzing the first complaint, the Court found that scienter had not been adequately plead for two reasons: (1) "Plaintiffs only offer a general inference that Defendants knew Sona's statements were incorrect based on an apparent possession of contradictory information"; and (2) "What is missing is the motive for doing so or how the executives would benefit. Although it is not automatically fatal to scienter to fail to allege a personal financial motive in the fraudulent scheme, personal financial motive matters in the balancing analysis." Order at 15:6-8, 16:1-4.

The SAC remedies both deficiencies. First, the SAC clarifies how and why the Individual Defendants—based on their own statements, their direct responsibilities, and the utmost importance of validating the Nasal Test to Sona's business and

operations—knew or should have known that an EUA submission based on samples from no more than 7 patients in the acute phase would be insufficient. Second, the SAC alleges how the alleged omissions resulted in unprecedented business opportunities for Sona, which the Defendants leveraged in their favor.

To plead scienter, a plaintiff "must state with particularity facts giving rise to a strong inference that defendants acted with the intent to deceive **or** with deliberate recklessness as to the possibility of misleading investors." *Berson v. Applied Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008). "The inference ... need not be irrefutable ... or even the most plausible;" nor is a "smoking-gun" required. *Tellabs,* 551 U.S. at 324-26. Instead, "accept[ing the allegations] as true and taken collectively," a court need only find a reasonable person would "deem the inference of scienter at least as strong as any opposing inference." *Id.* at 326. And "[i]n assessing the allegations holistically as required by *Tellabs*, [] courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

"Indeed, case law addressing misstatements relating to FDA approval lends support to Plaintiff['s] use of [the alleged] statements to demonstrate scienter." *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 811 (C.D. Cal. 2011) (finding that "taken alone, Defendants' statements concerning 'approval' by or an 'agreement' with the FDA are sufficient to demonstrate a strong inference of scienter").[2]

---

[2] *See Constr. Laborers Pension Tr. of Greater St. Louis v. Neurocrine Biosciences, Inc.,* 2008 WL 4370010, at *4 (S.D. Cal. Sep. 23, 2008) ("When the FDA tells a company about the problems with a product, and the company nonetheless continues to make confident statements about the product, courts have inferred scienter and falsity.") (citing *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1130 (C.D. Cal. 2005) ("These statements necessarily implied that there would be no serious impediments to timely FDA approval. Thus, Defendants' omission of facts suggesting a possible delay in approval was misleading.")); *see also In re Myriad Genetics, Inc.,* 2021 WL 977770 (D. Utah Mar. 16, 2021); *Voulgaris v. Array Biopharma Inc.*, 2020 WL 8367829 (D. Colo. Nov. 24, 2020); *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 4208442 (S.D.N.Y. July 21, 2020); *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,

---

1. <u>The Individual Defendants made detailed statements about the Tests.</u>

As the Ninth Circuit has explained, where defendants make specific misstatements about specific matters they purport to know, "[i]t is unclear what further facts plaintiffs would need to plead to create a stronger inference that [defendants] had access to [the] information [they] discussed publicly." *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) (finding scienter based on defendants' "public statements celebrating the merger as an unprecedented success"); *Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *15 (C.D. Cal. Jan. 17, 2020) (finding scienter where defendants "regularly referenced [relevant] conversations they had").

The Individual Defendants repeatedly spoke about Sona's efforts to optimize, validate, and commercialize the Tests – the subject of the alleged omissions. *See* ¶¶11, 16, 20, 23-24, 93, 102, 105, 110, 114-15, 130, 134, 137-38, 152, 155, 165, 173, 182, 223-25, 229. Those statements indicate their knowledge (or reckless disregard) of the true facts surrounding the increased risk of denial of Sona's submissions due to insufficient data to support the Nasal Test's intended use and of Sona's inability to develop the Saliva Test. Nothing more is required. *See In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019) (finding scienter where defendants "issued specific [statements] ... in response to questions from analysts and investors"); *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009) (finding scienter where defendant "repeatedly reassured investors [ ] in the face of direct questioning," evidencing "knowledge of the" undisclosed problems).[3]

2. <u>The Individual Defendants had direct responsibility for the Tests.</u>

"[A]llegations regarding management's role in a company … may

2020 WL 1479128 (E.D. Pa. Mar. 25, 2020); *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597 (4th Cir. 2015); *In re Forest Labs. Sec. Litig.*, 2006 WL 5616712, (S.D.N.Y. July 21, 2006).

[3] Accordingly, Defendants' claim that Plaintiff did not allege with particularity that they "possessed any specific information contradicting their disclosures" (Mot. at 31-32) simply ignores the SAC's well-pleaded allegations. ¶¶221-34.

independently satisfy the PSLRA [scienter requirement] where they are particular and suggest that defendants had actual access to the disputed information." *Killinger*, 542 F.3d at 785-86; *Berson*, 527 F.3d at 988 (finding scienter as to the CEO and CFO because they were "directly responsible for [its] day-to-day operations."); *MannKind*, 835 F. Supp. 2d at 814 ("Defendants' purported access to certain information contradicting their public statements provides additional support for finding a strong inference of scienter."). "This standard can be satisfied by specific admissions from top executives about their access to information within the company." *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 601 (N.D. Cal. 2019).

As chief officers of a company with less than 20 employees (including executives), primarily focused on obtaining regulatory approval of COVID-19 antigen tests during a global pandemic, the Individual Defendants were directly aware of and involved in validating the Nasal Test and Saliva Test. Sona told investors that "R&D work is being done … under the supervision of ... President and CEO [Rowles]" and that he and Regan "had an ongoing, open dialogue with regulators to ensure the Sona's test is being developed within the parameters regulators have outlined." ¶¶222-23. Sona's primary objective was to commercialize its Nasal Test, and later its Saliva Test, so its executives were focused on that subject. *See* ¶224 ("Sona's primary objective will be the development and production of its own lateral flow tests."); *id.* ("Sona has been focused on work related to the development of a rapid response COVID-19 lateral flow test."); *id.* ("The commercialization of its COVID-19 rapid, antigen test continues to be the top near-term priority for [Sona].").

Thus, Defendants' suggestion that they were in the dark about Sona's insufficient validation of its Nasal Test vis-à-vis the applicable regulatory requirements (Mot. at 31:15-33:1) is neither plausible nor credible. *See Union Asset Mgmt. Holding AG v. SanDisk LLC*, 2017 WL 3097184, at *1-*2 (N.D. Cal. Jun. 22, 2017) ("If the defendants were aware of the undisclosed information, the most logical explanation for their failure to disclose it … was that they intended to conceal it.").

Even if the Individual Defendants were in the dark, they acted recklessly by speaking about the Tests without investigating or otherwise amassing knowledge about them. *See S. Ferry*, 687 F. Supp. 2d at 1260 (finding scienter where defendant "displayed an intimate knowledge ... and ... represented to investors that he had all of the information necessary to make accurate predictions about [the company]'s risk" and "[i]f he did not in fact have such knowledge, it would be at least actionably reckless to reassure the public about these matters"); *see also McKessson*, 411 F. Supp. 3d at 602 (finding defendants who touted "intimate knowledge" of statements "was at least deliberately reckless not to investigate the accuracy of their statements").

In sum, viewed collectively, these facts and others in the SAC establish a strong inference that the Individual Defendants–while managing Sona's operations–knew or should have known the undisclosed facts about its validation of, progress with, and potential for commercialization of its COVID-19 antigen tests.[4]

### 3.  Sona's Tests were core to the Company's operations.

"The core operations doctrine—the theory that facts critical to a business's core operations ... are known to a company's key officers—can be one relevant part of a complaint that raises a strong inference of scienter." *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *20 (N.D. Cal. Nov. 27, 2018). "The core operations doctrine permits a court to infer that facts critical to a business's core operations or an important transaction are known to a company's key officers." *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *8-*9 (N.D. Cal. Nov. 4, 2020).

Under this doctrine, "[a]llegations regarding management's role in a company may support scienter ... on their own in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244,

---

[4] Because Plaintiff pleads more than simple negligence, Defendants' cases which only find negligence and/or errors are inapposite. *See* Mot. 27-28, n. 42.

1261 (D. Nev. 2019). *See also Longo v. OSI Sys., Inc.,* 2021 WL 1232678, at *9-*10 (C.D. Cal. Mar. 31, 2021) (Finding scienter where "defendants regularly made statements touting [the] turnkey business ... as 'driving the growth'" in a division "that accounted for 49%-58% of [the company]'s total revenues."); *Ortiz v. Canopy Growth Corp.,* 2021 WL 1851933, at *41 (D.N.J. May 7, 2021) (Finding scienter where misstatements related to Canopy's core operations, and "[i]t is therefore quite plausible that the company was aware of the [issues] and understood their significance, and thus was at least reckless in declining to disclose their existence."); *Apple,* 2020 WL 6482014 at *8-*9 ("Apple's China business was a 'core operation' of the Company to which Cook paid close attention" where "plaintiff alleges that Greater China is Apple's third-latest market, its highest growth market, and accounts for nearly 20% of Apple's revenue"); *Yelp,* 2018 WL 6182756, at *20-*21 ("[S]ignificantly more than half of Yelp's revenue derives from the local advertiser program, enough to suggest that the program's operation is prominent enough that it would be absurd to suggest that top management was unaware of the advertiser churn issues."); *Hefler v. Wells Fargo & Co.,* 2018 WL 1070116, at *10 (N.D. Cal. Feb. 27, 2018) (applying core operations doctrine to find scienter); *Roberti,* 2015 WL 1985562, at *13 (finding scienter where "Defendants allegedly had actual access to" information about problems in the company's "largest and most profitable division.").

Plaintiff has alleged that Sona's COVID-19 antigen tests were core to its business in that the alleged omissions: (i) involve the most important aspect of its business and operations (¶¶190-94); and (ii) resulted in unprecedented business opportunities, which the Defendants leveraged in their favor. ¶¶190, 195-220.

### 4. Defendants' challenges to scienter fail.

Seeking to sidestep the "holistic" analysis required by *Tellabs* – which establishes scienter here – Defendants raise three primary challenges to scienter: the SAC does not allege that Defendants (1) sold stock at inflated prices or were otherwise motivated to commit fraud or (2) possessed information contradicting their statements

and (3) there is an innocent explanation for failing to disclose specific details about Sona's Test. Mot. at 13:19-14:28, 31:15-33:10. Each argument is unpersuasive.

First, "insider trading is not required to establish scienter." *Sudunagunta v. NantKwest, Inc.*, 2017 WL 8810760, at \*12 (C.D. Cal. Sept. 20, 2017); *see also In re Alphabet, Inc. Sec. Litig.,* 1 F.4th 687, 707 (9th Cir. 2021) (rejecting argument that insider trading was required because while "such allegations may support an inference of scienter, they are not a *sine qua non* for raising such an inference."); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1149 (N.D. Cal. 2017) (finding lack of stock sales not dispositive as to scienter).

Furthermore, the allegations reflect Defendants' motivation to obtain financing to keep their Company afloat. As a fledgling biotech company, Sona required enough investor confidence to be able to continue its R&D and operations. Defendants' misleading statements drove a meteoric rise in Sona's share price from penny stock status to over $16 a share on July 27, 2020. ¶¶17, 106. Those circumstances permitted Defendants to continue their R&D and operations. After Sona failed to obtain EUA approval for its Nasal Test, for example, Defendants continued making misleading statements about the viability of commercializing the Test to obtain $2.26 million in financing for, *inter alia*, "general working capital purposes." ¶¶105-06, 153-55.[5]

Moreover, "*Nguyen* presents an unusual case because both the Supreme Court and the Ninth Circuit have found scienter on fairly similar allegations." *Apple,* 2020 WL 6482014, at \*12.[6] The holding in *Nguyen* has thus been limited to its precise

---

[5] Defendants' cases support scienter in light of the motive alleged in the SAC. First, the Court in *Nguyen v. Endologix, Inc.* acknowledges that, "[i]f defendants had sought to profit from this scheme in the interim … the theory might have more legs." 962 F.3d 405, 415 (9th Cir. 2020). Second, the plaintiffs in *Ortiz* "ha[d] not established any convincing motive for Canopy's alleged misbehavior," which "[wa]s not fatal to plaintiffs' claims, but it may raise the threshold of persuasion regarding conscious disregard or recklessness." 2021 WL 1851933, at \*43.

[6] *See Matrixx*, 563 U.S. at 48-49 (finding scienter where defendant failed to disclose certain reports because plaintiff alleged that defendant was concerned about those reports and affirmatively misrepresented the available studies); *Schueneman v. Arena*

---

facts:

> [T]he Court does not interpret *Nguyen* to require a specific theory of defendants' motives at the pleading stage. Instead, the Court considers *Nguyen* on its facts; defendants there apparently failed to plead sufficient facts to show the 'intractable' issues would lead the FDA to withhold approval.…Without stronger allegations of contemporaneous facts contradicting defendants' statements, the 'more plausible inference' was that 'defendants made promising statements about the timing of FDA approval based on the initial results of the U.S. clinical trial, but then modulated their optimism when the results began to raise questions.' Thus, while lack of obvious motive presented a challenge, the deeper concern stemmed from lack of data of contemporaneous falsity.

*Id*. at \*13. Here, Defendants knew or recklessly disregarded that Sona's FDA and HC submissions were deficient, supported by a flawed clinical trial designed to yield data for no more than 7 patients within 0 to 6 days of symptom onset (the specified use). Despite their flawed protocols and sparse data, Defendants made positive public statements about the success of Sona's validation studies; publicized that the clinical trial yielded sensitivity of 84.6% and specificity of 90.0% across 99 patient samples, without clarifying that only 7 of the positive samples were from the target population; assured investors that its submissions were and sufficiently supported; and expressed 100% confidence in attaining approval. Defendants' statements drove a 14,000% share price gain for a publicly held biotech company that had insufficient validation data and, therefore, inferior submissions as compared to every other company that

---

*Pharm., Inc.*, 840 F.3d 698, 707-08 (9th Cir. 2016) (finding scienter where defendants "made positive public statements about [a drug's] safety" and "told investors about their confidence in [the drug's] approval being based on" a clinical trial knowing that the trial had presented adverse side effects); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959-60 (9th Cir. 1996) (finding securities fraud where defendant represented that FDA approval was "going fine" while knowing approval was unlikely). Notably, none of these cases pled motive, and each expressly held that motive was ***not*** required. *See Matrixx*, 563 U.S. at 48; *Schuenemann*, 840 F.3d at 709 n.8; *accord Tellabs*, 551 U.S. at 325 (rejecting argument that lack of pecuniary motive is dispositive for scienter).

obtained EUA approval for their diagnostic tests. Those facts establish scienter.[7]

Second, Defendants incorrectly claim that Plaintiff alleges "fraud by hindsight." Mot. at 4:7-9, 9:19-11:14. Contrary to Defendants' cases, Plaintiff alleges contemporaneous facts showing the Individual Defendants knew their statements were misleading when made.[8] The issue is not that Sona submitted robust, encouraging data to the FDA and HC only to be denied based on unpredictable external factors. Defendants undertook an effective PR campaign to promote their Nasal Test, intended for use within 0 to 6 days of infection or symptom onset. They portrayed their data as unequivocally validating the Nasal Test, and even went so far as to express 100% confidence in attaining regulatory approval. But their submissions to the FDA and HC proved to be among the worst. While many other diagnostic tests were granted EUA, under exigent circumstances with lower-than-normal criteria given the necessity for COVID-19 tests, Defendants submitted deficient validation data with only 7 positive samples in the target population. A frontrunner expressing

---

[7] These factual allegations distinguish this case from Defendants' example cases that were dismissed for failure to plead scienter (Mot. at 26-28 n.42). *See Sanders v. AVEO Pharm., Inc.,* 2015 WL 1276824, at *10 (D. Mass. Mar. 20, 2015); *Jun Shi v. Ampio Pharms., Inc.,* 2020 WL 5092910, at *2 (C.D. Cal. Jun. 19, 2020); *Brennan v. Zafgen, Inc.,* 853 F.3d 606, 609 (1st Cir. 2017); *Ratner v. Ovascience, Inc.,* 2015 WL 5684068, at *8 (D. Mass. Sept. 28, 2015); *In re Columbia Labs., Inc. Sec. Litig.,* 2013 WL 5719500 (D.N.J. Oct. 21, 2013), *aff'd*, 602 F. App'x 80 (3d Cir. 2015).

[8] *Contra Kovtun v. VIVUS, Inc.,* 2012 WL 4477647, at *7 (N.D. Cal. Sept. 27, 2012), aff'd sub nom. *Ingram v. VIVUS, Inc.*, 591 F. App'x 592 (9th Cir. 2015) (finding statements of confidence in FDA approval not misleading because, unlike here, "plaintiff [] failed to allege facts showing 'why the difference between the earlier and later statements is not merely the difference between two permissible judgments, but rather the result of a falsehood'"); *In re Syntex Corp. Sec. Litig*, 95 F.3d 922, 930-31 (9th Cir. 1996) (by omitting other information, "[n]othing in this case indicate[d] that the company had knowledge contradicting its ability to achieve FDA approval within [the promised time period]" because, unlike here, "the FDA did actually issue its approval [in that time period].")*; Carr v. Zosano Pharma Corp*., 2021 WL 3913509, at *11-*12 (N.D. Cal. Sept. 1, 2021) (finding "the complaint alleges little more than that the FDA ultimately found the [data] material, coupled with Plaintiffs' conclusory allegation that Defendants must have seen it coming.").

---

confidence in prevailing may not be misleading. But that stated optimism becomes misleading when the worst applicant is the most vocal about its success.

Finally, Defendants fail to raise a more compelling inference to explain how they acted innocently, rather than at least recklessly, when misleading investors. For example, there is no compelling inference that Defendants did not know that their validation of the Nasal Test—*i.e.*, Sona's "top near-term priority" during the Class Period (¶224)—was insufficient to meet regulatory standards by including no more than 7 samples from the target population. If Defendants lacked that knowledge, then it was reckless for them to remain ignorant, ignore Sona's actual progress, and make positive statements to investors about its validation data, the Nasal Test's fruition, and their 100% confidence in the Nasal Test's approval.

In sum, the more compelling inference is that Defendants negligently amassed insufficient data to support EUA approval and then knowingly took the high risk of submitting a deficient application, rather than obtaining more data. The risks were that the Nasal Test would not be effective for its specified use and/or the FDA would deny the EUA based on a failure to establish that the test met a public need. ¶¶59-60. Instead of admitting those facts and risks to investors, Defendants **recklessly or knowingly** stated that the data was sufficient, while concealing the diminutive sample size and heightened risks. If they, nonetheless, had obtained approval and commercialized the Nasal Test, their misleading statements would not have become known. But those precise risks manifested. The FDA rejected Sona's EUA, and Defendants' subsequent efforts failed to yield a test worthy of regulatory approval or commercialization. Therefore, Defendants were forced to tell the truth to investors.

Thus, when considered holistically, Plaintiff's allegations support a strong inference that Defendants acted at least recklessly—not innocently or unwittingly—when portraying Sona's validation of its Tests in an unduly optimistic light.[9]

___

[9] Defendants' § 20(a) control person challenges rely on their § 10(b) primary liability arguments, and thus fail for the same reasons stated herein. *See* Mot. at 33:11-13.

PL.'S OPP'N TO DEFS.' MOT. TO DISMISS SEC. AM. COMPL.                                    25
CASE NO.: 2:20-cv-11405-MCS-MAA

## V.  CONCLUSION

Plaintiff respectfully requests denial of Defendants' Motion or leave to amend.

Dated: December 13, 2021                    Respectfully Submitted,

**ROCHE FREEDMAN LLP**

*/s/ Constantine P. Economides*
Constantine P. Economides (*pro hac vice*)
Ivy T. Ngo (249860)
Velvel (Devin) Freedman (*pro hac vice*)
1 SE 3rd Avenue, Suite 1240
Miami, Florida 33131
Telephone: (786) 924-2900
Facsimile: (646) 392-8842
ceconomides@rochefreedman.com
ingo@rochefreedman.com
vel@rochefreedman.com

*Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall (290685)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Lead Plaintiff*

# CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on December 13, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

*/s/ Constantine P. Economides*
Constantine P. Economides