UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re SONA NANOTECH INC. SECURITIES LITIGATION | Case No. 2:20-cv-11405-MCS-MAA<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS (ECF No. 68)** |

Defendants Sona Nanotech Inc., David Regan, Robert Randall, and Darren Rowles move to dismiss the Second Amended Complaint. SAC, ECF No. 67; Mot., ECF No. 68. This follows the Court's grant of Defendants' prior motion to dismiss and dismissal of the First Amended Complaint in its entirety with leave to amend. Order, ECF No. 66. Plaintiff opposes the motion, Opp'n, ECF No. 69, and Defendants filed a reply, Reply, ECF No. 70. The Court deems this motion appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. R. 7-15. For the following reasons, the Court grants the motion without leave to amend.

## I. BACKGROUND

The Court previously summarized the allegations in this case. Order 1–7. The Court declines to repeat the substantial summary and instead recounts Plaintiff's new allegations in its Second Amended Complaint. As a brief overview, Plaintiff alleged

that Sona Nanotech attempted to and failed to develop an antigen nasal swab to detect COVID-19 using proprietary gold nanotechnology. Following this failure, Sona Nanotech switched gears to developing a saliva-based COVID-19 test. This had not resulted in any success by April 19, 2021, the date of the filing of the First Amended Complaint.

Following Sona's March 1, 2021 announcement that it was working with potential partners to secure potential clinical trial support for regulatory submissions and disclosure that it had not yet received any firm orders for its antigen nasal swab, SAC ¶ 121, Sona announced a new regulatory update. On April 12, 2021, Sona stated it had been granted Health Canada Investigational Testing Authorization for a clinical trial of the Sona Saliva C-19 Rapid Test. *Id.* ¶ 123. Ten days later, on April 22, 2021, Sona confirmed it had received research ethics board approval for its clinical trial of the Sona Saliva C-19 Rapid Test. *Id.* ¶ 124. On June 11, 2021, however, before markets opened, Sona announced it was discontinuing its Saliva Test "due to inadequate test sensitivity with clinical saliva samples and challenges with patient recruitment and enrollment into the study." *Id.* ¶ 125. Sona's share price fell 70% upon this announcement. *Id.*

The Second Amended Complaint recounts the misleading statements Sona allegedly made, rephrasing the same arguments it made in the First Amended Complaint as to why the statements were materially misleading. *Id.* ¶¶ 127–63. Plaintiff adds new allegations that Sona's April 12 and 22, 2021 statements were misleading because: (1) despite a significant decrease in individuals contracting COVID-19 after vaccines began rolling out in Canada, Sona proceeded to design and conduct a clinical study for its Saliva Test in Toronto; (2) Sona struggled to ensure its technology could work for the Saliva Test even in a laboratory setting; (3) as a result, Sona would be forced to halt its clinical trial for its Saliva Test; and (4) Sona would be unable to financially capitalize on the need for rapid detection of COVID-19 in its acute phase, a need that was being fulfilled by other antigen tests. *Id.* ¶¶ 164–67.

Plaintiff adds pages of new additional allegations supporting scienter. *Id.* ¶¶ 190–220, 226, 231–34. Plaintiff starts with allegations establishing that Sona Nanotech was financially motivated to see its nasal swab and saliva-based antigen tests succeed. *Id.* ¶¶ 191–92. In fact, Sona shifted all its manufacturing and product marketing to support the validation and commercialization of its COVID-19 tests. *Id.* ¶ 192. Prior to the class period, Sona had incurred significant operating losses in fiscal years 2018 and 2019. *Id.* ¶ 193. A Management's Report covering fiscal years 2018 and 2019 indicated the necessity of securing additional funds to continue business operations since common shares and government funding were not providing the necessary funds. *Id.* ¶ 194. Defendants' statements concerning the development, validation, and commercialization of Sona's COVID-19 tests greatly increased its share price, driving its share price to $16.05 per share on July 28, 2020, a 14,545% return. *Id.* ¶ 195.

On January 14, 2020, Sona settled notes payable by issuing 2,520,270 common shares, 1,655,942 of which it issued to related parties at a price of $0.20 per share. *Id.* ¶ 197. Sona's stock price continued to increase throughout the year with its various announcements about the progress of the development of the COVID-19 test. *Id.* ¶¶ 198–203. On December 3, 2020, Sona announced its plan to raise up to $2,000,000 through a non-brokered private placement of up to 2,000,000 units at a price of $1.00 per unit. *Id.* ¶ 204. Defendants' statements about obtaining a CE mark[1] in December 2020 led to high trading volumes in January and February 2021. *Id.* ¶¶ 205–06. Once Defendant disclosed on March 1, 2021 it had still not received any firm orders and still lacked a sponsoring institution, the share price dropped. *Id.* ¶ 207. On March 23, 2021, Defendants announced the filing of a Shelf Prospectus to provide for additional financing opportunities. *Id.* ¶ 208. This would enable Sona to offer up to $20,000,000

[1] A CE mark signifies that products sold in the European Economic Area have been assessed to meet high safety, health, and environmental protection requirements. *CE marking*, European Commission (Oct. 25, 2021), https://ec.europa.eu/growth/single-market/ce-marking_en.

of common shares, debt securities, warrants, subscription receipts, and units. *Id.* ¶ 209. On April 9, 2021, Sona announced an At-the-Market Common Share Offering ("ATM") pursuant to the Shelf Prospectus, *id.* ¶ 210, which was right before the April 12, 2021 announcement Sona had secured a clinical trial for its Saliva Test, *id.* ¶ 211.

At the time of the ATM the individual defendants had interests in Sona Nanotech. *Id.* ¶ 212. Randall had 232,500 common shares, 290,000 options, and 12,500 warrants; Regan had 25,000 common shares, 750,000 options, and 12,500 warrants; and Rowles had 900,000 options. *Id.* By July 31, 2021, Sona sold 1,312,400 common shares pursuant to the ATM for net proceeds of $1,912,280. *Id.* ¶ 213. To make an ATM, Plaintiff alleges the market value of common equity held by non-affiliates must be at least $75 million. *Id.* ¶ 214. Sona had a market value of $112.45 million on April 30, 2021, but by July 31, 2021, the value had dropped to $23.77 million. *Id.* Plaintiff alleges Defendants knew that, to raise money from the ATM, they had to keep investors in the dark about the true value of the company and cash in on the COVID-19 value inflation. *Id.* Randall, Regan, Rowles, and other key managers also benefitted from increased salaries and benefits during the class period. *Id.* ¶¶ 215–20. Plaintiff alleges that the incredible importance of the COVID-19 tests to Sona's financial performance means there is no doubt Randall, Regan, and Rowles would immediately have been aware of any concerns raised by the FDA or Health Canada regarding Sona's regulatory submissions. *Id.* ¶ 226.[2]

Plaintiff brings the same claims for relief they brought in the First Amended Complaint: (i) a violation of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, *id.* ¶¶ 250–62; and (ii) a violation of Section

---

[2] Plaintiffs' allegations for scienter apply equally to Sona and its high-level officers. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008) (holding that a plaintiff alleges both the company and its high-level officers have the same scienter when the plaintiff alleges that high-level managers are responsible for day-to-day operations of the company).

20(a) of the Exchange Act against Randall, Regan, and Rowles, *id.* ¶¶ 263–69. Plaintiff changes the proposed class period to May 12, 2020 through June 10, 2021. *Id.* ¶ 1.

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Generally, a court must accept the factual allegations in the pleadings as true and view them in the light most favorable to the plaintiff. *Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017); *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (2009) (quoting *Twombly*, 550 U.S. at 555).

"[C]laims under section 10(b) and Rule 10b-5 must not only meet the requirements of Rule 8, but must satisfy the heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act" ("PSLRA"). *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012); *see also Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014) ("Rule 9(b) applies to all elements of a securities fraud action . . . ."). Under Rule 9(b), Plaintiff must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The complaint must identify the "who, what, when, where, and how" of the fraudulent misconduct, "as well as what is false or misleading about" the fraud, and "why it is false." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotation marks omitted).

///

## III. DISCUSSION

Defendants, like in their previous motion, argue that Plaintiff has not adequately pleaded actionable misstatements, Mot. 29–31, and that Plaintiff's allegations do not support a strong inference of scienter, *id.* at 31–33. Defendants also move to dismiss the Section 20 claim because Plaintiff does not properly allege a primary violation of the securities laws. *Id.* at 33.

### A. Misrepresentation

A public company has a duty not to mislead a reasonable investor through its statements. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Although the securities laws impose no affirmative duty to disclose any and all material information, once a company chooses to bring positive information to the market, it must also disclose adverse information that cuts against the positive information. *See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2018).

Plaintiff fails to allege actionable misrepresentations from March 12, 2020 to March 1, 2021 for the same reasons stated in the prior order. Order 9–14. The three new statements on April 12, April 22, and June 11, 2021 are not misrepresentations for the same reasons stated in the prior order. First, the statements—which disclose the beginning of a saliva-based test trial, the progress of that trial, and the failure of that trial—are literally true, so they are not misrepresentations. *In re Rigel Pharms.*, 697 F.3d at 882 ("Because the complaint does not allege that Defendants falsely represented their actual . . . plans and expectations, the allegations are insufficient to plead falsity."). The vague allegations in the Second Amended Complaint that Defendants knew these statements were untrue and declined to disclose them do not show these statements are actionable omissions. A plaintiff is "hard-pressed to build a fraud case" from publicly disclosed information. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 417 (9th Cir. 2020) (declining to find misrepresentation or omission from information disclosed on an investor call). The fact that negative information came later does not affect this conclusion because "the subsequent release of more extensive information" is not

actionable. *In re Rigel Pharms.*, 697 F.3d at 881 (holding it is not a misleading omission to later report additional cases of harmful side effects after an initial release of information about side effects).

The new facts alleged still show that Defendants followed the requirement that they must disclose any negative information they possess whenever the company releases good news. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1010 (9th Cir. 2018); *Schueneman*, 840 F.3d at 708. Plaintiff at no point identifies any specific facts indicating Defendants withheld information the FDA or Health Canada gave them about the failure of the COVID-19 tests. The allegations in the section of the Second Amended Complaint titled "Additional Allegations Supporting Scienter," SAC ¶¶ 190–234, do not suffice to adequately plead an omission. Under Rule 9(b), the complaint must identify the "who, what, when, where, and how" of the fraudulent misconduct. *Cafasso*, 637 F.3d at 1055. Plaintiff provides no specific allegations of which information was withheld, on what dates the FDA or Health Canada gave Plaintiff negative information, or for how long any negative information was purportedly withheld. This does not comport with the requirements of Rule 9(b) and does not state an actionable fraudulent omission.

Thus, Plaintiff fails to identify any actionable misrepresentations or omissions in their Second Amended Complaint.

**B. Scienter**

A plaintiff can establish scienter "by showing deliberate recklessness or 'some degree of intentional or conscious misconduct.'" *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016) (quoting *S. Ferry LP, No. 2. v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008)). "Deliberate recklessness is an *extreme* departure from the standards of ordinary care[] which presents a danger of misleading . . . that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Webb v. SolarCity Corp.*, 884 F.3d 844, 851 (9th Cir. 2018) (internal quotation marks omitted). The PSLRA requires that the inference of scienter be "strong" and that the

Court "take into account plausible opposing inferences." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23; *see also id.* at 326 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). Allegations of scienter also have to pass the hurdle of Rule 9(b) and PSLRA pleading requirements. *See Nguyen*, 962 F.3d at 414.

Plaintiff provides a stronger showing of scienter than in the First Amended Complaint. These allegations, however, are still insufficient to demonstrate scienter under the *Tellabs* standard. Plaintiff still fails to overcome the key defect the Ninth Circuit recognized in *Nguyen*: that the core theory—that a company invested in a U.S. clinical trial and made promising statements about FDA approval, yet knew that the FDA would eventually reject the product—has no basis in logic or common experience. *Nguyen*, 962 F.3d at 408. Instead, "the more plausible inference is that the company made optimistic statements about its prospects for FDA approval because its U.S. testing looked promising, not because the company was quixotically seeking FDA approval for [Emergency Use Authorization] it knew was destined for defeat." *Id.*

Unlike the First Amended Complaint, Plaintiff does a thorough job of explaining a plausible financial motive for Defendants to lie about a COVID-19 test it knew was faulty. SAC ¶¶ 190–234. Under the *Tellabs* balancing analysis, this points toward a finding of scienter. *See Prodanova v.H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1107 (9th Cir. 2021) ("Generally, we expect that a financial motive for securities fraud will be clear; for example, someone inside a company stands to gain a substantial profit by engaging in deceptive behavior, such as selling shares before the company discloses negative information."). The fact that Plaintiff does not allege that Defendants sold their stock at inflated prices points against a finding of scienter, though. *See Nguyen*, 962 F.3d at 415 ("If defendants had sought to profit from this scheme in the interim, such as by selling off their stock or selling the company at a premium, the theory might have

more legs."). Moreover, mere allegations of omission based on access to information from Defendants' roles as corporate officers are insufficient to allege scienter. *See DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002).

While Plaintiff can paint a picture of inventors so desperate for money they use the COVID-19 pandemic as a way to dupe investors, the more plausible inference is that Sona simply was unsuccessful in developing antigen tests for COVID-19. The motive to make more money to keep Sona afloat provided the incentive for Sona to use its intellectual property to develop a COVID-19 test in a nascent market. "Faulting a company for poor business decisions does not equal scienter . . . ." *In re Jones Soda Co. Sec. Litig.*, 393 F. App'x 507, 509 (9th Cir. 2010). The more reasonable inference is like the one in *Nguyen*—that a company tried and failed to get FDA approval for a product after optimistic predictions that did not pan out.

Thus, Plaintiff fails to allege scienter that is "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. In sum, the Section 10(b) claim fails because Plaintiff inadequately alleges facts supporting an actionable representation or omission and scienter.

**C. Section 20 Claim**

Because Plaintiff fails to allege a primary section 10(b) claim, their derivative Section 20(a) claim against Randall, Regan, and Rowles fails. *Nguyen*, 962 F.3d at 419.

**D. Judicial Notice**

Because the Court resolves the motion on other grounds, the Court denies Defendants' request for judicial notice (ECF No. 68-2) as moot.

**E. Leave to Amend**

The Court grants the motion without leave to amend. As a general rule, leave to amend a dismissed complaint should be freely granted unless it is clear the complaint could not be saved by any amendment. Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Plaintiff has enjoyed three opportunities to state its claims. Although Plaintiff summarily requests leave to amend,

Opp'n 26, the Court concludes the defects in the Second Amended Complaint are not curable. *See Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021) ("Because Plaintiffs have not shown any other basis for concluding that further amendment would not be futile, the district court correctly dismissed this action with prejudice."); *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) (affirming denial of leave to amend where amended complaint failed to cure defects identified in order dismissing prior complaint).

## IV. CONCLUSION

The Court grants the motion and denies leave to amend. The Court directs the Clerk to enter judgment and close the case.

**IT IS SO ORDERED.**

Dated: March 18, 2022

Mark C. Scarsi

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE